### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | |
|---|---|
| CHILD TRENDS, INCORPORATED,<br>12300 Twinbrook Parkway, Suite 235<br>Rockville, Montgomery County, MD<br>20852,<br><br> and<br><br>RMC RESEARCH CORPORATION,<br>1000 Market Street, Building 2<br>Portsmouth, NH 03801<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION,<br>400 Maryland Avenue, SW<br>Washington, DC 20202,<br><br>LINDA McMAHON, in her official capacity<br>as Secretary of Education,<br>400 Maryland Avenue, SW<br>Washington, DC 20202,<br><br>MATTHEW SOLDNER, in his official<br>capacity as Acting Director of the Institute of<br>Education Sciences,<br>550 12th Street, SW<br>Washington, DC 20024,<br><br>MARK WASHINGTON, in his official<br>capacity as Deputy Assistant Secretary for<br>Management and Administration at the<br>Department of Education,<br>400 Maryland Avenue, SW<br>Washington, DC 20202,<br><br>UNITED STATES DOGE SERVICE,<br>736 Jackson Pl NW<br>Washington, DC 20503, | Case No. 8:25-cv-01154 |

and

AMY GLEASON, in her official capacities
as Acting Administrator of the United States
DOGE Service and Consultant and Expert to
the Department of Health and Human
Services,
736 Jackson Pl NW
Washington, DC 20503

                    *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    This case concerns two educational programs established by Congress to support students, teachers, and communities across the nation. Sixty years ago, Congress created Regional Educational Laboratories (RELs) to provide critical education research and assistance to schools in every region of the country. Thirty-one years ago, Congress created the Comprehensive Centers program to provide research, training, and technical assistance to schools nationwide, with a special focus on schools with higher percentages of low-income families.

2.    Congress mandated that the Department of Education (the "Department") operate these programs through contracts or grants with qualified education research organizations. Congress prescribed specific numbers of contracts and grants that the Department *must* maintain to operate these programs. The Department "shall" enter into ten contracts with organizations to serve as RELs in ten different regions of the nation, 20 U.S.C. § 9564(a). The Department must award "not less than 20 grants" to entities to serve as Comprehensive Centers, and the Department "shall ensure that not less than 1 comprehensive center is established in each of the 10 geographic regions served by the regional educational laboratories established." 20 U.S.C. §

2

9602(a)(1)-(2). Congress has consistently appropriated funds to operate these programs, and Congress has even included a line item appropriation for funds that must be spent on the Comprehensive Centers program and for no other purpose.

3.       The Department has faithfully implemented Congress' will to maintain these programs—until now. In February 2025, officials from the U.S. DOGE Service ("DOGE"), acting through Department of Education officials, terminated all ten REL contracts and eighteen of twenty Comprehensive Center grants. The Department provided no official explanation in the termination notices for the RELs, although it did issue a press release citing vague concerns regarding "diversity, equity, and inclusion" (DEI) and "wasteful and ideologically driven spending." A week later, the Department terminated the Comprehensive Center grants the day after a prominent activist posted on X: "'Hey, @DOGE_ED, let's terminate the contracts for the 'comprehensive centers.' What do you think?" The termination notices—all carbon copies with no individualized allegations—claimed that the Centers promoted DEI and the terminated grants no longer reflected "program goals or agency priorities."

4.       As a result of these sweeping terminations, the statutorily required REL and Comprehensive Centers programs are defunct. Congress required the Department to have ten RELs, and now there are none. Congress required the Department to have at least twenty Comprehensive Centers, and now there are two. Congress required the Department to spend at least $100 million on the Comprehensive Centers program from Fiscal Years 2024 to 2026, but the Department has spent a fraction of that amount and does not intend to spend any more.

5.       This is unlawful many times over. Defendants are violating the statutes establishing the RELs and Comprehensive Centers, and the constitutional separation of powers, by refusing to implement Congress' explicit directives. Defendants are impounding funds

appropriated for the Comprehensive Centers, in violation of the relevant appropriations acts and Congress' exclusive power of the purse under the Constitution. Defendants are similarly violating the Impoundment Control Act of 1974 (ICA), which sets strict limits on the Executive Branch's ability to "defer" (i.e., delay) spending funds and to rescind appropriated funds. And the contract and grant terminations were *ultra vires* because they were undertaken by DOGE, a body that Congress has not empowered to do anything, let alone terminate another agency's contracts and grants.

6.     Plaintiffs Child Trends and RMC Research are small education research organizations that had Comprehensive Center grants. Plaintiffs also served as partners in administering several other Comprehensive Centers, and RMC Research was a subcontractor for two RELs. Plaintiffs have suffered immense harm to their finances and missions as a result of the unlawful terminations and the inability to compete for future REL and Comprehensive Center awards. Students and communities across the nation will also suffer. State and local educational agencies have been counting on the critical support that the RELs and Comprehensive Centers provide, and that support has been lost in a blink of an eye. And hundreds of millions of dollars in taxpayer-funded research will not be completed and be rendered useless.

7.     To stave off these extraordinary harms, Plaintiffs bring this suit to enjoin Defendants' unlawful actions and require the Department to continue operating the REL and Comprehensive Centers programs, unless and until Congress says otherwise.

**PARTIES**

8.     Plaintiff Child Trends, Incorporated (Child Trends) is a nonprofit research organization founded in 1979 that maintains its principal place of business in Rockville, Maryland. Child Trends focuses on improving the lives of children, youth, and families. In

September 2024, Child Trends received a five-year grant from the Department of Education to run the Pacific East Comprehensive Center, the primary capacity-building support for educators in American Samoa, Hawaii, and the Republic of the Marshall Islands. Also in September 2024, Child Trends was noted as a collaborator for a five-year award for the Northwest Comprehensive Center. Child Trends subsequently received a Letter of Authorization (LOA) for a subcontract from the Northwest Comprehensive Center to assist in carrying out the program for that region.

9.      Plaintiff RMC Research Corporation (RMC) is a research organization dedicated to leveraging evidence to bolster achievement. RMC maintains its principal place of business in Portsmouth, New Hampshire. Approximately forty percent of RMC's work is dedicated to the REL and Comprehensive Centers programs. In September 2024, RMC received a five-year grant award from the Department of Education for the Comprehensive Center for the Gulf Region. RMC was also a subcontractor for the Content Center on Strengthening and Supporting the Educator Workforce and the National Comprehensive Center. RMC also serves as a subcontractor on both the Regional Educational Laboratories Central and Southeast.

10.      Defendant United States Department of Education is a cabinet agency within the executive branch of the federal government.

11.      Defendant Linda McMahon is the Secretary of the Department of Education and is the agency's highest ranking official. As such, she is responsible for decisions of the agency. She is sued in her official capacity.

12.      Defendant Matthew Soldner is a Commissioner for the National Center for Education and the Economy and is serving as Acting Director of the Institute of Education Sciences (IES). As such, he is responsible for decisions of IES and for carrying out IES mandates. He is sued in his official capacity.

13.     Defendant Mark Washington is the Deputy Assistant Secretary for Management and Administration at the Department of Education. Defendant Washington signed the termination notices to the Comprehensive Centers. He is sued in his official capacity.

14.     Defendant United States DOGE Service is a component of the Executive Office of the President established by Executive Order 14158 on January 20, 2025.

15.     Defendant Amy Gleason is the Acting Administrator of the United States DOGE Service and is the department's highest ranking official. As such, she is responsible for activities of the organization. As a member of DOGE, Defendant Gleason also serves as an "expert/consultant" for the Office of the Secretary at the Department of Health and Human Services. She is sued in her official capacities.

## JURISDICTION AND VENUE

16.     This court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331; because Defendants are United States officials, 28 U.S.C. § 1346(a)(2); because this case raises claims under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704; and because Plaintiffs seek mandamus relief, 28 U.S.C. § 1361.

17.     This court may grant declaratory, injunctive, mandamus, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705, 706, 28 U.S.C. § 1361, and the court's inherent authority to enjoin federal officials from acting unlawfully.

18.     Venue is appropriate under 28 U.S.C. § 1391 in the District of Maryland because Plaintiff Child Trends maintains its principal place of business in Maryland and, as such, a substantial part of the events giving rise to this Complaint have taken place in Maryland.

## FACTUAL AND LEGAL BACKGROUND

***Congress Establishes and Requires Operation of Comprehensive Centers***

19.    Congress established the Comprehensive Centers program through the Improving America's Schools Act of 1994 and reauthorized the program through the Educational Technical Assistance Act of 2002, part of the larger Education Sciences Reform Act of that year.

20.    In creating the Comprehensive Centers program, Congress mandated that the Secretary of Education award "not less than" twenty grants to local entities or groups to serve as Comprehensive Centers. 20 U.S.C. § 9602(a)(1). The Act further directs that the Secretary of Education "shall ensure that not less than 1 comprehensive center is established in each of the 10 geographic regions served by the [RELs]." 20 U.S.C. § 9602(a)(2).

21.    Congress directed that the Comprehensive Centers "shall work with State educational agencies, local educational agencies, regional educational agencies, and schools in the region where such center is located on school improvement activities that take into account factors such as the proportion of economically disadvantaged students in the region." 20 U.S.C. § 9602(e). Congress provided that the Centers must "give priority to": "(1) schools in the region with high percentages or numbers of students from low-income families…including such schools in rural and urban areas, and schools receiving assistance under Title I" of the Elementary and Secondary Assistance Act of 1965; "(2) local educational agencies in the region in which high percentages or numbers of school-age children are from low-income families;" and (3) schools in the region that have been identified for school improvement. *Id.*

22.    Congress anticipated multi-year grants, requiring each Comprehensive Center to submit an annual report to the Secretary summarizing its activities and listing the localities it assisted during the preceding year. 20 U.S.C. § 9602(h).

23.     Congress required that grant applicants develop a five-year implementation plan, 20 U.S.C. § 9602(c)(2), and over the decades that the Department has been running the Comprehensive Centers program, grants have always provided for a five-year period of performance (although in some cycles, the grants have been extended for additional years).

24.     This multi-year structure makes sense. In forming the program, Congress mandated a detailed structure for the Comprehensive Centers to operate, including being informed by regional advisory committees and providing directives on how the Comprehensive Centers would interact with the Department and local stakeholders. The complicated structure involves coordination with advisory boards, the Department, RELs, state education agencies, and other regional providers. Such coordination and buy-in on each project undertaken by the Comprehensive Centers takes time and resources to implement.

25.     Congress appropriates funds specifically for the Comprehensive Centers Program. In the 2024 Appropriations Act, Congress provided that "$50,000,000 shall be available to carry out" the Comprehensive Centers program, with these funds to remain available until September 30, 2025. Further Consolidated Appropriations Act, Pub. L. 118-47, 138 Stat 460, 683 (Mar. 23, 2024). Such "shall be available" language in an appropriation act means that the agency must spend that amount of money on the program and cannot divert the funds for other purposes.

26.     Congress has carried forward the appropriations to the Comprehensive Centers program in a series of continuing resolutions. Most recently, Congress enacted a continuation resolution that has the effect of appropriating another $50 million to the Comprehensive Centers program, to remain available until September 30, 2026. Pub. L. 119-4 (Mar. 15, 2025).

***The Department Awards Grants for Comprehensive Centers for the 2025-2029 Cycle***

27.     On May 13, 2024, pursuant to the Department's statutory requirements, the Department sought applications for new awards for a National Comprehensive Center, Regional Comprehensive Centers, and Content Comprehensive Centers for a new five-year grant cycle from Fiscal Year 2025 through Fiscal Year 2029. 89 Fed. Reg. 41409 (May 13, 2024).

28.     Pursuant to a separate requirement that the Department develop grant priorities through notice and comment rulemaking, the Department also published a notice of final priorities, requirements, definitions, and selection criteria applicable to the program (NFP) and incorporated them into the solicitation. 89 Fed. Reg. 41498 (May 13, 2024).

29.     Here, the NFP, incorporated into the solicitation of applications, reflected the congressional scheme—ensuring that the Comprehensive Centers would be responsive to local needs while maintaining close direction by the Department itself. Indeed, the "Department [sought] to maximize the ability of the Comprehensive Centers to be flexible and responsive to specific State and local client needs while also providing leadership and focused support on issues of national importance to support education systems…." 89 Fed. at 41410.

30.     After receiving more than 90 applications, the Department issued Grant Award Notifications on September 26, 2024. The grant awards included one National Comprehensive Center, fourteen Regional Centers, and four Content Centers.[1] At all times, the Department referred to the grantees as the "2024-2029 Comprehensive Centers."

31.     Plaintiff Child Trends was selected as the prime grantee for the Pacific East Comprehensive Center. The grant award provided for a period of performance from October 1, 2024 to September 30, 2029. The grant provided that Child Trends would receive $1.25 million

---

[1] The Department also funded one Content Center continuation award, bringing the total number of Comprehensive Centers to the twenty required by statute.

for each of the five fiscal years of the award. The grant terms and conditions made no mention at all of the possibility that the Department could terminate the grant based on program goals and agency priorities. Child Trends received its grant funds from the Department on a cost-reimbursement basis.

32.    Child Trends was included as a collaborator for the Northwest Comprehensive Center application, meaning Child Trends would serve as a subcontractor. The Northwest Comprehensive Center award also provided for a period of performance from October 1, 2024 to September 30, 2029. The grant terms and conditions made no mention at all of the possibility that the Department could terminate the grant based on program goals and agency priorities. Under the subcontracts that Child Trends received and anticipated for these grants, Child Trends received funds solely from the prime grantee and did not receive funds directly from the Department or otherwise have a direct contractual relationship with the Department.

33.    Plaintiff RMC was selected as prime grantee for the Comprehensive Center for the Gulf Region. The grant award provided for a period of performance from October 1, 2024 to September 30, 2029. The grant provided that RMC would receive $2.45 million for each of the five fiscal years of the award. The grant terms and conditions made no mention at all of the possibility that the Department could terminate the grant based on program goals and agency priorities. RMC received its grant funds from the Department on a cost-reimbursement basis.

34.    RMC was included as a collaborator in applications for the Department's grants for the Content Center on Strengthening and Supporting the Educator Workforce (SSEW) and for the National Comprehensive Center, meaning that RMC would serve as a subcontractor on both grants. The SSEW Content Comprehensive Center and National Comprehensive Center awards provided for periods of performance from October 1, 2024 to September 30, 2029. The grant

terms and conditions made no mention at all of the possibility that the Department could terminate the grant based on program goals and agency priorities.  Under the subcontracts that RMC received and anticipated for these grants, RMC received funds solely from the prime grantee and did not receive funds directly from the Department or otherwise have a direct contractual relationship with the Department.

35.    Once the performance period began in October 2024, Plaintiffs and similarly situated Comprehensive Center grantees and subcontractors immediately got to work. As required, this involved working with local education officials and stakeholders across their regions to identify needs and develop project proposals to submit to the Department. To that end, in an introductory message to all Comprehensive Center leaders in October 2024, the Department reminded Comprehensive Centers that "[it] is essential that Centers consistently engage a broad range of stakeholders during the planning, implementation, and evaluation of your capacity building services" and that they are required to coordinate closely with the RELs.

36.    At this time, grantees were in near constant communication with the Department to understand the Department's goals and to ensure compliance and buy-in on their work.

37.    At the direction of the Department, this work included, for example, drafting an Annual Service Plan, due to the Department in January 2025. To do this, grantees had to expend resources consulting with Advisory Boards, identifying key client-needs across their regions, and developing a plan to study and address those needs.

38.    At no time were any of the grantees given any indication that the Department had concerns about their work or planned projects. Quite the opposite. As late as February 10, 2025, the Department emailed each of the Comprehensive Centers an updated summary of year one reporting deadlines, with deadlines ranging from January through December 2025.

39.    Moreover, the Department understood the importance of the grantees' work and notified grantees that they could seek provisional approval to begin work on time-sensitive projects. On February 13, Plaintiff RMC received provisional approval to begin "asap" on eleven different projects for the Gulf Region, ranging from a project focused on "updating Mississippi's resource allocation review process" to a project on "benchmark-aligned high-quality instruction." No RMC projects were rejected or seemed to raise concerns for the Department.

40.    Similarly, on February 14, 2025, Plaintiff Child Trends received an email inviting them to submit proposals for provisional approval for time-sensitive work.

***The Department of Education Abruptly Terminates Comprehensive Center Grants***

41.    Upon assuming office, President Trump issued several Executive Orders aimed at ending Diversity, Equity, Inclusion, and Accessibility programs. Among those, on January 20, he signed Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing (EO) that directs agencies to terminate "equity-related" grants or contracts.

42.    Also on January 20, the President by Executive Order established the United States DOGE Service as a new component of the Executive Office of the President. E.O. 14158 § 3(a) (Jan. 20, 2025). The Executive Order further directed that, "in consultation with USDS, each Agency Head shall establish … a DOGE Team of at least four employees," and "Agency Heads shall ensure that DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.* § 3(c). In a subsequent Executive Order, the President directed that "[e]ach Agency Head, in consultation with the agency's DOGE Team Lead, shall review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify . . . such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote

efficiency and advance the policies of my Administration." E.O. 14222 § 3(b) (Feb. 26, 2025).

43.    Upon information and belief, DOGE team members arrived at the Department of Education shortly after Inauguration Day and directed agency leadership on matters ranging from employment actions to contract and grant terminations. *See, e.g.* Tyler Kingkade and Natasha Korecki, *Inside DOGE's Takeover of the Education Department,* NBC NEWS, Feb. 8, 2025; Theodore Schleifer et al., *Young Aides Emerge as Enforcers in Musk's Broadside Against Government*, NYTIMES., Feb. 7, 2025,

44.    Despite the Department's continued correspondence with the Comprehensive Centers and recent approval of their projects, on February 19, 2025, nearly all Comprehensive Centers, including Child Trends and RMC, received the following identical notifications that their grants were being terminated, including the following explanation for the terminations:

> The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. § 200.340(a)(4); see also 34 C.F.R. § 75.253.

45.    Two Comprehensive Center grants were not terminated. The Department has provided no public explanation concerning why these two Comprehensive Centers were not terminated while the other eighteen were.

46.    Despite language in the termination notices accusing grantees of violating civil rights laws or engaging in activities constituting fraud or abuse, the Department cited only to 2 C.F.R. § 200.340(a)(4) as the basis for the termination, a provision of the Office of Management and Budget (OMB)'s Uniform Grants Guidance adopted by the Department. Under that

provision and the accompanying § 200.340(b), an agency may terminate a grant where it no longer effectuates program goals or agency priorities, but only where such basis for termination is "clearly and unambiguously" stated in the award's terms and conditions. This potential basis for termination was not stated in the terms and conditions of the Comprehensive Center awards.

47.    None of the termination notices contained language specific to the particular grant being cancelled, nor did they provide any examples of grant recipients' supposedly illegal or discriminatory behavior or behavior that "fails to serve the interest of the United States."

48.    The Department did not point to any work planned or already undertaken that was "inconsistent with" or "no longer effectuate[d]" Department priorities. Nor did the Department undertake the requisite notice-and-comment rulemaking process to change the priorities applicable to the Comprehensive Centers programs on which grantee selections had been based.

49.    The Department provided additional color on the terminations through a press release issued the day it terminated the Comprehensive Center grants. The Department stated that it had determined that the existing Comprehensive Centers program was "divisive and wasteful" and promoted "race-based discrimination and gender identity ideology." Press Release, *U.S. Department of Education Cancels Divisive and Wasteful Grants under the Comprehensive Centers Program* (Feb. 19, 2025) (Comprehensive Centers Press Release). In making these claims, the Department cited only to edited videos posted on X by activist Christopher Rufo hours before the terminations. The videos contained misleading edits and related to work from prior award cycles that, at least in some instances, involved companies no longer participating in the Comprehensive Centers program. In relying on Rufo's posts to eliminate millions of dollars in federal grants to Comprehensive Centers, the Department either failed to take the time to confirm Rufo's claims or chose to ignore his inaccuracies.

50.    It is clear that DOGE, and not the Department, made the decision to terminate the Comprehensive Center grants. On February 18, Chris Rufo alleged on X that the Comprehensive Centers program "push left-wing ideologies," prompting Elon Musk, the public face of DOGE, to reply "!!." Later that day, Chris Rufo posted on X to DOGE: "Hey, @DOGE_ED, let's terminate the contracts for the 'comprehensive centers.' What do you think?" The next day the Comprehensive Center awards were terminated.

51.    DOGE has taken direct credit for the Comprehensive Center grant terminations on its website, DOGE.gov. On its "Wall of Receipts," DOGE lists the termination of all of the Comprehensive Center grants, including Plaintiffs' grants, as among its "Savings."

52.    Moreover, the Department of Education staff who work with the Comprehensive Centers and would have had first-hand knowledge of any concerns with their work or planned activities were kept in the dark. Nearly two hours after Plaintiff Child Trends received a notification that its grant was terminated, Child Trends received an email from its program officer at the Department expressing shock. The program officer stated that she and her colleagues were "just made aware of the termination of the Comprehensive Centers program," and that "we are truly at a loss for words." She promised to gather information.

53.    In terminating eighteen out of the twenty Comprehensive Center awards, the Department has effectively shut down this statutory program. Directly contrary to the statute, the Department is failing to maintain "not less than 20 grants" for Comprehensive Centers and is not "ensur[ing] that not less than 1 [Comprehensive Center] is established in each of the 10 [REL regions]." 20 U.S.C. § 9602(a). And the congressional scheme requiring regional advisory councils, coordination with stakeholders, and annual reports has been abandoned.

54.    To date, the Department has not sought applications to recompete the terminated

awards nor has it given any indication that it intends to do so.

***Congress Establishes and Requires Operation of Regional Educational Laboratories***

55.    Congress created the Regional Educational Laboratories (RELs) nearly 60 years ago to assist education practitioners and policymakers by using research, evidence, and evidence-based practices to improve student outcomes.

56.    Congress has codified the REL program at 20 U.S.C. § 9564. The Department of Education's Institute of Education Sciences (IES) administers the REL program, which is part of a carefully integrated system of IES programs designed to complement one another.

57.    To effectuate the program, Congress has mandated that the Director of IES "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. § 9564(a).

58.    Congress provided that, "in entering into [these] contracts," "the Director shall[] (A) enter into contracts for a 5-year period; and (B) ensure that regional educational laboratories established under this section have strong and effective governance, organization, management, and administration, and employ qualified staff." 20 U.S.C. § 9564(e)(1). The 5-year contract period for the recently terminated REL contracts ran from 2022 through 2027.

59.    Each REL contractor shall "support applied research, development, wide dissemination, and technical assistance activities" in its region, 20 U.S.C. § 9564(f), and must consult and collaborate with key federal, state, and local stakeholders, 20 U.S.C. § 9564(g).

60.    While the specific goals of the REL program have shifted over time, at its core, the program has retained a "focus on basic research and the development and dissemination of education innovations." The Regional Educational Laboratories - About Us, U.S. Department of Education, https://bit.ly/4j0zdA5 (Last Accessed Apr. 7, 2025) (REL Website). Today, IES relies

on the RELs to serve as its "'boots on the ground' by translating and helping education stakeholders apply evidence." *Id.*

61.    Each REL is responsible for identifying, establishing, maintaining, and convening a Governing Board. 20 U.S.C. § 9564(h). The REL shall offer every chief state school officer in the region the opportunity to serve on the REL Governing Board, or to designate a personal representative to serve. Each REL Governing Board serves as the "sole entity" that "guides and directs" the REL in "satisfying the terms and conditions of the contract award." *Id.* Moreover, the Governing Board is responsible for identifying and sharing the needs of the education constituency they represent, and for providing strategic guidance on REL work and how the REL shall carry out its activities. Throughout the contract, the REL is required to engage in needs-sensing through communication with stakeholders in its region. *Id.* It is the Governing Boards, not the RELs themselves, that identify the work to be undertaken by the RELs.

62.    The REL contracts are not carried out solely by the prime contractors, but also by subcontractors such as Plaintiff RMC. The contractors and subcontractors operate under specific congressionally directed parameters and close monitoring by the Department.

63.    Under this framework, each of the ten RELs must conduct integrated activities in three key areas: applied research and development; training, coaching, and technical support for use of research; and dissemination activities. *See* REL Website.

64.    According to IES, REL "activities are intensive, narrowly focused on a high-leverage topic within a specific state, and characterized by effective communication, genuine cooperation, and a mutual understanding of the context, content, and intended outcomes of the work." *See* REL Website. These activities are then subject to evaluation, review, and annual reporting requirements to the Department. *See* 20 U.S.C. §§ 9564(j), (n).

65.    The REL program can provide enormous impacts for state educators. For example, after a 2013 state law in Mississippi required the state's superintendent to implement research-supported teaching, REL Southeast worked with the state to gather the necessary data. Mississippi's former state superintendent credits the REL program, in part, with what has become known as the "Mississippi Miracle" – a dramatic increase in literacy in the state that the former superintendent credits, in part, to the REL, stating that she "can't say enough about how important [the REL staff] were" in leading to this outcome. Greg Toppo, *Trump Cuts Research Lab that Helped Nurture "Mississippi Miracle,"* THE 74, Feb. 20, 2025, http://bit.ly/4jhtCEZ.

66.    During the 2022-2026 contract period, the RELs were actively working on translating rigorous research into cost-effective resources. An example was the development of ten research-based toolkits to support educator use of evidence-based practices identified through the Department's What Works Clearinghouse Practice Guides. These user-friendly toolkits include measurement tools and professional development resources for implementing and sustaining improved educator practice in reading and mathematics, among other topics.

67.    Congress has continuously appropriated funds for the REL program. In the 2024 Appropriations Act, Congress appropriated $793 million for IES. 138 Stat. at 690. These funds are available until September 30, 2025. In its Joint Explanatory Statement accompanying the 2024 Appropriations Act, Congress specified that $53.7 million of these funds were intended for the REL program. Joint Explanatory Statement, Division – Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024, at 155.

68.    Congress has carried forward IES' appropriations in continuing resolutions. Most recently, Congress enacted a continuation resolution that appropriates another $793 million to IES, to remain available until September 30, 2026. 139 Stat. at 11.

***The 2022-2027 REL Contract Cycle***

69.     In February 2021, the Department of Education posted a solicitation for bids for REL contracts for the 2022-2026 contract cycle, anticipating approximately $300 million in funding for the ten RELs over the five-year contract period.

70.     In the Department's Request for Proposals for this cycle, the Department laid out that each REL's purpose was to "assist practitioners and policymakers in their work to improve outcomes for learners." The RFP noted that all REL work must be rigorous and high leverage. ED defined "high leverage" as when REL work is "change-oriented, supporting consequential local, regional or statewide decisions about policies, programs, and practices designed to improve learner outcomes." The RFP explained that RELs work in partnership with stakeholders, defined as State Education Agencies, Local Education agencies, institutes of higher education, as well as student, parent, and community organizations. The RFP required that stakeholders be "actively involved in the design, execution and evaluation of a project, or set of related projects" in order to be considered working in "partnership" and meeting the conditions of the contract.

71.     Plaintiff RMC is a publicly listed subcontractor and partner for both the RELs Southeast and Central.

72.     RMC entered a subcontract with the prime contractor for the REL Southeast on January 24, 2022. That subcontract was amended several times to extend the period of performance, with the most recent amendment on February 13, 2025. The amended subcontract entered on February 13 extended the period of performance through June 30, 2025, and added $392,240 to the subcontract, bringing the total funding on the subcontract to that point to roughly $2.3 million, of which approximately $309,000 remain unspent.

73.     For the REL Southeast, RMC has worked in partnership with local stakeholders

across Alabama, Florida, and South Carolina to respond to their requests for projects to develop and implement evidence-based projects to inform decisionmakers on key issues affecting students and schools to improve student outcomes.

74.     To date, the REL Southeast has done significant work conducting applied research, delivering training and coaching, and publishing evidence-based practices.

75.     For example, it partnered with the Alabama State Department of Education and eleven districts to create the Alabama Research Partnership on Improving English Learner Outcomes to provide professional learning to teachers on four evidence-based recommendations from the What Works Clearinghouse Practice Guide on "Teaching Academic Content and Literacy to English Learners in Elementary and Middle School." IES, *Using Professional Learning Communities to Implement Evidence-Based Practices for English Learner Students in Alabama*, Aug. 2, 2022, https://bit.ly/4cnR29G (last accessed April 7, 2025).

76.     Some of RMC's other work in recent years includes partnering with teachers from the Florida Virtual School to adapt existing IES materials for families to digital formats, including videos and games, that can be more easily used in virtual schools. RMC has also provided intensive coaching to pre-kindergarten demonstration sites teams to support implementation of the *Professional Learning Community: Emergent Literacy* sessions with the goal of improving teachers' knowledge and instructional practices and increasing students' print knowledge, phonological awareness, vocabulary, oral language skills, and school readiness.

77.     For the REL Central, RMC entered a subcontract with the prime contractor for this REL to begin work on March 1, 2022. The subcontract was subsequently amended on January 1, 2023. Under the amended subcontract, RMC's period of performance ran from March 1, 2022 to December 31, 2026. The amended subcontract provided for a ceiling of $3.5 million

in payments to RMC, of which approximately $1.9 million remains unspent.

78.     For REL Central, RMC partnered with the Department's prime contractor and other stakeholders to offer important evidence-based work at the request of local communities in Colorado, Kansas, Missouri, Nebraska, North Dakota, South Dakota, Standing Rock Reservation, and Wyoming.

79.     A few of the many projects to which RMC has contributed this contract cycle include: multiple projects with the Kansas Department of Education and school districts in Kansas to support implementation of the Individual Plans of Study (IPS) initiative that helps better prepare students for college and careers; a partnership with the Colorado Department of Education (CDE) and the Colorado Department of Higher Education (CDHE) assisting districts to increase teacher recruitment and retention; and a partnership with CDE to provide guidance to districts that have adopted a reduced academic calendar, most of which are in rural settings.

80.     Under its subcontracts for REL Southeast and REL Central, RMC received funds solely from the prime contractor and did not receive funds directly from the Department or otherwise have a direct contractual relationship with the Department.

***The Department of Education Abruptly Terminates All REL Contracts***

81.     On February 13, 2025, with no advanced warning, each of the REL contractors, including the contractors for which RMC served as a subcontractor, received identical notifications terminating the contract. The notifications provided no rationale for the terminations other than the Government's convenience under Federal Acquisition Regulation (FAR) rule 52.249-6. The identical termination notices did not in any way indicate that the contracts were being terminated due to any malfeasance or raise any concerns about how the contractors were performing under their agreements.

82.    In a press release issued the same day as the termination, the Department said that it terminated the contracts due to purported concerns that the REL program enhanced DEI goals and represented "wasteful and ideologically driven spending," including advising schools on "equity audits" and "equity conversations." Press Release, *U.S. Department of Education Cancels Additional $350 Million in Woke Spending* (Feb. 13, 2025).

83.    The only "evidence" cited by the Department for its claims stemmed from a Midwest REL project that allegedly provided equity audits in Ohio. However, as required by the statutory scheme, these audits had to have been completed at the request of the relevant locality and approved by the Department. Regardless, this single REL project was not connected to the other nine RELs, including the two RELs for which Plaintiff RMC was a subcontractor.

84.    DOGE has publicly stated that it is responsible for the REL contract cancellations. "DOGE.gov" features a list of terminated contracts and grants, which DOGE originally described on its site as "DOGE's total estimated savings." The terminated contracts and grants are listed on a "Wall of Receipts," which the site originally subtitled, "a transparent account of DOGE's findings and actions." On its Wall of Receipts, DOGE lists all the REL cancellations, including the termination of the REL contracts for which RMC served as a subcontractor.

85.    At no point prior to the cancellation of the prime contracts did RMC or its partners receive any indication from the Department that there were concerns over the manner in which it was operating the REL program or that the Department considered its project inappropriately "DEI" focused. Had the Department raised any such concerns, RMC, through the prime contractors, would have worked with the Department to alter any proposed projects. Indeed, RELs cannot move forward with any projects absent the Department's approval. The RELs thus did not undertake any projects that were not (1) developed in close coordination with

and at the request of local stakeholders and (2) approved directly by the Department.

86.     With these cancellations, IES no longer maintains *any* REL, despite the statutory mandate that the Director of IES "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. § 9564(a). Defendants have shut down this statutorily required program.

87.     To date, IES has taken no public steps to re-award REL contractors.

88.     At the same time, the Department has taken steps to terminate nearly all IES employees, impeding its ability to ever operate the mandatory REL program. *See*, *Revealed: Trump Education Cuts Mean Years of Work – and Millions of Dollars – Go to Waste*, THE GUARDIAN, Mar. 20, 2025.

***The Contract and Grant Terminations Injure Plaintiffs and the Communities They Serve***

89.     As a Comprehensive Center direct grantee and partner, and a REL subcontractor, RMC dedicates approximately forty percent of its work on these now-terminated programs.

90.     As a result of the unlawful project terminations, RMC has lost roughly forty percent of its business base.

91.     RMC also has had to lay off about twenty percent of its workforce and reduce the work hours of another twenty percent of its workforce. RMC expects additional employee attrition due to the reduced work hours and uncertainty created by the terminated projects.

92.     In laying off key experts, RMC will be less able to compete for additional work.

93.     RMC has lost the chance to compete for future REL and Comprehensive Center contracts, grants, and subcontracts because the Defendants do not intend to restore the programs.

94.     RMC is also concerned that it will be less competitive for future awards when it has to disclose that it has had grants and subcontracts with the government terminated.

95.     Similarly, Child Trends anticipated spending five years dedicated to the important work of the Pacific East and Northwest Comprehensive Centers. As a result of these grant terminations, Child Trends has had to lay off twelve staff members, reduce hours for four additional staff members, and reduce salaries of all eleven members of its leadership team.

96.      The Comprehensive Center termination notifications included a purported appeals process, requiring grantees to submit information for the Department's consideration within thirty days. While grantees were given only thirty days to seek reconsideration, the process laid out by the Department provides no timeline or information about how the Department will consider appeals.

97.     Both Child Trends and RMC have used this process to seek reinstatement of their Comprehensive Center grants. Neither have received any response to their submissions, beyond acknowledgment of receipt. Plaintiffs have no way to know when or if they will receive a response. In the interim, they must make consequential staffing decisions at their organizations.

98.     Beyond Plaintiffs' direct injuries, DOGE and the Department's unlawful terminations of the REL and Comprehensive Centers programs undermine the careful, coordinated, and interconnected framework of education research Congress has developed to ensure that our nation's students benefit from teaching that is evidence-based.

99.     Rather than create efficiency, the terminations waste hundreds of millions of dollars in government spending over both the current and prior grant and contract cycles.

100.    The National Center, for example, served as a repository of products developed by the other Comprehensive Centers over the years, allowing a state to benefit from the policy work and research done in another region. State and district leaders frequently use that database for access to toolkits, policy briefs, training materials, and other information. With the

termination of the National Center grant, that resource is no longer available. Upon information and belief, the National Center has received numerous requests for documents since the grants were terminated, demonstrating the value of the Comprehensive Center work products.

101.    Similarly, the RELs spent four years developing various toolkits based on evidence-based instructional practices in mathematics. They invested in development of the toolkits and usability studies, and, at the time the REL contracts were terminated, were in the process of conducting efficacy studies. At the same time, the National Center was planning to coordinate with the RELs to develop projects to assist states in using the toolkits with districts and schools once the final studies were completed. With the termination of the RELs and Comprehensive Centers, all of that work has been abandoned and the benefits of the toolkits will not be realized for students across the nation.

102.    The same is true on a localized scale. In Kansas, the REL Central had spent years collecting data and was stopped before it could undertake analysis on that data. In South Carolina, the REL developed emergent literacy projects during the prior contract cycle; at the time of termination, the REL was in the process of analyzing data from a three-year implementation period in South Carolina to understand the impact of the work on pre-school student outcomes. That work has now stopped.

103.    Without the work of the Gulf Comprehensive Center, teams from the Northeast Florida Educational Consortium, the Panhandle Area Educational Consortium, the Heartland Education Consortium, and their small and rural district partners (Dixie County Schools, Glades County Schools, Hamilton County Schools, and Holmes County Schools) in Florida will not receive training and support they were counting on to assist with their increasing use of proven instructional practices in reading and mathematics; teachers and school leaders at thirty-two

schools in Mississippi recently designated as comprehensive support and improvement will not receive support to meet the needs of their students with disabilities; and Alabama's Office of Mathematics Improvement will be challenged in developing the legislatively required Academic Intervention Framework and Turnaround Leaders Academy in a timely manner to help elementary school principals whose schools were identified for support to improve outcomes.

104.    Similarly, states depending on Comprehensive Center resources will either have to go without the valuable services needed to address high-leverage problems or they will have to cut resources elsewhere to fill the void. Examples of projects that will no longer take place include addressing K-3 student literacy challenges by improving educator professional learning and data-driven instructional practices in American Samoa; improving secondary literacy and math outcomes by developing and supporting educator trainings on evidence-based practices in the Republic of the Marshall Islands; and developing and implementing educator professional learning trainings on evidence-based math practices to enhance K-8 math proficiency in Hawaii.

105.    States were anticipating engaging with and benefitting from these programs. The former state superintendent from Mississippi, now in Maryland, has stated that it is a "real shame" that her state cannot benefit from partnership with another REL. *Trump Cuts Research Lab that Helped Nurture "Mississippi Miracle," supra*.

106.    Absent court intervention, these losses–replicated across the country–will remain, and Plaintiffs and the other RELs and Comprehensive Centers will not be able to fulfill their missions under these important programs.

## CLAIMS FOR RELIEF

### COUNT ONE

**RELs and Comprehensive Centers: Administrative Procedure Act, 5 U.S.C. § 706(2)
(Against all Defendants)**

107.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

108.    The APA provides that a reviewing court shall hold unlawful and set aside agency action "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A)-(C).

109.    By statute, Congress has mandated the establishment and operation of, and provision of contracts and grants to, RELs and Comprehensive Centers.

110.    On February 13, 2025, each of the REL contractors, including the contracts for which RMC was a subcontractor, received identical termination notifications. With these cancellations, IES no longer maintains a single operating REL. Defendants have taken no steps to recompete the cancelled REL contracts and have placed nearly all IES employees on administrative leave pending termination.

111.    Defendants thus have made a final decision and taken final agency action to not maintain any RELs. At a minimum, Defendants have made a final decision and taken final agency action to not maintain any RELs for an extended period of time.

112.    On February 19, 2025, eighteen of twenty Comprehensive Center grant recipients, including Plaintiffs, received identical notifications that their grants were being terminated. The Comprehensive Center grants for the awards for which Plaintiffs were serving as subcontractors were among those terminated as well. In terminating eighteen out of the twenty Comprehensive Center awards, the Department has largely shut down this statutorily required program.

113.    Defendants have made a final decision and taken final agency action to not maintain eighteen of the twenty required Comprehensive Centers. At a minimum, Defendants have made a final decision and taken final agency action to not maintain eighteen of the twenty required Comprehensive Centers for an extended period of time.

114.    By virtue of these final agency actions, Defendants are violating numerous statutes. With respect to RELs, Defendants have violated Congress' statutory command that the Director of IES "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. § 9564(a). Defendants have violated the statutory requirement to allocate "assistance . . . to each laboratory . . . [that] shall reflect the number of local educational agencies and the number of school-age children within the region served by such laboratory, as well as the cost of providing services within the geographic area encompassed by the region." *Id.* Defendants are not maintaining RELs that "shall support applied research, development, wide dissemination, and technical assistance activities" in their regions. *Id.* § 9564(f).

115.    With respect to Comprehensive Centers, Defendants have violated the statutory requirement to maintain "not less than 20 grants" for Comprehensive Centers as statutorily required. 20 U.S.C. § 9602(a)(1). Defendants have violated the statutory command that the Department "shall ensure that not less than 1 [Comprehensive Center] is established in each of the 10 geographic regions served by the regional educational laboratories." *Id.* § 9602(a)(2). And Defendants have abdicated their statutory responsibilities to ensure that there are Comprehensive Centers that "shall support dissemination and technical assistance activities" by providing training, research, and facilitation of communication between education experts, school officials, teachers, parents, and librarians. *Id.* § 9602(f).

116.    Defendants also are in violation of the Further Consolidated Appropriations Act of 2024 and subsequent Continuing Resolutions. Congress provided in the 2024 Appropriations that, of the $5.78 billion lump-sum appropriated for carrying out school improvement activities, "$50,000,000 shall be available to carry out section 203 of the Educational Technical Assistance Act of 2002," which is the Comprehensive Centers program. The funds remain available until September 30, 2025. Congress has carried forward the appropriations for the Comprehensive Centers program in a series of continuing resolutions. Most recently, on March 15, 2025, Congress enacted a full-year continuation resolution that appropriates another $50 million to the Comprehensive Centers program, to remain available until September 30, 2026. Pub. L. 119-4.

117.    Through their final agency actions, Defendants will not spend the $50,000,000 that Congress mandated the Department to obligate for the Comprehensive Centers by September 30, 2025, nor will the Department spend the additional $50,000,000 that Congress mandated the Department to obligate for the Comprehensive Centers by September 30, 2026.

118.    Defendants' actions also violate the Impoundment Control Act of 1974 (ICA).

119.    Under the ICA, a "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). A deferral thus includes both delays in obligating funds and delays in disbursing funds that are already obligated. When the Executive Branch wishes to defer funds, it must send a special message to Congress detailing the money to be deferred and the reasons for deferral. There are only three permissible grounds for deferrals, none of which includes effort to ensure funds are spent consistent with the President's policy priorities. *Id.* § 684(b).

120.    Defendants' decisions to not maintain eighteen of the required Comprehensive

Centers and any of the ten required RELs both constitute a "deferral" because they reflect a "withholding or delaying [of] the obligation or expenditure of" funds that Congress appropriated for the program. 2 U.S.C. § 682(1). Defendants did not notify Congress of the deferrals as the ICA requires nor did Defendants undertake the deferrals for reasons permitted by the ICA.

121.     Defendants' decision to not maintain eighteen of the required twenty Comprehensive Centers also constitutes an unlawful "rescission" of the funds appropriated for the Comprehensive Centers program.

122.     Where the President seeks to "rescind" appropriated funds, the ICA requires, among other things, that the President send a special message to Congress specifying the funds he seeks to have rescinded and the reasons for his proposal. 2 U.S.C. § 683(a). The President did not do so for rescinding the Comprehensive Center grants.

123.      Defendants' final agency actions violate the constitutional separation of powers.

124.     The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018)).

125.      The Executive Branch has no constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriations based on the President's own policy preferences.

126.     Defendants' decisions to not maintain eighteen of the required twenty Comprehensive Centers or any of the ten required RELs violates the separation of powers. Defendants are entirely refusing to execute unambiguous commands of Congress regarding

establishing and operating the RELs and Comprehensive Centers programs, and Defendants are violating Congress' power of the purse in delaying and outright refusing to spend appropriations sums, including the funds appropriated for the Comprehensive Centers specifically.

127.    In all of these ways, Defendants' actions are "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory . . . authority." 5 U.S.C. §§ 706(2)(A)-(C).

## COUNT TWO

**RELs and Comprehensive Centers: Implied Right of Action, Nonstatutory Review, and *Ultra Vires* Actions, Acting without Constitutional Authority and in Violation of the Separation of Powers**
**(Against Defendants McMahon, Gleason, Soldner, and Washington)**

128.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

129.    Federal district courts have jurisdiction to enjoin federal officials from violating the Constitution, including the separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

130.    The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco*, 897 F.3d at 1238.

131.    The Executive Branch has no constitutional authority to refuse to carry out laws enacted by Congress, and it has no constitutional authority to block, amend, subvert, or delay spending appropriations based on the President's own policy preferences.

132.    Defendants' terminations of the REL contracts and Comprehensive Center grants,

including the contracts and grants for which RMC and Child Trends served as prime grantees or

subcontractor, and Defendants' decisions to not maintain eighteen of the required twenty

Comprehensive Centers or any of the ten required RELs violates the separation of powers.

Defendants are entirely refusing to execute unambiguous commands of Congress regarding

establishing and operating the RELs and Comprehensive Centers programs, and Defendants are

violating Congress' power of the purse in delaying and outright refusing to spend appropriations

sums, including the funds appropriated for the Comprehensive Centers specifically.

133. Because Defendants' actions violate the separation of powers and are *ultra vires*,

they should be enjoined and declared unconstitutional.

### COUNT THREE

**RELs and Comprehensive Centers: Nonstatutory Review and *Ultra Vires* Actions, Acting without Statutory Authority and in Violation of the Educational Technical Assistance Act of 2002 (20 U.S.C. §§ 9602, 9564) (Against Defendants McMahon, Gleason, Soldner, and Washington)**

134. Plaintiffs hereby incorporate by reference the foregoing paragraphs of the

Complaint as if set forth herein.

135. Plaintiffs may bring a nonstatutory claim to enjoin Defendants McMahon,

Gleason, and Soldner from acting *ultra vires* and in violation of statutory commands.

136. In the Education Sciences Reform Act and Educational Technical Assistance Act

of 2002, Congress set forth a comprehensive statutory scheme mandating the establishment of,

and provision of contracts and grants to, RELs and Comprehensive Centers.

137. In terminating the REL contracts, IES no longer maintains a single operating

REL, and Defendants have taken no steps to recompete the cancelled REL contracts.

138. Defendants' shutting down of the REL program is without statutory authority and

violates numerous mandates of 20 U.S.C. § 9564.

139.    In terminating eighteen out of the twenty Comprehensive Center awards, Defendants have effectively shut down this statutorily-required program.

140.    Defendants' termination of the Comprehensive Center grants, and Defendants' not maintaining eighteen of the required twenty Comprehensive Centers, is without statutory authority and violates numerous mandates of 20 U.S.C. § 9602.

141.    Defendants' termination of the Comprehensive Center grants, and Defendants' not maintaining eighteen of the required twenty Comprehensive Centers, also is without statutory authority and violates the 2024 Appropriations Act and subsequent Continuing Resolutions because Defendants are refusing to spend the appropriations that Congress mandated be spent on the Comprehensive Centers program. Because Defendants' actions violate statutory commands and are *ultra vires*, they should be enjoined and declared unlawful.

### COUNT FOUR

**RELs and Comprehensive Centers: Implied Right of Action, Nonstatutory Review, and
*Ultra Vires* Actions, Actions by DOGE without Legal Authority
(Against Defendants McMahon, Gleason, Soldner, and Washington)**

142.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

143.    Federal agencies "possess only the authority that Congress has provided." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

144.    Congress did not create DOGE and has not vested DOGE with any powers. Rather, DOGE is an agency that was created by the President via Executive Order.

145.    DOGE has not been authorized by Congress to conduct business of another

congressionally authorized agency such as the Department of Education.

146.    The terminations of Comprehensive Center grants and REL contracts were directly undertaken by, or specifically directed by, DOGE.

147.    Because DOGE does not possess any congressionally conferred authority to terminate the Department of Education's grants and contracts, McMahon's, Gleason's, Soldner's actions are *ultra vires* and should be enjoined and declared unlawful.

**COUNT FIVE**

**All Federal Grants Awarded to Plaintiffs: Nonstatutory Review and *Ultra Vires* Actions, Actions Contrary to 2 C.F.R. 200.340(a)(4) (Against Defendants McMahon, Gleason, Soldner, and Washington)**

148.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

149.    In its termination notices to the Comprehensive Centers, and in termination notices sent to grantees across the federal government, Defendants have cited a provision of the Uniform Grants Guidance, 2 C.F.R. § 200.340(a)(4), as the legal authority for terminating the awards. Defendants have claimed that this provision authorizes it to terminate any grant that is "inconsistent with, and no longer effectuates, Department priorities."

150.    The Department of Education and most other agencies have adopted the Uniform Grants Guidance as the agency's own regulations. *See, e.g.*, 2 C.F.R. § 3474.1(a).

151.    The current Uniform Grants Guidance does not authorize Defendants to terminate awards based on changing agency policy priorities for which the period of performance began on October 1, 2024 or later, where the terms and conditions of the awards do not "clearly and unambiguously" provide such potential ground for termination. 2 C.F.R. §§ 200.340(a)(4), (b).

152.    A prior version of the Uniform Grants Guidance adopted in 2020 allowed

agencies to terminate based on "program goals or agency priorities" even where such ground for termination was not clearly and unambiguously stated in the terms and conditions of an award. However, not all federal agencies adopted this 2020 version of the Uniform Grants Guidance.

153.    Plaintiff Child Trends has active grants at agencies where the period of performance began on October 1, 2024 or later and the terms and conditions of the award do not "clearly and unambiguously" provide that the agency may terminate based on program goals and agency priorities, or where the period of performance began prior to October 1, 2024 but the awarding agency did not adopt the 2020 version of the Uniform Grants Guidance.

154.    The termination of Plaintiffs' Comprehensive Center grants was *ultra vires*, and the likely imminent termination of Child Trends' grants by Defendants or those acting in participation or concert with them based on programs goals or agency priorities is *ultra vires*.

**COUNT SIX**

**RELs and Comprehensive Centers: Mandamus**
**(Against Defendants McMahon, Gleason, Soldner, and Washington)**

155.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of the Complaint as if set forth herein.

156.    Under applicable regulations and the terms and conditions of Plaintiffs' Comprehensive Center grants, as well as the Comprehensive Center grants for which Plaintiffs were subcontractors, Defendants McMahon and Washington have a mandatory duty to maintain the grant awards through their obligation period, unless the grantee fails to comply with the terms and conditions of the Federal award, or the grantee consents to the termination. 2 C.F.R. § 200.340(a)(1)-(3). Defendants McMahon and Washington could not terminate the Comprehensive Center grants pursuant to 2 C.F.R. § 200.340(a)(4), because the terms and conditions of the grants did not clearly and unambiguously provide that Defendants McMahon

and Washington could terminate based on program goals or agency priorities.

157.    Plaintiffs have a right to have their grants, and the grants for which they serve as subcontractors, remain in place for the obligation period unless terminated on lawful grounds.

158.    Under 20 U.S.C. § 9602, Defendant McMahon has a mandatory duty to maintain, without interruption, "not less than 20 grants" for Comprehensive Centers, and a mandatory duty to "ensure," at all times, "that not less than 1 [Comprehensive Center] is established in each of the 10 geographic regions served by the regional educational laboratories."

159.    Plaintiffs have a right to maintain their grants, and the grants for which they serve as subcontractor, where the termination would lead to the required number of Comprehensive Centers not being in place, or at least a right to compete for grant and subcontractors for the statutorily required number of Comprehensive Centers.

160.    Under 20 U.S.C. § 9564, Defendants McMahon and Soldner have mandatory duties to: (1) "enter into contracts with entities to establish," at all times, "a networked system of 10 regional educational laboratories that serve the needs of each region of the United States;" (2) allocate "assistance . . . to each laboratory . . . [that] shall reflect the number of local educational agencies and the number of school-age children within the region served by such laboratory, as well as the cost of providing services within the geographic area encompassed by the region;" (3) maintains RELs that "shall support applied research, development, wide dissemination, and technical assistance activities" in their regions; and (4) keep REL prime contracts in place "a 5-year period."

161.    Plaintiff RMC has a right to have the contracts for which it serves as a subcontractor remain in place for the statutorily required five-year period, a right to have these contracts remain in place where the termination would lead to the required number of RELs not

being in place, or at least a right to compete as a prime contractor or subcontractor for the statutorily required number of REL contractors..

162.    Under the separation of powers, Defendants McMahon, Washington, and Soldner have a mandatory duty to faithfully execute the laws enacted by Congress, which includes, at a minimum, not entirely abdicating their mandatory statutory duties.

163.    Under the separation of powers, Defendants McMahon, Washington, and Soldner have a mandatory duty to obligate and expend, without delay for policy reasons, the funds that Congress appropriated for the REL and Comprehensive Centers. For example, Defendants must obligate all of the funds Congress appropriated specifically for the Comprehensive Centers.

164.    If complete relief is not available on the other Counts in this complaint, Plaintiffs have no adequate remedy other than mandamus.

165.    The government has argued in other litigation that contractors and grantees may not restore their terminated awards through claims under the Administrative Procedure Act. On April, 4, 2025, the Supreme Court issued an order determining that the government was likely to succeed on this argument in the context of an arbitrary and capricious claim under the APA. *Dep't of Education v. California*, No. 24A910, 2025 WL 1008354 (U.S. Apr. 4, 2025).

166.    Plaintiffs cannot obtain an adequate remedy in the Court of Federal Claims with respect to the contracts and grants for which they served as subcontractors. Under existing precedent, Plaintiffs could not bring claims on their subcontracts in the Court of Federal Claims.

167.    To the extent Plaintiffs cannot obtain monetary damages for their terminated Comprehensive Center grants in the Court of Federal Claims, in the amount of the full grant funds that were to be paid to Plaintiff, Plaintiffs lack an adequate remedy elsewhere.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

A.      Declare as unlawful and *ultra vires* Defendants' terminations of Plaintiffs' Comprehensive Center grants, the Comprehensive Center grants for which Plaintiffs were partner organizations, and the REL contracts for which RMC was a subcontractor;

B.      Declare as unlawful and set aside Defendants' decisions to not maintain eighteen of the required Comprehensive Center, or any of the ten required RELs, as not in accordance with law, 5 U.S.C. § 706(2)(A), contrary to the Constitution, 5 U.S.C. § 706(2)(B), in excess of statutory authority, 5 U.S.C. § 706(2)(C), and unlawful and *ultra vires*;

C.      Enjoin Defendants from enforcing and giving effect to the termination notices for Plaintiffs' Comprehensive Center grants, the Comprehensive Center grants for which Plaintiffs were partner organizations, and the REL contracts for which RMC was a subcontractor;

D.      Enjoin Defendants from terminating the contracts or grants for the remainder of the five-year terms of the contracts and grants;

E.      Enjoin Defendants to immediately and continuously maintain the statutorily required number of contracts and grants for the REL and Comprehensive Centers programs, and to immediately and continuously operate the REL and Comprehensive Centers programs consistent with Congress' statutory directives.

F.      Enjoin Defendants to obligate and spend the full amount of funds that Congress has appropriated for the Comprehensive Centers program, including funds appropriated for the program that expire on September 30, 2025 and September 30, 2026, and funds appropriated in the future for the REL and Comprehensive Centers programs;

G.      Enjoin Defendants, and those acting in concert or participation with Defendants,

from terminating any grants to Plaintiffs across the federal government or grants to other entities across the federal government for which Plaintiffs are subcontractors, where the termination is based on purported program goals and agency priorities, and the grant either: (a) has a period of performance beginning on October 1, 2024 or later and the terms and conditions of the grant do not clearly and unambiguously provide that the grant may be terminated based on program goals and agency priorities; or (b) has a period of performance beginning prior to October 1, 2024 but the awarding agency did not adopt the 2020 version of the Uniform Grants Guidance.

H.    Enjoin Defendants DOGE and Gleason, and those acting in concert or participation with them, from terminating any grants, contracts, or cooperative agreements with Plaintiffs across the federal government, or any grants, contracts, or cooperative agreements across the federal government with other entities for which Plaintiffs are subcontractors or subrecipients, where the terminations are directly undertaken by, or specifically directed by, DOGE or Gleason.

I.    Issue a writ of mandamus compelling Defendants McMahon and Washington to restore or not effectuate the termination of Plaintiffs' Comprehensive Center grants, as well as the Comprehensive Center grants for which Plaintiffs served as subcontractors.

J.    Issue a writ of mandamus compelling Defendants McMahon, Washington, and Soldner to maintain, without interruption or delay, the statutorily required number of Comprehensive Centers and RELs, and ensure that those grantees and contractors perform their mandatory statutory requirements.

K.    Issue a writ of mandamus compelling Defendants McMahon and Washington to obligate and expend, without delay for policy reasons, the funds that Congress appropriated for the REL and Comprehensive Centers, including by obligating all of the funds that Congress

appropriated specifically for the Comprehensive Centers program before those funds expire.

L.    Award Plaintiffs reasonable costs and attorneys' fees; and

M.    Award such other relief as this Court may deem just and proper.


April 7, 2025                              Respectfully submitted,

                                          */s/Lynn D. Eisenberg*
                                          Daniel F. Jacobson[+]
                                          Lynn D. Eisenberg*
                                          Kyla M. Snow**[+]
                                          JACOBSON LAWYERS GROUP PLLC
                                          *1629 K Street NW, Suite 300*
                                          *Washington DC, 20006*
                                          *(301) 823-1148*
                                          *lynn@jacobsonlawyersgroup.com*

                                          * Of Counsel

                                          ** Not admitted in the District of Columbia.
                                          Practiced limited to matters before U.S. courts.

                                          [+]    *pro hac vice* motion forthcoming

                                          *Counsel for Plaintiffs*