**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CHILD TRENDS, INCORPORATED et al., | Case No. 8:25-cv-01154-BAH |
| *Plaintiffs*, | |
| v. | |
| UNITED STATES DEPARTMENT OF EDUCATION et al., | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION OR, IN THE ALTERNATIVE, WRIT OF MANDAMUS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iv

INTRODUCTION ........................................................................................................1

FACTUAL AND LEGAL BACKGROUND ................................................................2

    A. Congress Mandates the Operation and Funding of Regional Education Laboratories and
        Comprehensive Centers.......................................................................................2

    B. The Department Awards Comprehensive Center Grants for Fiscal Years 2024-2029 ........4

    C. The Department Awards REL Contracts for the 2022-2027 Cycle ....................................6

    D. DOGE, through the Department, Shuts Down the Comprehensive Centers and REL
        Programs................................................................................................................7

LEGAL STANDARDS ...............................................................................................10

ARGUMENT ..............................................................................................................11

    A. Plaintiffs Are Likely to Succeed on the Merits of Their Claims ........................................12

        1. The Decisions to Maintain Zero RELs and Two of the Required Twenty
           Comprehensive Centers, and to Terminate Plaintiffs' Grants, Are Unlawful..............13

           a. Defendants Are Violating the Education Sciences Reform Act .............................13

           b. Defendants Are Violating the 2024 Appropriations Act and
              Continuing Resolutions .........................................................................14

           c. Defendants Are Violating the Impoundment Control Act .......................................15

           d. Defendants Are Violating the Constitution.............................................................17

        2. DOGE's Termination of the Grants and Contracts Was Ultra Vires............................19

        3. The Court Should Enter a Writ of Mandamus ...............................................................21

           a. Defendants Have A Duty to Maintain Plaintiffs' Grants Unless Terminated in
              Accord with Department Regulations .....................................................21

b. Defendants Have Mandatory Duties to Establish and Operate the Required Numbers of Comprehensive Centers and RELs ..................................................... 24

B. Absent Relief, Plaintiffs RMC and Child Trends Will Suffer Irreparable Harm ......... 25

C. The Balance of Equities and Public Interest Merit a Preliminary Injunction .............. 27

CONCLUSION ............................................................................................................................ 29

CERTIFICATE OF SERVICE ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Califano*, 474 F. Supp. 974 (D. Md. 1979) ................................................................. 23

*AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706 (2021) ............................................ 27

*Aids Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 752378 (D.D.C. Mar. 10, 2025)........... 18

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.,*
   2025 WL 996542 (S.D.N.Y. Apr. 3, 2025)......................................................................... 19

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ................................... 17

*Clinton v. City of N.Y.*, 524 U.S. 417, 468 (1998) ...................................................................... 18

*Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004 (D.C. Cir. 2022) ................... 26

*Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.,*
   2025 WL 996542 (S.D.N.Y. Apr. 3, 2025),....................................................................... 22

*First Fed. Sav. & Loan Ass'n of Durham v. Baker*, 860 F.2d 135, 138 (4th Cir. 1988).............. 11

*Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647 (D. Md. 2018)..................................... 23, 26

*Hughes Auto., Inc. v. Mid-Atl. Toyota Distributors, Inc.*, 543 F. Supp. 1056 (D. Md. 1982) ...... 27

*In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013)................................................. 17, 18, 24

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986).............................................................. 20

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016). ............................................ 29

*Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313 (Fed. Cir. 2017) ........ 23

*Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196 (Fed. Cir. 1997) ................................. 23

*Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) .......................................................... 20

*Network v. Azar*, 322 F. Supp. 3d 647 (D. Md. 2018) .......................................................... 24, 26

*Nken v. Holder,* 556 U.S. 418 (2009) ....................................................................................... 11

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62 (D.D.C. 2018) 23

*Sav. & Loan Ass'n of Durham*, 860 F.2d 135 (4th Cir. 1988).................................................... 11

*Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022)........................................................... 19

*T Square Logistics Servs. Corp. v. United States*, 134 Fed. Cl. 550 (2017) ................................. 27

*Train v. City of New York*, 420 U.S. 35 (1975) ........................................................ 15, 19

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................ 11

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .................................. 18

**Constitutional Provisions, Statutes, Regulations, and Executive Orders**

2 U.S.C. § 682(1) ..................................................................................................... 16

2 U.S.C. § 683(a) ..................................................................................................... 16

2 U.S.C. § 684(b) ..................................................................................................... 16

5 U.S.C. § 706(2)(A)-(C) .......................................................................................... 19

20 U.S.C. § 9564 .......................................................................................... 2, 10, 14

20 U.S.C. § 9564(a) ...................................................................................... 3, 10, 14

20 U.S.C. § 9564(e) ................................................................................................... 3

20 U.S.C. § 9564(f) .................................................................................................. 14

20 U.S.C. § 9602(a)(1) ......................................................................................... 3, 13

20 U.S.C. § 9602(a)(2) ......................................................................................... 3, 13

20 U.S.C. § 9602(c)(2) ............................................................................................... 3

20 U.S.C. § 9602(e) ................................................................................................... 3

20 U.S.C. § 9602(f) .................................................................................................. 13

20 U.S.C. § 9602(h) ................................................................................................... 3

2 C.F.R. § 200.340(a)(2) (2020) ............................................................................. 22

2 C.F.R. § 200.340(a)(4) .......................................................................... 8, 21, 22, 27

2 C.F.R. § 200.340(b) .............................................................................................. 22

2 C.F.R. § 3474.1(a) ................................................................................................ 22

85 Fed. Reg. 49506 (Aug. 13, 2020) ...................................................................... 22

E.O. 14158 (Jan. 20, 2025) ....................................................................................... 7

E.O. 14222 (Feb. 26, 2025)................................................................................................ 7

Pub. L. 89-10, 79 Stat 27 (Apr. 11, 1965) ....................................................................... 3

Pub. L. 103-382, 108 Stat. 3518 (Oct. 20, 1994)............................................................. 3

Pub. L. 107-279, 116 Stat. 1940 (Nov. 5, 2002).............................................................. 3

Pub. L. 118-47, 138 Stat 460 (Mar. 23, 2024)........................................................... 3, 14

Pub. L. 119-4, 129 Stat. 9 (Mar. 15, 2025). ............................................................. 4, 14

U.S. const. I, § 1 ............................................................................................................. 16

U.S. const. II, § 3 ............................................................................................................ 16

**INTRODUCTION**

Plaintiffs Child Trends and RMC Research bring this motion to enjoin Defendants' numerous violations of unambiguous legal duties. Several straightforward propositions resolve this motion. Federal law requires the Department of Education (the "Department") to maintain at least twenty grants to operate Comprehensive Centers, and the Department now maintains only two. Federal law requires the Department to maintain at least ten contracts to operate Regional Educational Laboratories ("RELs"), and the Department is currently operating zero. Federal law requires the Department to spend at least $100 million from Fiscal Years 2024 to 2026 on the Comprehensive Centers program, and Defendants will spend only a tiny fraction of that amount. The Constitution requires Defendants to faithfully carry out the laws passed by Congress, including by spending the funds appropriated by Congress without intentional delay, and Defendants are not doing so. The Constitution prohibits agencies from taking action without authority conferred by statute, but the U.S. DOGE Service ("DOGE") terminated the Comprehensive Center grants and REL contracts without any statutory authority at all.

Given Defendants' many violations of law, it is no surprise that Plaintiffs bring several claims seeking several forms of relief. Distinct from Plaintiffs' challenge to their individual award terminations, Plaintiffs bring a claim under the Administrative Procedure Act (APA) with respect to Defendants' decision to shut down the Comprehensive Centers and RELs programs. Plaintiffs seek a preliminary injunction on this claim requiring Defendants to immediately operate the required number of grants and contracts, and to spend the required amounts of appropriations. Plaintiffs bring nonstatutory claims based on Defendants' constitutional and statutory violations, and seek a preliminary injunction both requiring Defendants to comply with their statutory requirements and prohibiting Defendants from giving effect to the termination of

1

Plaintiffs' awards specifically. Plaintiffs bring *ultra vires* claims with respect to DOGE's unlawful role in terminating their awards, and seek to enjoin DOGE's administrator from taking similar action on Plaintiffs' awards across the government. And if complete relief is not available under the above claims, Plaintiffs seek a writ of mandamus to compel Defendants to comply with their unambiguous legal duties.

Absent the requested relief, Plaintiffs, students, local communities, and the rule of law will all suffer. Child Trends and RMC, a non-profit and small business respectively, are facing ongoing extreme hardship, having been abruptly deprived of the ability to receive substantial grants and subcontracts. Students and schools that have counted on the Comprehensive Centers and RELs for decades have been left with a massive void in support without any advanced notice. And on the other side of the ledger, Defendants can claim no cognizable harm from having to comply with their legal obligations.

Given the many ways in which Defendants are violating the law, and the likelihood of rapid appeals if Plaintiffs prevail on this motion, Plaintiffs respectfully request that the Court rule on all of their requested claims and relief in resolving this motion.

## FACTUAL AND LEGAL BACKGROUND

### A. Congress Mandates the Operation and Funding of Regional Education Laboratories and Comprehensive Centers

For decades, Congress has mandated the creation, operation, and funding of RELs and Comprehensive Centers as part of a carefully integrated system of Department of Education programs designed to support states and educational institutions nationwide.

Nearly 60 years ago, Congress created RELs to assist education practitioners and policymakers by using research, evidence, and evidence-based practices to improve student

outcomes.[1] The Department of Education's Institute for Education Sciences (IES) administers the REL program. Congress has directed that the IES Director "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. §§ 9564(a), (e).

Thirty-one years ago, Congress established the Comprehensive Centers program.[2] Comprehensive Centers work with State, local, and regional educational agencies and schools on school improvement activities, prioritizing areas with a higher percentage of students from low-income families and schools identified for improvement. 20 U.S.C. § 9602(e). In creating the program, Congress required the Secretary of Education to award "not less than" 20 grants to local entities or groups to serve as Comprehensive Centers. *Id.* § 9602(a)(1). Congress further mandated that the Secretary "shall ensure that not less than 1 Comprehensive Center is established in each of the 10 geographic regions served by the [RELs]." *Id.* § 9602(a)(2). Congress anticipated multi-year grants, requiring applicants to submit a 5-year implementation plan, *id.* § 9602(c)(2), and an annual report to the Secretary. *Id.* § 9602(h). This multi-year structure reflects the highly time- and resource-intensive process required for Comprehensive Centers to collaborate with stakeholders and implement education assistance plans.

Congress has consistently funded RELs and Comprehensive Centers through annual appropriations. The Further Consolidated Appropriations Act of 2024 (the "2024 Appropriations Act") provided that of the $5.78 billion lump-sum appropriated for carrying out school improvement activities, "$50,000,000 shall be available to carry out" the Comprehensive Centers

---

[1] *See* Elementary and Secondary Education Act of 1965, Pub. L. 89-10, 79 Stat. 27 (Apr. 11, 1965). Currently, RELs are authorized by the Education Sciences Reform Act of 2002, Pub. L. 107-279, § 174, 116 Stat. 1940 (Nov. 5, 2002).

[2] *See* Improving America's Schools Act of 1994, Pub. L. 103-382, 108 Stat. 3518, at 3877 (Oct. 20, 1994). Congress reauthorized and amended the program through the Educational Technical Assistance Act of 2002, Pub. L. 107-279, § 203, 116 Stat. 1940 (Nov. 5, 2002).

program, with these funds to remain available until September 30, 2025. Pub. L. 118-47, 138 Stat 460, 683 (Mar. 23, 2024). Congress has carried forward the appropriations to the Comprehensive Centers program in a series of continuing resolutions. The most recent full-year Continuing Resolution appropriated another $50 million to the Comprehensive Centers program, to remain available until September 30, 2026. Pub. L. 119-4, 139 Stat. 9, 10-12 (Mar. 15, 2025).

As for the RELs, the 2024 Appropriations Act appropriated $793 million for IES, which remains available to be obligated until September 30, 2025.138 Stat. at 690. In its Joint Explanatory Statement accompanying the 2024 Appropriations Act, Congress specified that $53.7 million of these funds was intended for the REL program. Joint Explanatory Statement, Division – Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024, at 155, https://perma.cc/8J97-7K82. Congress has carried forward the appropriations to IES in a series of continuing resolutions, including in the recent full-year Continuing Resolution that appropriated another $793 million to IES, to remain available until September 30, 2026. 139 Stat. at 10-12.

**B. The Department Awards Comprehensive Center Grants for Fiscal Years 2025-2029**

On September 26, 2024, the Department awarded grants to nineteen Comprehensive Centers.[3] *See* Eisenberg Decl., Ex. 1 (Pane Decl.), ¶ 11; Eisenberg Decl., Ex. 2 (Dwyer Decl.), ¶ 8. The grants to these Comprehensive Centers, which the Department referred to as the "2024-2029 Comprehensive Centers," provided for a period of performance from October 1, 2024 to September 30, 2029. Pane Decl. ¶ 12; Dwyer Decl. ¶ 8. Child Trends and RMC were among the award recipients.

---

[3] The Department also issued a continuation award to one additional Comprehensive Center, which was on a different period of performance timeline, totaling twenty Comprehensive Centers as required by statute.

The Department selected Child Trends to be the prime grantee for the Pacific East Comprehensive Center. *See* Eisenberg Decl., Ex. 3 (Child Trends Grant). The grant awarded Child Trends $1.25 million during each fiscal year (FY) from 2024 to 2029. Pane Decl. ¶ 8. Child Trends also received funds as a collaborator, pursuant to a subcontract, with the prime grantee for the Northwest Comprehensive Center. *Id* at ¶ 11.

The Department selected RMC to be the prime grantee for the Comprehensive Center for the Gulf Region. *See* Eisenberg Decl., Ex. 4 (RMC Grant). The grant awarded RMC $2.245 million during each FY from 2024 to 2029. Dwyer Decl. ¶ 8. RMC also received funds, pursuant to a subcontract, with two other prime grantees, the Content Center on Strengthening and Supporting the Educator Workforce (SSEW) and the National Comprehensive Center. *Id.* at ¶ 9.

The awards to all the Comprehensive Center grantees, including Child Trends and RMC, laid out the various requirements of the award and provided that the Department could terminate the awards for failure to comply with the terms of the grant award. *See, e.g.*, Child Trends Grant at 2. They did not provide for termination based on program goals or agency priorities. *Id.*

Once the performance period began in October 2024, Child Trends, RMC, and similarly situated Comprehensive Center grantees and subcontractors immediately got to work. As required, this involved collaborating with local education officials and stakeholders across their regions to identify needs and developing project proposals to submit to the Department. Pane Decl. ¶ 12; Dwyer Decl. ¶¶ 10-12. At this time, grantees were in near constant communication with the Department to understand the Department's goals and priorities, and to ensure compliance and buy-in on their work. Pane Decl. ¶ 14; Dwyer Decl.¶ 18.

At no time were the grantees given any indication that the Department had concerns about their work or planned projects or that the program was at risk. Quite the opposite. As late

as February 10, 2025, Comprehensive Centers program staff at the Department emailed each of the Comprehensive Centers an updated summary of reporting deadlines, ranging from January to December 2025, for the program's first fiscal year. Dwyer Decl. ¶ 14. On February 13, just five days before its grant was terminated, RMC received provisional approval to begin "asap" on eleven different projects. *Id*. The next day, Child Trends received an email inviting them to submit proposals for provisional approval for time-sensitive work. Pane Decl. ¶ 15.

### C. The Department Awards REL Contracts for the 2022-2027 Cycle

The Department awarded contracts to RELs for a contract cycle covering fiscal years 2022 through 2027. *See About Us*, IESs, https://perma.cc/5EA7-7EKJ. RMC entered into several subcontracts with prime contractors for this performance period. In January 2022, RMC subcontracted with the prime contractor for the REL Southeast. Dwyer Decl. ¶ 21. The most recent amendment to that subcontract—on February 13, 2025—extended the period of performance through June 30, 2025, and added $392,240, bringing the total funding on the subcontract to roughly $2.3 million. *Id.* at ¶ 22. RMC also entered into a subcontract with the prime contractor for the REL Central, for work beginning on March 1, 2022, and (after an amendment) extending through December 31, 2026. *Id.* ¶ 26. The amended subcontract provided for a ceiling of $3.5 million in payments to RMC. *Id.*

Under these agreements, RMC has done significant work conducting applied research, delivering training and coaching, and publishing evidence-based practices in partnership with local stakeholders. *Id.* ¶ 23. For example, RMC partnered with the Alabama State Department of Education and eleven districts to create evidence-based professional learning resources designed to improve outcomes for English learners. *Id.* ¶ 24. RMC has helped other state education departments and school districts implement initiatives to prepare students for college and careers,

and to increase teacher recruitment and retention. And RMC has provided guidance to districts primarily in rural settings that have adopted a reduced academic calendar. *Id.* ¶ 27.

### D. DOGE, through the Department, Shuts Down the Comprehensive Centers and REL Programs

On January 20, the President by Executive Order established the United States DOGE Service as a new component of the Executive Office of the President. E.O. 14158 § 3(a) (Jan. 20, 2025). The Executive Order required agencies to establish "a DOGE Team of at least four employees" within their agency, including a "DOGE Team Lead" who would "advise" the agency "on implementing the President's DOGE Agenda." *Id.* § 3(c). In a subsequent Executive Order, the President directed agencies to consult with the Agency DOGE Team Lead to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify . . . such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." E.O. 14222 § 3(b) (Feb. 26, 2025).

According to news outlets, shortly after Inauguration Day—even before the President's written directive that agencies work with DOGE—DOGE team members arrived at the Department of Education and began directing agency leadership on contract and grant terminations. *See, e.g.*, Tyler Kingkade and Natasha Korecki, *Inside DOGE's Takeover of the Education Department,* NBC NEWS, Feb. 8, 2025, https://perma.cc/54GB-TXSF; Theodore Schleifer et al., *Young Aides Emerge as Enforcers in Musk's Broadside Against Government,* NYTIMES., Feb. 7, 2025, https://www.nytimes.com/2025/02/07/us/politics/musk-doge-aides.html.

DOGE subsequently terminated eighteen of the Comprehensive Center grants, at the urging of activist Christopher Rufo. On February 18, Rufo posted on X that the Comprehensive

Centers "push left-wing ideologies." Christopher F. Rufo (@realchrisrufo), X (Feb. 18, 2025,

1:30 PM), https://perma.cc/PQ9Z-TU8Y. (Feb. 18 1:30 Rufo Post). Elon Musk, the public face

of DOGE, replied, "!!." Eisenberg Decl., Ex. 5 (Feb. 18 Musk Post). Later that day, Rufo posted

on X to DOGE: "Hey, @DOGE_ED, let's terminate the contracts for the 'comprehensive

centers.' What do you think?" Christopher F. Rufo (@realchrisrufo), X (Feb. 18, 2025, 5:08

PM), https://perma.cc/SW6Q-5QRJ. (Feb. 18 5:08 Rufo Post).

The next day, eighteen of the twenty Comprehensive Center awards were terminated

through identical, boilerplate notices from the Department.[4] Dwyer Decl. ¶ 15; Pane Decl. ¶ 16.

The notices alleged generally that the grants promoted DEI initiatives, engaged in "fraud, abuse,

or duplication," or "otherwise fail[ed] to serve the best interests of the United States." Eisenberg

Decl., Ex. 6 (Child Trends Notice), Ex. 7 (RMC Notice). The notices stated that "[t]he grant is

therefore inconsistent with, and no longer effectuates, Department priorities." Child Trends

Notice (citing 2 C.F.R. § 200.340(a)(4) and 34 C.F.R. § 75.253); RMC Notice (same).

The Department issued a press release on the same day, citing directly to selectively

edited videos posted on X by Rufo mere hours before in which he highlighted speakers from

prior awards cycles. Citing only Rufo's posts as support, the press release claimed that the

Comprehensive Centers program writ large was "divisive and wasteful" and promoted "race-

based discrimination and gender identity ideology." Press Release, *U.S. Department of

Education Cancels Divisive and Wasteful Grants under the Comprehensive Centers Program*

(Feb. 19, 2025) (Comprehensive Center Press Release), https://perma.cc/N4G4-ASUV. DOGE

then took direct credit for the grant terminations on its website, DOGE.gov. DOGE lists all of the

Comprehensive Centers program grants, including Plaintiffs', as "Savings" it has produced on its

---

[4] Defendants have provided no public explanation why two of the twenty Comprehensive Centers were not
terminated.

"Wall of Receipts." Eisenberg Decl., Ex. 8 (Comprehensive Centers Wall of Receipts). The Wall of Receipts was originally subtitled a "transparent account of DOGE's findings and actions." Aliss Higham, *DOGE Reveals Social Security Administration Cuts*, Newsweek (Feb. 20, 2025), https://perma.cc/UQ69-58G2.

Meanwhile, Department of Education employees responsible for the program made it clear that they were not involved in the termination decision. In addition to continuing to move forward with the Comprehensive Centers program in the days leading up to the terminations, *supra*, program staff expressed surprise at the terminations after the fact. At 6:07 pm on February 19, nearly two hours after Plaintiff Child Trends received a notification that its grant was terminated, Child Trends received an email from its program officer at the Department expressing surprise. Pane Decl. ¶ 18. The program officer stated that she and her colleagues were "just made aware of the termination of the Comprehensive Centers program." *Id.*

The Department has not sought applications to recompete the terminated Comprehensive Center grants, nor has it given any indication that it intends to do so. A significant portion of the $50,000,000 that Congress mandated the Department spend on the program will expire on September 30, 2025.

The REL terminations followed a similar path as the Comprehensive Centers. On February 13, 2025, with no advanced warning, each of the REL contractors, including the contractors for whom RMC served as a subcontractor, received identical notifications terminating the contract. Dwyer Decl. ¶ 28. The notifications provided no rationale for the terminations other than the Government's convenience under Federal Acquisition Regulation (FAR) rule 52.249-6. *Id.* However, in a press release issued the same day as the terminations, the Department said that it terminated the contracts due to purported concerns that the REL program

enhanced DEI goals and represented "wasteful and ideologically driven spendings. Press Release, *U.S. Department of Education Cancels Additional $350 Million in Woke Spending* (Feb. 13, 2025), https://perma.cc/U8PM-4UPM.

Once again, DOGE publicly took credit for the cancellations, listing the REL contract terminations on its "Wall of Receipts" that represents "a transparent account of DOGE's findings and actions." Eisenberg Decl., Ex. 9 (REL Wall of Receipts).

With these terminations, IES no longer maintains any REL, despite the statutory mandate that the Director of IES "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories." 20 U.S.C. § 9564(a). IES has taken no public steps to re-award REL contracts, and a former official attests in an attached declaration that as of March 21 the Department had taken no formal steps internally toward resuming the program. Eisenberg Decl, Ex. 10 (Doe Decl.), ¶ 5. And, as mentioned, $53.7 million in appropriations that Congress intended for the RELs will expire on September 30, 2025. Moreover, the Department has taken steps to terminate nearly all IES employees—including every career employee that worked on the REL program. *Id.* ¶ 6. *See* Jill Barshay, *Chaos and Confusion as the Statistics Arm of the Education Department is Reduced to a Skeletal Staff of 3*, THE HECHINGER REPORT, https://perma.cc/4K2C-LWVU.

Through these actions, Defendants have shut down two statutorily required, congressionally funded programs aimed at providing tailored, evidence-based support to educators nationwide.

## LEGAL STANDARDS

To obtain a preliminary injunction, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of

equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is the opposing party, the final two factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009).

A writ of mandamus may issue where "(1) the petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner; and (3) no other adequate remedy is available." *First Fed. Sav. & Loan Ass'n of Durham v. Baker*, 860 F.2d 135, 138 (4th Cir. 1988).

## ARGUMENT

Each of the preliminary injunction factors—and if necessary, mandamus factors—cuts decisively in Plaintiffs' favor. The merits are straightforward. Federal statutes require Defendants to maintain specific numbers of Comprehensive Centers and RELs, and to spend specific amounts of funds on the Comprehensive Centers, and Defendants have decided to ignore their statutory and constitutional duties. DOGE has publicly stated that it is responsible for terminating the Comprehensive Center grants and REL contracts, but black-letter law provides that DOGE lacks authority to take any such action absent congressional authorization. And for mandamus purposes, Defendants have violated a mandatory duty set forth in regulations not to terminate the Comprehensive Center grants except for good cause.

The equities are just as clear. Plaintiffs RMC and Child Trends are suffering irreparable harm every day that Defendants persist in their termination of Plaintiffs' awards and their refusal to at least allow Plaintiffs to compete for awards. Meanwhile, state education staff, students, schools, and local communities are suffering from the massive void left without these programs that they have counted on for decades and were counting on for the current school year. If that harm were not enough, the public interest would be greatly served by enjoining Defendants'

patent disregard for federal laws and the Constitution. And Defendants have no cognizable harm from being required to comply with their legal obligations. This is not a close case.

### A. Plaintiffs Are Likely to Succeed on the Merits of Their Claims

Plaintiffs seek relief on a number of claims set forth in their Complaint. For clarity, Plaintiffs pursue the following claims and relief in the instant motion:

● An APA claim challenging Defendants' decisions to operate zero RELs and only two of the required twenty Comprehensive Centers, and seeking an injunction requiring Defendants to immediately operate the required numbers of RELs and Comprehensive Centers and spend the required amounts of appropriations. Plaintiffs do not bring APA claims seeking to restore their terminated awards specifically.

● Nonstatutory claims that Defendants are acting without legal authority and violating the Constitution and statutes. Plaintiffs bring these claims with respect to both the decisions to not operate the required number of RELs and Comprehensive Centers, and the termination of Plaintiffs' awards specifically. Through these claims, Plaintiffs seek to enjoin Defendants to not give effect to the termination notices to Plaintiffs and, in addition or in the alternative, require Defendants to immediately operate the required numbers of RELs and Comprehensive Centers and spend the required amounts of appropriations.

● *Ultra vires* claims that DOGE's termination of the Comprehensive Center grants and REL contracts was without legal authority. Plaintiffs seek to enjoin Acting DOGE Administrator Gleason's termination of the relevant REL and Comprehensive Center awards, and to enjoin Gleason and those acting in concert or participation with her from terminating Plaintiffs' other awards at other agencies, where DOGE carries out, or at least is directly responsible for, the terminations.

● If the other claims do not provide complete relief, a writ of mandamus: (a) compelling Defendants to restore Plaintiffs' terminated grants because Defendants had a duty to not terminate these grants except as permitted under applicable regulations; and (b) compelling Defendants to comply with their statutory duties to maintain the required numbers of Comprehensive Centers and RELs and spend the required amounts of appropriations.

Plaintiffs are likely to succeed on all of these claims, as set forth below.

### 1. The Decisions to Maintain Zero RELs and Two of the Required Twenty Comprehensive Centers, and to Terminate Plaintiffs' Grants, Are Unlawful

#### a. Defendants Are Violating the Education Sciences Reform Act

Defendants' decisions to operate zero RELs and only two Comprehensive Centers violate a multitude of statutory commands.

With the Comprehensive Centers program, Defendants are violating the statutory requirement to maintain "not less than 20 grants" for Comprehensive Centers. 20 U.S.C. § 9602(a)(1). Defendants are violating the statutory command that the Department "shall ensure that not less than 1 comprehensive center is established in each of the 10 geographic regions served by the regional educational laboratories." *Id.* § 9602(a)(2)(A). And Defendants are abdicating their statutory responsibilities to ensure that there are Comprehensive Centers that "shall support dissemination and technical assistance activities" by providing training, research, and facilitation of communication between education experts, school officials, teachers, parents, and librarians. *Id.* § 9602(f). The statutes do not contemplate any gap in time where the Secretary would not maintain the required number of Comprehensive Centers, let alone the indefinite period of time that Defendants have now decided to leave the program largely non-operational.

The statutory violations are equally plain with respect to the REL program. Defendants are violating Congress' statutory command that the Director of IES "shall enter into contracts

13

with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. § 9564(a). Defendants are violating the statutory requirement to allocate "assistance . . . to each laboratory. . . [that] shall reflect the number of local educational agencies and the number of school-age children within the region served by such laboratory, as well as the cost of providing services within the geographic area encompassed by the region." *Id.* Defendants are not maintaining RELs that "shall support applied research, development, wide dissemination, and technical assistance activities" in their regions. *Id.* § 9564(f). As with the Comprehensive Centers, the statute does not allow for any gap in maintaining the required number of RELs, let alone the indefinite period for which Defendants have decided to have no RELs at all.

> **b. Defendants Are Violating the 2024 Appropriations Act and Continuing Resolutions**

Defendants' near-complete shutdown of the Comprehensive Centers program also violates the 2024 Appropriations Act and subsequent Continuing Resolutions. Congress provided in the 2024 Appropriations Act that, of the $5.78 billion appropriated for carrying out school improvement activities, "$50,000,000 shall be available to carry out section 203 of the Educational Technical Assistance Act of 2002," which is the Comprehensive Centers program. These funds are available until September 30, 2025. 138 Stat at 683. On March 15, 2025, Congress enacted a full-year continuation resolution that appropriates another $50 million to the Comprehensive Centers program, available until September 30, 2026. 39 Stat. at 10-12.

The Government Accountability Office (GAO) has held that this "shall be available" language means the agency must spend the specified amount on the designated program, and these funds "cannot be diverted to purposes other than" the designated program. GAO, *Small Business Administration—Availability of Appropriations for Loan Modernization and*

*Accounting System*, B-326941, at 6-7 (Dec. 10, 2015), https://perma.cc/Q398-8RMJ. GAO has explained, moreover, that the specified amount (here, $50 million) is the minimum the agency must spend on the program from the broader lump-sum appropriation (here, the $5.78 billion). *See id.* Congress thus mandated that the Department spend at least $50 million from the 2024 Appropriations Act on the Comprehensive Centers program across Fiscal Years 2024 and 2025, and at least another $50 million from the 2025 Continuing Resolution on the program, across Fiscal Years 2025 and 2026.

Because Defendants shut down eighteen of the twenty required Comprehensive Centers less than halfway through Fiscal Year 2024, Defendants have spent only a portion of the $50 million from the 2024 Appropriations Act, and will spend only a tiny fraction of the $50 million from the 2025 Continuing Resolution. Defendants' actions violate these appropriations laws.

Defendants' failure to spend the required amount in appropriations is analogous to the circumstances in *Train v. City of New York*, 420 U.S. 35 (1975). There, the Supreme Court held that President Nixon had unlawfully directed the Environmental Protection Agency to not expend the full amount of money that Congress directed be spent under a statute. *See id.* at 42-49. The Court rejected the agency's argument that it had discretion to spend less. *Id.* The Court thus affirmed an order compelling the agency to distribute the full sums of money, as Congress had directed. *Id.* at 41. Here, as in *Train*, Congress has directed Defendants to spend at least $100 million on the Comprehensive Centers program before September 30, 2026, and Defendants are violating that directive.

### c. Defendants Are Violating the Impoundment Control Act

Defendants are also violating the Impoundment Control Act of 1974 (ICA) with respect to the REL and Comprehensive Centers programs. The ICA sets forth very limited circumstances

in which the Executive Branch may undertake a "deferral" or "rescission" of funds.

Under the ICA, a "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). A deferral thus includes both delays in obligating funds and delays in disbursing funds already obligated. When the Executive Branch wishes to defer funds, it must send a special message to Congress detailing the money to be deferred and the reasons for deferral. There are only three permissible grounds for deferrals. *Id.* § 684(b). "Policy reasons," including efforts to ensure funds are spent in accordance with the President's policy preferences, are not a proper basis for deferrals. GAO, *Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, at 6 (Jan. 16, 2020), https://perma.cc/6TMT-3CH2.

Defendants' decisions to not maintain eighteen of the required Comprehensive Centers and any of the ten required RELs constitute "deferrals," because they reflect a "withholding or delaying [of] the obligation or expenditure of" funds that Congress appropriated for the programs. 2 U.S.C. § 682(1). Defendants did not notify Congress of the deferrals as the ICA requires, nor did Defendants undertake the deferrals for reasons permitted by the ICA.

Defendants' decision to not maintain eighteen of the required twenty Comprehensive Centers also constitutes an unlawful "rescission" of the funds appropriated for the Comprehensive Centers program. Where the President seeks to "rescind" appropriated funds, the ICA requires, among other things, that the President send a special message to Congress specifying the funds he seeks to have rescinded and the reasons for his proposal. 2 U.S.C. § 683(a). If Congress does not enact the proposed rescission within 45 session days, the Executive Branch must make the funds available for obligation.

Here, the President did not follow the ICA's required procedures for proposing a rescission of the Comprehensive Center appropriations. Instead, Defendants are leaving the vast majority of the $100 million in appropriations unspent.

### d. Defendants Are Violating the Constitution

The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. As then-Judge Kavanaugh explained, these provisions carry with them "settled, bedrock principles of constitutional law." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). "Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." *Id.* "[T]he President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *Id.* at 260.

But Defendants are doing exactly that. They are outright refusing to comply with Congress' mandates to maintain specific numbers of RELs and Comprehensive Centers. There could not be a clearer case of executive agencies and officials acting in derogation of their constitutional responsibilities, subverting "the constitutional authority of Congress." *Id.* at 267.

The Constitutional violations do not stop there. Congress' powers to set the nation's policies are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program," but "in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *Aiken Cnty.*, 725 F.3d at 261 n.1. President Nixon once claimed a

"'constitutional right' to impound appropriated funds," but as Justice Scalia explained, the Court's "decision two years later in *Train . . .* proved him wrong." *Clinton v. City of N.Y.*, 524 U.S. 417, 468 (1998) (quotations omitted) (Scalia, J., concurring in part and dissenting in part).

 If any doubt remained that the President lacks constitutional authority to impound funds based on his policy preferences, the ICA resolves it. Through the ICA, Congress has expressly limited the circumstances where the President may defer or rescind funds. Congress thus has directly spoken to the issue, and consequently the President's constitutional power is "at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring). The President must show that the Constitution affords him "conclusive and preclusive" authority in this field, which he cannot possibly show given that the Constitution affords Congress the power of the purse. *San Francisco*, 897 F.3d at 1234 (quotation omitted); *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *15 (D.D.C. Mar. 10, 2025).

Defendants thus lack any constitutional authority to delay spending or refuse to spend the $100 million that Congress appropriated specifically to the Comprehensive Center program for Fiscal Years 2024 to 2026. Defendants also lack constitutional authority to delay spending and refuse to spend IES' appropriations by shutting down the REL program that was set to receive more than $50 million from these appropriations each fiscal year.

In short, "[t]his case has serious implications for our constitutional structure. *Aiken Cnty.*, 725 F.3d at 266-67. "It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive . . . agencies to disregard federal law in the manner" done by Defendants here. *Id.*

\*\*\*

Plaintiffs are overwhelmingly likely to succeed on the merits of their APA claim that Defendants' final decisions to not operate the REL program at all, and to operate only two of the required twenty Comprehensive Centers, are contrary to the Constitution and a multitude of statutes. For these same reasons, Plaintiffs are likely to succeed on their nonstatutory claims that Defendants, in shutting down these programs, "acted beyond the scope of their powers and/or in an unconstitutional manner," "entitl[ing] [Plaintiffs] to equitable relief." *Strickland v. United States*, 32 F.4th 311, 366 (4th Cir. 2022).

Plaintiffs Child Trends and RMC are also likely to succeed on their nonstatutory claims that the termination of their specific grants, and the grants for which they served as subcontractors, were unconstitutional and in excess of Defendants' statutory authority. The termination of each individual award was the mechanism by which Defendants effectuated their unconstitutional and *ultra vires* plans, making these terminations themselves unconstitutional and *ultra vires*. Defendants therefore should be enjoined from closing out these grants and from otherwise giving effect to the termination notices.

### 2. DOGE's Termination of the Grants and Contracts Was *Ultra Vires*

The termination of Plaintiffs' grants, and the contracts and grants for which Plaintiffs served as subcontractors, were *ultra vires* because DOGE simply has no authority to terminate another agency's contracts and grants.

Defendants can hardly dispute that DOGE carried out, or at least was directly responsible for, the termination of the REL contracts and Comprehensive Center grants. The Court need not take Plaintiffs' word for it—DOGE has taken direct credit for the terminations on its website. The "Wall of Receipts" on DOGE.gov, which DOGE initially described as a "transparent

account of DOGE's findings and actions," Higham, *supra*, lists all of the terminated REL contracts and Comprehensive Center grants as among the "Savings" that DOGE has produced, *see* REL Wall of Receipts, Comprehensive Centers Wall of Receipts.

The events leading to the terminations of the Comprehensive Centers confirm that DOGE drove these terminations. The eighteen Comprehensive Centers were terminated the day after activist Chris Rufo had an exchange with Elon Musk on X denigrating the Comprehensive Centers, punctuated by Rufo posting "Hey, @DOGE_ED, let's terminate the contracts for the 'comprehensive centers.' What do you think?" Feb. 18 5:08 Rufo Post. The Department's press release on the Comprehensive Centers then cited the edited videos that Rufo had posted about the Comprehensive Centers the day before. Comprehensive Center Press Release, *supra*. It is not a mystery what happened here.[5]

DOGE's role in terminating the contracts and actions was without any lawful authority under the Constitution or federal statutes. It is well-settled that federal agencies "possess only the authority that Congress has provided." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Here, DOGE was not created by Congress and has not been vested with any powers by Congress. It is a "department" created by the President, and has no authority to conduct business of another agency. DOGE has no authority to take any actions, perhaps other than advising the President, and it certainly has no authority to cancel the contracts and grants that Congress directed the Department to administer.

---

[5] The fact that the Comprehensive Center program officers at the Department had no advance notice that the grants were going to be terminated, and no explanation of why they were terminated after it occurred, further confirms that the Department was merely a front through which DOGE acted.

Recently, another court found DOGE's actions taken at another agency to be likely *ultra vires*. In *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 2025 WL 996542, at *20 (S.D.N.Y. Apr. 3, 2025), the plaintiffs allege that improper access to records of the Office of Personnel Management "was directed and controlled by the DOGE Defendants." *Id.* at *20. The court held that the plaintiffs had convincingly pled that DOGE's actions were "blatantly lawless," and thus *ultra vires*, because "[t]he DOGE Defendants have no statutory authority with respect to OPM records." *Id.* (quotations omitted). The same is true here.

DOGE's *ultra vires* termination of Plaintiffs' grants and the contracts and grants for which Plaintiffs served as subcontractors, carried out under the purview of Defendant Gleason, should be preliminarily enjoined under this Court's equitable authority. The Court should also preliminarily enjoin Defendant Gleason, and those acting in concert or participation with her, not to terminate any open contracts or grants of Plaintiffs Child Trends and RMC across the federal government, because DOGE lacks legal authority to terminate awards at any other agency the same as it does at the Department of Education.

### 3. The Court Should Enter a Writ of Mandamus

In addition or in the alternative to affording preliminary injunctive relief, the Court should enter a writ of mandamus. This is one of the rare cases where Defendants have failed to comply with unambiguous legal duties, and Plaintiffs may lack adequate remedies otherwise, depending on the resolution of Plaintiffs' other counts.

### a. Defendants Have A Duty to Maintain Plaintiffs' Grants Unless Terminated in Accord with Department Regulations

Under the Plaintiffs' grants, the Department "obligated" the grant and its associated funds to Plaintiffs at least through the end of Fiscal Year 2025. Child Trends Grant at 3, RMC Grant at 3. Defendants had a duty to Plaintiffs to abide by that obligation unless the Department lawfully

terminated the award pursuant to the Department's regulations governing grant terminations. Here, Defendants cited 2 C.F.R. § 200.340(a)(4), a provision of Uniform Grants Guidance (UGG) issued by the Office of Management and Budget (OMB), as the basis for terminating Plaintiffs' grants. But that provision did not allow for the termination of Plaintiffs' grants.

OMB issues the UGG to serve as a template of regulations for agencies to adopt to govern financial assistance awards. *See* 2 C.F.R. part 200. Most agencies, including the Department of Education, adopt the UGG as their own regulations. 2 C.F.R. § 3474.1(a) ("The Department of Education adopts the [UGG], except for [two non-pertinent provisions]."). In 2020, OMB revised the Guidance to purport to allow agencies to terminate at any time "if an award no longer effectuates the program goals or agency priorities." 85 Fed. Reg. 49506, 49559 (Aug. 13, 2020) (revising 2 C.F.R. § 200.340(a)(2)). But in 2024, OMB revised the Guidance, and specifically 2 C.F.R. § 200.340(a)(4) and (b), to permit termination on these grounds *only* where such bases for termination are "clearly and unambiguously" stated in the terms and conditions of an award. OMB explained that under the revised Section 340, agencies may terminate a grant or award based on new program goals or agency priorities "[p]rovided that the language is included in the terms and condition of the award." 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024). This revised provision took effect on October 1, 2024, and the Department of Education confirmed that the revised UGG applied to "[a]ny Discretionary grant" awarded by the Department "with a performance period start date on or after October 1, 2024." U.S. Dep't of Educ., *Frequently Asked Questions* (July 2024), https://perma.cc/Q398-8RMJ.

Because the period of performance for the Comprehensive Center grants began on October 1, 2024, the revised Guidance applies. There is no clear and unambiguous language in the Comprehensive Center grants to Plaintiffs regarding terminating based on program goals or

agency priorities, as 2 C.F.R. § 200.340(a)(4) requires. *See* Child Trends Grant at 17, 48-49;

RMC Grant at 18, 49-50. Defendants thus are violating their mandatory duties to Plaintiffs to

maintain the grants unless terminated consistent with the applicable regulations. *See, e.g.*,

*Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 657 n.11 (D. Md. 2018) ("An agency has no

discretion to decide whether and when to abide by its own regulations."); *Adams v. Califano*, 474

F. Supp. 974, 986 (D. Md. 1979) ("A fundamental concept of administrative law is that an

agency must follow its own regulation.").

Nor do Plaintiffs appear to have an adequate remedy for this violation elsewhere.

Defendants are likely to argue that any challenge to Defendants' termination in violation of the

regulations must be brought in the Court of Federal Claims. But the Federal Circuit has held that

the Court of Federal Claims lacks jurisdiction to restore access to grant funds subject to a grant

agreement with strings attached. *See Lummi Tribe of the Lummi Rsrv., Wash. v. United States*,

870 F.3d 1313, 1318 (Fed. Cir. 2017); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196,

199 (Fed. Cir. 1997). And were Plaintiffs to pursue their claims in the Court of Federal Claims,

the United States would surely argue that grantees may not obtain money damages equal to the

gross grant funds they expected, particularly where, as here, grant funds would be distributed as

reimbursements for costs. If Defendants concede that Plaintiffs could obtain such damages in the

Court of Federal Claims, Plaintiffs will withdraw this particular mandamus request, but if

Defendants do not so concede, they should be deemed to have waived any argument that

Plaintiffs have an adequate remedy in the Court of Federal Claims.

Where Defendants have violated a mandatory duty to maintain Plaintiffs' grants, and

Plaintiffs have no adequate remedy elsewhere for the violation, a writ of mandamus requiring

Defendants to restore the grants is warranted. Other courts have required agencies to restore

terminated grants in similar circumstances. *See, e.g., Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62 (D.D.C. 2018); *Healthy Teen Network*, 322 F. Supp. 3d 647.

### b. Defendants Have Mandatory Duties to Establish and Operate the Required Numbers of Comprehensive Centers and RELs

This Court should also issue a writ of mandamus compelling Defendants to establish and operate the required number of REL contracts and Comprehensive Center grants, if Plaintiffs do not obtain a preliminary injunction providing such relief. As described *supra*, Defendants McMahon and Soldner have unambiguous duties to maintain specific numbers of contracts and grants to operate the Comprehensive Center and REL programs respectively, and they are violating those clear duties. Defendants McMahon and Soldner also have a clear duty to obligate the full amount of funds that Congress appropriated for the Comprehensive Center program, and they are violating that duty. If Plaintiffs cannot obtain relief on their other claims compelling Defendants to take these mandatory actions, mandamus relief is appropriate and necessary

Then-Judge Kavanaugh's opinion in *Aiken* is highly instructive. There, the D.C. Circuit entered a writ of mandamus where the Nuclear Regulatory Commission failed to comply with statutory requirements that it "'shall consider' the Department of Energy's license application to store nuclear waste at Yucca Mountain and 'shall issue a final decision approving or disapproving' the application within three years of its submission." *Aiken Cnty.*, 725 F.3d at 257 (citation omitted). The court had "no good choice but to grant the petition for a writ of mandamus" given the Commission's failure to abide by its legal duties. *Id.* at 266. Mandamus was needed "to correct transparent violations of a clear duty to act." *Id.* at 258 (citation omitted).

Mandamus is warranted here for the same reason. Issuing the writ would vindicate "the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress." *Id.* at 267.

24

**B. Absent Relief, Plaintiffs RMC and Child Trends Will Suffer Irreparable Harm**

Defendant's illegal actions have already caused both Child Trends and RMC substantial harm, and Plaintiffs will suffer further, irreparable harm absent immediate relief.

Already, both organizations have had to undertake significant layoffs to address losses in funding. In response to the Comprehensive Center grant terminations, Child Trends has had to lay off 12 staff members, reduce working hours for 4 additional staff, and reduce salaries for all 11 members of its leadership team. Pane Decl. ¶ 22. With REL and Comprehensive Centers work amounting to 40% of the organization's work, RMC has laid off 20% of its workforce. Dwyer Decl. ¶¶ 30-31. Both organizations anticipate either having to make additional cuts or losing seasoned members of their workforce due to the lack of security that now exists for their jobs. *Id.* ¶ 31; Pane Decl. ¶¶ 23, 27. Plaintiffs have used the process delineated in their grant termination notifications to appeal the Comprehensive Centers program terminations, but have not received any response, nor is there any timeline or formalized process to use to get additional clarification. Dwyer Decl. ¶ 31; Pane Decl. ¶¶ 23, 27.

These layoffs have had and, should they remain, will continue to have cascading effects, depriving the organizations of decades of expertise and making it more difficult to compete for contracts or grants moving forward. Dwyer Decl. ¶ 19; Pane Decl. ¶ 19. To that end, Plaintiffs intend to rehire these experts once their grants are restored, to the extent they are able. Dwyer Decl. ¶ 32; Pane Decl. ¶ 25. In the interim, Plaintiffs' leadership teams are expending time and resources addressing staffing and budget shortages that should be spent dedicated to their core missions—assisting state education agencies and other partner organizations to design, implement, and train on essential education research projects. Pane Decl. ¶ 27.

Having to disclose that their grants and subcontracts were terminated will also likely make future awards more difficult to obtain. Dwyer Decl. ¶¶ 31, 34-35. And Plaintiffs have lost trust built up over years of working with partner states and organizations, who may question the sustainability of any agreements with them moving forward. *Id.*; Pane Decl. ¶ 29.

Plaintiffs are also irreparably harmed by Defendants' broader refusal to operate REL and Comprehensive Centers as statutorily required. The Department has taken no steps to reinstate the Comprehensive Centers or REL programs, and clearly has no intent to do so anytime soon. Doe Decl. ¶ 8. The Department has fired *all* of the career staff who worked on the REL program, *Id.* ¶ 9, laying the Department's intent bare. And the Department certainly has no plans to issue new Comprehensive Center grants given Defendants' strenuous criticisms of the program writ large. *See* Comprehensive Center Press Release, *supra*. Moreover, $50 million appropriated specifically for the Comprehensive Center program, and a separate $50 million appropriated to IES that Congress intended for REL programs, will expire on September 30, 2025. Once that money expires, Plaintiffs will have forever lost the opportunity to earn contracts, grants, and subcontracts with those funds. Indeed, every day that passes means fewer funds that can be obligated to perform on the awards through the end of the fiscal year, in the unlikely chance that the grants and contracts are re-issued by Defendants.

Nor is it remotely speculative that RMC and Child Trends would receive business if given the opportunity to compete. RMC has received prime Comprehensive Center grants in *every* award cycle since 2005, and it has received subcontracts on REL contracts for more than two decades. Dwyer Decl. ¶¶ 6, 20. And while this is the first award cycle in which Child Trends has participated in the Comprehensive Center program, it was chosen for a prime grant and picked to be a subcontractor for another prime grantee's award. Pane Decl. ¶¶ 9-11.

It is well-established in the world of government contracts that the "lost [] opportunity to compete" for federal funds constitutes irreparable harm. *AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706, 740 (2021) (citing dozens of cases so holding). The Court of Federal Claims thus routinely grants injunctive relief in bid protests cases where a plaintiff "will suffer irreparable harm in the form of a lost opportunity to compete for [an] award." *T Square Logistics Servs. Corp. v. United States*, 134 Fed. Cl. 550, 560 (2017). Article III courts likewise regularly hold that the loss of an opportunity to compete for business is cognizable injury. *See, e.g.*, *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1015 (D.C. Cir. 2022); *Hughes Auto., Inc. v. Mid-Atl. Toyota Distributors, Inc.*, 543 F. Supp. 1056, 1058 (D. Md. 1982). Plaintiffs' lost opportunity to compete for business through the programs at issue is real and irreparable.

Finally, Child Trends faces enormous irreparable harm with the likely imminent termination of additional Department of Health and Human Services (HHS) contracts and grants they hold. Plaintiffs seek two forms of injunctive relief in this respect. First, Plaintiffs seek to prevent Defendants (and those acting in concert or participation with them) from terminating any of Plaintiffs' federal grants based on "program goals" or "agency priorities" where the applicable regulations under 2 C.F.R. § 200.340 do not permit termination on those bases, as was the case with Plaintiffs' Comprehensive Center grants. Second, Plaintiffs seek to enjoin Defendants (Gleason, and those acting in concert or participation with them) from terminating any of Plaintiffs' contracts or grants, where the terminations are directly undertaken, or specifically directed, by DOGE or Gleason. DOGE lacks legal authority to terminate awards at any agency, just as it lacked such authority at the Department of Education.[6]

---

[6] Plaintiffs will withdraw this requested relief, however, if Defendants represent that none of Plaintiffs' other federal contracts and grants will be terminated at agencies where DOGE is operating, during the pendency of this case.

### C. The Balance of Equities and Public Interest Merit a Preliminary Injunction

The balance of equities and public interest overwhelmingly support Plaintiffs' requested relief. Every region and state anticipating the services of the RELs and Comprehensive Centers faces irreparable harm absent immediate relief requiring the Department to operate these programs as required by law. Absent continued operation of the REL and Comprehensive Centers programs, states and partner organizations will not have the capacity to address daunting challenges they face. Across the country, RELs and Comprehensive Centers have been engaged in years-long projects or the development of project proposals, work that is either wasted or will need to be advanced at a cost to states and education organizations themselves. *See* Dwyer Decl. ¶¶ 36-41; Pane Decl. ¶¶ 12, 30. For example, the REL projects are already in year four of a five-year cycle, with significant resources already spent engaging in the development and implementation of testing. Dwyer Decl. ¶ 40. For the REL program overall, this represents approximately $240 million of taxpayer investment in multi-year testing that will not be realized. *Id.* That money is simply wasted if these projects are not completed.

Students, teachers, and communities have enormous interests in obtaining the results of these taxpayer-funded research projects, and in accessing the repository of completed resources that the Department has shut down. Projects the public will no longer benefit from range from studying emergent literacy in South Carolina's preschoolers to training and coaching teachers in rural counties in Florida in proven instructional practices in reading and math. Dwyer Decl. ¶¶ 25, 37(d). Further, the public has a significant interest in ensuring that the hundreds of millions of taxpayer dollars expended over the last several years on these programs are not wasted.

In contrast, restoring the pre-termination status quo does not impose any cost on the government, as it would require only that the government take steps it is already legally

obligated to take and expend funds appropriated for these very REL contracts and Comprehensive Center grants. Indeed, the public interest is always served by requiring the government to comply with the law. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). That is never more true than here, where the Executive Branch has shown a complete "disregard of federal law" and "the constitutional system" in which the Executive Branch operates. *Aiken Cnty.*, 725 F.3d at 266-67.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be granted and the Court should issue the accompanying proposed preliminary injunction or, in the alternative, writ of mandamus.

April 15, 2025

Respectfully submitted,

*/s/Lynn D. Eisenberg*
Daniel F. Jacobson[+]
Lynn D. Eisenberg*
Kyla M. Snow**
JACOBSON LAWYERS GROUP PLLC
*1629 K Street NW, Suite 300*
*Washington DC, 20006*
*(301) 823-1148*
*lynn@jacobsonlawyersgroup.com*

* Of Counsel

** Not admitted in the District of Columbia.
Practiced limited to matters before U.S. courts.

[+]    *pro hac vice* motion forthcoming

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Lynn Eisenberg, hereby certify that on April 15, 2025, I served the foregoing Motion for Preliminary Injunction or, In the Alternative, Writ of Mandamus, and all supporting documents, on Defendants' counsel via the Court's ECF filing system.

*/s/Lynn D. Eisenberg*
Lynn D. Eisenberg