# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHILD TRENDS, INCORPORATED et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION et al., <br><br> *Defendants*. | Case No. 8:25-cv-01154-BAH |

### DECLARATION OF NATALIA PANE

I, Natalia Pane, declare as follows:

1. I am the President and CEO at Child Trends, Incorporated (Child Trends). I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction or, in the Alternative, Writ of Mandamus. The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at Child Trends.

2. Plaintiff Child Trends is an independent, nonpartisan, not-for-profit, research organization incorporated in New York with tax-exempt status under Section 501(c)(3) of the Internal Revenue Code and a business address of 12300 Twinbrook Parkway, Suite 235, Rockville, MD 20852. We have approximately 250 staff and roughly $45 million in annual revenue.

3. Child Trends was founded in 1979 by the Foundation for Child Development to provide decisionmakers, especially Congress, data and information about child well-being. At the time, there was little known about how children in the country were faring, and we were instrumental in collecting those data. A few years later, after the release of our data, the Congressional Select

1

Committee on Children, Youth, and Families thanked Child Trends on the first page of its report and called attention to the critical role Child Trends plays in improving the scope, quality, and use of data about child and family wellbeing. Over the decades, our work has differed from other research organizations in three critical ways: (1) we focus exclusively on children and families; (2) we communicate clearly and concisely; and (3) we combine researchers from different disciplines to ensure we look at the whole child. Our work in child welfare financing, fatherhood, marriage, family structure, welfare reform, education, and mentoring have appeared across the Congressional record, committee meetings and reports, and legislation.

4.  Child Trends is now a nationally recognized nonprofit research organization that has, for over four decades, provided trusted, reliable data and analysis on the well-being of children and families. We partner with federal, state, and local agencies to deliver evidence-based insights that inform policies and practices affecting education, health, economic security, and child welfare. Our work spans a wide array of research-to-policy-and-practice activities. For example, we have developed sophisticated technical reports on financing for a select few in Congress, worked with state administrators across the country to implement evidence-based practices, developed one-minute local television news spots on research for parents that have been seen by millions. We meet decision-makers where they are, with the data they need.

5.  We are trusted to provide unbiased data and information. Every single state in the country currently cites us as a resource or cites our work on their webpages. Ohio says it best: "Child Trends promotes the well-being of all children and youth through applied research that informs public policies, builds the evidence base for what works, and mines data to identify young people who are overlooked or ill served by public systems. Their research is known for its rigor and objectivity, making Child Trends a uniquely powerful and respected voice for children and youth."[1]

---

[1] Trauma Informed Care Series Early Childhood Trauma, Part 1, Ohio Department of Children and Youth at 4,

Our research has been instrumental in shaping programs and policies that reach millions of children.

6. We are a project-based or soft-money organization; we have no meaningful source of funding outside of our ongoing contracts and grants. Despite the seemingly precarious nature of our funding, we have always maintained sufficient work and have not previously, to my knowledge, had layoffs of groups of program staff for lack of work. Our success in finding ongoing work is attributable in part to the ability to plan; we know grant lifespans (months if not years in advance) and carefully manage development cycles to prevent gaps in project work. Even under sequestration, this careful planning allowed for maintenance of staff as current projects finished out their periods of performance and new projects from other funders ramped up.

7. Approximately 80% of Child Trends' funding comes from the U.S. government, primarily the U.S. Departments of Education and Health and Human Services. Some of this funding flows through states, other jurisdictions, or partner organizations. More than half of that work is in the form of grants and cooperative agreements, which we train our staff to manage differently than contracts. Many of these grants, like the Comprehensive Centers, have extensive partnership arrangements with entities across the sector to ensure we move the field and drive change. We also use those partnerships to feed information back to the government to improve the efficiency and effectiveness of services, in alignment with what Congress intended.

8. In terms of financial health, as of January 2025, with about two months of funds in reserves, we had less than the advised benchmark for nonprofits, but we had approximately two years of work already awarded to us in grants and contracts. We were operating at about $45 million in annual revenue and had a backlog of work of approximately $90 million.

---

https://dam.assets.ohio.gov/image/upload/v1734985104/childrenandyouth.ohio.gov/For%20Providers/FCL/Early_Childhood_Trauma_Part_One.pdf

**2024-2029 Comprehensive Center Grant**

9. Although Child Trends had never led a Comprehensive Center before, we had been preparing for years and decided to enter the highly competitive process based on our reputation for delivering high-quality, evidence-based technical assistance and capacity-building services tailored to support state and local education agencies in addressing complex educational challenges. Three years ago, we hired an expert in newer methods of technical assistance within education to increase our impact on educational systems. She and I discussed at that time the possibility of greater impact through leading a Comprehensive Center or Regional Lab in the future. More than a year ago, she recruited another expert in transformational technical assistance in education to join her. They brought a unique collaborative approach focused on building human, organizational, policy, and resource capacities at both state and local education agency levels. Using networked improvement communities, adult learning theories, and implementation science, the Child Trends team proposed that we would co-develop solutions with state and local education partners.

10. On September 26, 2024, Child Trends received notice that, through the competitive process, we had won a Comprehensive Centers program grant, Absolute Priority 2 - Region 12 (Pacific 1) (later and generally referred to as Pacific East) with the Award Number S283B240036. The five-year award amount was $6,250,000. By fiscal year, the grant amounts were: FY2025 $1,250,000; FY2026 $1,250,000; FY2027 $1,250,000; FY2028 $1,250,000; FY2029 $1,250,000. The grant included a period of performance from October 1, 2024, to September 30, 2029.

11. In February of 2025, we were also finalizing our written agreement to effectuate our role as a partner organization with Education Northwest, the prime awardee on the Absolute Priority 2 - Region 11 (Northwest) with the Award Number S283B240076. Child Trends' share of the five-year award was $2,293,235. By fiscal year, the subgrant amounts were: FY2025 $458,647; FY2026

$458,647; FY2027 $458,647; FY2028 $458,647; FY 2029 $458,647. The grant included a period of performance from October 1, 2024 to September 30, 2029.

12. As customary with federal awards, and as required to meet the deadlines in our grant award, the Child Trends team began work on the grant as soon as notice of the award was given. Child Trends actively engaged chief state school officers, and their education agency teams, across the Pacific East region to confirm each state's specific high-leverage problems. Working closely with these stakeholders, Child Trends co-developed detailed service plans explicitly aimed at addressing persistent student achievement gaps in math and literacy, tailored to each state's unique educational landscape. Additionally, efforts were underway to engage key business leaders, parent representatives, and community groups to strengthen advisory board membership, ensuring partners in each state are truly guiding our work.

13. In addition to the earlier hires, to further our work, Child Trends hired two additional technical assistance specialists with extensive knowledge of the region dedicated to the Comprehensive Centers grant and subcontract and brought supporting staff onto the project.

14. During this time, we were in close communication with the Department. Our program officers at the Department of Education provided positive feedback, specifically recognizing our proactive, strategic planning process and our ability to effectively foster collaboration among stakeholders from various sectors to address lingering gaps in student achievement.

15. On February 14, 2025, our program officer acknowledged the time sensitivity of the work to be done under the grant and invited us to submit projects for provisional approval for time-sensitive work.

16. On February 19, 2025, however, Child Trends received notice that the Department was terminating our award under the Comprehensive Centers program. Awards covering 18 of the 20

Comprehensive Centers were terminated with identical notices alleging that the award "provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States."

17. Prior to receiving this notification, we had no indication that the Department had any concerns with our implementation of the award. As mentioned above, in the weeks leading to the termination, we had several communications from the Department indicating that it was preparing to approve time-sensitive projects and providing information for the remainder of the five-year award cycle.

18. Based on communications with us, it appears that our program officer was also taken by surprise by the cancellations. At 6:07 pm on February 19, we received an email from our program officer stating that she and her colleagues were "just made aware of the termination of the Comprehensive Centers program."

19. On March 17, 2025, Child Trends submitted an appeal to ED. To date, we have not received a response or any information concerning the timeline for a potential response.

20. During this time, we were not paid for work performed and had no indication that we would be paid for work performed. We formed a special task force of the board to address potential cash flow issues resulting from cuts. It was not until the week of March 24th that we received approval of our drawdown requests that we submitted on 2/20, 3/7, and 3/11 for the work leading up to the cancellation; we received the funds on 3/31 and 4/1.

**Effect of the Cancellation**

21. The effects of the Comprehensive Center grant termination are many and continue to unfold.

22. **Layoffs**: The significant loss of reimbursable work meant that we needed to take immediate steps to terminate some staff. We made the difficult decision to lay off twelve (12) staff members, our first known layoff in our over 45-year history. The layoff occurred on March 4 and included the two technical assistance experts with regional expertise. The speed with which the cuts were made also meant that we had no time to find replacement work, which often takes months. At the same time, we reduced hours for four (4) additional staff members and reduced salaries for all eleven (11) members of our leadership team. After losing additional federal work from DOGE cuts on April 3-4, we made another layoff on April 9 of nine (9) staff and required a handful of additional staff to reduce their time.

23. The remaining staff who had significant roles on the Comprehensive Center, as a result of the loss of the grant, may still need to be laid off over the next few months. These potential layoffs include the two earlier high-level educational experts, one of whom now leads and oversees the Education Research program area within Child Trends, and three support staff. We are keeping them on, but if they do not find replacement work by the fall, they are likely to be laid off.

24. Among those staff that were laid off were individuals who we had hired strategically to provide expertise on school improvement strategies with specific experience and expertise related to school administration and leadership to improve our mission work. Specifically, staff members cut included a senior technical assistance specialist with over 26 years of experience in education including as a teacher, principal, district superintendent, and school improvement specialist and another senior technical assistance specialist with over 20 years working directly with local- and

state-level education leaders to support systems improvement to support academic achievement.

25. Should our Comprehensive Centers work be reinstated with sufficient time, we anticipate restaffing to complete the work. Should the reinstatements occur before they obtain new employment, we plan to rehire the specific experts we had to dismiss, saving us time and resources in training replacements.

26. If the Court were not to restore the grant for which we received a termination notice, but did order ED to issue new Comprehensive Centers grants, we would submit proposals to serve as prime grantees and partner organizations with other applicants.

27. **Productivity & impending staff departures**. When we announced the layoffs, the entire organization's focus pivoted from strategic planning and mission to managing risk and departures. Members of the leadership team have had to divert significant time from mission-related work to cash flow analyses, scenario planning, layoff modelling, consultations with attorneys about layoffs, contract and regulation reviews, financial asset policy revisions, and board communications. Key strategic experts, essential to achieving our mission in the years ahead, have directly told me that they are actively looking for new jobs—and they are likely to get them. Our data science team, which has taken nearly a decade to build and is critical for our future as a data organization, is among them. One of two leaders of our data science area just announced that she is leaving for a new job in May.

28. **Cash flow:** We are facing significant threats of cash flow problems, which our board set up a special task force to oversee. The government is not currently, reliably paying bills. We have already seen delays in payments, inaccessibility of payments systems with no communication about when or if they would reopen, and no responses to invoices for over a month. Although the federal government is not paying bills in a timely way, we are still required to pay our vendors and subgrantees, per regulations, covering the costs out of our own cash. For example, during the month

the Comprehensive Center invoice for work performed prior to cancellation was submitted and unpaid, we needed to cover the expenses—at the same time our expenses were increasing for severance and attorney fees on layoffs. In early March, I gave an all-staff presentation in which I alerted staff that because of the way the federal government is making cuts—without timely payment of bills and without any transition time—we will have to make terminations immediately and could have cash limitations that would preclude us from paying even a modest severance. For example, in the case in which we would lose all of our federal work, assuming those projects experience the same delays as the Comprehensive Centers, we would need to cover payroll for staff time for work already done (in the month preceding the termination for which the government is withholding payment) and all of our subcontractor costs, which may well be more than one month.

29.  **Reputation, external and internal**: We have lost some trust with state and local partners. When we come back to them on a new project, they may understandably question the sustainability of the work and question any investment in partnering. We have also lost the reputation as a secure place to work where one can expect to have a career while contributing to the well-being of children and families across the country.

30.  **Mission impact:** Specific to the Comprehensive Center award alone, absent resumption of the program and reinstatement of our grant award, states and jurisdictions will not have the support that they requested and, under the program, anticipated to address their most daunting challenges, as they seek to address the persistent student achievement underperformance in math and literacy and learning loss of the pandemic. We had established relationships across the region to work with educators in a peer-to-peer model to begin to select tried-and-true evidence-based education practices and implement them together to drive K-8 math proficiency up. Relationship building is central to the model for bringing about and sustaining change—as well as resource sustainability. And our work is

9

not done in a vacuum–the lessons are shared beyond the Pacific East Region. As such, in addition to our regional partners not directly benefiting from our work, the rest of the country will not benefit from the evidence-based learnings we provide. Many of the lessons that could have been from our implementation work—such as opportunities to address the challenges specific to students' increasing drop-off in K-12 academic achievement and educational transformation approaches in highly rural contexts with limited internet connectivity—would be lost. Our region was counting on these services to help them address these issues.

31. Beyond the Comprehensive Center grant and subcontract, we face the potential loss of critical work tied to other grants we believe may be cut. For instance, one such grant is designed to identify solutions to the childcare workforce challenges and address the nation's childcare crisis—a project we lead because we house some of the country's foremost experts in early childhood education. Many of these experts are now contemplating leaving the field, at a time when their expertise is more vital than ever for both families and the broader economy.

32. Taken together—and viewed in the broader context of federal funding cuts—these threats risk, at the least, obliterating in mere months what took decades to build. At worst, should we lose all funding and be subject to significant cash delays, the cuts could pose an existential threat to our ability to survive sufficiently to effectively pursue our mission.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 15, 2025, in Rockville, Maryland.

                                                                                                                            /s/*

                                                                                                        Natalia Pane
                                                                                                        President & CEO
                                                                                                        Child Trends

*Counsel hereby certifies that she has a signed copy of the foregoing document available for inspection at any time by the court or a party to this action.

11