## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CHILD TRENDS, INC., ET AL.,

     Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
EDUCATION ET AL.,

     Defendants.

\*

\*

\*

\*

\*

\*

\* ·

Civil No. 25-1154-BAH

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Plaintiffs Child Trends, Inc. ("Child Trends") and RMC Research Corporation ("RMC") challenge the termination of statutorily authorized grant and contract programs supporting Comprehensive Centers and Regional Education Laboratories ("RELs"). Both programs aim to assist education policymakers, professionals, agencies, and schools in their quest to improve student outcomes and close achievement gaps. Plaintiffs allege that the termination of these programs runs afoul of statutory and constitutional law and seek an injunction compelling Defendants, including the United States Department of Education ("Department" or "DOE"), Linda McMahon (in her official capacity as Secretary of Education), Matthew Soldner (in his official capacity as Acting Director of the Institute of Education Sciences), Mark Washington (in his official capacity as Deputy Assistant Secretary for Management and Administration at the Department of Education), the United States Department of Government Efficiency ("DOGE"), and Amy Gleason (in her official capacities as Acting Administrator of the United States DOGE Service and Consultant and Expert to the Department of Health and Human Services), to resume

operating the full number of Comprehensive Centers and RELS as required by law and to prevent the termination of grants Plaintiffs received under both programs.

This matter is currently before the Court on Plaintiffs' motion for a preliminary injunction. ECF 16. To obtain a preliminary injunction, a movant must demonstrate: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). On May 20, 2025, the Court held a hearing on the motion. *See* ECF 35 (transcript of May 20, 2025 hearing). Upon consideration of the parties' filings and their arguments at the hearing,[1] the Court **DENIES** Plaintiffs' motion but sets an expedited schedule for deciding the matter on the merits.

---

[1] Plaintiffs filed the motion for a preliminary injunction on April 15, 2025, ECF 16, which is supported by a memorandum of law and numerous exhibits, *see* ECFs 16-1 through 16-12. Defendants filed a response on April 23, 2025, which was one day after the deadline. ECF 18. Defendants belatedly sought permission to file their untimely response, *see* ECF 19, which the Court now grants. Plaintiffs filed a reply on April 27, 2025. ECF 22. After the Court sought input from the parties on the prudence of a stay of the pending action, *see* ECF 25, Plaintiffs filed a response opposing a stay, *see* ECF 26, and Defendants filed a short letter in support of staying the case, *see* ECF 27. The Court held a hearing on the motion for a preliminary injunction on May 20, 2025. No party asked to present evidence at the hearing. Subsequently, Defendants filed a short supplement on June 2, 2025, drawing the Court's attention to a recent decision by another judge of this Court. *See* ECF 36, at 2–3 (citing *Sols. in Hometown Connections v. Noem*, Civ. No. 25-885-LKG, 2025 WL 1530318, at *14 (D. Md. May 29, 2025)). Plaintiffs responded to this notice on June 4, 2025. *See* ECF 37. On June 5, 2025, Defendants again filed a supplement, this time highlighting a recent Fourth Circuit decision as well as a decision from a fellow trial court in Washington, D.C. *See* ECF 38 (citing *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025); *Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, No. 25-CV-00999, --- F. Supp. 3d ---, 2025 WL 1568301 (D.D.C. June 3, 2025)). Plaintiffs promptly responded on June 6, 2025, noting the result in *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025), and Judge Boardman's recent opinion in *Maryland v. AmeriCorps*, Civ. No. 25-1363-DLB, --- F. Supp. 3d ---, 2025 WL 1585051 (D. Md. June 5, 2025), as supportive of their respective positions. *See* ECF 40.

## I.    BACKGROUND

Plaintiff Child Trends is a non-profit entity, incorporated in the state of New York and headquartered in Maryland, which aims "to provide decisionmakers, especially Congress, data and information about child well-being." ECF 16-3, at 2 ¶ 2 (Declaration of Child Trends President and CEO Natalia Pane).[2]  The organization "partners with federal, state, and local agencies to deliver evidence-based insights that inform policies and practices affecting education, health, economic security, and child welfare." *Id.* at 3 ¶ 4.  Plaintiff RMC is "a small business that for over four decades has specialized in (a) education research and evaluation for policy development and implementation, and (b) capacity building and technical assistance for state education agencies." ECF 16-4, at 2 ¶ 2 (Declaration of RMC Senior Vice President Christine Dwyer).  RMC is "headquartered in Portsmouth, NH and has regional offices in Arlington, VA; Tampa, FL; Denver, CO; and Portland, OR." *Id.* at 3 ¶ 2.  Both Plaintiffs work on efforts to support Comprehensive Centers programming. *Id.* ¶ 3; *see also* ECF 16-3, at 5 ¶ 9.  In addition, RMC undertakes work pursuant to the REL program. ECF 16-4, at 3 ¶ 3.

Congress established the REL program, administered by a DOE subagency called the Institute for Education Sciences ("IES"), sixty years ago and the Comprehensive Centers program thirty years ago.  ECF 16-1, at 9. The former aims to "assist education practitioners and policymakers by using research, evidence, and evidence-based practices to improve student outcomes," while the latter works with "[s]tate, local, and regional educational agencies and schools on school improvement activities, prioritizing areas with a higher percentage of students from low-income families and schools identified for improvement." *Id.* at 8–9.  Currently, both

---

[2] Page citations refer to the ECF-generated page numbers at the top of the page.

programs are authorized by the Education Sciences Reform Act of 2002[3] (20 U.S.C. § 9501 et

seq.) ("ESRA"). The portion of the statute that authorizes RELs provides that the director of IES

> shall enter into contracts with entities to establish a networked system of 10 [RELs]
> that serve the needs of each region of the United States in accordance with the
> provisions of this section.   The amount of assistance allocated to each
> [REL] . . . shall reflect the number of local educational agencies and the number of
> school-age children within the region served by such [REL], as well as the cost of
> providing services within the geographic area encompassed by the region.

20 U.S.C. § 9564(a). Section 9564 also delineates which entities constitute eligible applicants and

the process by which the IES director enters into contracts, providing that the director "shall enter

into contracts for a 5-year period" following a period of "competitions for contracts[.]" *Id.* §§

9564(e)(1)(A), 9564(e)(3). Section 9602, which authorizes the Comprehensive Centers, provides

that "the Secretary [of Education] is authorized to award not less than 20 grants to local entities,

or consortia of such entities, with demonstrated expertise in providing technical assistance and

professional development in mathematics, science, and technology, especially to low-performing

schools and districts, to establish comprehensive centers." *Id.* § 9602(a)(1).

Congress funds RELs and Comprehensive Centers through annual appropriations. Most

recently, the Appropriations Act of 2024 ("Appropriations Act" or "2024 Appropriations Act")

"provided that of the $5.78 billion lump-sum appropriated for carrying out school improvement

activities, '$50,000,000 shall be available to carry out' the Comprehensive Centers Program, with

these funds to remain available until September 30, 2025." ECF 16-1, at 9–10 (quoting Pub. L.

118–47, 138 Stat 460, 683 (Mar. 23, 2024)). The Appropriations Act also appropriated $793

million for IES, of which $53.7 million was intended for the REL program. *Id.* at 10 (citing Joint

---

[3] RELs are authorized under Title I of the statute, titled Education Sciences Reform, while
Comprehensive Centers are authorized under Title II, which is titled Educational Technical
Assistance. *See* Pub. L. 107–279, 116 Stat. 1941. For clarity, the Court will refer to the statute
encompassing both as the Education Sciences Reform Act or ESRA.

Explanatory Statement, Division–Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024, at 155, https://perma.cc/8J97-7K82 ("Joint Explanatory Statement")). In addition, the most recent Continuing Resolution to the Appropriations Act, passed in March 2025, appropriated another $50,000,000 to the Comprehensive Centers program, with funds to remain available for obligation through September 30, 2026. Pub. L. 119-4, 139 Stat. 9, 1012 (Mar. 15, 2025). However, this Continuing Resolution did not extend the deadline for the funds appropriated in 2024, and the $50 million set aside for Comprehensive Centers and the $53.7 million intended for RELs in the 2024 Appropriations Act still must be obligated by September 30, 2025. *See* Pub. L. 118–47, 138 Stat 460; Joint Explanatory Statement; *see also* ECF 35, at 15:5–13 (Plaintiffs' explanation of funding timelines).[4]

On September 26, 2024, the DOE awarded grants for Fiscal Years 2025–2029 to operate several different Comprehensive Centers, with Child Trends and RMC among the award recipients. ECF 16-3, at 5 ¶ 10; ECF 16-4, at 5 ¶ 8. The Department selected Child Trends to be the prime grantee for the "Pacific East" Comprehensive Center, ECF 16-3, at 5 ¶ 10, while it selected RMC to "receive[] the prime grant award for the Comprehensive Center for the Gulf Region," ECF 16-4, at 5 ¶ 8. Child Trends also participated as a partner organization, or subcontractor, with the prime grantee for the Northwest Comprehensive Center, ECF 16-3, at 5 ¶ 11, while RMC served a subcontractor to the Content Center on Strengthening and Supporting the Educator Workforce (SSEW), and to the National Comprehensive Center (NCC), ECF 16-4, at 5 ¶ 9.

---

[4] Plaintiffs also represented that while Congress appropriates funding for both Comprehensive Centers and RELs year by year, the Department awards grants and contracts thereunder on a five-year timeline. ECF 35, at 13:23–14:5.

In addition to the Comprehensive Centers grants, the Department also awarded REL contracts through Fiscal Years 2022–2027, with RMC entering into several subcontracts with prime grantees on the REL program. ECF 16-4, at 8–11 ¶¶ 20–28. Plaintiffs both performed substantive work under their Comprehensive Centers awards, *see* ECF 16-3, at 6 ¶¶ 12–15, while RMC also did "significant work" under its REL agreements, ECF 16-4, at 10 ¶ 23.

Just after his inauguration, President Donald J. Trump issued Executive Order 14,151, captioned "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "DEI Order"). *See* Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025). The DEI Order provided that each agency head, "in consultation with the Attorney General, the Director of OMB [the Office of Management and Budget], and the Director of OPM [the Office of Personnel Management]," shall "provide the director of the OMB with a list of all . . . [f]ederal grantees who received Federal funding to provide or advance DEI, DEIA, or environmental justice programs, services, or activities since January 20, 2021."[5] *Id.* (internal quotation marks omitted). Thereafter, DOGE was created through Executive Order 14,158. *See* Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025). In the days that followed, Plaintiffs allege that DOGE team members arrived at the DOE "and began directing agency leadership on contract and grant terminations." ECF 1, at 13 ¶ 43; ECF 16-1, at 13. Subsequently, on February 19, the DOE terminated Plaintiffs' Comprehensive Centers grants, *see* ECF 16-3, at 6 ¶ 16; ECF 16-4, at 7 ¶ 15. The Department also terminated the REL contracts under which RMC performed work as a partner organization. ECF 16-4 at 11 ¶ 28.

---

[5] "DEI" stands for Diversity, Equity, and Inclusion, while "DEIA" stands for Diversity, Equity, Inclusion, and Accessibility. *See* DEI Order.

The notice of termination sent via email to Child Trends cited their Comprehensive Center grant's purported inconsistency with "the Department's priorities," ECF 16-8, at 2, while the formal termination letter elaborated that the grant supposedly "provide[d] funding for programs that promote or take part in DEI initiatives," *id.* at 4. The termination letter sent to RMC provided the same rationale. ECF 16-9, at 2. Prior to the terminations, neither Plaintiff had any "indication that the Department had any concerns" with their implementation of the Comprehensive Centers awards. ECF 16-3, at 7 ¶ 17. Rather, in the days and weeks beforehand, both "were in close communication with the Department" and received "positive feedback" on their work. *Id.* at 6 ¶ 14; *see also* ECF 16-4, at 7 ¶ 14. According to Plaintiffs, Defendants terminated eighteen out of twenty grants under the Comprehensive Centers program and all ten REL contracts. ECF 16-1, at 14–15. Plaintiffs ascribe these terminations to DOGE. *Id.* at 13–14.[6]

On February 13, 2025, the Department issued a press release announcing that it had "terminated [ten] contracts totaling $336 million" under the REL program on the grounds that "review of the contracts uncovered wasteful and ideologically driven spending," such as the funding of "equity conversations." Press Release, DOE, U.S. Department of Education Cancels Additional $350 Million in Woke Spending (Feb. 13, 2025) (https://perma.cc/U8PM-4UPM) ("REL Press Release"). The next week, coincident with when Plaintiffs learned of the termination of their Comprehensive Centers grants, the Department put out another press release, which

---

[6] Plaintiffs allege that the terminations began after an "activist" posted about the Comprehensive Centers program on X, alleging that the program "push[ed] left-wing ideologies." ECF 16-1, at 13–14 (quoting ECF 16-7, at 2 (screenshot of the post on X)). Plaintiffs further allege that Elon Musk, the owner of X and then "the public face of DOGE," replied to the post. *Id.* (quoting ECF 16-7, at 2 (screenshot of Feb. 18 Musk reply on X)). Later that day, Plaintiffs say, the activist again posted on X, specifically tagging DOGE, and stating: "Hey, @DOGE_ED, let's terminate the contracts for the 'comprehensive centers.' What do you think?" *Id.* (quoting Christopher F. Rufo (@realchrisrufo), X (Feb. 18, 2025, 5:08 PM), https://perma.cc/SW6Q-5QRJ). The termination of the Comprehensive Centers grants occurred the following day.

announced cancellation of eighteen grants "totaling $226 million that were awarded under the Comprehensive Centers Program" on the grounds that the money had allegedly been used to "forc[e] radical agendas onto states and systems, including race-based discrimination and gender identity ideology." Press Release, DOE, U.S. Department of Education Cancels Divisive and Wasteful Grants under the Comprehensive Centers Program (Feb. 19, 2025) (https://perma.cc/N4G4-ASUV) ("Comprehensive Centers Press Release").

Plaintiffs contend that Defendants offended federal statutory and constitutional law by terminating eighteen out of twenty Comprehensive Centers and all of the RELs. Plaintiffs bring six counts in their complaint: an Administrative Procedure Act ("APA") claim (count one), ECF 1, at 27–31 ¶¶ 107–27; a constitutional *ultra vires* claim (count two), *id.* at 31–32 ¶¶ 128–33; a statutory *ultra vires* claim (count three), *id.* at 32–33 ¶¶ 134–41; an *ultra vires* claim as to DOGE (count four), *id.* at 33–34 ¶¶ 142–47; a regulatory *ultra vires* claim (count five), *id.* at 34–35 ¶¶ 148–54; and a mandamus claim (count six), *id.* at 35–37 ¶¶ 155–67. Plaintiffs separate out counts one through three into two sets of claims. The first set of claims challenges Defendants' decision to terminate eighteen of a total of twenty Comprehensive Centers awards and all REL awards, arguing that these actions violated the ESRA, the 2024 Appropriations Act (and subsequent Continuing Resolution), the Impoundment Control Act ("ICA"), U.S. Const. art. II, § 3 (the "Take Care Clause"), and the separation of powers under the Constitution (the "Program Claims"). ECF 1, at 27–33 ¶¶ 107–41 (counts one through three); ECF 16-1, at 7. Through the "non-statutory claims based on Defendants' alleged constitutional and statutory violations," Plaintiffs also challenge the terminations of Plaintiffs' specific grant awards (the "Termination Claims"). ECF 1, at 31–33 ¶¶ 128–41 (counts two through three); ECF 16-1, at 7–8.

Plaintiffs seek preliminary injunctive relief on the Program and Termination Claims as well as on their DOGE *ultra vires* claim, or, alternatively, on their mandamus claim. *See generally* ECF 16-1; ECF 22. As to their Program Claims, they seek a preliminary injunction that would "requir[e] Defendants to immediately operate the required numbers of grants and contracts, and to spend the required amounts of appropriations." ECF 16-1, at 7. As to their Termination Claims, Plaintiffs seek an injunction "both requiring Defendants to comply with their statutory requirements and prohibiting Defendants from giving effect to the termination of Plaintiffs' awards specifically."[7] *Id.* at 7–8. Further, "[i]n addition or in the alternative to affording preliminary injunctive relief," Plaintiffs also ask the Court to enter a writ of mandamus commanding Defendants to abide by their statutory and constitutional duties. *Id.* at 27.[8]

In the hearing held on May 20, Plaintiffs focused in particular on their Program Claims, arguing that they would suffer irreparable harm absent a preliminary injunction. *See* ECF 35, at 75:18–79:24. Specifically, Plaintiffs argued that Defendants' decision not to operate, or not to operate fully, the Comprehensive Centers and RELs deprives Plaintiffs of future bidding opportunities for contracts and grants under both programs, which are essential for their continued work. *Id.* at 75:22–76:8.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224,

---

[7] Plaintiffs specify that they "do not bring APA claims seeking to restore their terminated awards specifically" but only to "requir[e] Defendants to immediately operate the required numbers of RELs and Comprehensive Centers and spend the required amounts of appropriations." ECF 16-1, at 18.

[8] Plaintiffs do not appear to have moved for preliminary injunctive relief on count five. *See generally* ECF 16-1.

230 (4th Cir. 2017) (citations omitted). To obtain a preliminary injunction, the Plaintiffs must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *See Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20). When a government entity is a party to the case, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). The movant "must establish all four elements in order to prevail." *Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 746 (D. Md. 2020) (citing *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013), *abrogated on other grounds by Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022)).

"Mandamus is a 'drastic' remedy that must be reserved for 'extraordinary situations' involving the performance of official acts or duties." *Cumberland Cnty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 52 (4th Cir. 2016) (quoting *Kerr v. U.S. Dist. Ct. for the N. Dist. Of Cal.*, 426 U.S. 394, 402 (1976)). "Courts provide mandamus relief only when (1) petitioner 'has no other adequate means to attain the relief it desires'; (2) petitioner has shown a 'clear and indisputable' right to the requested relief; and (3) the court deems the writ 'appropriate under the circumstances.'" *In re Murphy-Brown, LLC*, 907 F.3d 788, 788 (4th Cir. 2018) (quoting *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380–81 (2004)) (cleaned up).

## III.   ANALYSIS

### A.  Termination and Program Claims

While Defendants generally contend that Plaintiffs' motion for a preliminary injunction should be denied because "the grant and contract terminations were not unlawful," Defendants' primary argument is that the Court does not possess jurisdiction over Plaintiffs' claims. ECF 18, at 8; ECF 35, at 39:15–22. Defendants argue that Plaintiffs' allegations are, in essence, contract

claims, and therefore must proceed before the Court of Federal Claims in accordance with the Tucker Act (28 U.S.C. §§ 1346, 1491). ECF 18, at 12 (citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)).[9] Defendants point to the Supreme Court's recent decision staying a preliminary injunction entered by the district court in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), and argue that the determination that the district court lacked jurisdiction to order payment of money under the APA in that case should also control here. ECF 18, at 13.

"The Tucker Act grants jurisdiction to the United States Court of Federal Claims 'to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort.'" *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996) (quoting 28 U.S.C. § 1491). "Jurisdiction is exclusive in the Court of Federal Claims for claims over $10,000, while district courts have concurrent jurisdiction with the Court of Federal Claims for claims at or under $10,000." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 818 (2024) (citing *Randall*, 95 F.3d at 347).

The Supreme Court has previously "recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief," which may nonetheless require the payment of some money. *Bowen v. Massachusetts*, 487 U.S. 879, 893

---

[9] "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Both the APA and the Tucker Act waive sovereign immunity; under the APA, the federal government waives sovereign immunity for suits brought by persons "suffering legal wrong because of agency action" and who seek relief "other than money damages," 5 U.S.C. § 702, while the Tucker Act waives sovereign immunity for "any claim against the United States" founded in "express or implied contract with the United States," 28 U.S.C. § 1491(a)(1).

(1988). "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.*

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act." *United States v. Mitchell*, 463 U.S. 206, 216 (1983). Rather, a claim must be one for "money damages against the United States." *Id.* "To determine whether a plaintiff seeks primarily injunctive relief such that a district court has jurisdiction over [a plaintiff's] claim, courts must look to the 'essence' of the complaint and whether the relief requested is 'not . . . an incident of, or collateral to, a monetary award.'" *Coleman*, 74 F. 4th at 615–16 (quoting *Randall*, 95 F. 3d at 347). "The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968.[10]

---

[10] Plaintiffs argued at the May 20 hearing that *Megapulse* applied specifically to APA claims that "relate[] in some way to an existing actual contractual agreement." ECF 35, at 73:20-24. Plaintiffs thus urge the Court not to apply *Megapulse* here because the Program Claims do not relate to "actual contracts," *id.* at 80:4-6, and because the Termination Claims are not raised under the APA, which, in Plaintiffs' view, would preclude the application of *Megapulse* since its "two-part test is paper specific to the APA," *id.* at 81:7-8. However, numerous other recent cases appear to apply *Megapulse* to claims involving both APA challenges to general agency action as well as the same kind of standalone constitutional challenge that Plaintiffs bring here. *See, e.g.*, *San Francisco United Sch. Dist. v. AmeriCorps*, No. 25-CV-02425, 2025 WL 1180729, at *6–7 (N.D. Cal. Apr. 23, 2025) (applying *Megapulse* to claims alleging "violations of the Spending Clause" as well as "provisions of the APA"); *Am. Bar Ass'n v. Dep't of Just.*, No. 25-cv-1263, --- F. Supp. 3d ---, 2025 WL 1388891, at *5 (D.D.C. May 14, 2025) (applying *Megapulse* to a standalone First Amendment claim). As such, the Court does not find this reasoning persuasive and sees no reason to ignore *Megapulse* or, more importantly, the recent Fourth Circuit decision in *Sustainability Institute v. Trump*, which, while not citing explicitly to *Megapulse*, essentially applied it in finding that "[w]hile the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Sustainability Inst.*, 2025 WL 1587100, at *2.

1. Grant Termination Claims

    *i.*    *Jurisdiction and Likelihood of Success on the Merits*

The Court is unable to conclude that Plaintiffs are likely to succeed on the merits of their

Termination Claims in the face of Defendants' jurisdictional challenge. And though Plaintiffs urge

the Court to see it differently, *see* ECF 40, at 1, a recent decision from the Fourth Circuit only

lends further support to this determination. In that case, *Sustainability Institute v. Trump,* No. 25-

1575, 2025 WL 1587100 (4th Cir. June 5, 2025), the Fourth Circuit stayed a lower court's

preliminary injunction requiring the government to restore certain grants that were funded by

statute, finding that the government was likely to succeed in showing that the district court lacked

jurisdiction over such claims.[11]

At issue in *Sustainability Institute* is the legality of cutting congressionally mandated

grants, including some issued by the Environmental Protection Agency ("EPA") "under the

Environmental and Climate Justice Block Grants program, a $2.8 billion dollar appropriation that

provided that the [EPA] 'shall . . . award grants for periods of up to 3 years . . . that benefit

disadvantaged communities . . . .'" *Sustainability Inst. v. Trump*, No. 25-CV-2152, --- F. Supp.

3d ---, 2025 WL 1486979, at *2 (D.S.C. May 20, 2025) (*Sustainability Inst. II*) (citing 42 U.S.C.

§ 7438(a)(1), (b)(1)). In that case, the plaintiffs, who filed suit against numerous government

defendants, were recipients of the grants, and they alleged that "the freezing and/or terminating of

their grants violated their rights under the United States Constitution and the [APA]." *Id.* at *1.

Ahead of the lower court's ruling on the plaintiffs' motion for a preliminary injunction, the

---

[11] The Court cites to the Fourth Circuit opinion as *Sustainability Inst.* It also cites to two previous decisions of the lower court. The first, *Sustainability Institute v. Trump*, No. 25-CV-2152, WL 1486978 (D.S.C. Apr. 29, 2025) was a jurisdictional ruling and is abbreviated as *Sustainability Inst. I* in citation. The latter, *Sustainability Inst. v. Trump*, No. 25-CV-2152, --- F. Supp. 3d ---, 2025 WL 1486979 (D.S.C. May 20, 2025), granted plaintiffs' motion for a preliminary injunction and is cited to as *Sustainability Inst. II.*

government defendants largely conceded the merits of the plaintiffs' APA claims and "recognized that a judgment [on those claims] would require [d]efendants to fund or negotiate grant agreements[.]" *Id.* at *3. On May 20, 2025, the lower court issued a preliminary injunction holding that the "freeze and/or termination" of many of the grants "were *ultra vires* acts outside the legal authority of the [relevant federal agencies] and in violation of the United States Constitution, constituting unlawful agency action under [the APA]." *Id.* at *4. The lower court "[s]et[] aside the freeze and/or termination" of the grants at issue and "[e]njoin[ed] the [relevant agencies] from freezing, terminating or otherwise interfering with the funding of [the relevant grants] without written authorization from [the trial court]." *Id.* After the lower court denied a stay of its preliminary injunction, the agency defendants appealed and requested a stay pending appeal. *Sustainability Inst.*, 2025 WL 1587100, at *1.

The Court cannot understate the similarity of the claims at issue in *Sustainability Institute* to those raised by Plaintiffs in their Termination Claims. For example, as the trial court in *Sustainability Institute* noted:

> Plaintiffs' primary purpose in bringing their claims is to seek equitable, not monetary, relief. They do not bring claims for past pecuniary harms. Rather, like the plaintiffs in *Bowen*, Plaintiffs' claims are to preserve their ongoing and prospective agreements with the Government. Plaintiffs have an ongoing relationship with the government and seek declaratory and injunctive relief to confirm the Government's future obligations towards Plaintiffs under [relevant statutes]. Plaintiffs' claims are about the process in which their grants were frozen, not the monetary awards in the grants themselves.

*Sustainability Inst.*, 2025 WL 1486978, at *4. This is nearly identical to the relief sought here. Plaintiffs bring claims under the APA, as well as nonstatutory claims seeking equitable relief, namely to "enjoin Defendants to not give effect to the termination notices to Plaintiffs and, in addition or in the alternative, require Defendants to immediately operate the required numbers of

RELs and Comprehensive Centers and spend the required amounts of appropriations." ECF 16-1, at 18.

The similarities between the two cases do not end there. In *Sustainability Institute,* the district court reasoned that plaintiffs had alleged harms that could "only be remedied by specific, not monetary, relief" and that the grant terminations and funding freezes at issue would cause harms that "[m]oney damages will not resolve," including lost "jobs, suspension of research and community initiatives, loss of goodwill, and harm to the [p]laintiffs' reputation." *Sustainability Inst. I,* 2025 WL 1486978, at *4. However, in ordering a stay of the preliminary injunction, the Fourth Circuit disagreed with this reasoning. *Sustainability Inst.,* 2025 WL 1587100, at *2. The type of harm alleged in *Sustainability Institute* is precisely what Plaintiffs allege here, as they argue that the grant terminations pose risks to their immediate funding needs and operational capacity, injury to their mission of addressing challenges in education, and potential harm to their reputation. *See* ECF 16-3, at 8–10 ¶¶ 22–29; ECF 16-4, at 11–16 ¶¶ 29–39. Simply stated, therefore, there is little daylight between the grant termination claims at issue in *Sustainability Institute* and the Termination Claims before the Court here.

Most notably, in staying the lower court's decision in *Sustainability Institute,* the Fourth Circuit explicitly determined that the government defendants were "likely to succeed in showing" that the Court of Federal Claims, not the district court, had exclusive jurisdiction pursuant to the Tucker Act over claims challenging the cancellation or suspension of individual federal grants, regardless of the framing of such claims. *Sustainability Inst.,* 2025 WL 1587100, at *2. In doing so, the court emphasized that while federal law, including appropriations statutes, "authorize[s] the agencies to award grants, it is the operative grant agreements which entitle any particular [p]laintiff to receive federal funds." *Id.* Relevant to Plaintiffs' Termination Claims, the court

expressed skepticism that "*ultra vires* claims, which allege the [g]overnment violated the Constitution when it terminated or suspended [p]laintiffs' grants, would provide a detour around the Tucker Act." *Id.*

The Court is mindful that a stay of a preliminary injunction is not a decision on the merits, *see Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring), and stresses both that the Fourth Circuit did not make a final merits determination in *Sustainability Institute* and that the Court is not doing so here. The Court is also conscious of Plaintiffs' argument that there is existing precedent that appears not to be called into question either by the result in *Sustainability Institute* or by the Supreme Court's decision in *California*, on which the Fourth Circuit relied. *See* ECF 40, at 3.[12] Still, a panel opinion of the Fourth Circuit has held that the government is likely to succeed in showing that the Tucker Act precludes Article III courts from exercising jurisdiction over *any* claims pertaining to individual grant agreements, even if those claims are brought as constitutional or *ultra vires* actions. *Sustainability Inst.*, 2025 WL 1587100, at *2. In light of the panel decision in *Sustainability Institute*, the Court is unable to conclude that has jurisdiction over

---

[12] Plaintiffs maintain that this Court is bound by *Webster v. Doe*, 486 U.S. 592 (1988), and its progeny, in which the Supreme Court required "an express—not implied—statement from Congress where it seeks to provide no judicial forum at all for a party to challenge the constitutionality of a government action." ECF 40, at 3 (citing *Webster*, 486 U.S. at 603). However, the United States Court of Appeals for the D.C. Circuit appeared to disagree when, in *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *5 (D.C. Cir. May 3, 2025), it suggested that *Webster* does not pose a bar in sending claims pertaining to specific grants to the Court of Federal Claims, even if brought as constitutional claims. However, this decision was later set aside by the en banc circuit in *Middle E. Broad. Networks, Inc. v. United States of Am.*, No. 25-5150, 2025 WL 1378735 (D.C. Cir. May 7, 2025). The Fourth Circuit's recent panel decision further complicated matters when it cited to Supreme Court precedent noting that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to . . . *implied* statutory limitations." *Sustainability Inst.*, 2025 WL 1587100, at *2 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)) (emphasis added).

Plaintiffs' Termination Claims and thus cannot determine that Plaintiffs are likely to succeed on the merits of their Termination Claims for the purposes of preliminary injunctive relief.

### 2. Program Claims

#### i.    Jurisdiction

It is less clear that the decision in *Sustainability Institute* has bearing on the Court's ability to hear Plaintiffs' Program Claims, which do not challenge the cancellation of Plaintiffs' individual grants and contracts but rather challenge the Defendants' decisions "not to operate the REL program at all, and to operate only two of the required twenty Comprehensive Centers." ECF 16-1, at 25. In assessing whether the Court has jurisdiction over the Program Claims, the Court looks to the two-part evaluation announced in *Megapulse*, which the Fourth Circuit endorsed in *United States v. J&E Salvage Co.*, 55 F.3d 985, 987–88 (4th Cir. 1995).[13]   The first prong of the *Megapulse* test, as noted above, examines the "source of the rights upon which" a plaintiff bases their claims. 672 F.2d at 968.

Plaintiffs ground their Program Claims in the APA, arguing that the decision to suspend the REL and Comprehensive Centers programs violates numerous statutes and constitutional provisions and is thus "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory . . . authority." *See* ECF 1, at 27 ¶ 108 (citing 5 U.S.C. § 706 (2)(A)-(C)). Plaintiffs also bring their Program Claims as standalone constitutional and *ultra vires* actions, *see* ECF 1, at 31–33 ¶¶ 128–141, though the same constitutional and *ultra vires* claims represent part of their "contrary to law" APA claim. Though Plaintiffs did have individual grants and contracts through the two programs, they do not  base their Program Claims

---

[13] Other courts in this District have also applied *Megapulse*. *See Sols. in Hometown Connections*, 2025 WL 1530318; *Sci. Sys. & Applications, Inc. v. U.S.*, Civ. No. 14-2212-PWG, 2014 WL 3672908 (D. Md. July 22, 2024); *Lockheed Martin Corp. v. Def. Cont. Audit Agency*, 397 F. Supp. 2d 659 (D. Md. 2005).

on those agreements, or even cite to the text of the agreements as a source for their claims. Indeed, at the hearing held on May 20, Plaintiffs averred that in a hypothetical scenario involving no specific grant agreements but merely the recission of the programs, they would still seek to bring the same statutory and constitutional claims as to the program cancellations as an aggrieved party that had lost the opportunity to bid on contracts to operate the Comprehensive Centers and RELs. ECF 35, at 75:1–6. The mere existence of grants and contracts does not mean that Plaintiffs' claims are "necessarily on the contract and therefore directly within the Tucker Act." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106–07 (D.C. Cir. 2022). And the fact that Plaintiffs allege that Defendants "us[ed] [their] contracting powers as a means to retaliate" likewise do not "transform" Plaintiffs' claims into contractual ones. *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 68 (D.D.C. 2009), *aff'd sub nom., Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011). As such, the Court determines that the Plaintiffs are likely to succeed in showing that the Program Claims should remain in federal district court. However, as the Court will discuss below, a preliminary injunction is nonetheless inappropriate as Plaintiffs have failed to establish irreparable harm.

## ii.    *Irreparable Harm*

As to their Program Claims, Plaintiffs ask the Court to bar Defendants from "carrying out or effectuating" their decisions to "not obligate the funds" appropriated by Congress for both programs and order them to "immediately maintain the statutorily required number of RELs and Comprehensive Centers." ECF 34-1, at 2. To obtain such relief, Plaintiffs must demonstrate, *inter alia*, that they are "likely to suffer [irreparable] harm in the absence of injunctive relief." *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 172 (4th Cir. 2019), *as amended* (Oct. 31, 2019). "[T]he basis of injunctive relief in the federal courts has always been irreparable harm,"

and so the Court's analysis begins there.[14] *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

To establish irreparable harm, a plaintiff "must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted). Additionally, the harm "must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (quotations and citations omitted). And a plaintiff seeking a preliminary injunction has the burden to provide a "clear showing" that the "irreparable harm to be suffered by the plaintiff from a denial of the relief [is] both 'actual' and 'immediate[.]'" *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Dan River, Inc. v. Icahn*, 701 F.2d 278, 284 (4th Cir. 1983)).

Though the Court has no doubt that the harm alleged by Plaintiffs is real, their requested relief is simply too dependent on unknown future events to justify the "extraordinary remedy" sought here. *Winter*, 555 U.S. at 24. To elaborate, the harm that Plaintiffs articulate for their Program Claims concerns the loss of the opportunity to bid for contracts and grants under the Comprehensive Centers and REL programs. ECF 16-1, at 32. Plaintiffs note that they are established entities in this field, with a long track record of successful participation in the programs, and thus they have a probable expectation of competitiveness in bidding for grants and contracts. *See* ECF 16-4, at 2 ¶ 3; ECF 16-3, at 5 ¶ 9 (detailing Plaintiffs' history and experience in this area); ECF 35, at 79:17–20 (explaining that Plaintiffs are well positioned to bid for and win business). At the hearing held on May 20, Plaintiffs stressed that the loss of the opportunity to

---

[14] Courts may begin their analysis of a motion for a preliminary injunction with any of the *Winter* factors. *Washington Post v. McManus*, 355 F. Supp. 3d 272, 305 (D. Md. 2019), *aff'd*, 944 F.3d 506 (4th Cir. 2019).

participate in the programs would constitute an irreparable harm to their organizations, emphasizing that the expiration of much of the congressionally appropriated funds on September 30 is both irreversible and imminent.[15]  ECF 35, at 75:22–76:13.  And throughout the course of this action, Plaintiffs have repeatedly reiterated that their Program Claims seek an order obligating Defendants to "immediately maintain the statutorily required number of RELs and Comprehensive Centers" and to obligate the congressionally appropriated funds for both programs before they expire.  ECF 34, at 2.

As an initial matter, the Court acknowledges that the type of harm alleged by Plaintiffs— the loss of the right to bid—appears to register as an injury for Article III standing purposes.  *See LSP Transmission Holdings II*, 45 F.4th at 989; *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004 (D.C. Cir. 2022).  However, the Court is reluctant to conclude that such harm is irreparable to the extent that preliminary injunctive relief is warranted.  The chief problem is whether this harm is "imminent."  *Mountain Valley Pipeline*, 915 F.3d at 216.  Here, the crucial deadline Plaintiffs identify in relation to their Program Claims is September 30, 2025, when the funds set aside by Congress for Comprehensive Centers and RELs in the 2024 Appropriations Act will lapse.  That date is far enough away to make it difficult for the Plaintiffs to argue, and the Court to decide, that the harm of losing the opportunity to bid is imminent and therefore

---

[15] The Court acknowledges that Plaintiffs allege other harms that are actively ongoing, such as risks to their immediate funding needs and operational capacity, injury to their mission of addressing challenges in education, and harm to their reputation. *See* ECF 16-3, at 8–10 ¶¶ 22–29; ECF 16-4, at 11–16 ¶¶ 29–39. However, at the hearing, Plaintiffs stressed that the irreparable harm connected to their Program Claims was the loss of the opportunity to bid for grants and contracts under the Comprehensive Centers and REL programs. ECF 35, 75:18–76:8. The Court has considerable doubts as to whether the more immediate harms to Plaintiffs' day to day operations would be redressable by the relief requested as part of Plaintiffs' Program Claims. *See California v. Texas*, 593 U.S. 659, 671 (2021) ("To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered.").

irreparable. *See Direx Israel*, 952 F.2d at 816 (emphasizing that "where the harm is admittedly not present or immediate but merely problematic," injunctive relief is unavailable).

This uncertainty is amplified further by the recent decision from Judge Joun in the District of Massachusetts in *New York v. McMahon*, Civ. No. 25-10601, --- F. Supp. 3d ---, 2025 WL 1463009 (D. Mass. May 22, 2025), which ordered the government to reinstate all federal DOE employees "whose employment was terminated or otherwise eliminated," *id.* at *40. Previously, Plaintiffs had supported their argument that the loss of the opportunity to bid for grants was irreparable in large part by citing to the Department's decision to place all REL program staff members, including those responsible for oversight of Department grants and contracts, on administrative leave, with final termination of their employment set to occur by June 10. ECF 16-12, at 3 ¶ 7. Plaintiffs indicated that such a wholesale staff loss would render the government incapable of managing funding for, and thus operating, the programs. *See* ECF 35, at 8:15–9:1. However, Judge Joun's order required the Department to reinstate *all* Department employees who had been placed on administrative leave, necessarily encompassing those employees responsible for management of Comprehensive Centers and RELs. And last week, the First Circuit declined to stay the order pending the government's appeal. *See Somerville Pub. Schs. v. McMahon*, No. 25-1495, --- F.4th ---, 2025 WL 1576570 (1st Cir. June 4, 2025). It is true that the practicability and longevity of that order remains to be seen.[16] However, that simply underscores the point that there is too much uncertainty to be able to conclude how and when, or even whether, the alleged harm will materialize.

---

[16] Notably, the government has filed an application for a stay of the injunction with the Supreme Court. *See* Application to Stay Injunction, *McMahon v. New York*, No. 24A1203 (2025). At this stage, the Supreme Court has not made any ruling on the application but has requested a response from the plaintiffs, due by 4 p.m. on June 13, 2025. *See* Response to Application Requested by Justice Jackson, *McMahon v. New York*, No. 24A1203 (2025).

Now that the Department has been ordered to restore all employees to work, Plaintiffs' argument that they face immediate and irreparable harm rests primarily on two points: the characterization of the terminations as "savings" on DOGE's website, *see* ECF 16-10, and the Defendants' inability to identify concrete steps taken to restore the Comprehensive Centers and RELs to the extent required by statute, *see* ECF 35, at 51:7–11. While the DOGE proclamation and Defendants' inability to articulate any effort to fully resuscitate the shuttered programs certainly suggest that Defendants intend to entirely cancel RELs and Comprehensive Centers, these two pieces of evidence fall short, at least at this preliminary stage, of sufficiently establishing a clear intent not to fund or operate both programs. The Court acknowledges that Defendants have produced very little that shows substantive efforts to reallocate the remaining appropriated funds, and at the hearing Defendants were "not prepared to answer" questions about future plans. ECF 35, at 41:16–17. At the same time, however, the press release announcing the termination of the REL contracts stated that the Department "plans to enter into new contracts that will satisfy the statutory requirements[.]"    REL Press Release.    And though the vast majority of the Comprehensive Centers grants were cancelled, two out of eighteen were still left operational. *See* Comprehensive Centers Press Release.

The picture the Court has before it is therefore mixed and incomplete. On the one hand, Defendants have yet to articulate a clear plan for, let alone provide evidence of, moving forward with either program. On the other hand, some of the government's public statements and the partial continuation of at least some grants, as well as the reinstatement of relevant employees within the Department, suggest that wholesale cessation of the Comprehensive Centers and RELs

is not a foregone conclusion. At this juncture, the record is too underdeveloped to permit the Court to fully and reliably assess the imminence of irreparable harm to the Plaintiffs.[17]

### iii.   Remaining Winter Factors

It bears noting that in declining to issue a preliminary injunction, the Court is not denying that Plaintiffs are likely to show success on the merits on their Program Claims, as the available evidence does suggest that the decision to shutter the Comprehensive Centers and RELs may very well represent a final agency action that flatly contradicts the express direction of Congress. *Cf. Rhode Island v. Trump,* No. 1:25-cv-128, --- F. Supp. 3d ---, 2025 WL 1303868, at *12–14 (D.R.I. May 6, 2025) (finding that plaintiffs were likely to show that unilateral administrative termination of grant programs established by Congress and funded through congressional appropriations both offended the constitutional separation of powers and was contrary to law under the APA); *AIDS Vaccine Advoc. Coal. v. Dep't of State,* Civ. No. 25-00400, --- F. Supp. 3d ---, 2025 WL 752378, at *17 (D.D.C. Mar. 10, 2025) (determining that plaintiffs were likely to succeed on their claims that administrative suspension of all congressionally appropriated foreign aid violated the separation of powers); *Cmty. Legal Servs. in E. Palo Alto v. Dep't of Health and Hum. Servs.,* No. 25-cv-02847, --- F. Supp. 3d ---, 2025 WL 1233674, at *9 (N.D. Cal. Apr. 29, 2025) (finding plaintiffs likely to succeed on their claims that administrative suspension of all funding for unaccompanied children in immigration proceedings violated the Trafficking Victims Protection Act ("TVPRA") and was therefore contrary to law under the APA).

---

[17] It also bears mentioning that the Fourth Circuit noted in *Sustainability Institute* that ordering the government to refund terminated programs at the preliminary injunction stage may represent an "irreparable harm" *to the government* in that it would be "forced to disburse funds from a finite appropriation and will not be able to recoup those funds once expended." *Sustainability Inst.,* 2025 WL 1587100, at *2 (citing *California,* 145 S. Ct. at 969).

Moreover, weighing the equities and the public interest arguably tips in favor of Plaintiffs, as Defendants are not harmed by a court's issuance of a preliminary injunction preventing it from implementing activities likely to be found unconstitutional. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Rather, there is "substantial" public interest in "having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). And regardless of whether their harms are redressable by their proposed remedy or immediate enough to justify a preliminary injunction, Plaintiffs have alleged several harms that threaten their operation and ability to enact their mission. *See* ECF 16-3, at 10 ¶ 30; ECF 16-4, at 13 ¶ 36. Defendants respond that it is in the public interest to end discrimination (presumably referring to "DEI"), but they do not actually provide evidence of the supposedly unlawful practices found to have occurred. Even the press releases detailing the purportedly "woke" programming is vague and provides little supporting evidence of the extent of such practices.[18]

Thus, while the Court declines to issue a preliminary injunction, it nonetheless recognizes that an expedited schedule for the resolution of this case is appropriate here and is convinced that the relevant administrative record is likely to be concise and manageable. As such, the Court

---

[18] The press release announcing the termination of eighteen Comprehensive Centers grants alleged that the funding had been used to promote "radical agendas," such as teaching on "race-based discrimination and gender identity ideology." Comprehensive Centers Press Release. This press release contained four links purporting to show evidence of such conduct, with each link leading to posts on X featuring short excerpts from training videos or, in one instance, a brief excerpt from a training paper. *Id.* At the hearing, Plaintiffs contended both that they were not involved in any of the challenged conduct and that such conduct occurred in prior Comprehensive Centers that no longer exist. ECF 35, at 30:21–31:2. The Department's press release concerning the termination of the ten RELs merely said that the contracts represented "wasteful and ideologically driven" "woke spending" and did not provide any links. REL Press Release.

intends to accelerate a resolution on the merits of the case, with a desired deadline in early to mid-July for the parties to complete all filings. The schedule will be as follows:

- Deadline to file Administrative Record                    June 18, 2025

- Deadline for Cross Motions for Summary Judgment           July 9, 2025

- Deadline for Responses                                     July 16, 2025

If the need to change the schedule arises, the parties are directed to confer and jointly submit a proposed modification for the Court's consideration. Absent agreement of the parties, there will be no change to the proposed schedule.

### B. Mandamus and *Ultra Vires* Claim against DOGE

As a final matter, the Court addresses together the remaining claims upon which Plaintiffs have moved, beginning with the *ultra vires* claim against DOGE. The Court cannot conclude that Plaintiffs have shown they are likely to succeed on the merits of this claim. Though Plaintiffs point to the characterization of the cancellations as "savings" on DOGE's website, ECF 35, at 34:7–13, the Court is cognizant that it may well be the case that the DOE defendants already shared the same views and priorities as DOGE, suggesting that the terminations were not necessarily at the instigation of DOGE, and thus minimizing the likelihood of success on the DOGE claim. *See Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, Civ. No. 25-702-JRR, --- F. Supp. 3d ---, 2025 WL 833917, at *16 n.11 (D. Md. Mar. 17, 2025).

Nor is a writ of mandamus warranted in this case. As indicated *supra*, a writ of mandamus may issue only when there is no other relief available to a petitioner. *In re Murphy-Brown*, 907 F.3d at 788. Moreover, a petitioner must show they have a "clear and indisputable" right to the relief requested. *Cheney*, 542 U.S. at 380–81. Given the foregoing analysis, the Court cannot conclude that Plaintiffs have made such a showing, and mandamus is therefore unavailable.

## IV.   **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is DENIED.

A separate implementing Order will issue.

Dated: <u>June 11, 2025</u>

_____/s/_____

Brendan A. Hurson
United States District Judge
