**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CHILD TRENDS, INCORPORATED et al.,    | Case No. 8:25-cv-01154-BAH

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION et al.,

*Defendants*.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTUAL AND LEGAL BACKGROUND ......................................................................2

    A.  Congress Mandates the Operation and Funding of Regional Education Laboratories and Comprehensive Centers ...............................................................................................2

    B.  The Department Awards Comprehensive Center Grants for the 2024-2029 Cycle ...........4

    C.  The Department Awards REL Contracts for the 2022-2027 Cycle ...................................6

    D.  The Department Shuts Down the Comprehensive Centers and REL Programs .................6

LEGAL STANDARD........................................................................................................ 10

ARGUMENT .................................................................................................................... 10

    A.  This Court Has Jurisdiction to Hear Plaintiffs' Claims ................................................ 10

        1. Plaintiffs' Program Claims Challenge Discrete, Final Agency Action ...................... 10

        2. The Tucker Act Does Not Strip this Court of Jurisdiction ........................................ 12

            a. Plaintiffs' Program Claims.................................................................................... 12

            b. Plaintiffs' Termination Claims .............................................................................. 14

    B.  Plaintiffs are Entitled to Summary Judgment on the Program Claims ........................... 18

        1. Defendants Are Violating the Education Sciences Reform Act and the Educational Technical Assistance Act ........................................................................................ 19

        2. Defendants Are Violating Appropriations Statutes .................................................... 20

        3. Defendants Are Violating the Impoundment Control Act........................................... 22

        4. Defendants Are Violating the Separation of Powers .................................................. 24

        5. Plaintiffs Are Entitled to a Writ of Mandamus on the Program Claims...................... 25

    B.  Plaintiffs Are Entitled to Summary Judgment on Their Termination Claims ................. 25

    C.  The Court Should Declare Unlawful and Set Aside Defendants' Actions Underlying the Program Claims ...................................................................................................... 26

    D.  The Court Should Enter a Permanent Injunction on Both Sets of Claims....................... 26

        1. Plaintiffs are Suffering Injury that Damages Cannot Cure .......................................... 27

        2. The Balance of Equites and Public Interest Favor a Permanent Injunction ................ 29

CONCLUSION.................................................................................................................. 30

CERTIFICATE OF SERVICE .......................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706 (2021) ................................................. 27

*Am. Council of Learned Societies v. McDonald*, No. 25-cv-3657 ................................................ 13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 10

*CC Distributors, Inc. v. United States*, 883 F.2d 146 (D.C. Cir. 1989) ........................................ 27

*Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998) ............................................. 17

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ...................................... 26

*City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021) .............................................. 29

*City of New Haven. v. United States*, 809 F.2d 9001 (D.C. Cir. 1987) ......................................... 23

*City of New York v. U.S. Dep't of Def.*, 913 F.3d 423 (4th Cir. 2019) ........................................ 11

*Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932 (9th Cir. 2025) ................................... 17

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017) ......................................... 28

*Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004 (D.C. Cir. 2022) .............. 13, 27

*Collins v. Dep't of the Treasury*, 83 F.4th 970 (5th Cir. 2023) .................................................... 15

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ........................... 26

*Dalton v. Specter*, 511 U.S. 462 (1994) ..................................................................................... 1

*Deese v. Esper*, 483 F. Supp. 3d 290 (D. Md. 2020) .................................................................. 10

*Department of Education v. California*, 145 S. Ct. 966 (2025) .............................................. 14, 25

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ............................................................. 26

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*,
    2025 WL 1865971 (D. Md. July 7, 2025) .............................................................................. 18

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) ........................................................................... 14

*First Fed. Sav. & Loan Ass'n of Durham v. Baker*, 860 F.2d 135 (4th Cir. 1988) ........................ 25

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) .................................................................... 17

*Global Health Council v. Trump*, No. 25-5097 (D.C. Cir. May 9, 2025) ..................................... 13

*Harris Cnty., Texas v. Kennedy*, 2025 WL 1707665 (D.D.C. June 17, 2025) ............ 16, 18, 24, 25

*Hatzlachh Supply Co., Inc. v. United States*, 444 U.S. 460, 463 (1980) ...................................... 12

*Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44 (D.C. Cir. 2013) ...................... 10

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) .......................................................... 20, 24, 25

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................................... 28

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995) ........................................................... 15

*Maryland v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051 (D. Md. June 5, 2025) ........ 11, 12

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ............................................................ 13

*NAACP v. Bureau of the Census*, 945 F.3d 183 (4th Cir. 2019)................................................ 11

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
   2023 WL 5221367 (D.D.C. Aug. 15, 2023)...................................................................... 10

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................................... 26

*PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 444 (D. Md. 2025)................................................ 30

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) .................................................................. 30

*Sierra Club v. United States Army Corps of Engineers*, 909 F.3d 635 (4th Cir. 2018)............... 29

*Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022)........................................................ 14

*Sustainability Institute v. Trump*, No. 25-1575 (4th Cir. June 5, 2025)......................... 1, 15, 16

*T Square Logistics Servs. Corp. v. United States*, 134 Fed. Cl. 550 (2017) ............................... 26

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994).............................................................. 14

*Tootle v. Sec'y of Navy*, 446 F.3d 167 (D.C. Cir. 2006) ............................................................ 17

*Train v. City of New York*, 420 U.S. 35 (1975).......................................................................... 21

*United States v. North Carolina*, 192 F. Supp. 3d 620 (M.D.N.C. 2016) ................................... 29

*Webster v. Doe*, 486 U.S. 592 (1988) ................................................................................... 1, 15

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9 (2018)............................................ 23

*Widakuswara v. Lake,* 2025 WL 1288817 (D.C. Cir. May 3, 2025) .......................................... 16

*Widakuswara v. Lake*, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ........................................ 16

**Statutes**

2 U.S.C. § 681(3) ................................................................................................................... 23

2 U.S.C. § 682 ........................................................................................................................ 22

2 U.S.C. § 682(1) ................................................................................................................... 22

2 U.S.C. § 683(a) ................................................................................................................... 22

2 U.S.C. § 684(a) ................................................................................................................... 22

2 U.S.C. § 684(b) ................................................................................................................... 22

5 U.S.C. § 702 ........................................................................................................................ 14

5 U.S.C. § 706(2) .............................................................................................................. 18, 26

20 U.S.C. § 9564(a) ............................................................................................................. 3, 19

20 U.S.C. § 9564(b) ................................................................................................................ 19

20 U.S.C. § 9564(e) ............................................................................................................. 3, 19

20 U.S.C. § 9564(f).................................................................................................................. 19

20 U.S.C. § 9602(a) ........................................................................................... 3, 19

20 U.S.C. § 9602(c)(2) ........................................................................................... 4

20 U.S.C. § 9602(e) ................................................................................................ 3

20 U.S.C. § 9602(h) ................................................................................................ 4

28 U.S.C. § 1331 ................................................................................................... 14

28 U.S.C. § 1491(a)(1) ......................................................................................... 12

31 U.S.C. § 1502(a) ............................................................................................. 21

Pub. L. 103-382, 108 Stat. 3518 (Oct. 20, 1994) ................................................. 3

Pub. L. 107-279, 116 Stat. 1940 (Nov. 5, 2002) .................................................. 3

Pub. L. 118-47, 138 Stat 460 (Mar. 23, 2024) ..................................................... 4

Pub. L. 119-4, 139 Stat. 9, 10-12 (Mar. 15, 2025) ............................................... 4

Pub. L. 89-10, 79 Stat. 27 (Apr. 11, 1965) ........................................................... 3

**Rules**

89 Fed. Reg. 41,409 (May 13, 2024) ................................................................... 21

Fed. R. Civ. P. 56(a) ............................................................................................. 10

**Other Authorities**

William Baude et al., Hart and Wechsler's
   The Federal Courts and the Federal System 462 (8th ed. 2025) ............................. 15

# INTRODUCTION[1]

Since this Court's preliminary injunction decision a month ago, there have been significant legal developments—and factual non-developments—that all support Plaintiffs' claims and the need for expedited relief.

Regarding Plaintiffs "Program Claims" that challenge Defendants' failure to operate 20 Comprehensive Centers and 10 Regional Educational Laboratories (RELs), Defendants have not taken a single step to restart these programs or issue new awards for which Plaintiffs could compete. Nor have they announced any timeline by which they will do so, and for the Comprehensive Centers, Defendants have never made any statement or indicated any intention to ever restart the program. Issuing grants and contracts takes many months, and yet appropriations for these programs will expire in less than three months. Immediate summary judgment is warranted to provide redress for Defendants' violations of their clear legal duties to maintain 20 Comprehensive Centers and 10 RELs, and to spend funds appropriated for these programs.

With respect to the Termination Claims challenging the Plaintiffs' grant and subcontract terminations, the Fourth Circuit's stay order ruling in *Sustainability Institute v. Trump*, No. 25-1575 (4th Cir. June 5, 2025), no longer provides any basis for finding that the Tucker Act strips jurisdiction over Plaintiffs' constitutional Termination Claims. That is because the Department of Justice has *abandoned* its Tucker Act defense with respect to constitutional claims in the *Sustainability Institute* appeal. Likely recognizing that the Tucker Act cannot strip district courts of jurisdiction over constitutional claims under *Webster v. Doe*, 486 U.S. 592 (1988), the government now argues only that separation of powers claims are not "bona fide" constitutional claims under *Dalton v. Specter*, 511 U.S. 462, 472-74 (1994). *See* Gov't C.A. Br., Doc. 54 at 14-

---

[1] Plaintiffs request a hearing at the Court's earliest convenience if it would facilitate resolution of this matter.

15, No. 25-1575 (4th Cir. June 23, 2025) (attached as Ex. D); *see id.*, Resp. C.A. Br., Doc. 52 at 37-38 (same) (attached as Ex. E). The notion that separation of powers claims are not *real* constitutional claims is without merit and Plaintiffs will address that argument if Defendants raise it here, but the critical point is that the government has effectively conceded that the stay panel's application of the Tucker Act to constitutional claims was erroneous, and that there must be some other basis for rejecting constitutional claims over grant terminations. And other courts have recently ruled that the Tucker Act cannot preclude district court jurisdiction over constitutional claims for the reasons Plaintiffs have raised in this case.

On the merits, summary judgment is warranted on Plaintiffs' separation of powers Termination Claims. Through the terminations, Defendants violated Congress' unambiguous statutory mandates, solely because the President's policy preferences do not align with Congress' policy choices in creating and funding these programs. Under our system of government, the Executive Branch lacks constitutional authority to defy Congress in this manner.

Plaintiffs thus respectfully request that this Court enter summary judgment for Plaintiffs on the Programs and Termination Claims. The Court should declare unlawful and set aside Defendants' actions underlying the Program Claims, enjoin Defendants from refuting to comply with their statutory mandates moving forward, and enjoin Defendants from effectuating the termination of Plaintiffs' grants and the grants and contracts for which they were subcontractors.

## FACTUAL AND LEGAL BACKGROUND

### A. Congress Mandates the Operation and Funding of Regional Education Laboratories and Comprehensive Centers

For decades, Congress has mandated the establishment, operation, and funding of RELs and Comprehensive Centers as part of a carefully integrated system of Department of Education programs designed to support states and educational institutions nationwide.

Nearly 60 years ago, Congress created RELs to assist education practitioners and policymakers in improving student outcomes.[2] The Department's Institute for Education Sciences (IES) administers the REL program. Congress directed that the IES Director "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States," and the REL contracts must endure "for a 5-year period." 20 U.S.C. §§ 9564(a), (e). "Each regional educational laboratory awarded a contract . . . shall support applied research, development, wide dissemination, and technical assistance activities" by, among other things, providing training and technical assistance to state and local educational agencies, developing and disseminating research, and conducting a continuous survey of the needs of each region. *Id.* § 9564(e).

The Comprehensive Centers program complements the REL program, and was created by Congress 31 years ago.[3] Comprehensive Centers work with state, local, and regional educational agencies and schools on school improvement activities, prioritizing areas with a higher percentage of low-income families and schools identified for improvement. 20 U.S.C. § 9602(e). In carrying out the program, the Secretary of Education must award "not less than" 20 grants to entities to serve as Comprehensive Centers, and "shall ensure that not less than 1 Comprehensive Center is established in each of the 10 geographic regions served by the [RELs]." *Id.* § 9602(a). The Secretary has organized Comprehensive Centers into a network of one National Center, 14 Regional Centers, and five Content Centers, each with distinct but complementary areas of focus. *See Comprehensive Centers Program*, U.S. Dep't of Educ., https://perma.cc/UTL5-M3B2.

---

[2] *See* Pub. L. 89-10, 79 Stat. 27 (Apr. 11, 1965). Today, RELs are authorized by the Education Sciences Reform Act of 2002, Pub. L. 107-279, § 174, 116 Stat. 1940 (Nov. 5, 2002).
[3] *See* Pub. L. 103-382, 108 Stat. 3518, at 3877 (Oct. 20, 1994). Congress reauthorized and amended the program through the Educational Technical Assistance Act of 2002, Pub. L. 107-279, § 203, 116 Stat. 1940 (Nov. 5, 2002).

Congress anticipated that grants to Comprehensive Centers, like contracts to RELs, would last for a multi-year period. By statute, applicants must submit a 5-year implementation plan, 20 U.S.C. § 9602(c)(2), and grantees must transmit an annual report to the Secretary, *id.* § 9602(h). This multi-year structure reflects the time- and resource-intensive process required for the centers to collaborate with stakeholders and implement intensive education assistance plans—plans that, for instance, help state agencies establish career education pathways.

Congress appropriates funds specifically for the Comprehensive Center program, with each appropriation lasting two fiscal years. In the Further Consolidated Appropriations Act of 2024 (the "2024 Appropriations Act"), Congress provided that, of the $5.78 billion lump-sum appropriated to carry out school improvement activities, "$50,000,000 shall be available" until September 30, 2025 "to carry out" the Comprehensive Centers program. Pub. L. 118-47, 138 Stat 460, 683 (Mar. 23, 2024). In the 2025 full-year Continuing Resolution, Congress appropriated another $50 million to the Comprehensive Centers program, to remain available until September 30, 2026. Pub. L. 119-4, 139 Stat. 9, 10-12 (Mar. 15, 2025) ("2025 Continuing Resolution").

The 2024 Appropriations Act also appropriated $793 million for IES, to remain available until September 30, 2025. 138 Stat. at 690. The accompanying Joint Explanatory Statement specifies that, of that amount, $53.7 million is intended for the REL program. Joint Explanatory Statement, at 155, https://perma.cc/8J97-7K82. The 2025 Continuing Resolution appropriates another $793 million to IES, to remain available until September 30, 2026. 139 Stat. at 10-12.

**B. The Department Awards Comprehensive Center Grants for the 2024-2029 Cycle**

On September 26, 2024, the Department awarded grants to Comprehensive Centers for a period of performance from October 1, 2024 to September 30, 2029. *See* Supp. Decl. of Natalia

4

Pane ¶¶ 10-11 ("Pane Decl.") (attached as Ex. B); Supp. Decl. of M. Christine Dwyer ¶¶ 8

("Dwyer Decl.") (attached as Ex. C). Child Trends and RMC both received awards.

For RMC, this award was the latest in the company's awards under the Comprehensive

Centers program. RMC has participated in the program and its predecessor programs since the

1970s, and RMC has served as a prime grantee in every Comprehensive Center award cycle

since 2005. Dwyer Supp. Decl. ¶ 6. For the most recent cycle, RMC received the prime grant for

the Gulf Region Comprehensive Center, which awarded RMC $2.45 million for each year from

2024 to 2029. *See* AR 800-850 (RMC Grant); Dwyer Supp. Decl. ¶ 8. RMC also received

subcontracts with the prime grantees for the Content Center on Strengthening and Supporting the

Educator Workforce and the National Comprehensive Center. Dwyer Supp. Decl. ¶ 9.

This was Child Trends' first time applying for a Comprehensive Centers award, but it

was immediately successful. Child Trends received the prime grant for the Pacific East Regional

Comprehensive Center. *See* ECF 16-5; AR 2137-2186 (Child Trends Grant). The grant awarded

Child Trends $1.25 million during each year from 2024 to 2029. Pane Decl. ¶ 10. Child Trends

also received funds as a collaborator, pursuant to a subcontract, with the prime grantee for the

Northwest Regional Comprehensive Center. *Id* ¶ 11.

Immediately upon receiving awards, Child Trends, RMC, and other Comprehensive

Center grantees and subcontractors began performing the work required under their grants,

including collaborating with local education officials and stakeholders to develop projects

tailored to specific community needs. Pane Decl. ¶ 12; Dwyer Decl. ¶¶ 10-12. Plaintiffs were in

near-constant communication with the Department to ensure their proposals aligned with its

goals and priorities. Pane Decl. ¶ 14; Dwyer Decl.¶ 18.

At no time were grantees given any indication that the Department had concerns about their projects or the Comprehensive Centers program generally. Quite the opposite. As late as February 10, 2025, Comprehensive Centers program staff at the Department emailed each center an updated summary of the fiscal year (FY) reporting deadlines, which ranged from January to December 2025. Dwyer Decl. ¶ 14. On February 13, RMC received provisional approval to begin "asap" on eleven different projects. *Id*. The next day, Child Trends was invited to submit proposals for provisional approval for time-sensitive work. Pane Decl. ¶ 15.

### C. The Department Awards REL Contracts for the 2022-2027 Cycle

RMC has held subcontracts for REL contracts for the last 25 years, in every cycle since 2000. Dwyer Suppl. Decl. ¶ 20. RMC's receipt of REL subcontracts continued in the most recent cycle, which ran from 2022 to 2027. In January 2022, RMC subcontracted with the prime contractor for the REL Southeast, with the most recent amendment extending the agreement through September 30, 2025. Dwyer Decl. ¶¶ 21-22. RMC also entered into a subcontract with the prime contractor for the REL Central, for work beginning on March 1, 2022 and (after amendment) extending through December 31, 2026. *Id*. ¶ 26. RMC has done significant work under these agreements, conducting applied research, delivering training and coaching, and publishing evidence-based practices in partnership with local stakeholders. *Id*. ¶¶ 23, 27.

### D. The Department Shuts Down the Comprehensive Centers and REL Programs

On February 18, 2025, activist Christopher Rufo posted on X that the Comprehensive Centers "push left-wing ideologies." Christopher F. Rufo (@realchrisrufo), X (Feb. 18, 2025, 1:30 PM), https://perma.cc/PQ9Z-TU8Y. Elon Musk, then the public face of DOGE, replied, "!!" ECF 16-7. Later that day, Rufo posted: "Hey, @DOGE_ED, let's terminate the contracts for the 'comprehensive centers.' What do you think?" Christopher F. Rufo (@realchrisrufo), X (Feb. 18,

2025, 5:08 PM), https://perma.cc/SW6Q-5QRJ. Rufo's posts contained selectively edited videos from former Comprehensive Center grantees during prior award cycles.

The next day, on February 19, the Department terminated the grants of 18 of the 20 Comprehensive Centers through identical, boilerplate notices. Dwyer Decl. ¶ 15; Pane Decl. ¶ 16. The notices alleged generally that the grants promoted DEI initiatives, engaged in "fraud, abuse, or duplication," or "otherwise fail[ed] to serve the best interests of the United States." AR 852-853 (RMC Notice), 2281-2282 (Child Trends Notice). The notices stated that "[t]he grant is therefore inconsistent with, and no longer effectuates, Department priorities." *Id*. Also on February 19, the Department issued a press release, citing only Rufo's posts on X, claiming that the Comprehensive Centers program writ large was "divisive and wasteful" and promoted "race-based discrimination and gender identity ideology." AR 79-86. Defendants have provided no explanation, either publicly or in the Administrative Record in this case, for why two of the twenty centers were not terminated. More broadly, nothing in the Administrative Record shows any deliberations regarding the terminations, any individualized consideration of Plaintiffs' awards, or even which official decided to carry out the terminations.

Department of Education employees responsible for the program expressed shock at the terminations. At 6:07 pm on February 19, Child Trends received an email from its Department program officer stating that she and her colleagues were "just made aware of the termination of the Comprehensive Centers program." Pane Decl. ¶ 18.

The Department has not sought applications to recompete the terminated grants, and there is no public statement or document in the Administrative Record reflecting an intent to ever award new Comprehensive Centers grants, let alone before funds expire on September 30, 2025.

Indeed, the Comprehensive Center Network website is entirely shut down "due to a lack of federal funding to support [the] work." https://compcenternetwork.org/.

The REL terminations followed a similar path as the Comprehensive Centers. On February 13, with no advance warning, each REL contractor received identical termination notifications. Dwyer Decl.¶ 28. The Department provided no rationale for the terminations, but the Department's press release said that terminations were based on purported concerns that the RELs promoted DEI and "wasteful and ideologically driven spending." AR 75-76. As with the Comprehensive Centers, the Administrative Record shows no individualized consideration of any particular REL contract, nor does it show who decided to terminate the contracts.

Following these terminations, IES no longer maintains any REL. The Administrative Record contains no materials reflecting that the Department will re-compete the REL contracts before funds expire on September 30, or in time for the next academic year, or ever. During the last funding cycle with IES fully staffed, it took the Department roughly one year to issue awards from the date bids were solicited. *See Regional Educational Laboratory FY21/FY22 Acquisition*, Department of Education, https://perma.cc/5YA5-4PWA (showing a solicitation initial publication date on February 2, 2021, and three awards issued in January, February, and March 2022); https://perma.cc/CP78-G6A6 (showing seven awards issued in December 2021).

On April 7, 2025, Plaintiffs filed this action seeking declaratory and injunctive relief. *See* Compl., ECF 1. Plaintiffs bring two categories of claims: (1) "Program Claims" challenging the decisions to not maintain twenty Comprehensive Centers and ten RELs, and to not spend appropriated funds; and (2) "Termination Claims" challenging the termination of Plaintiffs' grants and the grants and contracts for which Plaintiffs were subcontractors. As to the Program Claims, Plaintiffs seek declaratory and injunctive relief that would require Defendants to operate

the statutorily mandated number of Comprehensive Centers and RELs and to obligate the funds appropriated for the Comprehensive Centers before those funds expire. *Id.* at 38-39. As to the Termination Claims, Plaintiffs seek declaratory and injunctive relief that would prohibit Defendants from giving effect to the termination notices for the Comprehensive Center grants for which Plaintiffs served as the prime grantee or a subcontractor, the REL contracts for which RMC was a subcontractor. *Id.* The Complaint also seeks mandamus relief. *Id.* For ease of reference, Plaintiffs attach as a chart summarizing the category of claims (Program or Termination), violations alleged, and relief sought for each claim. *See* Claim Chart (Ex. A).

On June 11, 2025, the Court denied Plaintiffs' motion for a preliminary injunction. PI Op., ECF 41. The Court rejected Defendants' argument that the Tucker Act strips jurisdiction over the Program Claims, finding that "Plaintiffs are likely to succeed in showing that the Program Claims should remain in federal district court." *Id.* at 18. On the merits, the Court did "not deny[] that Plaintiffs are likely to show success[,] … as the available evidence does suggest that the decision to shutter the Comprehensive Centers and RELs may very well represent a final agency action that flatly contradicts the express direction of Congress." *Id.* at 23. The Court also found that the balance of equities and public interest "arguably tips in favor of Plaintiffs." *Id.* at 24. Ultimately, however, the Court declined to enter a preliminary injunction because the harm from Plaintiffs' lost opportunity to compete for funds was not "imminent," given that relevant appropriations do not expire until September 30, 2025. *Id.* at 20. But the Court ordered expedited production of the Administrative Record and summary judgment briefing. *Id.* at 25.

On the Termination Claims, the Court was "unable to conclude that [it] has jurisdiction over Plaintiffs' claims," based on the Fourth Circuit's unpublished stay order in *Sustainability Institute v. Trump*, No. 25-1575 (4th Cir. June 5, 2025). *See* PI Op. 10-18. The Court stressed,

however, that it was not making a final determination on the jurisdictional question. *Id.* at 16.

Plaintiffs now move for summary judgment on their Program and Termination Claims alleged at Counts One through Three of the Complaint, as well as their mandamus claim on the failure to maintain 20 Comprehensive Centers grants and 10 REL contracts. Plaintiffs do not move for summary judgment on: (1) their claims regarding whether the terminations violated Department regulations, in Count Five and part of Count Six; (2) their claim regarding DOGE at Count Four. *See* Claims Chart. For the DOGE claim, there are material disputed facts regarding DOGE's role in terminating the contract and grants, which require discovery.[4]

## LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For APA claims, "summary judgment is the mechanism by which the court decides as a matter of law whether the administrative record permitted the agency to make the decision it did." *Deese v. Esper*, 483 F. Supp. 3d 290, 304 (D. Md. 2020).

## ARGUMENT

### A.  This Court Has Jurisdiction to Hear Plaintiffs' Claims

#### 1.  Plaintiffs' Program Claims Challenge Discrete, Final Agency Action

Defendants have argued that the Program Claims do not challenge "discrete" agency

---

[4] If Defendants move for summary judgment on the DOGE claim, Plaintiffs will submit a Rule 56(d) affidavit with their response brief. Plaintiffs note that because the DOGE claim does not arise under the APA, and challenges the "procedural validity" of the terminations based on the personnel involved, the Court's review is not limited to the Administrative Record. *See Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013)); *see also Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 2023 WL 5221367, at *7 (D.D.C. Aug. 15, 2023).

action. *See* ECFs 36, 38. The discrete action requirement is intended to "avoid entangling the judiciary in programmatic oversight" and "internal agency management," *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 432 (4th Cir. 2019). But while the APA's term "agency action" is "not so all-encompassing as to authorize [courts] to exercise 'judicial review over everything done by an administrative agency,'" it "undoubtedly has a broad sweep." *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051, at *12 (D. Md. June 5, 2025) (citation omitted).

As an initial matter, the discrete action requirement is limited to the APA and presents no bar to Plaintiffs' constitutional and *ultra vires* Program Claims. *See NAACP v. Bureau of the Census*, 945 F.3d 183, 183 (4th Cir. 2019). But Defendants' discreteness defense fails as to Plaintiffs' APA claims as well.

Plaintiffs challenge three discrete agency actions: (1) the decision not to operate 10 RELs as required by statute, (2) the decision not to operate 20 Comprehensive Centers as required by statute, and (3) the decisions to not spend or delay spending the funds that Congress appropriated for the Comprehensive Centers and RELs. Each of these involves a concrete choice Defendants made, and measuring compliance with a ruling granting relief on these claims would be simple— either Defendants maintain the required number of Comprehensive Centers and RELs and spend the appropriations as required, or they do not. The Court would not need to "engage in day-to-day oversight of the executive's administrative practices," *City of New York*, 913 F.3d at 431. In short, Plaintiffs' Program Claims do not challenge *how* Defendants operate the Comprehensive Centers and RELs programs, but *whether* they operate the programs.

The challenged actions resemble those recently found to be discrete in *Maryland v. Corporation for National and Community Service*, 2025 WL 1585051 (D.Md. June 5, 2025). There, the court held that the plaintiffs could bring an APA challenge against the agency's

"decision to close over 1,000 AmeriCorps programs," which it carried out through the termination of all grant funding. *Id.* at *13. The court rejected the defendants' argument that the challenge was a "broad programmatic attack" and that the APA required the plaintiffs to challenge each grant termination individually. *Id.* Rather, the court concluded that the "same-day decision to" "terminate grant funding and close over 1,000 AmeriCorps programs" due to a shift in priorities was "an 'across the board' agency action that 'can of course be challenged under the APA by a person adversely affected.'" *Id.* (quotations omitted. So too here.

### 2. The Tucker Act Does Not Strip this Court of Jurisdiction

The Court correctly concluded in its PI Opinion that the Tucker Act did not strip jurisdiction over Plaintiffs' Program Claims, but the Court erred in not finding jurisdiction over Plaintiffs' Termination Claims. PI. Op. 13-18. There have been a number of developments since this Court's preliminary injunction opinion that demonstrate that the Tucker Act does not preclude jurisdiction over either set of claims. Most notably, the government has abandoned its Tucker Act defense as to constitutional claims in the *Sustainability Institute* appeal.

### a. Plaintiffs' Program Claims

The Tucker Act categorically does not apply to the Program Claims because they are not "founded . . . upon any express or implied contract with the United States," which is a textual predicate to the Court of Federal Claims' jurisdiction. 28 U.S.C. § 1491(a)(1). Based on this statutory text, the Supreme Court has held that the Tucker Act does not apply where a claim does not involve an "actual contract." *Hatzlachh Supply Co., Inc. v. United States*, 444 U.S. 460, 463, 465 n.5 (1980). The Program Claims do not involve any actual contract. They do not challenge the termination of any grant, do not seek to restore any grant, and do not seek payments under any grant agreement. Rather, Plaintiffs seek with these claims the *opportunity to compete* for

grants and subcontracts, a well-established form of redressable injury. *See Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1015 (D.C. Cir. 2022).

The government has conceded in recent cases that the Tucker Act does not apply where the lost opportunity to compete is the injury asserted. In a case that similarly challenges an agency's elimination of entire programs (for which the plaintiff rely on lost opportunity to compete), and the termination of grants, the government argued that the Tucker Act precluded only the latter claims that "focus on the termination of grants and seek the reinstatement of those grants and continued payment thereunder," not the program-related claims. *Am. Council of Learned Societies v. McDonald*, No. 25-cv-3657, ECF No. 77 at 6; ECF No. 104 at 1 (S.D.N.Y.). Likewise, in a D.C. Circuit appeal of an order requiring USAID and the State Department to spend its appropriations, so as to give the plaintiffs the opportunity to compete, the government did not raise the Tucker Act at all on appeal, and instead noted that it would have made that argument if the court had ordered that awards be given to the plaintiffs specifically. Appellants' Br. at 58-59, *Global Health Council v. Trump*, No. 25-5097 (D.C. Cir. May 9, 2025).

Because Plaintiffs' Program Claims could not possibly be brought in the Court of Federal Claims—since they do not involve any "express or implied contract"—there is no need for the Court to apply the two-part test in *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982). But even if the Court does apply that test, the analysis is straightforward. The "source of the rights" upon which Plaintiffs base their Program Claims is not any grant or contract but instead the statutory and constitutional provisions requiring Defendants to operate a minimum number of Comprehensive Centers and RELs and to spend appropriated funds. *See* PI Op. 18. Nor is the "type of relief sought" the payment of money or any other contract remedy. The relief sought is

to offer new awards, which is not contractual and could not be awarded by the Court of Federal Claims, which is limited to awarding money damages.

### b.  Plaintiffs' Termination Claims

The Tucker Act also does not preclude Plaintiffs' Terminations Claims, as recent case law and developments make clear.[5] The linchpin of Defendants' Tucker Act defense in all recent grant termination cases—and in the *Megapulse* line of cases—has been sovereign immunity, and specifically whether the Tucker Act "impliedly forbids" the APA's waiver of sovereign immunity from applying under 5 U.S.C. § 702. The "APA's limited waiver of sovereign immunity" was the sole basis for the Supreme Court's order in *Department of Education v. California*, 145 S. Ct. 966, 968 (2025). But there is no dispute that sovereign immunity does not apply to Plaintiffs' Termination Claims, which are not brought under the APA. The Fourth Circuit has held that "sovereign immunity does not apply when a plaintiff files suit seeking equitable relief against federal officials … alleging that those officials exceeded the scope of their authority and/or acted unconstitutionally." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022).

With sovereign immunity not an issue, the government must identify some actual legal basis for how the grant of jurisdiction to an Article I court to hear breach of contract claims would strip this Court of jurisdiction to hear claims "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. There is, in fact, an established test that applies to such arguments, *see Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), but Defendants conspicuously have not invoked that test or asserted they could meet it here. They cannot.

---

[5] The Tucker Act is likewise inapplicable to Plaintiffs' constitutional and *ultra vires* Program Claims for the reasons explained in this section, in addition to reasons already provided with respect to the APA claims.

Moreover, the *Thunder Basin* test for "implied preclusion" of district court jurisdiction, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 12 (2012), does not apply to Plaintiffs' *constitutional* claims here, because Plaintiffs could not assert their constitutional claims in the Court of Federal Claims or any other forum. *Webster v. Doe* imposed a clear-statement rule where Congress intends to provide a party no forum to assert a constitutional claim. 486 U.S. 592, 603 (1988). It is undisputed here that Plaintiffs could not assert their separation of powers claims in the Court of Federal Claims, because the relevant constitutional provisions are not money-mandating, *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). And it is also undisputed that the Tucker Act contains no clear statement stripping district courts of jurisdiction over grant-related constitutional claims. That is dispositive under *Webster*.

The Court must reach this conclusion to avoid rendering the Tucker Act itself unconstitutional. *Webster* required a "heightened showing" for these circumstances "in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." 486 U.S. at 603. In other words, "[t]he [*Webster*] rule is an interpretive tool of constitutional avoidance," *Collins v. Dep't of the Treasury*, 83 F.4th 970, 980–81 (5th Cir. 2023). To the knowledge of undersigned counsel, the Supreme Court has *never* read a statute to preclude all judicial review of a constitutional claim, to "avoid squarely facing" the "serious constitutional question" that such a statute would present. William Baude et al., Hart and Wechsler's The Federal Courts and the Federal System 462 (8th ed. 2025). There is no reason for this Court to go where the Supreme Court has never gone, and find that the Tucker Act is the first federal statute in history that deprives a party of any judicial forum to challenge the constitutionality of a government action.

15

It is likely for these reasons that the government has *abandoned* its Tucker Act defense as to constitutional claims on appeal in *Sustainability Institute*. In its merits brief and its opposition to a petition for en banc review, the government did not contend that the Tucker Act precludes the separation of powers claim there. *Sustainability Inst.*, Gov't C.A. Br., Doc. 54 at 14-15, No. 25-1575 (4th Cir. June 23, 2025) (attached as Ex. D); *see id.*, Resp. C.A. Br., Doc. 52 at 37-38 (same) (attached as Ex. E). Instead, the government's only defense to that claim now is that separation of powers claims are not "bona fide constitutional claims." *Id.* Plaintiffs will address that meritless argument should Defendants make it here. But for present purposes, what matters is that the government has effectively conceded that the stay panel opinion in *Sustainability Institute* was erroneous in finding that the Tucker Act strips jurisdiction over constitutional claims. The stay panel order thus should not be relied upon as authority on this question.

Other recent decisions have held that the Tucker Act does not preclude constitutional claims over grant terminations. In *Widakuswara v. Lake*, the en banc D.C. Circuit reversed a stay that had blocked relief on constitutional grant termination claims, "substantially for the reasons explained by Judge Pillard" in her dissent from the stay. 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025). Judge Pillard reasoned that the district court had jurisdiction over the constitutional claims because "the Court of Claims could not adjudicate [the] plaintiffs' constitutional claims," and "[c]onstitutional claims for injunctive or declaratory relief face no sovereign immunity bar." 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting).

More recently, in *Harris Cnty., Texas v. Kennedy*, 2025 WL 1707665 (D.D.C. June 17, 2025), the district court "conclude[d] that it likely has jurisdiction over plaintiffs' separation-of-powers claim because the Court of Federal Claims appears not to have jurisdiction" over such a

claim. *Id.* at *6. The Court "reject[ed] the government's implicit suggestion that *no* court would have jurisdiction over constitutional claims that happen to involve a contract." *Id.* "Foreclosing judicial review entirely to such a broad class of constitutional claims cannot be reconciled with the "strong presumption favoring judicial review of administrative action." *Id.* (quotation omitted). "And to the extent the government is arguing that 'a separation-of-powers claim should be treated differently than every other constitutional claim, it offers no reason and cites no authority why that might be so.'" *Id.* (quoting *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010)).

Finally, the Ninth Circuit's published decision in *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932 (9th Cir. 2025), explains an independent reason why this Court has jurisdiction over RMC's claims regarding the REL terminations: "[s]ubcontractors such as [RMC] do not even have the right to sue under the Tucker Act." *Id.* at 938. "Subcontractors, who have not entered into contracts with the Government, generally have no right to sue under the Tucker Act, and the Court of Federal Claims has no jurisdiction to hear their suit." Id. (citing *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998)). And "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Id.* at 939 (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006)). The Ninth Circuit thus joined the D.C. Circuit in "categorically reject[ing] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Id.* (quotations omitted). Here, as in that case, RMC would not have standing to bring suit over its REL subcontracts in the Court of Federal Claims, and it is therefore "contrary to common sense" for the Tucker Act's grant of jurisdiction to that court to control here. *Id.*

The *Megapulse* test should not apply the Termination Claims because it is specific to "implied" preclusion of the APA's sovereign immunity waiver, but if this Court did apply that test, it would again counsel in favor of jurisdiction here. The source of the rights for Plaintiffs' Termination Claims is the Constitution and the federal statutes requiring the Department to maintain ten RELs—over a full five-year contract period—and twenty Comprehensive Centers. Plaintiffs do not rely on the terms of the contract and grant agreement at all. On that basis alone, the claims cannot be "in essence" contractual. Regarding the relief sought, Plaintiffs do not seek "damages" or any "retroactive payments." *Harris Cnty.*, 2025 WL 1707665, at *5. Plaintiffs seek only to enjoin the terminations going forward, which is a remedy that "[c]ourts have long granted" for "violations of federal law by federal officials." *Id.* (quotations omitted). Numerous courts, including in this District, have recently concluded that the Tucker Act does not preclude terminations claims such as those brought here. *See Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1865971, at *13 (D. Md. July 7, 2025) (citing many cases).

### B. Plaintiffs are Entitled to Summary Judgment on the Program Claims

There can be no disputed facts that Defendant decided to not operate 20 Comprehensive Centers and 10 RELs, and to not spend all of the funds appropriated for the Comprehensive Centers program, at a minimum through the end of this fiscal year. It has now been five months since the Department terminated all the RELs and 18 of 20 Comprehensive Centers. And while the Department stated in its press release five months ago that it intends to recompete the REL contracts, PI Op. 22 the Department has not taken a single step to restart that program. Dispositively, the Administrative Record contains not a shred of evidence that Defendants intend to resume either program, ever, and certainly not any time soon. Indeed, the President's budget request submitted to Congress sought zero dollars for both programs, belying any notion that

Defendants intend to operate the programs again. U.S. Dep't of Ed., Fiscal Year 2026 Budget

Summary, 19, 46 (June 4, 2026), https://perma.cc/3CJR-9GNW. The Department's actions are

not in accordance with law, contrary to their constitutional powers, and in excess of statutory

authority. 5 U.S.C. § 706(2)(A)-(C). They are also unconstitutional and *ultra vires*. *See*

*Strickland*, 32 F.4th at 365.

> ### 1.  Defendants Are Violating the Education Sciences Reform Act and the Educational Technical Assistance Act

There is no ambiguity in Defendants' statutory duties. For the REL program, Congress

mandated that the Director of IES "shall enter into contracts with entities to establish a

networked system of 10 [RELs] that serve the needs of each region of the United States." 20

U.S.C. § 9564(a). The Director "shall . . . enter into contracts for a 5-year period" for the RELs,

*id*. § 9564(e)(1), and the "regions served by the regional educational laboratories shall be the 10

geographic regions served by the regional educational laboratories established under" a different

statute. *Id*. § 9564(b). "Each [REL] awarded a contract under this section shall support applied

research, development, wide dissemination, and technical assistance," by undertaking specific

types of training and research activities. *Id.* § 9564(f). Everything about the statute is mandatory,

and Defendants have no discretion to refuse to operate the program.

Likewise, Congress mandated that the Secretary of Education must "award not less than

20 grants . . . to establish comprehensive centers," and "shall ensure that not less than 1

comprehensive center is established in each of the 10 geographic regions served by the [RELs]."

*Id.* § 9602(a)(1), (2)(A). "Each comprehensive center . . . shall allocate such center's resources to

and within each State in a manner which reflects the need for assistance," "shall work with" state

and local educational agencies, and "shall support dissemination and technical assistance

activities by" undertaking specific activities. *Id.* Again, the statute could not be phrased in more

mandatory terms. Defendants are brazenly violating these statutory commands by not having 20 Comprehensive Centers across the country and at least one "established in each of the 10 geographic regions served by [RELs]." *Id.* § 9602(a)(1), (2)(A).

### 2. Defendants Are Violating Appropriations Statutes

Defendants' near-complete shutdown of the Comprehensive Centers program also violates the 2024 Appropriations Act and the 2025 Continuing Resolution. Congress provided in the 2024 Appropriations Act that, of the $5.78 billion appropriated for carrying out school improvement activities, "$50,000,000 shall be available to carry out section 203 of the Educational Technical Assistance Act of 2002," (that is, the Comprehensive Centers program), with the funds to remain available until September 30, 2025. 138 Stat at 683. The 2025 Continuation Resolution appropriates another $50 million to the Comprehensive Centers program, which is available until September 30, 2026. 39 Stat. at 10-12.

It is long settled that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). "[E]ven the President does not have unilateral authority to refuse to spend the funds." *Id.* The Government Accountability Office (GAO) has also affirmed that "shall be available" language means the agency must spend the specified amount on the designated program, and "cannot … divert[]" the funds "to purposes other than" the designated program. GAO, B-326941, at 6-7 (Dec. 10, 2015), https://perma.cc/Q398-8RMJ. Congress thus mandated that the Department obligate $50 million for the Comprehensive Centers program before September 30, 2025, *see* 138 Stat at 683, and another $50 million before September 30, 2026, *see* 39 Stat. at 10-12.

Defendants have not disputed that as a result of shutting down eighteen of the twenty required Comprehensive Centers in February 2025, the Department will not spend anywhere close to the $50 million in FY2024 funds that are expiring on September 30, 2025. Any FY2024 funds that had been obligated to the 20 Comprehensive Centers that received awards in September 2024 will be "de-obligated" once the Department closes out the grant terminations, and those funds will revert to the Treasury on or after October 1, 2025 if they have not been re-obligated before then. *See* 31 U.S.C. § 1502(a). The same will be true for any of the FY2024 that were never obligated in the first place. *Id.* The vast majority of the additional $50 million appropriated for the Comprehensive Centers in the 2025 Continuing Resolution will also expire unspent, absent relief in this case, given Defendants' elimination of 18 of 20 Centers.

Defendants' failure to spend the appropriated funds is much like the Environmental Protection Agency's unlawful refusal to spend the full amount of appropriations in *Train v. City of New York*, 420 U.S. 35 (1975). There, the Supreme Court rejected the agency's argument that it had discretion to spend less than the full amount provided by the statute and thus affirmed an order compelling the agency to distribute the entire appropriation. *Id.* at 41-49. Here, as in *Train*, the Department lacks discretion to appropriate less than the full amount appropriated by the 2024 Appropriations Act and the 2025 Continuing Resolution for the Comprehensive Centers.

Defendants have insisted they are not in violation of the statutes because they still have time to spend the funds. Defs.' PI Opp. 11, ECF 18. But Defendants cannot wait until the eve of September 30, 2025 to spend the funds expiring then. Grants cannot be issued overnight. In prior Comprehensive Centers program funding cycles, it has taken the Department more than four months after its initial announcement of funds to make awards. *See* 89 Fed. Reg. 41,409 (May 13, 2024) (soliciting applications for the 2024-2029 cycle); Dwyer Decl. ¶ 8 (award notification

received on September 26, 2024); Pane Decl. ¶ 10 (same); *see also Comprehensive Centers*, Department of Education, https://perma.cc/JB29-NNFS (noting an average of four to six months to review and approve applications). As it stands, if the Department intends to issue new awards to meet its spending requirements, it has *less than three months* before the fiscal year ends to announce new funding opportunities, review applications, and make awards for 18 Comprehensive Centers before September 30. And given that Defendants have no intent to re-establish the Comprehensive Centers program any time soon, Defendants are in violation of the 2025 Continuing Resolution as well.

### 3.  Defendants Are Violating the Impoundment Control Act

Defendants' refusal to spend appropriations for RELs and Comprehensive Centers also violates the Impoundment Control Act of 1974 (ICA). The Act provides limited circumstances in which the Executive Branch may undertake a "deferral" or "rescission" of funds. 2 U.S.C. § 682.

Under the ICA, a "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. 2 U.S.C. § 682(1). When the Executive Branch wishes to defer funds, it must send a special message to Congress detailing the money to be deferred and the reasons for deferral. *Id.* § 684(a). There are only three permissible grounds for deferrals. *Id.* § 684(b). "Policy reasons," including efforts to ensure funds are spent in accordance with the President's policy preferences, are not a proper basis for deferrals. GAO, B-331564, at 6 (Jan. 16, 2020), https://perma.cc/6TMT-3CH2.

Where the President seeks to "rescind" appropriated funds, the ICA requires, among other things, that the President send a special message to Congress specifying the funds he seeks to have rescinded and the reasons for his proposal. 2 U.S.C. § 683(a).

Defendants' decisions to terminate all of the REL contracts and nearly all of the Comprehensive Centers constitute "deferrals," because they reflect a "withholding or delaying [of] the obligation or expenditure of" funds that Congress appropriated for the programs. 2 U.S.C. § 682(1). Defendants violated the ICA because they did not notify Congress of the deferrals as the ICA requires, and Defendants made the deferrals for impermissible policy reasons. Defendants' decision to terminate 18 of 20 Comprehensive Centers also constitutes an unlawful "rescission," because the President did not follow the ICA's required procedures for proposing a rescission, and the appropriations for the Comprehensive Centers will be functionally rescinded when they expire at the end of each fiscal year.

By Defendants' telling, they are in compliance with the ICA because they are withholding or delaying the expenditure of funds for a permissible "programmatic delay." Defs.' PI Opp. 12. However, permissible programmatic delays "occur when an agency is taking necessary steps to implement a program, but because of factors external to the program, funds temporarily go unobligated." B-331564, at 7. They do not include actions to delay an expenditure taken on the agency's "own volition" or "to ensure compliance with presidential policy prerogatives." *Id.* at 6. Delays are "programmatic" where they are intended "to advance *congressional* budgetary policies," not the "objectives of the Administration." *City of New Haven. v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (emphasis moved). Defendants clearly are not seeking to advance Congress's objectives here.

Defendants have also contended that the ICA does not allow for private enforcement, *see* Defs.' PI Opp. 12. But the APA carries a "strong presumption favoring judicial review," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quotations omitted), and a provision of the ICA specifically provides that "[n]othing contained in this Act . . . shall be

construed as . . . affecting in any way the claims or defenses of any party to litigation concerning any impoundment." 2 U.S.C. § 681(3).

### 4.  Defendants Are Violating the Separation of Powers

The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id*. art. II, § 3. As then-Judge Kavanaugh explained, these provisions carry with them "settled, bedrock principles of constitutional law." *Aiken Cnty.*, 725 F.3d at 259. "Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." *Id.* "[T]he President and federal agencies may not ignore statutory mandates … merely because of policy disagreement with Congress." *Id.* at 260.

That is especially so when it comes to the expenditure of appropriated funds. The Constitution "exclusively grants the power of the purse to Congress, not the President," *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018), and thus "the President does not have unilateral authority to refuse to spend the funds," *Aiken Cnty.*, 725 F.3d at 261 n.1. In *Harris County*, for instance, the district court found that HHS violated the separation of powers where it "willfully decided not to spend funds based on policy objections to Congress's enactments." 2025 WL 1707665, at *9.

Defendants are likewise violating the separation of powers here. They are outright refusing to comply with Congress's mandates to maintain specific numbers of RELs and Comprehensive Centers and to spend appropriated funds—solely because the statutes do not align with the President's policy goals. This is a clear case of executive agencies acting in derogation of their constitutional responsibilities, subverting "the constitutional authority of

24

Congress." *Aiken Cnty.*, 725 F.3d at 267. "It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if [courts] were to allow executive . . . agencies to disregard federal law in the manner" done by Defendants here. *Id.*

### 5. Plaintiffs Are Entitled to a Writ of Mandamus on the Program Claims

Alternatively, if the Court concludes there are no other means of affording relief on the Program Claims, the Court should enter a writ of mandamus compelling Defendants to operate the minimum required number of Comprehensive Centers and RELs. A writ of mandamus may issue where "(1) the petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner; and (3) no other adequate remedy is available." *First Fed. Sav. & Loan Ass'n of Durham v. Baker*, 860 F.2d 135, 138 (4th Cir. 1988). As explained above, Defendants have unambiguous duties to maintain specific numbers of Comprehensive Centers and RELs and to obligate funds Congress has appropriated for the Comprehensive Centers program. Here, just as in *Aiken County*, mandamus is needed "to correct transparent violations of a clear duty to act." 725 F.3d at 258 (citation omitted).

### B. Plaintiffs Are Entitled to Summary Judgment on Their Termination Claims

Summary judgment is warranted on Plaintiffs' Termination Claims as well. Defendants effectuated their unlawful shuttering of the Comprehensive Centers and REL programs, and their refusal to spend required appropriations, through the mass termination of grants and contracts, including Plaintiffs' grants and the awards for which Plaintiffs wer subcontractors. The terminations thus violated the separation of powers. *See Harris Cnty.*, 2025 WL 1707665, *9 (enjoining grant terminations that were the mechanism for not spending required appropriations).

In addition, or in the alternative, to enjoining the terminations based on Plaintiffs' freestanding constitutional claim, the Court may also award relief on Plaintiffs' separate claim

that Defendants' actions are *ultra vires* by exceeding their authority under the relevant statutes. Because the Supreme Court's decision in *California* suggests that Plaintiffs could not assert a grant termination claim under the APA, and because Plaintiffs could not assert claims in the Court of Federal Claims under the relevant statutes since they are not money-mandating, Plaintiffs have no other mechanism to seek relief on the statutory violations tied to the grant terminations. Accordingly, Plaintiff may obtain relief on an *ultra vires claim* based on statutory violations. *See PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 444 (D. Md. 2025).

### C. The Court Should Declare Unlawful and Set Aside Defendants' Actions Underlying the Program Claims

If Plaintiffs prevail on their Program Claims under the APA, this Court must "hold unlawful and set aside" the challenged actions, 5 U.S.C. § 706(2); *see Sierra Club v. United States Army Corps of Engineers*, 909 F.3d 635, 655 (4th Cir. 2018). To "set aside" an agency action, "vacatur is required." *City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 772 (D. Md. 2021). As Justice Kavanaugh has explained, "the text and history of the APA, [and] the longstanding and settled precedent adhering to that text and history," makes clear that to "set aside" an unlawful agency action means to vacate that action—"in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (2024) (Kavanaugh, J., concurring). This Court must declare unlawful and vacate Defendants' decisions to not operate 20 Comprehensive Centers and 10 RELs as required by law, and to not spend the relevant appropriations on these programs.

### D. The Court Should Enter a Permanent Injunction on Both Sets of Claims

To obtain a permanent injunction, a party must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The final two factors merge when the government is a defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Each factor weighs in favor of injunctive relief here.

### 1. Plaintiffs are Suffering Injury that Damages Cannot Cure

Absent a permanent injunction, Plaintiffs will suffer irreparable harm that cannot be remedied through money damages. Plaintiffs are already suffering several compounding injuries.

First, as to the Program Claims, Defendants are depriving Plaintiffs of the "opportunity to compete" for new awards, a well recognized form of irreparable injury. *AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706, 740 (2021); *see also See T Square Logistics Servs. Corp. v. United States*, 134 Fed. Cl. 550, 560 (2017). Regardless of whether Plaintiffs are "certain to receive" an award, *CC Distributors, Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989), they are suffering cognizable harm where they have been "walled off from an entire category of projects for which it is qualified, prepared, and eager to compete." *MISO Transmission*, 45 F.4th at 1016. And the harm is irreparable because the appropriations that Plaintiffs would compete for will expire unspent if Plaintiffs do not prevail in this case.

Plaintiffs are more than "ready, willing, and able to perform" the relevant grants and subcontracts. *Id.* at 1015 (quotation omitted). RMC has received prime Comprehensive Center grants in *every* award cycle since 2005, and it has received REL program subcontracts for more than two decades. Dwyer Decl. ¶¶ 6, 20. Comprehensive Center grants and REL subcontracts have historically comprised a large percentage of RMC's revenues, and recently represented 40% of RMC's business base. *Id.* ¶ 30. RMC's Chris Dwyer attests in her supplemental declaration that the lost opportunity to compete for Comprehensive Center and REL awards is

devastating to RMC's business. *Id.* ¶ 33. It means that RMC is foreclosed from obtaining this business, guaranteeing that RMC will lose a large percentage of its historical revenues, which would cause permanent impacts to its revenue potential and the number of staff it can retain. *Id.*

While this is the first award cycle in which Child Trends has participated in the Comprehensive Center program, it received a grant from a competitive pool of applicants, and was selected as a subcontractor to two other grantees. Pane Decl. ¶¶ 9-11. Child Trends would be well positioned to compete for new awards given the Department's new priorities announced in May. *See id.* ¶ 27; The shutting down of the Comprehensive Centers program deprives Child Trends of any chance to obtain the sizable grants and subcontracts associated with the program.

Second, regarding the Termination Claims, the termination of Plaintiffs' grants and subcontracts are causing immense harm, most obviously in terms of lost staff and interrupted programming. As a first-time Comprehensive Centers awardee, Child Trends invested substantial time and money into building its team, including by hiring technical assistance specialists with extensive knowledge of the relevant regions, and even more support staff. Pane Decl. ¶ 13. Immediately after losing its awards, Child Trends was forced to terminate 12 staff members, its first known layoff in its more than 45-year history. *Id.* ¶ 22. For RMC, the significant loss in business after its grants and subcontracts were terminated forced RMC immediately to lay off 20% of its employees and reduce the hours of another 20%. Dwyer Decl. ¶ 31. The sudden loss of funds and staff has caused both organizations to immediately halt programs, mid-stream, losing the results of their years-long labor on these programs. *Id.* ¶ 29; Pane Decl. ¶ 28.

And as relevant to all claims, Plaintiffs have had to make mission-disruptive changes to their operations. This, too, causes irreparable harm. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (having to take "mitigating steps" due to funding uncertainty

"cause[s] … irreparable harm); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (actions that "directly conflict with the organizations' mission" cause irreparable harm). While Plaintiffs hope to rehire the experts they have lost if their grants resume or they are able to compete for new awards, it becomes less clear whether they will be able to do so with the passage of time, which reduces their ability to compete for business. Dwyer Decl. ¶ 31-32; Pane Decl. ¶ 25. Moreover, the organization's leadership teams have had to divert their time and energy to addressing funding cuts—including by negotiating with landlords, Dwyer Decl. ¶ 30, or working on cash flow analyses, Pane Decl. ¶ 28—rather than supporting the organizations' mission. Defendants actions have had "an immediate impact on [Plaintiffs'] ability to provide critical resources to the public, causing damage that [will] persist" beyond repair absent an injunction. *See United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016).

### 2. The Balance of Equites and Public Interest Favor a Permanent Injunction

The balance of equities and public interest also militate in favor of permanent injunctive relief. The elimination of the REL and Comprehensive Centers programs will cause significant harm to the educational institutions, students, and teachers that Plaintiffs serve.

Every state has substantially benefitted from the work of RELs and Comprehensive Centers over the decades. To highlight a few recent REL projects: the REL Southeast has partnered with the state of Alabama to provide professional learning to teachers on evidence-based recommendations for teaching literacy to elementary and middle school English learners, Dwyer ¶ 24; and the REL Central has supported the implementation of Individual Study Plans in Kansas to help students prepare for college and careers, *Id.* ¶ 27. Recent Comprehensive Center projects include: developing toolkits to support Florida classroom teachers in low-performing schools better meet the needs of English learners with disabilities, *id.* ¶ 11; and implementing

well-tested education practices throughout the Pacific East Region designed to increase K-8 math proficiency. Pane Decl. ¶ 31.

Under the recently terminated program grants and contracts, RELs and Comprehensive Centers had been engaged in years-long projects or the development of project proposals that have suddenly halted midstream. *See* Dwyer Decl. ¶¶ 36-42; Pane Decl. ¶¶ 12, 31. As a result, much of this work will now be wasted. The education practices that were being rolled out in the Pacific East Region could have been shared nationwide, *id.*—but, no longer. And the public will be unable to receive the benefits of the organizations' other work supporting evidence-based practices for teaching math, *id.*, Dwyer Decl. ¶ 38, alleviating the shortage of teachers in critical areas, Dwyer Decl. ¶ 40, implementing professional development approaches aimed at improving the capacity of early childhood educators to improve students' language and vocabulary skills, *id.* ¶ 41, and addressing the unique challenges of highly rural areas with limited internet activity, Pane Decl. ¶ 31.

In contrast, any harm to the government is minimal at most. Defendants have claimed harm by making passing reference to "ending discrimination," Defs.' PI Opp. 17, but they have never set forth facts substantiating their insinuation that these organizations have discriminated. *See* PI Op. 24. In reality, an injunction would cause the government no harm, as it would simply ensure that Defendants comply with their statutory duties. The public, on the other hand, has a strong interest in receiving the benefits of these educational support programs and "undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (quotation omitted), *as amended* (Jan. 14, 2020).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be granted.

July 9, 2025                                    Respectfully submitted,

                                                */s/ Daniel F. Jacobson*
                                                Daniel F. Jacobson
                                                Lynn D. Eisenberg
                                                Kyla M. Snow*
                                                JACOBSON LAWYERS GROUP PLLC
                                                *1629 K Street NW, Suite 300*
                                                *Washington DC, 20006*
                                                *(301) 823-1148*
                                                *dan@jacobsonlawyersgroup.com*

                                                * Not admitted in the District of Columbia. Practice
                                                supervised by members of the D.C. bar.


                                                *Counsel for Plaintiffs*

31

## CERTIFICATE OF SERVICE

I, Daniel Jacobson, hereby certify that on July 9, 2025, I served the foregoing Motion for Summary Judgment, and all supporting documents, on Defendants' counsel via the Court's ECF filing system.

*/s/Daniel F. Jacobson*
Daniel F. Jacobson