**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CHILD TRENDS, INCORPORATED, ET AL., <br><br>     Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, ET AL., <br><br>     Defendants. | Case No.: 8:25-cv-01154-BAH |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS, OR
TO TRANSFER, OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

UNDISPUTED FACTS .......................................................................................................2

    I.     The Educational Technical Assistance Act ("ETA")......................................................2

    II.    The Education Sciences Reform Act ("ESRA")............................................................3

    III.   Executive Order 14158 ...............................................................................................4

LEGAL STANDARDS ........................................................................................................4

ARGUMENT........................................................................................................................6

    I.     Plaintiffs' Claims Should Be Dismissed for Lack of Subject Matter Jurisdiction ........6

          a.  Plaintiffs' Claims Are Contract Claims Over Which the United States Court of Federal Claims Has Exclusive Jurisdiction (counts four-six)............................6

          b.  *Ultra Vires* Review is Unavailable in This Case ...............................................8

          c.  The Broad Programmatic Challenge in Plaintiffs' Program Claims are Not Subject to Review Under the APA (count one)...............................................10

    II.    Plaintiffs' Claims Should Be Dismissed for Failure to State a Claim under FRCP 12(b)(6) .....................................................................................................................12

          a.  Termination of the REL Contracts and the Comprehensive Center Grants are Not Contraty to Law .......................................................................................12

               1.  The Terminations Do Not violate the Education Sciences Reform Act or the Educational Technical Assistance Act (count one-three)..........12

               2.  Plaintiffs' Free-Standing Constitutional Claim Fails (count two)........19

               3.  The Terminations Do Not Violate the Appropriations Act and Continuing Resolutions (count one - three)......................................20

               4.  The Terminations Do Not Violate the Impoundment Control Act (count one-two)................................................................................21

               5.  Agency DOGE Employees Did Not Act in Contravention of Any Laws

(count four) ...........................................................................................22

6. Comprehensive Center Grant Terminations Were in Accordance with Department Regulations (count five)...................................................22

b. The Court Should Exercise Its Discretion Not to Issue a Writ of Mandamus in This Case (count six) ......................................................................25

III. The Relief Sought by Plaintiffs Is Overboard..........................................................28

CONCLUSION................................................................................................................28

CERTIFICATE OF SERVICE .........................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                         **Page(s)**

*13th Reg'l Corp. v. U.S. Dep't of Interior*,
   654 F.2d 758–63 (D.C. Cir. 1980) ..................................................................................... 26

*Am. Ass'n of Colleges for Teacher Educ. v. McMahon*,
   770 F. Supp. 3d 822, (D. Md. Mar. 19, 2025) .................................................................. 25

*Am. Educ. Research Ass'n v. Dep't of Educ., No. CV SAG-25-1230*,
   2025 WL 1665401 (D. Md. June 12, 2025) ...................................................................... 14

*Amica v. Department of Justice*,
   2025 WL 1313593 at page (D.D.C. 2025) ....................................................................... 19

*APA," Kravitz v. United States Dep't of Commerce*,
   355 F. Supp. 3d 256 (D. Md. 2018) ................................................................................... 5

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991) ............................................................................................................. 9

*Bennett v. New Jersey*,
   470 U.S. 632 (1984) ......................................................................................................... 24

*Biodiversity Legal Found. v. Norton*,
   285 F. Supp. 2d 1 (D.D.C. 2003) ..................................................................................... 16

*City of New York v. U.S. Dep't of Defense*,
   913 F.3d 423 (4th Cir. 2019) ..................................................................................... 10, 11

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024) ......................................................................................................... 20

*Cutler v. Hayes*,
   818 F.2d 879 (D.C. Cir. 1987) ......................................................................................... 17

*Dalton v. Specter*,
   511 U.S. 462 (1994) ......................................................................................................... 19

*Department of Education v. California*,
   145 S. Ct. 966 (2025) ......................................................................................... 8, 9, 26, 27

*Fed. Aviation Admin. v. Cooper*,
   566 U.S. 284 (2012) ........................................................................................................... 6

*Gen. Land Off. v. Biden*,
   722 F. Supp. 3d 710 (S.D. Tex. 2024) ............................................................................. 21

*In re Barr Laboratories, Inc.*,
   930 F.2d 72 (D.C. Cir. 1991) ..................................................................................... 16, 25

*In re Ctr. for Biological Diversity*,
   53 F.4th 665 (D.C. Cir. 2022) .......................................................................................... 17

*In re Int'l Chem. Workers Union*,
    958 F.2d 1144 (D.C. Cir. 1992) ................................................................................. 17

*In re Medicare Reimbursement Litig.*,
    414 F.3d 7 (D.C. Cir. 2005) ................................................................................. 25-26

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) ................................................................. 8, 9-10, 10, 23

*Kerr v. U.S. Dist. Court for N. Dist. of Cal.*,
    426 U.S. 394. (1976) ................................................................................................. 5, 25

*Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*,
    56 F.3d 279 (D.C. Cir. 1995) ................................................................................. 8

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ................................................................................................. 5, 6

*LaBuy v. Howes Leather Co.*,
    352 U.S. 249 (1957) ................................................................................................. 5

*Lincoln v. Vigil*,
    508 U.S. 182, (1993) ................................................................................................. 20

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................................................. 12

*Marquez–Ramos v. Reno*,
    69 F.3d 477 (10th Cir. 1995) ................................................................................. 6

*Maryland v. U.S. Dep't of Agriculture, Case No. 25-cv-0748-JKB*,
    2025 WL 973159 (D. Md. Apr. 1, 2025) ................................................................. 27-28, 28

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
    336 F.3d 1094–02 (D. C. Cir. 2003) ................................................................. 16

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ................................................................................. 7

*Milligan v. Pompeo*,
    502 F. Supp. 3d 302 (D.D.C. 2020) ................................................................. 16

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55, (2004) ................................................................................................. 11-12, 18

*Nuclear Regul. Comm'n v. Texas*,
    145 S. Ct. 1762 (2025) ................................................................................................. 9

*People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*,
    852 F.3d 990 (10th Cir. 2017) ................................................................................. 17

*Portsmouth Redev. & Hous. Auth. v. Pierce*,
    706 F.2d 471 (4th Cir. 1983) ................................................................................. 7

iv

*Pub. Citizen v. Stockman*,
528 F. Supp. 824 (D.D.C. 1981) ..................................................................... 21

*South Carolina v. United States*,
243 F. Supp. 3d 673 (D.S.C. 2017) ......................................................... 5, 6, 25

*South Carolina v. United States*,
907 F.3d 742 (4th Cir. 2018) ............................................................. 14, 15, 27

*Spectrum Leasing*,
764 F.2d ........................................................................................................ 23

*Sustainability Institute v. Trump*,
No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ......................... 7, 8, 26

*Telecommunications Research & Action Ctr. v. F.C.C.*,
750 F.2d 70 (D.C. Cir. 1984) ............................................................. 15, 16, 17

*Transohio*,
967 F.2d ........................................................................................................ 23

*Trump v. CASA, Inc., No. 24A884*,
2025 WL 1773631 (U.S. June 27, 2025) ........................................................ 17

*Trump v. Sierra Club*,
140 S. Ct. 1 (2019) ....................................................................................... 21

*United States ex rel. Rahman v. Oncology Assocs., P.C.*,
198 F.3d 502 (4th Cir. 1999) ........................................................................... 5

*U.S. Conf. of Catholic Bishops*
770 F. Supp. 3d at 162–64 ............................................................................. 23

*Vaz*,
33 F.4th (9th Cir. 2022) ................................................................................. 16

*Vein & Wellness Grp., LLC v. Becerra*,
2022 WL 9361896 (D. Md. Oct. 14, 2022) ....................................................... 5

*W. Rangeland Conservation Ass'n v. Zinke*,
265 F. Supp. 3d 1267 (D. Utah 2017) ................................................. 17, 18, 19, 27

**Statutes**

2 U.S.C. § 687 ............................................................................................. 21, 22
2 U.S.C. §§ 681 .................................................................................................. 21
5 U.S.C. § 551 .................................................................................................... 10
5 U.S.C. § 706 ............................................................................................... 14, 18
20 U.S.C. § 9564 ......................................................................................... 3, 14, 19
20 U.S.C. § 9602 ..................................................................................... 2, 12, 13, 20
20 U.S.C § 9604 .................................................................................................. 13

28 U.S.C. § 1292 .................................................................................................................... 7

28 U.S.C. § 1491 ................................................................................................................. 6, 7

28 U.S.C. § 1631 .................................................................................................................... 7

## Rules

Fed. R. Civ. P. 12 ........................................................................................................... 5, 6, 12

Fed. R. Civ. P. 56 ................................................................................................................... 5

## Other

2 C.F.R. § 200 ...................................................................................................................... 13

2 C.F.R. § 200.340 ............................................................................................... 13, 23, 24, 25

2 C.F.R. § 3474.1 .................................................................................................................. 25

90 Fed. Reg. 8441 (Jan. 29, 2025) .................................................................................... 4, 22

90 Fed. Reg. 11095 ............................................................................................................... 22

U.S. Const. art. II, § 3 ............................................................................................................ 1

**INTRODUCTION**

Before the Court is one of the greatest opportunities to reject an attempt to artfully plead a case within the bounds of district court jurisdiction. Plaintiffs have set forth six separate claims, five of which are nearly identical in substance, but plead differently. (counts one-four, six). Count five, which purports to be an *ultra vires* regulatory claim is nothing of the sort. Like much of the rest of the Complaint, it is a contractual claim dressed in regulatory, statutory and constitutional clothing.

Plaintiffs bring six counts in their Complaint. The claims include an Administrative Procedure Act ("APA") claim (count one), ECF 1, at 27–31 ¶ 107–27; a constitutional *ultra vires* claim (count two), *id.* at 31–32 ¶¶ 128–33; a statutory *ultra vires* claim (count three), *id.* at 32–33 ¶¶ 134–41; an *ultra vires* claim as to DOGE (count four), *id.* at 33–34 ¶¶ 142–47; a regulatory *ultra vires* claim (count five), *id.* at 34–35 ¶¶ 148–54; and a mandamus claim (count six), *id.* at 35–37 ¶¶ 155–67.

Plaintiffs separate the claims into two sets. The first set of claims are a programmatic challenge to Defendants' current status of maintaining less than twenty comprehensive centers and no Regional Educational Laboratories ("RELs"). Plaintiffs argue that this violates the Educational Technical Assistance Act ("ETA"), the Education Sciences Reform Act ("ESRA"), the 2024 Appropriations Act (and subsequent Continuing Resolution), the Impoundment Control Act ("ICA"), U.S. Const. art. II, § 3 (the "Take Care Clause"), and the separation of powers under the Constitution (the "Program Claims"). ECF 1, at 27–33 ¶¶ 107–41 (counts one through three). Through the non-statutory claims based on Defendants' alleged constitutional, statutory and regulatory violations, Plaintiffs also challenge the terminations of Plaintiffs' specific grant awards (the "Termination Claims"). ECF 1, at 31–33 ¶¶ 128–54 (counts two through five).

1

The Court should grant Defendants summary judgment as 1) this Court lacks subject matter jurisdiction over the termination claims, 2) Plaintiffs' broad programmatic challenge under the APA is impermissible, 3) the *ultra vires* claims are improper and 4) Defendants have acted in accordance with all relevant laws. Furthermore, this Court should exercise its discretion and deny the request for mandamus relief, as it is simply an attempt to contravene the clear jurisdictional prohibitions in this case.

## UNDISPUTED FACTS

### I.    The Educational Technical Assistance Act ("ETA")

Congress authorized the comprehensive centers program through the Educational Technical Assistance Act of 2002.  20 U.S.C. § 9602. The statute states "the Secretary *is authorized* to award not less than 20 grants to establish comprehensive centers."  20 U.S.C. § 9602(a)(1). The statute also provides that in "awarding grants under paragraph (1), the Secretary…shall ensure that not less than 1 comprehensive center is established in each of the 10 geographic regions served by the regional educational laboratories…" 20 U.S.C. § 9602(a)(2)(A).

In the Further Consolidated Appropriations Act of 2024 ("the Act"), for school improvement programs, Congress appropriated "$5,776,178,000, of which $3,947,312,000 shall become available on July 1, 2024, and remain available through September 30, 2025, and of which $1,681,441,000 shall become available on October 1, 2024, and shall remain available through September 30, 2025." Pub. L. 118-47, 138 Stat 460 at 682 (Mar. 23, 2024). The Act further provides that "$50,000,000 *shall be available* to carry out section 203 of the Educational Technical Assistance Act of 2002 (ETA)." *Id.* (emphasis added). This Congressional appropriation contains

2

no guarantees of funding to any particular grant recipient.[1]  *Id.* It does it provide specific limits on the Secretary's ability to terminate grants as needed.  *Id.* Nor does it mandate that the Secretary spend the money.

The instant Plaintiffs are two entities that received comprehensive center program grants. ED 000875; ED 002140. Child Trends was selected as a prime grantee for the Pacific East comprehensive Center. ED 002140. Child Trends also subcontracted with the prime grantee to collaborate on the Northwest Comprehensive Center.  ED 001784.   RMC was selected as the prime grantee for the Gulf Region Comprehensive Center and served as a subcontractor on the Content Center on Strengthening and Supporting the Educator Workforce (SSEW) and the National Comprehensive Centers.  ED 000875; ED 000342; ED 001204.

The comprehensive center grants at issue in this case were terminated in February 2025. ED 000390; ED 000852; ED 001253; ED 001833; ED 002281.

## II.    The Education Sciences Reform Act  ("ESRA")

The Regional Educational Laboratory ("REL") program is a part of the larger Education Sciences Reform Act, codified at 20 U.S.C. § 9564.  The Institute of Education Sciences ("IES") administers the program. The statute states "The Director shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories."  20 U.S.C. § 9564.

In the Act, Congress appropriated $793,106,000 to IES for carrying out activities authorized by section 208 of the ETA. 138 Stat 460 at 690. Congress further specified that $53.7 million of these funds was intended for the REL program. 170 Cong. Rec. H1501 at H2058 (daily ed. Mar. 22, 2024); see also 138 Stat 460 at 462 (providing that the explanatory statement shall have the

---

[1] In contrast, Congress included direct funding for particular grant recipients, like the National Technical Institute for the Deaf and Gallaudet University, through the Department in the same bill. 138 Stat. 687.

effect "with respect to the allocation of funds […] as if it were a joint explanatory statement of a committee of conference."). This funding is to remain available through September 30, 2025. 138 Stat 460 at 690.

Plaintiff RMC subcontracted with the prime contractors for the REL Southeast and the REL Central. ED 002415; ED 002842. Neither Plaintiff contracted directly with the Department of Education ("the Department" or "Agency") for a REL. The REL contracts at issue in this case were terminated in February 2025. ED 002819; ED 003739.

### III.    Executive Order 14158

On the first day of President Donald J. Trump's second term, he issued Executive Order 14158, which renamed the United States Digital Service as the United States DOGE Service ("USDS") and relocated the new entity within the Executive Office of the President with an Administrator who reports to the White House Chief of Staff. Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025) ("EO 14158"). In addition to creating USDS, EO 14158 directed Agency heads to establish within their respective agencies an agency "DOGE Team" of at least four employees. 90 Fed. Reg. 8441 § 3(c). These agency DOGE Teams are comprised of *agency employees* reporting up agency chains and are charged with "implementing the President's DOGE agenda," "coordinat[ing] their work with USDS and advis[ing] their respective Agency Heads on implementing the President's DOGE Agenda." *Id.* As explained in EO 14158, USDS and agency DOGE Teams are distinct. USDS derives all of its authority from Executive Orders and has purely advisory and consultative authority, while agency DOGE Teams have authority to act within agencies to advance and implement the President's DOGE agenda. *Id.*

### LEGAL STANDARDS

I. A plaintiff bears the burden of demonstrating that the court has jurisdiction over a claim.

4

*See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). At any time, if the plaintiff fails to carry that burden, the court must dismiss the action, including at the summary judgment stage. Fed. R. Civ. P. 12(h)(3).

II.   A motion for summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is often "an appropriate mechanism for deciding claims arising under the APA," *Kravitz v. United States Dep't of Commerce*, 355 F. Supp. 3d 256, 262 (D. Md. 2018), because, in many cases, "all the facts are set forth in the Certified Administrative Record." *Vein & Wellness Grp., LLC v. Becerra*, 2022 WL 9361896, at *4 (D. Md. Oct. 14, 2022).

III.   Mandamus is an extraordinary remedy, which should only be used in exceptional circumstances of peculiar emergency or public importance.  *LaBuy v. Howes Leather Co.*, 352 U.S. 249 (1957). To establish the conditions necessary for issuance of a writ of mandamus, "the party seeking the writ must demonstrate that (1) [it] has a clear and indisputable right to the relief sought; (2) the responding party has a clear duty to do the specific act requested; (3) the act requested is an official act or duty; (4) there are no other adequate means to attain the relief [it] desires; and (5) the issuance of the writ will effect right and justice in the circumstances." *South Carolina v. United States*, 243 F. Supp. 3d 673, 681 (D.S.C. 2017), *aff'd,* 907 F.3d 742 (4th Cir. 2018), and *aff'd,* 907 F.3d 742 (4th Cir. 2018); *See also United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 511 (4th Cir. 1999).

The "issuance of the writ [of mandamus] is in large part a matter of discretion with the court to which the petition is addressed."  *Kerr v. U.S. Dist. Court for N. Dist. of Cal.,* 426 U.S. 394. 403 (1976); *South Carolina*, 243 F. Supp. 3d at 682. Even if "a party seeking issuance of a writ of

mandamus meets its burden of showing the prerequisites have been met, a court still exercises its own discretion in deciding whether or not to issue the writ." *Id.*; *Marquez–Ramos v. Reno*, 69 F.3d 477, 479 (10th Cir. 1995).

## **ARGUMENT**

The Court should dismiss this case or transfer it to the Court of Federal Claims, as it clearly lacks subject matter jurisdiction over Plaintiffs' claims regarding termination of their grant agreements. Furthermore, the Court should issue summary judgment in favor of Defendants, as there is no genuine dispute that Defendants acted in accordance with the law.  In light of previous briefing, the Administrative Record, and the summary judgment briefing, it is clear that the Defendants are entitled to summary judgment as a matter of law.

## I.    **Plaintiffs' Claims Should Be Dismissed for Lack of Subject Matter Jurisdiction**

A plaintiff bears the burden of demonstrating that the court has jurisdiction over a claim.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). At any time, if the plaintiff fails to carry that burden, the court must dismiss the action, including at the summary judgment stage. Fed. R. Civ. P. 12(h)(3).

### a.   **Plaintiffs' Claims Are Contract Claims Over Which the United States Court of Federal Claims Has Exclusive Jurisdiction (counts four-six)**

To sue a federal agency, a plaintiff must identify an express waiver of sovereign immunity in the text of a federal law and show that its claim falls within the waiver's scope.  *See Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 290 (2012) ("a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text"). The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States."  28 U.S.C. § 1491(a).  Where such a claim "seek[s] monetary relief in excess of $10,000," the Tucker Act

"vest[s] subject matter jurisdiction exclusively in the Claims Court." *Portsmouth Redev. & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir. 1983); *See also* 28 U.S.C. § 1491(a)(1).

Courts apply a two-part test to determine whether the Tucker Act applies: the source of the rights upon which the plaintiff bases its claims, and the type of relief sought. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Here, the essence of Plaintiffs' termination claims is contractual, in that they challenge individual contract termination and seek reinstatement. Such claims clearly fall under the Tucker Act and as such, this Court lacks subject matter jurisdiction over them. The claims should be dismissed, or in the alternative, the case should be transferred to the Court of Federal Claims.[2]

The Court of Federal Claims has exclusive jurisdiction over claims challenging the cancellation or suspension of individual federal grants, regardless of the framing of such claims. *See Sustainability Institute v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025). Like the plaintiffs in *Sustainability Institute,* Plaintiffs in the instant case bring termination claims seeking to "enjoin Defendants from enforcing and giving effect to the termination notices" and to "enjoin Defendants from terminating the contracts or grants for the remainder of the five-year terms of the contracts and grants." ECF No. 1 at page 38.

Here, the source of the right for the requested relief in Plaintiffs' termination claims – i.e. reinstate my grants – could only come from the operative grant agreements, as the agreements are

---

[2] Defendants have moved to transfer the case to the Court of Federal Claims under 28 U.S.C. § 1631, which applies to transfer for want of jurisdiction.  Once such a motion has been filed, under 28 U.S.C. § 1292(d)(4)(B), "no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Court of Federal Claims pursuant to the motion shall be carried out."

the only source of entitlement for any particular organization to receive funds. *Sustainability*, 2025 WL 1587100, at 4 ("While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds.")

Furthermore, relief seeking to enforce a contractual obligation to pay money is not equitable. Jurisdiction under the Tucker Act cannot be avoided by disguising a monetary claim as a claim requesting equitable relief. *See Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *See also Ingersoll-Rand Co. v. United States,* 780 F.2d 74, 80 (D.C. Cir. 1985) *(*A request for specific performance must be resolved by the Claims Court). Here, Plaintiffs seek to "enjoin" Defendants from "giving effect to the termination notices…"[3] and "enjoin" Defendants from "terminating the contracts…" ECF No. 1 at 28. The question then becomes, whether the word "enjoin" transforms this clear request to reinstate the terminated grants into a request for equitable relief. It does not. Indeed, the Fourth Circuit and Supreme Court have confirmed that such requests are properly before the Court of Federal Claims. *Sustainability Inst.,* 2025 WL 1587100, at 1; *Department of Education v. California*, 145 S. Ct. 966, 968 (2025).

   **b.  *Ultra Vires* Review is Unavailable in This Case**

Plaintiffs' attempt to avoid the clear jurisdictional issues in this case by sprinkling the words *ultra vires* throughout the Complaint, is unavailing. *Ultra vires* claims, which allege the Government violated the Constitution, statutes or federal regulations when it terminated or suspended Plaintiffs' grants, do not provide a detour around the Tucker Act. *Sustainability,* 2025 WL 1587100, at 4.  And because *ultra  vires* review could easily circumvent judicial-review

---

[3] "A request for specific performance must be resolved by the Claims Court" when, as here, the source of right is contractual. *Ingersoll-Rand Co. v. United States,* 780 F.2d 74, 80 (D.C. Cir. 1985).

statutes, it is intended to be extremely limited in scope.  *See Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1766 (2025) (citing *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)).

To prevail on an *ultra vires* claim, Plaintiffs must overcome the rule that a nonstatutory *ultra vires* claim will not be recognized if there is a "meaningful and adequate means of vindicating" plaintiffs' rights."  *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991).  Here, a mere cursory review of counts one through four reveals the *ultra vires* claims are nearly identical to the APA claim. While count four of the Complaint makes conclusory statements that USDS terminated or directed termination of the grants and contracts, paragraph 147 makes clear that count four is nothing more than another way of saying that the Department acted contrary to law.  ECF No. 1 ⁋ 147 ("Because DOGE does not possess any…authority to terminate the…grants and contracts, ***McMahon's, Gleason's, [and] Soldner's actions are ultra vires***…") (emphasis added) Simply put, these *"non-statutory"* claims are nothing more than a variant of the statutory claims, for which there are adequate forms of judicial review.  *See Vera v. Department of Justice*, Case No. 1:25-cv-01643-APM (D.D.C. 2025) (dismissing *ultra vires* claim that was a variant of other claims in the complaint that alleged Defendants lacked constitutional, statutory, and regulatory authority to terminate grants) (Attached hereto as Exhibit 1).

A decision to the contrary would render the *Megapulse* test obsolete.  On Plaintiffs' theory, every breach-of-government-contract claim could be reframed as an *ultra vires* action against the relevant executive official, and plaintiffs could then circumvent the Tucker Act's (or APA's) remedial and jurisdictional limits in every case. In *Department of Education*, for example, plaintiffs could have simply argued that the Secretary of Education acted *ultra vires* in terminating their grants.  *See California* 145 S.Ct. 966. Or, in *Ingersoll-Rand*, the company could have just sued the Secretary of Defense for the *ultra vires* act of terminating its contract.  *See Ingersoll-*

9

*Rand,* 780 F.2d 74, 75. This Court should reject this transparent attempt to artfully plead and recast claims for purposes of establishing jurisdiction within this Court.

The second requirement for a successful *ultra vires* claim is that Plaintiffs must show that the termination decisions were "an attempted exercise of power that had been specifically withheld" and violated a "specific prohibition" in the relevant statutes. *Id*. (citing *Leedom v. Kyne*, 358 U.S. 184, 188-189 (1958.) The *Kyne* exception is a "narrow one" that does not apply simply because an agency arguably reached "a conclusion which does not comport with the law." *Boire*, 376 U.S., at 481. These are claims of last resort, and they "rarely succeed." 145 S. Ct. 1762, 1776 (citations ommitted).

Here, Plaintiffs have not pointed to any specific statutory provision which prohibits the termination of the grants and contracts at issue. As discussed in more detail below, to the contrary, it would be absurd to read the statutes as prohibiting the Department from *ever* terminating grants or contracts once they were awarded, as Plaintiffs suggest. And even the contracting parties did not believe that (which is why they included termination provisions in the grants) ED 000342; ED 000876; ED 001205; ED 001785; ED 002140; ED 002422, ED 002851.

c. **The Broad Programmatic Challenge in Plaintiffs' Program Claims are Not Subject to Review Under the APA (count one)**

District courts lack subject matter jurisdiction over APA claims "if the plaintiff fails to challenge a particular 'agency action' that is fit for review." *City of New York v. U.S. Dep't of Defense,* 913 F.3d 423, 430 (4th Cir. 2019). The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Under this definition, agency action "is limited to those acts that are 'circumscribed' and 'discrete.'" *City of New York*, 913 F.3d at 431 (quoting *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004)). When challenging agency action,

the plaintiff must "identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on the government's operations." *Id*. Thus, the APA distinguishes between "***discrete acts, which are reviewable, and programmatic challenges, which are not***." *Id*. (emphasis added). Otherwise, "courts would be forced to enter a disfavored 'obey the law' injunction, or to engage in day-to-day oversight of the executive's administrative practices." *Id.*

As to the comprehensive center program, Plaintiffs allege, by way of terminating the majority of the comprehensive center grants "the Department has largely ***shut down this statutorily required program***" and "***Defendants have effectively shut down this statutorily-required program***." ECF No. 1 ¶¶ 112, 139. (emphasis added). Plaintiffs also allege, by way of terminating all ten REL contracts, "***IES no longer maintains a single operating REL***" and "***Defendants' shutting down of the REL program is without statutory authority***." ECF No. 1 at ¶¶ 110, 138. (emphasis added).

While the words were not used specifically in the Complaint, this is a challenge to the wholesale dismantling of the programs themselves, not a discrete agency action. Indeed, the Complaint alleges that the RELs and comprehensive centers *are* the programs and terminating the grants and contracts for the programs is essentially terminating the programs themselves. Meaning, terminating the comprehensive center grants is "effectively" shutting down the comprehensive center *program* and terminating the REL contracts is "shutting down the REL *program."* ECF No. 1 at ¶ 138. (emphasis added).

Which brings us to the obvious reason why the Complaint endeavors to package together many individual actions, which Plaintiffs purport to be a singular discrete agency action. ECF No. 1 ¶¶ 114 – 115. The reason being, broad programmatic attacks are not reviewable under the APA and have been rejected by the Supreme Court. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 55,

(2004); *See also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990) (a collection of "many individual actions" cannot be packaged together and "laid before the courts for wholesale correction under the APA.") This Court should reject this improper claim and dismiss count one of the Complaint.

**II.   Plaintiff's Claims Should Be Dismissed for Failure to State a Claim under FRCP 12(b)(6)**

**a.   Termination of the REL Contracts and the Comprehensive Center Grants are Not Contrary to Law**

**1.   The Terminations Do Not Violate the Education Sciences Reform Act or the Educational Technical Assistance Act (count one-three)**

As a part of the ETA, Congress "authorized" the Secretary "to *award* not less than 20 grants" to local entities to serve the comprehensive centers. 20 U.S.C. § 9602(a)(1) (emphasis added). The clear language of the statute requires the Department to award twenty grants at the time they choose to compete the program. That was done most recently in September 2024. ECF No. 1  P 30. The Department fulfilled its statutory obligation by making twenty awards and performed its obligation to disburse funds under the grants, until conditions arose that permitted the Department to exercise discretion to terminate.

Plaintiffs allege § 9602 requires the Department to "maintain, without interruption," "not less than 20 grants" for comprehensivecenters, and to "ensure," at all times, "not less than 1 [comprehensive center] is established in each of the 10 geographic regions served by the regional educational laboratories."  ECF No. 1 P 158. This interpretation of the statute contradicts the clear and unambiguous language provided within it and would lead to an absurd result. Plaintiffs' interpretation would prohibit the Department's ability to fulfill its oversight responsibilities, which includes the potential termination of a comprehensive center, without also breaching § 9602(a)(1). 20 U.S.C. § 9602 (b)(3). It is hard to imagine that Congress would have intended to limit the

Department's authority to enforce compliance against a grantee or automatically place the Department out of compliance with the law.[4]

Similarly, the Department has adhered to the mandate in § 9602(a)(2), requiring the Department to ensure that not less than one comprehensive center is established in each of the 10 geographic regions served by the RELs. This requirement simply states that at the time the Department competes the program, at least one center must be established in the REL regions. That was done in this case. ECF No. 1 ⁋ 30. There is no specifc prohibition on grant termination within the statute.

Moreover, there is no genuine dispute that the Department had the authority to terminate Plaintiffs' grants or the grants for which Plainitffs were subcontractors. The Code of Federal Regulations permits grant termination "[i]f the award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340. Further, Plaintiffs' original Grant Award Notification (GAN) incorporates 2 C.F.R. § 200 and specifically provides that funding will only be continued if the "Department determines that continuing the project would be in the best interest of the government." ED 000342; ED 000876; ED 001205; ED 001785; ED 002140 ("2 CFR PART 200 AS ADOPTED AT 2 CFR 3474 (BLOCK 8)"). Moreover, the terms and conditions of Plaintiffs' initial grants allow the Secretary to terminate the grants. *Id.* Indeed, the ETA requires the Secretary to perform ongoing assessments of the programs to effecuate agency priorties and the best interestes of the government. 20 U.S.C. § 9602 (b)(3).

In addition, the terminations of the REL contracts were carried out in accordance with the law. In the ESRA, Congress instructed IES to "enter into contracts with entities to establish a

---

[4] Congress also knew how to require the Department to continue certain awards within the statutory framework, and it did not do so here. *See* 20 U.S.C § 9604.

networked system of 10 regional educational laboratories." 20 U.S.C. § 9564. The Plaintiffs argue that the statute requires Defendants to "enter into contracts with entities to establish," *at all times*, "a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." ECF No. 1 ¶ 160. The "at all times" phrase does not appear in the statute. The argument that the statute does not allow for *any* interruption in maintaining ten RELs is unreasonable. Just as with the potential termination of a comprehensive center grant, it is implausible that Congress would require Defendants to uphold contracts without the option to terminate if necessary. Indeed, § 9564 does not include a specific prohibition against contract termination.

Thus, Plaintiffs' true, and only possible contention must be that Defendants are taking too long to recompete the grants and contracts.[5] A termination itself cannot, alone, place Defendants outside of statutory compliance, particularly where the contracts themselves and the applicable regulations contemplate possible terminations. A claim challenging agency action as unlawfully withheld or unreasonably delayed should be brought pursuant to 5 U.S.C. § 706 (1), not 5 U.S.C. § 706 (2), like the Plaintiffs did here. As such, count one of the Complaint should be dismissed entirely for failure to state a claim.

Nevertheless, even if Plaintiffs would have brought an APA claim pursuant to § 706 (1), the claim would fail. A claim that an agency action is *unlawfully withheld* is treated differently from one that alleges agency action is *unreasonably delayed. South Carolina v. United States,* 907 F.3d 742, 760 (4th Cir. 2018). Unless Congress has specifically required agency action by a specified date in the relevant statute, the Court will analyze the inaction as an unreasonable delay.

---

[5] On June 5th, the Agency announced its intent to rebid all ten REL contracts. *Am. Educ. Research Ass'n v. Dep't of Educ.,* No. CV SAG-25-1230, 2025 WL 1665401, at *3 (D. Md. June 12, 2025).

*Id.* This distinction is critical, as it reveals the reason why Plaintiffs have attempted to squeeze their APA claim into § 706 (2). An action that is "delayed" rather than "withheld" is not generally a "final action" that can be addressed under the APA. *Id.* Accordingly, claims of unreasonable delay can only be addressed through a mandamus proceeding, employing a reasonableness standard. *Id.* Therefore, as explained *supra*, any claim pursuant to § 706 (1) should be dismissed because the applicable statues do not include a temporal component.

But let's assume, arguendo, the claim was properly plead[6], when assessing the reasonableness of a delayed action, courts generally follow the test laid out in *Telecommunications Research & Action Ctr. v. F.C.C.,* 750 F.2d 70, 80 (D.C. Cir. 1984). The test looks to six factors (the "TRAC factors"):

> (1) the time agencies take to make decisions must be governed by a "rule of reason";
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
>
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

TRAC, 750 F.2d at 80 (citations and quotations omitted).

---

[6] Defendants note that Plaintiffs have also brought a claim requesting mandamus relief in count six, which should be dismissed pursuant to the TRAC factors.

15

The first TRAC factor, which provides the time it takes for an agency to act must be governed by a "rule of reason," is the "'most important' factor." *Vaz, 33 F.4th at 1137 (9th Cir. 2022) (citations omitted).* The second TRAC factor, whether Congress has provided a timetable for action, can also inform a reasonability inquiry. *TRAC*, 750 F.2d at 80. Accordingly, these factors are typically considered together. *See Milligan v. Pompeo,* 502 F. Supp. 3d 302, 317 (D.D.C. 2020) (first and second factors often considered together).

The grants and contracts at issue in this case were terminated in February of 2025. ED 000390; ED 000852; ED 001253; ED 001833; ED 002281; ED 002819; ED 003739. To date, a mere five months have elapsed, approximately. It is no secret that the Agency is in a transition phase, requiring a careful balancing of priorities to fulfill its obligations. Review and analysis of the issues presented to determine the appropriate course of action takes time, especially with a constraint on resources. *See generally*, *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099, 1101–02 (D. C. Cir. 2003) (reversing an order directing agency action because the district court did not consider "'competing priorities' for limited resources…"); *Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1 (D.D.C. 2003) (declining to find a four-year delay unreasonable where there was no express statutory deadline, "reflect[ing] a general congressional priority" for other duties towards which the agency was directing resources).

Factors three and five often overlap and direct the Court to consider the effect of agency delay. *In re Barr Laboratories, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991)). In an attempt to craft a novel argument related to non-monetary equitable relief, Plaintiffs have consistently argued that the harm caused by the program claims is Plaintiffs' "lost right to compete." ECF No. 1 ⁋ 6, 93,

16

159, 161.  As Plaintiffs do not have standing to challenge the lost right of non-parties to compete,[7] the nature, extent and impact of such an individualized harm counsels against judicial intrusion on agency discretion.

TRAC factor four instructs the Court to consider the impact of judicial interference on higher or competing agency priorities.  *TRAC*, 750 F.2d at 80. Courts are "generally cautious against facilitating line-jumping and reordering agency priorities." *In re Ctr. for Biological Diversity*, 53 F.4th 665, 672 (D.C. Cir. 2022) (citation omitted).  Courts owe final agency action "considerable deference," *see People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 999 (10th Cir. 2017), and, to a certain extent, review of agency inaction is similarly circumspect. *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1291 (D. Utah 2017).

Therefore, any court evaluating the reasonableness of agency delay "should give due consideration in the balance to practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *In re Int'l Chem. Workers Union,* 958 F.2d 1144, 1149 (D.C. Cir. 1992); *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987) (internal quotations omitted) (explaining that courts should consider "the agency's explanation, such as administrative necessity, insufficient resources, or the complexity of the task confronting the agency").  Indeed, line jumping in this scenario and rushing the Department to rebid terminated grants and contracts without providing it enough time to fully consider how to do so in manner consistent with their current priorities, could cause more harm than good.

---

[7] *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) (holding that nationwide universal injunctions generally are not within the authority of the district courts, and injunctive relief should only be provided to the extent necessary to provide complete relief to each plaintiff in the case before the Court with standing to sue).

17

Regarding the sixth factor, Plaintiffs have not alleged any bad faith on the part of the Department. However, as the Agency has recently announced, consideration is being given to rebidding the ten REL contracts, which supports a finding that the Agency is in fact working toward addressing the situation.

Finally, other jurisdictions have added a seventh factor, which focuses on an evaluation of "the complexity of the task envisioned by a ... remand order" in this case. *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1294–95 (D. Utah 2017). Such an inquiry requires evaluation of the logistical implications of a mandatory injunction for both the targeted agency and the court. *Id.* In making such an inquiry, the court is mindful that the Supreme Court has interpreted 5 U.S.C. § 706(1) circumspectly, so as to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66, (2004). In other words, evaluation of this factor requires frank acknowledgement of the fact that mandatory injunctive relief is necessarily disruptive of agency priorities and programming. 265 F. Supp. 3d 1267, 1294–95. Moreover, the issuance of such relief often requires the district court—ill-equipped to evaluate either agency priorities or programming—to wade into the administrative murk by ordering specific agency action and monitoring compliance. *Id.* Consequently, "it is clear that a court-imposed deadline for agency action constitutes an extraordinary remedy." *Id.*

Nonetheless, Plaintiffs ask this Court to "enjoin Defendants to ***immediately and continuously*** maintain the statutorily required number of contracts and grants…" (emphasis added) ECF No. 1 at 38. Plaintiffs also request the Court to enjoin Defendants to obligate and spend funds currently appropriated for the programs and any funds that may be obligated in the

18

future. *Id.* It is well known that administrative grant and contract award procedures are complex. The process of rebidding the comprehensive center grants and REL contracts would be no different and any order demanding that the Agency "immediately" and "continuously" award and maintain contracts is both impractical and improper. Such an order would certainly require this Court to become entangled in decisions regarding how the Agency manages its priorities, decisions that are best left to the internal experts of the Agency. It would also require oversight of internal agency processes in a manner that would be disruptive to the Agency's right to exercise its discretion.

### 2. Plaintiffs' Free-Standing Constitutional Claim Fails (count two)

Plaintiffs assert the same alleged statutory violations in count one and count three (violations of 20 U.S.C. § 9564, 20 U.S.C. § 9602, 2024 Appropriations Acts, and Impoundment Control Act, Separation of Powers) in count two, but in count two, the claim is framed as "nonstatutory," "Constituional", and "*ultra vires*". ECF No. 1 ¶ 128-133. In other words, count two repeats Plaintiffs' allegations that Defendants violated the referenced statutes, and nothing more. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review...." *Dalton v. Specter*, 511 U.S. 462, 473 (1994); *See also Amica v. Department of Justice*, 2025 WL 1313593 at page 36 (D.D.C. 2025) (court dismissing separation of powers claim because Plaintiff "may not circumvent the Tucker Act or the APA's reviewability bar by reframing an alleged statutory violation as a constitutional claim) (Attached hereto as Exhibit 2). Because Plaintiffs' separation-of-powers claim simply relabels their allegation that the Department acted in excess of its statutory duty, the claim is *at best* statutory.[8]

---

[8] To be clear, Defendants do not agree that the claims are statutory or Constitutional, but rather they are contractual.

**3. The Terminations Do Not Violate the Appropriations Act and Continuing Resolutions (count one - three)**

Plaintiffs' claims based on the relevant appropriations statutes are based on a fundamental misunderstanding of appropriations law. An appropriation "is simply a law that authorizes expenditures from a specified source of public money for designated purposes." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 424 (2024). Plaintiffs overread the governing statutes, which do not give them an unqualified right to the appropriated funds. Rather, they allocate funds for the comprehensive centers, IES and the REL program, in general. ECF No. 1 ¶¶ 25, 67.

Moreover, careful review of the Act reveals that in every other appropriation made in 138 Stat 460, 683, Congress used the phrase "shall be for," which implies a mandate that the appropriated funds be used for a specified purpose.  For example, the Act states that "$44,953,000 *shall be for* part C of title VI." This "shall be for" phrase was used over and over in the appropriations preceding the one related to the comprehensive centers. However, when discussing the comprehensive centers, in the very next sentence, Congress chose to use the words "shall be *available* for." Reading this language in conjunction with the language of 20 U.S.C. § 9602(a)(1), which states the Secretary "*is authorized* to award," makes clear that Congress left the decision to actually award the grants within the discretion of the Department.

Furthermore, Plaintiffs' appropriations act arguments are fatally flawed, as they are unable to identify either (i) a statutory obligation as to specific funds owed to any particular grantee or contractor, or (ii) a statutory prohibition on terminating any particular grant or contract. And, since there is no statutory directive to the contrary, the Department has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192, (1993).

20

In other words, Plaintiffs cannot challenge their access to funding via the Department's general, programmatic appropriations. Fundamentally, Plaintiffs are not funded through direct congressional appropriations; rather, they are solely funded through agreements awarded at the Department's discretion. Execution and termination of those agreements are governed by the applicable agreements, not by any appropriations statute. Defendants' conduct under those agreements may be reviewable—as Defendants argue, in the Court of Federal Claims—but their mere funding through an appropriation does not mean that the routine execution of that individualized agreement takes on statutory dimensions.

### 4.   The Terminations Do Not Violate the Impoundment Control Act (count one-two)

The Impoundment Control Act ("ICA") of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 333 (1974) (codified as amended at 2 U.S.C. §§ 681 *et seq.*), under 2 U.S.C. § 687, provides for enforcement by the Comptroller General (an official in the Legislative Branch), not private parties. Accordingly, courts have held that private plaintiffs cannot bring suit for alleged violations of the ICA. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734 (S.D. Tex. 2024) ("In short, an alleged ICA violation has only one proper plaintiff: the Comptroller General."); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019). So too should this Court. *Gen. Land Off.*, 722 F. Supp. 3d at 735 (finding such a claim "unreviewable").

The ICA is also inapplicable. Individual grant agreement terminations do not constitute a rescission, reservation, or deferral under the ICA. They are simply the cancelations of contracts. Plaintiffs do not meaningfully dispute the Department's authority to cancel grant agreements or government contracts in general. Nor could they: the agreements contained express termination provisions.  ED 000342; ED 000876; ED 001205; ED 001785; ED 002140; ED 002422, ED 002851. If all such cancelations constituted ICA claims, then it would make no sense for Congress

21

to require their enforcement by the Comptroller General, as opposed to private parties. *Contra* 2 U.S.C. § 687. And it would create an absurd outcome: an agency would be *permanently* barred from canceling a grant or contract, no matter how problematic the grant or lawful the cancelation.

## 5. Agency DOGE Employees Did Not Act in Contravention of Any Laws (count four)

Per EO 14158, each agency is required to select at least four employees to serve as the agency's DOGE Team, including one DOGE Team Lead. DOGE team members are selected by Agency Heads, are employees of the agency reporting up agency supervisory chains and are expected to "coordinate their work with USDS and advise their respective Agency Heads." 90 Fed. Reg. 8441 § 3(c). Further, EO 14222 directs the Agency Heads to consult with that agency's DOGE Team Lead and DOGE Team members during any review of existing contracts and grants, to determine if termination is appropriate. 90 Fed. Reg. 11095 § (b).

As a threshold matter, there is no evidence that the agency DOGE employees did more than function in an advisory role here, but even if they had, they are not part of USDS and therefore have authority to make decisions within their respective agency supervisory chains and processes. USDS, as distinct from these agency DOGE Teams, derives all of its authority from Executive Orders that make clear that it is empowered to advise and consult with agency DOGE teams and agency leadership on various aspects of the President's DOGE agenda. In contrast, agency leadership and employees are empowered to make decisions relating to contracts and grants. Plaintiffs have not adequately pled that USDS made any final decisions related to grant or contract terminations, nor could they, because USDS lacks authority to take or direct such action. Indeed, any advice or consultation by USDS would be definitionally predecisional. USDS is therefore not a proper defendant in this litigation and should be dismissed.

**6. Comprehensive Center Grant Terminations Were in Accordance with Department Regulations (count five)**

Plaintiffs allege that the termination of funding violated the Uniform Guidance and were therefore contrary to the law.   ECF No. 1 ¶¶ 148-153. Specifically, Plaintiffs contend that "Defendants… could not terminate the grants pursuant to 2 C.F.R. § 200.340(a)(4), because the terms and conditions of the grants did not clearly and unambiguously provide that Defendant could terminate based on program goals or agency priorities."  ECF No. 1 ¶ 156.  Thus, to determine whether the Department violated § 200.340(a)(4), the Court must look back to the awards themselves. The Court must determine whether the agreements contain a term permitting the Department to terminate the award for no longer effectuating agency priorities or is such provision absent. That is a classic contract question.  *See Vera,* Case No. 1:25-cv-01643, at page 25 (holding plaintiff's alleged regulatory challenge to grant termination based on the Uniform Guidance was at essence contractual.)

Furthermore, the remedy sought in count five also supports the finding that the claim is contractual. Plaintiffs seek continued payment of the grants—in other words, specific performance.

> "A request for specific performance must be resolved by the Claims Court" when, as here, the source of right is contractual. *Ingersoll-Rand*, 780 F.2d at 80; *Spectrum Leasing*, 764 F.2d at 894 ("Spectrum seeks the classic contractual remedy of specific performance."); *see also Transohio*, 967 F.2d at 613 (explaining that the Supreme Court's decision in *Bowen* did not overrule the D.C. Circuit's "very specific holdings that the APA does *not* waive sovereign immunity for contract claims seeking specific relief"); *U.S. Conf. of Catholic Bishops*, 770 F. Supp. 3d at 162–64 (holding that claims belonged in the Court of Federal Claims where the plaintiffs asked "to cancel the termination, pay money due, and reinstate the contracts").

*Id.* at 25-26. Consequently, any claim regarding the improper termination of the comprehensive center grants based on the Uniform Guidance essentially presents a claim for breach of contract.

Nonetheless, the Plaintiffs do not possess a clear right to reinstate the terminated grants, as the terminations were allowed under relevant regulations. Plaintiffs accurately point out that the Uniform Grant Guidance (UGG) specifies that a GAN must outline the termination provisions set forth in 2 C.F.R. § 200.340(a); ECF No. 1 at ⁋ 151. Additionally, the Plaintiffs correctly note that this new guidance became effective on October 1, 2024. *Id.* However, the Plaintiffs' allegation that because the period of performance for their comprehensive center grants began on October 1, 2024, the revised guidance applies" is misguided. ECF No. 1 at ⁋ 153.

For federal grant programs, courts consistently apply the legal requirements that were in effect at the time the grants were made. *Bennett* v. *New Jersey,* 470 U.S. 632, 638 (1984). The Supreme Court has held that "changes in substantive requirements for federal grants should not be presumed to operate retroactively." *Id.* General background principles and "practical considerations related to the administration of federal grant programs" support the principle "that obligations generally should be determined by reference to the law in effect when the grants were made." *Id.* As noted, federal grants sound in contract, and retroactive changes to the terms are unfair to the granting agency and the grantee. *See Bennett,* 470 U.S. at 638.

In February 2025, the Department addressed the issue of retroactive application of the 2024 revisions. It released additional guidance clarifying that the revised 2024 Guidance for Federal Financial Assistance, dated April 22, 2024 "only applies to grants *awarded* after the OMB effective date of October 1, 2024." U.S. Department of Education, "Retroactive Application of the Revised Version of the Guidance for Federal Financial Assistance," February 2025,

https://www.federalregister.gov/documents/2025/02/10/2025-02396/retroactive-application-of-the-revised-version-of-the-guidance-for-federal-financial-assistance. As Plaintiffs' grants were awarded prior to October 1, 2024, the prior guidance issued in 2020 applies here, and it permitted the Department to terminate the grants, at any time, if the award "no longer effectuates the program goals or agency priorities." ECF No. 1 ⁋ 152. That is what happened here.

Moreover, even if the Court finds that 2024 guidelines apply and the Department was required to comply with § 200.340(b), the Department included the termination provisions set forth in § 200.340(a) in the GANs provided to Plaintiffs. ED 000342; ED 000876; ED 001205; ED 001785; ED 002140. The GANs provided to Plaintiffs state, in relevant part, "2 CFR Part 200 as adopted at 2 CFR 3474." Section 3474.1 is titled "Adoption of 2 CFR part 200" and reads:

> "(a) The Department of Education adopts the Office of Management and Budget (OMB) Guidance in 2 CFR part 200, except for 200.102(a) and 2 CFR 200.207(a). Thus, this part gives regulatory effect to the OMB guidance and *supplements the guidance as needed for the Department.* (b) The authority for all of the provisions in 2 CFR part 200 as adopted in this part is listed as follows. (Authority: 20 U.S.C. 1221e-3, 3474, and 2 CFR part 200)."

2 C.F.R. § 3474.1. As this Court determined in *American Association v. McMahon*, the language provided in the GANs is adequate to ensure that the terminations complied with § 200.340(b). *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, 770 F. Supp. 3d 822, 853, (D. Md. Mar. 19, 2025). Thus, count five should be dismissed, as Defendants did not violate any regulations when terminating the grants at issue.

**b. The Court Should Exercise Its Discretion Not to Issue a Writ of Mandamus in This Case (count six)**

The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations. *Kerr*, 426 U.S. at 402. It is well established that, "[e]quitable relief, particularly mandamus, does not necessarily follow a finding of a violation: respect for the autonomy and comparative

institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities." *South Carolina*, 243 F. Supp. 3d at 682; *In re Barr Labs., Inc*., 930 F.2d 72, 74 (D.C. Cir. 1991); *see In re Medicare Reimbursement Litig*., 414 F.3d 7, 10 (D.C. Cir. 2005) ("Even when the legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds compelling equitable grounds." (internal quotation marks and ellipsis omitted)); *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 762–63 (D.C. Cir. 1980) ("[O]ur finding that [the prerequisites of mandamus were met] does not necessarily lead us to conclude that this extraordinary remedy should be invoked [because,] ... 'a writ of mandamus' issuance is largely controlled by equitable principles.'" (parentheses omitted) (quoting *Duncan Townsite Co. v. Lane*, 245 U.S. 308, 312 (1917)). Plaintiffs ask the Court to issue three writs of mandamus, all of which should be rejected, because Plaintiffs have not demonstrated an indisputable right to the relief sought and Plaintiffs have an adequate remedy elsewhere.  ECF No. 1 at 39.

First, Plaintiffs ask the Court to issue a writ compelling Defendants to "restore or not effectuate the termination of Plaintiffs' comprehensive center grants, as well as the comprehensive center grants for which Plaintiff serve as subcontractors." *Id.* This is the same relief Plaintiffs seek for their "termination claims" and it should not be granted for the same reasons – namely, the CFC has exclusive jurisdiction, pursuant to the Tucker Act, over claims challenging the cancellation or suspension of individual federal grants, no matter how they are framed.  *Sustainability Inst.,* 2025 WL 1587100, at 2.

In light of recent caselaw, it is clear that Plaintiffs do not have an indisputable right to reinstatement of their grants by this Court in contravention of the Tucker Act.  *See Sustainability Inst.,* 2025 WL 1587100, at 1; *Department of Education v. California*, 145 S. Ct. 966, 968 (2025).

Further, Plaintiffs have an adequate remedy for what is essentially a breach of contract claim. In the Tucker Act, Congress set forth what remedies are available for breaches of government contract. The fact that Congress did not provide that Plaintiffs can obtain the exact relief they would prefer from the CFC, does not render the remedy "inadequate," and it certainly is not a reason to exercise jurisdiction in the face of a clear Congressional prohibition. This Court should exercise its discretion and deny the request.

Next, Plaintiffs request a writ compelling Defendants to "maintain, without interruption or delay, the statutorily required number of Comprehensive Centers and RELs…" and a writ compelling Defendants to "obligate and expend, without delay…the funds that Congress appropriated…before the funds expire." *Id.* These two requests are born out of Plaintiffs' "program claims," and as discussed *supra* in II(a)(1), the TRAC factors counsel against such relief. A writ that essentially tells the Department that under no circumstances can it cancel a previously awarded grant, or contract would be an extreme imposition on agency discretion over managing its programs, contracts and priorities. Further, a court-imposed deadline for agency action constitutes an extraordinary remedy that should be reserved for only the most extreme situations. 265 F. Supp. 3d 1267, 1294–95.  And even if this Court should find that Plaintiffs have met their burden of showing the prerequisites have been met for a writ of mandamus on their program claims, the Court should exercise its discretion not to issue the writ in the face of Plaintiffs' speculative allegations of harm related to the lost right to compete for grants and contracts at some point in the future. *See South Carolina,* 907 F.3d at 759 (explaining that it is within the Court's discretion to issue a writ of mandamus, despite Plaintiff satisfying the prerequisites).

27

**III.     The Relief Sought by Plaintiffs Is Overbroad**

If the Court is inclined to grant Plaintiffs relief, it should reject their request for a sweeping nationwide injunction. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Maryland v. U.S. Dep't of Agriculture*, Case No. 25-cv-0748-JKB, 2025 WL 973159, at *33 (D. Md. Apr. 1, 2025) (discussing "heated debate surrounding nationwide (or 'universal') injunctions in recent years" but noting that "[a] district court may issue a nationwide injunction so long as the court molds its decree to meet the exigencies of the particular case"). *See also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, App. No. 25-1189, ECF No. 29 at 9 (4th Cir. Mar. 14, 2025) (Rushing, J., concurring) (in granting stay of preliminary injunction order, warning that "[t]he scope of the preliminary injunction alone should raise red flags: the district court purported to enjoin *nondefendants* from taking action against *nonplaintiffs*."). When granting an injunction, "more narrowly tailored relief" should be granted where feasible. *Maryland*, 2025 WL 973159, at *33. Here, a nationwide injunction is wholly unnecessary to protect the named Plaintiffs who brought this lawsuit. Accordingly, any relief in this case should be tailored solely to the named Plaintiffs who are able to establish a likelihood of success on the merits and irreparable harm.

**<u>CONCLUSION</u>**

Considering the facts and law stated above, Defendants respectfully urge the Court to grant its motion for summary judgment. In the alternative, Defendants respectfully request that this case be transferred to the Court of Federal Claims.

*(SIGNATURE BLOCK ON THE FOLLOWING PAGE)*

Respectfully submitted,

Kelly O. Hayes

United States Attorney

      /s/

Tianna Bethune (Bar No. 31376)
Assistant United States Attorney
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
410-209-4800
Tianna.Bethune@usdoj.gov
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that, on July 9, 2025, I caused a copy of the foregoing to be electronically served upon all parties receiving CM/ECF notices in this case.


<u>                    */s/*                    </u>
Tianna Bethune
Assistant United States Attorney