# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHILD TRENDS, INCORPORATED et al., | Case No. 8:25-cv-01154-BAH |
| *Plaintiffs*, | |
| v. | |
| UNITED STATES DEPARTMENT OF EDUCATION et al., | |
| *Defendants*. | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, FOR TRANSFER TO THE COURT OF FEDERAL CLAIMS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 2

   I.   This Court Has Jurisdiction Over All of Plaintiffs' Claims................................ 2

      A.   The Tucker Act Does Not Deprive the Court of Jurisdiction Over Any Claims ........... 2

      B.   Plaintiffs May Bring Their Constitutional and *Ultra Vires* Claims ............................. 7

      C.   Plaintiffs' Programs Claims Challenge Discrete Agency Action ................................ 8

   II.   Plaintiffs are Entitled to Summary Judgment .................................................. 11

      A.   Defendants' Actions Violate Several Statutory Provisions ......................................... 11

      B.   Defendants Are Violating the Appropriations Acts and the Impoundment Control Act ................................................................................................ 14

      C.   Defendants Are Violating the Impoundment Control Act ........................................... 17

      D.   Defendants Are Violating the Constitution ................................................................. 18

      E.   Plaintiffs' Properly Challenge Agency Action under 5 U.S.C. § 706(2) but Would Also Prevail under the Standards of 5 U.S.C. § 706(1) ........................ 20

   III.   The Court Should Deny Defendants' Motion on the DOGE Claim ................................ 23

   IV.   Plaintiffs are Entitled to a Writ of Mandamus on their Program Claims.......................... 24

   V.   Plaintiffs Withdraw Their Claims Based on Department Regulations ............................. 24

   VI.   The Relief Requested Is Not Overbroad .......................................................... 24

CONCLUSION.................................................................................................. 26

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aids Vaccine Advoc. Coal. v. Dep't of State*,
  2025 WL 752378 (D.D.C. Mar. 10, 2025) ................................................................ 17

*All. To Save Mattaponi v. U.S. Army Corps of Enf'rs*, 515 F. Supp. 2d 1 (D.D.C. 2007) ........... 21

*Am. Educ. Research Ass'n v. Dep't of Educ.*,
  2025 WL 1665401 (D. Md. June 12, 2025) .............................................................. 10

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ................................................. 6

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ...................................................................... 4

*Board of Governors of the Federal Reserve System v. MCorp Fin., Inc.*,
  502 U.S. 32 (1991) ............................................................................................... 7, 8

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) ....................................................................... 3

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024) ........................................ 15

*Chamber of Comm. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ...................................... 19

*City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021) ........................................ 25

*Collins v. Yellen*, 594 U.S. 220 (2021) ...................................................................... 5, 7, 18

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) .................... 24, 25

*Dalton v. Specter*, 511 U.S. 462 (1994) ...................................................................... 18, 19, 20

*Diamond Alternative Energy, LLC v. EPA*,
  2025 WL 1716141 (U.S. June 20, 2025) ................................................................ 25

*Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 459 (D. Md. 2012) ............................................... 17

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*,
  2025 WL 1865971 (D. Md. July 7, 2025) ................................................................. 5

*Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756 (D.C. Cir. 2022) ................................... 2, 8

*Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697 (D.Md. 2008) ........................................ 22

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) ............................. 7, 18

*Furlow v. United States*, 55 F. Supp. 2d 360 (D. Md. 1999) ................................................ 13

*Gonzalez v. Cuccinelli*, 985 F.3d 357 (4th Cir. 2021) ......................................................... 22

*Green & Healthy Home Initiatives, Inc. v. Env't Prot. Agency*,
  2025 WL 1697463 (D. Md. June 17, 2025) .............................................................. 6

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214 (4th Cir. 2002) .......................... 23

*Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44 (D.C. Cir. 2013) ................... 23

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) ....................................................... *passim*

*In re Sunterra Corp.*, 361 F.3d 257 (4th Cir. 2004) ............................................................ 12

*Jacobs v. Tawes*, 250 F.2d 6115 (4th Cir. 1957) ............................................................... 12

*Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524 (1838) ........................................................... 24

*Leigh v. Salazar*, 2014 WL 4700016 (D. Nev. Sept. 22, 2014) ............................................ 21

*Lincoln v. Vigil*, 508 U.S. 182 (1993) .............................................................................. 16

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ........................................................... 9

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ................................................... 5

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ........................................................... 15

*NAACP v. Bureau of the Census*, 945 F.3d 183 (4th Cir. 2019) .................................... 9

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
    2023 WL 5221367, at *7 (D.D.C. Aug. 15, 2023) ................................................... 23

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ........... 25

*New York v. Trump*, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ....................................... 17

*Nuclear Regulatory Commission v. Texas*, 145 S. Ct. 1762 (2025) .............................. 7,8

*Palacios v. Spencer*, 906 F.3d 124 (D.C. Cir. 2018) .................................................. 6

*PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405 (D. Md. 2025) ..................................... 7, 19

*Sanders v. Callender*, 2018 WL 33775 (D. Md. Jan. 9, 2018) .................................... 6

*South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018) .................................. 22

*Maryland v. Corp. for Nat'l & Community Serv.*,
    2025 WL 1585051 (D.Md. June 5, 2025) ............................................................ 9, 21

*Strickland v. United States*, 32 F.4th 311 (4th Cir. 2022) ......................................... 3

*Sustainability Institute v. Trump*, No. 25-1575 (4th Cir. 2025) ................................. 1, 4

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ............................................ 4

*TRAC v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ......................................................... 22

*Trump v. CASA*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ................. 24, 25, 26

*Vara v. DeVos*, 2020 WL 3489679 (D. Mass. June 25, 2020) .................................. 21

*Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068 (9th Cir. 2016) ......... 11

*Webster v. Doe*, 486 U.S. 592 (1988) ................................................................... 3, 4

## Statutes

2 U.S.C. § 682 .......................................................................................... 17

5 U.S.C. § 701 .......................................................................................... 17

5 U.S.C. § 706 ..................................................................................... *passim*

20 U.S.C. § 7113 ...................................................................................... 16

20 U.S.C. § 9564 ............................................................................ 11, 12, 13

28 U.S.C. § 1292 ....................................................................................... 6

20 U.S.C. § 9602 ............................................................................ 11, 12, 13

Pub. L. 118-47, 138 Stat. 460 (Mar. 23, 2024) ...................................... 14, 15

Pub. L. 119-4, 139 Stat. 9 (Mar. 15, 2025) ................................................ 14

## Regulations

2 C.F.R. § 200.340(a), (b) ........................................................................ 13

89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) .............................................. 13

90 Fed. Reg. 9240, 9241 (Feb. 10, 2025) .................................................. 13

## Other Sources

GAO, *Principles of Federal Appropriations Law*, 6-28 (3d ed. Jan. 2004) ............... 14

GAO, B-326941 (Dec. 10, 2015) ................................................................. 14

GAO, B-329092 (Dec. 12, 2017) ................................................................. 14

## INTRODUCTION

As has been true throughout this case, Defendants barely mount any defense in support of the lawfulness of their actions. The only merits defense that Defendants advance is the implausible claim that Congress merely required them to "award" or "enter into" grants and contracts, without any obligation to ensure that the Comprehensive Centers and Regional Educational Laboratories (RELs) are actually operational and capable of carrying out their detailed statutory mandates. The absurdity of that claim is self-evident.

Rather than present a plausible merits defense, Defendants advance a kitchen sink of non-merits arguments. With respect to the Program Claims, however, Defendants no longer contend that the Tucker Act strips this Court of jurisdiction. Defendants instead put forward two other, non-merits defenses against the Program Claims. Defendants erroneously argue that the Program Claims do not challenge "discrete" agency actions. Defendants made specific policy decisions to not operate the required number of Comprehensive Centers and RELs, and to not spend appropriations, and Defendants effectuated these decisions in a single day for each program. Those are clearly discrete actions for APA purposes. Defendants also err in contending that the Program Claims should be brought under 5 U.S.C. § 706(1) rather than § 706(2). Defendants previously operated these programs as required, made policy decisions to no longer do so, and implemented those decisions through affirmative acts. These are actions that must be set aside under § 706(2). Regardless, relief would be warranted under § 706(1) if it did apply.

For the Termination Claims, Defendants do raise the Tucker Act, but they ignore that DOJ has abandoned that defense as to constitutional claims in *Sustainability Institute v. Trump*, No. 25-1575 (4th Cir. 2025), likely because DOJ knows that *Webster v. Doe* forecloses depriving grantees of any forum to challenge a termination's constitutionality. Defendants also conflate

1

Plaintiffs' freestanding constitutional claims with Plaintiffs' separate *ultra vires* claims for exceeding statutory authority; only the latter face the hurdles that Defendants describe. And Plaintiffs do surmount those hurdles for their *ultra vires* claims, because Plaintiffs would have no other avenue to bring these claims, and the statutory violations are "blatantly lawless." *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (quotations omitted).

The scope of relief that Plaintiffs request is proper. Under the Administrative Procedure Act (APA), vacating an unlawful agency action in full is the default remedy. That relief is independently warranted on the Program Claims because it is the only way to provide complete relief for Plaintiffs' injuries. Plaintiffs have lost the opportunity to compete for the required number of grants and contracts, and the only complete remedy is for Defendants to offer the full number of grants and contract for competition. For the Termination Claims, Plaintiffs seek only relief that would directly benefit them—reinstatement of their grants and subcontracts.

The Court should enter summary judgment for Plaintiffs on both the Program Claims and the Terminations claims and end Defendants' open defiance of the law.

## **ARGUMENT**

### I.    **This Court Has Jurisdiction Over All of Plaintiffs' Claims**

#### A.  **The Tucker Act Does Not Deprive the Court of Jurisdiction Over Any Claims**

Defendants concede that the Tucker Act does not deprive this Court of jurisdiction to hear Plaintiffs' Program Claims. They limit their Tucker Act arguments to the "termination claims," Defs.' Br. 7, ECF 49-1, and describe their jurisdictional challenge as a whole as limited to the Termination Claims, *see id.* at 2 ("this Court lacks jurisdiction over the termination claims"). Their only justiciability argument regarding the Program Claims is that those claims do not challenge discrete agency action, which Plaintiffs address further below in Section I.C.

On the Termination Claims, Defendants continue to ignore the critical distinctions between APA claims and freestanding constitutional and *ultra vires* claims. They assert that, "[t]o sue a federal agency, a plaintiff must identify an express waiver of sovereign immunity in the text of a federal law." *Id.* at 6. Plaintiffs do not assert their Termination Claims against "a federal agency"; these claims are brought against individual officers for violating the Constitution and exceeding their statutory authority. "[S]overeign immunity does not apply when a plaintiff files suit seeking equitable relief against federal officials … alleging that those officials exceeded the scope of their authority and/or acted unconstitutionally." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022). Defendants do not dispute that *Strickland* remains binding precedent on this Court. And without sovereign immunity, Defendants still do not identify any actual doctrinal basis for finding that the Congress's grant of jurisdiction to the Court of Federal Claims to hear breach of contract claims precludes this Court from exercising jurisdiction over constitutional and *ultra vires* claims.

For the constitutional Termination Claims, the clear statement rule under *Webster v. Doe*, 486 U.S. 592 (1988), is the applicable test, because Plaintiffs could not assert these claims elsewhere. *Cf. Elgin v. Dep't of Treasury*, 567 U.S. 1, 9-10 (2012) (*Webster* did not apply because the plaintiffs could assert their constitutional claims in the alternative forum). Defendants do not dispute that: (1) *Webster* remains binding precedent; (2) Plaintiffs could not assert their constitutional claims in the Court of Federal Claims, and (3) the Tucker Act has no "clear" statement depriving grantees of any forum to challenge the constitutionality of their terminations.

Nor do Defendants provide any example—ever—where the Supreme Court has held that a federal statute strips parties of any ability to challenge the constitutionality of a government

action. Defendants cite no such precedent because the Supreme Court has avoided ever finding a federal statute to have this effect, given "the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster*, 486 U.S. at 603. Defendants ask this Court to find the Tucker Act to be the first ever such federal statute, and Defendants make nary a mention of *Webster* in making this request. *Webster* is binding precedent that forecloses this outcome, and binding precedent does not disappear merely because a party has no response to its applicability.

Indeed, as Plaintiffs explained in their opening brief, the government has abandoned its Tucker Act defense for constitutional claims in the *Sustainability Institute* appeal. *See* Pls.' Br. 16, ECF 48-1. Defendants' reliance on the *Sustainability Institute* stay order should hold no purchase as to Plaintiffs' constitutional claims given that the government has effectively disclaimed that portion of the stay order on appeal. It is now assured that the merits decision in *Sustainability Institute* will not rely upon the Tucker Act as a basis for rejecting the grantees' constitutional claims.

With respect to Plaintiffs' separate *ultra vires* claims, which are based on Defendants' exceeding their authority under the Education Sciences Reform Act and the Educational Technical Assistance Act, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), provides the applicable test for whether "[a] special statutory review scheme" "implicitly" "preclude[s] district courts from exercising jurisdiction over challenges to federal agency actions." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). The key question under this test is "whether the particular claims brought were 'of the type Congress intended to be reviewed within this statutory structure.'" *Id.* at 186 (quoting *Thunder Basin*, 51 U.S. at 208). To answer this question, courts must evaluate: (1) "could precluding district court jurisdiction 'foreclose all meaningful

judicial review' of the claim?"; (2) "is the claim wholly collateral to the statute's review provisions?"; and (3) "is the claim outside the agency's expertise?" *Id.* (quotations omitted).

All of these factors favor jurisdiction over Plaintiffs' *ultra vires* claims. Finding implied preclusion would foreclose all judicial review of these claims because the Court of Federal Claims would lack jurisdiction to adjudicate violations of the relevant statutes, which are not money-mandating. The *ultra vires* claims are wholly collateral to any Court of Federal Claims proceedings over whether Defendants breached the terms of the grants. And the Court of Federal Claims has no expertise in reviewing statutory provisions like those here.

Instead of relying on the relevant tests under Supreme Court precedent, Defendants continue to cite only the two-part test that the D.C. Circuit developed (pre-*Thunder Basin*) for assessing whether the Tucker Act precludes the APA's sovereign immunity waiver. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982). Regardless, Plaintiffs prevail under that test as well. The sources of the rights for the Termination Claims are exclusively constitutional and statutory provisions, not the terms and conditions of the grants. Defendants assert that the only possible source of rights for Plaintiffs' termination claims is "the operative grant agreements." Defs.' Br. 8. Not so. The source of Plaintiffs' right for their separation of powers claim is the fundamental "liberty"—"of all the people"—that the doctrine preserves. *Collins v. Yellen*, 594 U.S. 220, 245 (2021). This right is so important that the Supreme Court has declared that, "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Id.* And the source of the rights for the *ultra vires* claims is the statutory provisions that Defendants are violating. Again, Plaintiffs' claims make no mention of contractual terms at all. *See, e.g.*, *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025

WL 1865971, at *13 (D. Md. July 7, 2025); *Green & Healthy Home Initiatives, Inc. v. Env't Prot. Agency*, 2025 WL 1697463, at *14 (D. Md. June 17, 2025).

As for the relief sought, Defendants erroneously assert that Plaintiffs are "seeking to enforce a contractual obligation to pay money." Defs.' Br. 8. Plaintiffs do not seek any order compelling payment of money. Nor do the Termination Claims include any allegation that Defendants failed to make contractually obligated payments. Plaintiffs seek to enjoin Defendants from effectuating unlawful terminations, to restore Plaintiffs' awards. If that were to occur, and if Plaintiffs subsequently performed under the awards and Defendants did not pay as required, Plaintiffs agree that those claims would have to be brought in the Court of Federal Claims.

Finally, Defendants make a passing request that, "in the alternative" to dismissing or granting summary judgment on the Termination Claims, the claims should be "transferred to the Court of Federal Claims." Defs.' Br. 7, 28. Defendants add a footnote that, again without argument, includes a block quote from 28 U.S.C. § 1292(d)(4)(B) concerning a limited stay. Defs.' Br. 7 n.2. Defendants make no argument regarding a stay and its scope, have not argued that the Court cannot adjudicate Plaintiffs' summary judgment motion, and in fact ask the Court to rule in the first instance on their requests to dismiss and summary judgment. Defendants thus have waived and forfeited any argument regarding a stay and its scope. *See Palacios v. Spencer*, 906 F.3d 124, 127 n.1 (D.C. Cir. 2018) (holding that the plaintiff "has forfeited any argument about this statute," referring to § 1292(d)(4)(B)); *see also Sanders v. Callender*, 2018 WL 337756, at *7 (D. Md. Jan. 9, 2018) (collecting cases that issues raised in a footnote are not considered raised). If the Court seeks further information on § 1292(d)(4)(B), though, Plaintiffs will be prepared to address the provision at the hearing or in any requested briefing.

### B. Plaintiffs May Bring Their Constitutional and *Ultra Vires* Claims

In arguing that "*ultra vires* review is unavailable in this case," Defs.' Br. 8, Defendants conflate freestanding constitutional claims and *ultra vires* claims based on officials' exceeding their *statutory* authority. The cases that Defendants cite—such as *Nuclear Regulatory Commission v. Texas*, 145 S. Ct. 1762 (2025), and *Board of Governors of the Federal Reserve System v. MCorp Fin., Inc.*, 502 U.S. 32 (1991)—concerned the latter, where plaintiffs alleged that agency officials violated a statutory scheme by exceeding their statutory authority. Plaintiffs here bring such *ultra vires* claims—but also freestanding constitutional claims.

The Supreme Court has consistently reaffirmed the right of plaintiffs to bring freestanding constitutional claims to enjoin federal officials from violating the constitution. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 425 (D. Md. 2025) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)). "The Supreme Court has rejected the argument that there is no right to equitable relief under the Constitution to challenge governmental action under separation-of-powers principles." *Id.* at 426 (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)). There is "no reason and no authority," the Supreme Court has explained, why a "separation-of-powers claim should be treated differently than every other constitutional claim." *Free Enter. Fund*, 561 U.S. at 491 n.2. To the contrary, "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins*, 594 U.S. at 245. Plaintiffs have a right to challenge Defendants' actions for violating the separation of powers, and the cases Defendants cite requiring heightened showings for *ultra vires* statutory claims are inapplicable.

7

For Plaintiffs' separate *ultra vires* claims based on exceeding statutory authority, Plaintiffs make the showings required to bring these claims—that they would have no "alternative path to judicial review," *Nuclear Reg. Comm'n*, 145 S. Ct. at 1775, and that there is a "clear departure by the agency from its statutory mandate," *Fed. Express Corp.*, 39 F.4th at 76. The latter requirement is clearly met as discussed below in Section II.A, and Plaintiffs would have "meaningful and adequate opportunity for judicial review" for the Program or Termination Claims elsewhere, *Bd. of Governors*, 502 U.S. at 43. Defendants now admit that if Plaintiffs cannot bring the Program Claims under the APA, Plaintiffs could not bring these claims in the Court of Federal Claims. For the Termination Claims, the Supreme Court suggested in *Department of Education v. California*, 145 S. Ct. 966, 968 (2025), that grant terminations may not be challenged under the APA, and Plaintiffs could not challenge the terminations on statutory grounds in the Court of Federal Claims given that the statutes are not money-mandating.

Adjudicating Plaintiffs' freestanding constitutional and *ultra vires* claims would not, as Defendants argue, mean that "every breach-of-government-contract claim could be reframed as an *ultra vires* action against the relevant executive official." Defs.' Br. 9. An actual breach of contract claim—based on violating some term or condition of a contract (which Plaintiffs do not allege here)—would rarely give rise to constitutional or *ultra vires* claims. Regardless, here, Plaintiffs' constitutional and *ultra vires* claims have nothing to do with any breach of contract.

### C.  Plaintiffs' Programs Claims Challenge Discrete Agency Action

Defendants contend that Plaintiffs' Programs Claims do not challenge "discrete" agency action. Defs.' Br. 10. Defendants erroneously lump together Plaintiffs' APA, *ultra vires*, and constitutional Programs Claims in asserting this defense. The APA's discrete action requirement

applies only to APA claims. *See NAACP v. Bureau of the Census*, 945 F.3d 183, 183 (4th Cir. 2019). It has no relevance to Plaintiffs' freestanding constitutional and *ultra vires* claims.

Plaintiffs' APA-based Programs Claims do challenge discrete policy decisions and actions. In February 2025, Defendants decided on new policies to eliminate or nearly eliminate the REL and Comprehensive Centers programs, and to stop spending the funds appropriated for those programs. Defendants effectuated those policies in a single day for each —February 13 for the RELs and February 19 for the Comprehensive Centers—by ceasing to operate the statutorily required number of RELs and Comprehensive Centers and ceasing to spend appropriated funds.

Defendants reframe their across-the-board policy decision to cease operating these programs as "many individual actions" that must be challenged one by one. Defs.' Br. 11-12. But Defendants did not make individualized decisions to terminate any single grant or contract for any reason specific to that grant or contract—nor do they even claim that they did; and the Administrative Records contain no evidence of any individualized analysis. Rather, for each program, Defendants made a singular decision not to operate the specific number of Comprehensive Centers or RELs that Congress commanded be "establish[ed]." *Infra* II.A. And they effectuated that decision in a single day for each program, through a single wave of terminations. That the decision *affected* many grants and contracts does not make the decision non-discrete. Here, just as in *Maryland v. Corporation for National and Community Service*, the decision to terminate these programs, carried out by withdrawing grant and contract funds for the programs, is "an 'across the board' agency action that 'can of course be challenged under the APA by a person adversely affected.'" 2025 WL 1585051, at *13 (D.Md. June 5, 2025) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990)).

Defendants also do not genuinely dispute that they made these decisions. They have never denied that they decided to indefinitely not operate 18 of 20 Comprehensive Centers. At no point in their briefs, in the Administrative Record, or in their public statements have Defendants said that they intend to restart the Comprehensive Centers program. To the contrary, in their Fiscal Year 2026 budget request, Defendants wrote: "the Administration does not request funding for the Comprehensive Centers program for fiscal year 2026. States and localities, not the Federal government, are best suited to determine whether to support the activities authorized under this program or similar activities within their own budgets and without unnecessary administrative burden imposed by the Federal government."[1]

For the RELs, in a footnote, Defendants point to a filing in a different case in which the Department vaguely indicated that it would rebid REL contracts, without any details or timeline. *See* Defs.' Br. 14 n.5 (citing *Am. Educ. Research Ass'n v. Dep't of Educ.,* 2025 WL 1665401, at *3 (D. Md. June 12, 2025)). But Defendants say even less here: they state only that "consideration is being given to rebidding the ten REL contracts." *Id.* at 18. Yet they provide no supporting evidence for even that statement. All of the evidence in the record—the blanket termination of all RELs, the firing of all Department staff working on RELs (which the Supreme Court has now permitted to proceed), the fact that the President's FY2026 budget requested no money for RELs, and the lack of any step toward resuming the program over five months and counting—establish that Defendants decided to eliminate the program. Defendants produce no evidence in the Administrative Record to create a genuine issue on this question. At a minimum, Defendants clearly have decided to not operate the program through the end of the fiscal year, given the time it takes to compete new contracts.

---

[1] U.S. Department of Education, Fiscal Year 2026 BudgetSummary, at 19.
https://www.ed.gov/media/document/fiscal-year-2026-budget-summary-110043.pdf

Finally, Defendants do not meaningfully dispute that providing relief on the Program Claims would not implicate the concerns animating the discreteness requirement, which is to avoid having the Court manage an agency's day-to-day operations, without a clear standard for measuring compliance. Granting relief on the Program Claims would require only that Defendants operate the programs through the required number of grants and contracts at the required spending levels—it would not mandate *how* the Department operates them. *See Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1079 (9th Cir. 2016). It is up to the Department how to carry out these programs, but it is not up to the Department *whether* to do so.

## II.    Plaintiffs are Entitled to Summary Judgment

### A.  Defendants' Actions Violate Several Statutory Provisions

Defendants do not dispute that the Department is currently operating zero RELs, despite the statutory requirement that the Department "shall enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States." 20 U.S.C. § 9564(a). Nor do they dispute that the Department is maintaining just two Comprehensive Centers, even though the statute requires the Department to "award not less than 20 grants [to entities] to establish comprehensive centers," and to "ensure that not less than 1 comprehensive center is established in each of the 10 geographic regions." *Id.* § 9602(a).

Yet Defendants continue to make the remarkable argument that Congress merely required the Department to "enter into" 10 REL contracts and "award" at least 20 Comprehensive Center grants, not to actually have these instruments be operational to carry out the detailed statutory programs that Congress devised. Defs.' Br.12-14. According to Defendants, they would fully comply with the statutes by awarding 10 contracts and 20 grants and then terminating them the next day. The plain text of the statutes and common sense close the door to this contention.

The statutes here do not just require Defendants to "enter into" and "award" the contracts and grants; they require that the RELs and Comprehensive Centers be "establish[ed]" in particular regions. 20 U.S.C. § 9564(a), § 9602(a). To "establish" is to "set up . . . on a firm or permanent basis." Encyclopedia.com ("Establish"), https://perma.cc/NH4A-2MDJ; *accord* Dictionary.com, "establish," https://perma.cc/ZS9J-KBYD ("to found, institute, build, or bring into being on a firm or stable basis"). The statutes also require that the RELs and Comprehensive Centers be established to "serve[]" the regions in which they operate. 20 U.S.C. §§ 9564(a), (b), (d)(2); *id.* § 9602(c)(2); *see* Cambridge Dictionary, "serve," https://perma.cc/5J3U-M6NX ("to help achieve something or to be useful as something"). RELs and Comprehensive Centers are not "established" and do not "serve" their regions if they do not exist. Indeed, Congress required Defendants to "enter into contracts for a 5-year period" for the RELs to carry out the program. 20 U.S.C. § 9564(e)(1)(A). Defendants violated that statutory command as well by terminating the RELs during the five-year period, based only on disfavor for the program generally.

Even if the statutes were not clear, "statutes should be construed to avoid absurd consequences, as Congress must be presumed not to have intended what was absurd." *Jacobs v. Tawes*, 250 F.2d 611, 615 (4th Cir. 1957). Defendants' interpretation would "result[] in an outcome that can truly be characterized as absurd." *In re Sunterra Corp.*, 361 F.3d 257, 265 (4th Cir. 2004). It would mean that a congressional direction to enter into agreements to carry out educational programs comes with no obligation to maintain those agreements to actually carry out those programs. Congress drafted these statutes to set up *programs* that would serve schools and students; Congress did not require the signing of a contract or grant for its own sake.

Defendants also continue to mischaracterize Plaintiffs' argument as claiming that the Department cannot, under any circumstance, terminate a REL or Comprehensive Center for

12

misconduct or other reasons outside the agency's control. That is not what Plaintiffs claim, and not what happened here. The statutes require Defendants to establish 20 Comprehensive Centers and 10 RELs, but if fraud or failure to perform the agreement necessitate terminating a contract or grant, Defendants must immediately take all steps needed to re-establish the required numbers of grants and contracts. Doing so is necessary to meet the statutory requirements that "the Secretary . . . award not less than 20 grants . . . *to establish* comprehensive centers," and "*shall ensure* that not less than 1 comprehensive center *is established* in each of the 10 geographic regions served by [RELs]." 20 U.S.C. § 9602(a) (emphases added). It is also necessary to meet the requirement that the Director of IES "shall enter into contracts with entities *to establish* a networked system of 10 regional educational laboratories." *Id.* § 9564(a) (emphasis added).

This case does not fall into any gray area concerning whether Defendants are complying with these requirements. Defendants gutted the programs five months ago, have never stated any intent to re-establish the Comprehensive Centers, and have not taken a single step toward re-establishing the RELs before the end of the fiscal year. Defendants have cancelled two statutory programs that Congress required them to operate.

Defendants contend that the Department "had the authority to terminate [the Comprehensive Centers] grants" under the certain regulations and "the terms and conditions of Plaintiffs' initial grants." Defs.' Br. 13. They are wrong, but this question is irrelevant to the alleged statutory violations regardless. "It is a fundamental principle of American law that legislative statutes take precedence over conflicting administrative regulations," and the same is true for contractual terms. *Furlow v. United States*, 55 F. Supp. 2d 360, 364 (D. Md. 1999). The regulatory and contractual terms have no bearing on the alleged statutory violations at all.[2]

---

[2] The applicable regulations did not permit Defendants to terminate the Comprehensive Centers grants based on new "programs goals or agency priorities." The current version of the Uniform Grants Guidance permits agencies to

### B. Defendants Are Violating the Appropriations Acts and the Impoundment Control Act

Defendants fundamentally misunderstand appropriations laws in asserting the Department need not spend the $50 million that Congress appropriated for the Comprehensive Centers in the 2024 Appropriations Act and again in the 2025 Continuing Resolution. *See* Defs.' Br. 20-21. Those acts each appropriated $5,776,178,000 for "School Improvement Programs," and provided that, of that lump sum, "$50,000,000 shall be available to carry out" the Comprehensive Centers program. Pub. L. 118-47, 138 Stat. 460, 683 (Mar. 23, 2024); Pub. L. 119-4, 139 Stat. 9, 10-12 (Mar. 15, 2025). Under well-settled principles of appropriations law, discussed further below, Congress must spend the full $5.77 billion appropriated for School Improvement Programs. And in providing that $50 million of this amount "shall be available for" the Comprehensive Centers program, Congress required that "those funds cannot be diverted to other purposes within the [lump-sum] appropriation." GAO, B-326941, at 7 (Dec. 10, 2015), https://perma.cc/Q398-8RMJ. If the Department must spend the full $5.77 billion, and cannot spend $50 million of that on anything but the Comprehensive Centers, then the Department must spend the full $50 million on the Comprehensive Centers.

It is black letter appropriation law that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). The President has no "unilateral authority to refuse to spend the funds." *Id.* Where

---

terminate grants based on "program goals or agency priorities" *only* where that basis for termination is "clearly and unambiguously" specified in the award's "terms and conditions." 2 C.F.R. § 200.340(a), (b); *see* 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024). The terms and conditions of Plaintiffs' grants nowhere said that they could be terminated on these bases. *See* ECF 16-5, AR 2137-2186 (Child Trends Grant); ECF 16-6, AR 800-850 (RMC Grant). And the Department of Education has stipulated that the current Uniform Grants Guidance applies to any awards issued after June 21, 2024, where grantees drew down funds between January 16, 2025 and February 10, 2025. 90 Fed. Reg. 9240, 9241 (Feb. 10, 2025). That covers Plaintiffs' grants.

Congress intends to deviate from this default result, it does so through explicitly permissive language, such as appropriating "up to," "not more than," or "sums not exceeding" specific amounts. *See* GAO, *Principles of Federal Appropriations Law*, 6-28 (3d ed. Jan. 2004) (explaining that, with a "not to exceed" appropriation, "the agency is not required to spend the entire amount"); *see also CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 442 (2024) (Kagan, J., concurring). In the 2024 Appropriations Act, the phrase "not to exceed" appears over 200 times, and "up to" appears 125 times. For instance, the Act appropriates $457 million for Safe Schools and Citizenship Education, and "up to $5,000,000" of that amount for the Project School Emergency Response to Violence. 138 Stat. 648. This language would be entirely unnecessary unless an appropriation, by default, required agencies to spend the full amount appropriated.

Moreover, Congress conclusively answered this question in the Impoundment Control Act (ICA), which rejected the Nixon administration's claim that it could spend less than the full amounts Congress appropriated. As the GAO has explained, "the [ICA] operates on the *premise* that when Congress appropriates money to the executive branch, the President is required to obligate the funds." GAO, B-329092 (Dec. 12, 2017) (emphasis added)). The Act takes as a given that agencies must spend the full amounts appropriated, and the Act sets forth exclusive processes whereby the President may secure authorization from Congress not to spend the full amount of funds. Congress enacts every appropriations act knowing and relying on the premise underlying the ICA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("Congress is aware of existing law when it passes legislation.").

It is unclear the extent to which Defendants contest these principles, including whether they dispute that the Department must spend the full $5.77 billion appropriated for School Improvement Programs. Defendants focus on the "shall be available" language for the

15

Comprehensive Centers program, Defs.' Br. 20-21, but they do not contest that this language prohibits the Department from spending those funds on other School Improvement Programs. As explained above, that means the Department must spend that entire amount on the Comprehensive Centers. It is immaterial that Congress wrote "shall be available" for the Comprehensive Centers versus "shall be for" other funding programs. In that same appropriation, Congress specified that "$1,380,000,000 shall be available for grants under subpart 1 of part A of title IV," CITE, and that is a formula funding program for which the Department indisputably must spend the precise amount appropriated. *See* 20 U.S.C. § 7113.

Defendants' citation to *Lincoln v. Vigil*, 508 U.S. 182 (1993), is also inapt. In *Lincoln*, the plaintiffs challenged the Indian Health Service's discontinuation of the Indian Children's Program. *Id.* at 184. That program was not required by statute or even mentioned in any statute. *See id.* at 184-86. It had been created entirely at the agency's discretion. Congress had provided a broad lump-sum appropriation for the Service generally, and "Congress never expressly appropriated funds for" the program. *Id.* Here, by contrast, Congress did "statutorily restrict[] what can be done with those funds," *id.* at 192 (quotations omitted), by specifying that the Department must spend $50 million on the Comprehensive Centers. And unlike in *Lincoln*, both the Comprehensive Centers and REL programs are mandated by statute, and the Executive Branch "must follow statutory *mandates* so long as there is appropriated money available." *Aiken Cnty.*, 725 F.3d at 259. The appropriations for the Comprehensive Centers and for IES remain available (although only for a few more months), and Defendants must use the appropriated funds to carry out the required statutory programs.

Defendants' responses to the appropriations-based claims are most notable for what Defendants do not say. Nowhere do they assert that they intend to obligate the funds

appropriated for the Comprehensive Centers, or for the REL program within the IES appropriation, before the first buckets of funds expire on September 30, 2025, and before the next buckets expire on September 30, 2026. Defendants do not produce any materials in the Administrative Record or submit any other evidence indicating otherwise. Thus, there is no materially disputed fact that Defendants do not intend to obligate these funds absent this Court's intervention.

### C.  Defendants Are Violating the Impoundment Control Act

Defendants also do not meaningfully dispute that they are deferring the obligation of the relevant appropriations for policy reasons. There is no materially disputed fact that Defendants are "withholding or delaying the obligation or expenditure of" appropriated funds, without having sent a special message to Congress as required by the ICA, and for reasons that are not permissible reasons for deferring funds under the ICA. 2 U.S.C. §§ 682(1), (4). As courts have recently held, Plaintiffs may bring APA claims for violations of the ICA in these circumstances. *See Aids Vaccine Advoc. Coal. v. Dep't of State*, 2025 WL 752378, at *17 n.17 (D.D.C. Mar. 10, 2025); *New York v. Trump*, 2025 WL 715621, at *9 n.13 (D.R.I. Mar. 6, 2025).

Defendants erroneously argue that "private plaintiffs cannot bring suit for alleged violations of the ICA," because the Act authorizes some enforcement by the Comptroller General. Defs.' Br. 21. But the mere possibility of Comptroller General enforcement does not "preclude judicial review." 5 U.S.C. § 701(a)(1). The APA embraces a "strong presumption in favor of judicial review of administrative action" that can only be rebutted with a "showing of clear and convincing evidence of a contrary legislative intent." *Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 459 (D. Md. 2012) (quotations omitted). Nothing in the ICA says the statute is to be enforced exclusively by the Comptroller. Although the statute *allows* the Comptroller to enforce it in some circumstances, it does not state that such enforcement is exclusive or displaces the

APA's strong presumption of judicial review. For this reason, courts have held that the ICA is privately enforceable through the APA. *See supra.*

On the merits, Defendants aim at strawmen in contending that Plaintiffs' claim "would create an absurd outcome: an agency would be *permanently* barred from canceling a grant or contract, no matter how problematic the grant or lawful the cancellation." Defs.' Br. 22. Plaintiffs do not suggest that an agency may never terminate a grant or contract where the recipient is failing to perform, or engaging in fraud, or otherwise violating the terms of the award. Plaintiffs argue only that an agency may not mass-terminate grants and contracts with the specific goal of delaying the spending of, or rescinding entirely, appropriated funds because the agency dislikes the policies Congress enacted. Agencies certainly cannot carry out such mass terminations and then do nothing to spend the funds for five months and running, again solely for policy reasons. There is no genuinely disputed fact that Defendants are doing just that here.

### D. Defendants Are Violating the Constitution

Defendants do not dispute that the Constitution gives Congress the exclusive authority to make laws and to exercise the power of the purse. Nor do Defendants dispute that the Executive Branch must faithfully execute the laws enacted by Congress and has no authority to countermand Congress's spending mandates. Defendants' sole defense on the merits of Plaintiffs' constitutional claims is that the claims are not actionable because they are predicated on statutory violations. *See* Defs.' Br. 19 (citing *Dalton v. Specter*, 511 U.S. 462 (1994)).

The Supreme Court has rejected any suggestion that separation of powers claims hold second-class constitutional status: there is "no reason and . . . no authority" that "separation-of-powers claim should be treated differently than every other constitutional claim." *Free Enter. Fund*, 561 U.S. at 491 n.2; *see also Collins*, 594 U.S. at 245.

There is also no basis for treating separations of powers claims differently when they are premised on refusals to comply with statutory mandates. *Dalton* did not hold otherwise. In *Dalton*, the President allegedly violated the "procedural requirements" of a statute governing closure of military bases by "accepting procedurally flawed" recommendations of a federal commission. 511 U.S. at 474, 476. While the Court assumed "that some claims that the President violated a statutory mandate are judicially reviewable outside the framework of the APA," it reaffirmed that "such review is not available when the statute in question commits the decision to the discretion of the President." *Id.* at 474. It was simply because the statute in *Dalton* committed the challenged decision "to the discretion of the President," *id.* at 474, that the decision was not subject to judicial review, and the plaintiffs could not avoid that outcome by framing the alleged procedural violations as constitutional ones.

This Court, the D.C. Circuit, and other courts have held that *Dalton*'s holding is limited to claims challenging discretionary statutory decisions. This Court has concurred with the D.C. Circuit that "*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President *and contains no limitations on the President's exercise of that authority*, judicial review of an abuse of discretion claim is not available." *See Chamber of Comm. of U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996) (emphasis added); *PFLAG*, 769 F. Supp. 3d at 427. In *Reich*, the government argued that *Dalton* foreclosed constitutional claims because they were "statutory claims in constitutional dress." Br. for Appellee at 23, *Reich*, 1995 WL 17204619 (Oct. 26, 1995). Rejecting that argument, the D.C. Circuit explained that "*Dalton* is inapposite where the claim instead is that the presidential action—not one, it should be added, even contemplated by Congress—independently violates" the statute at issue. *Reich*, 74 F.3d at 1332.

Consistent with this understanding of *Dalton*, the D.C. Circuit has also held that an agency's refusal to comply with a statute *does* give rise to a separation of powers violation where the agency violates clear "statutory *mandates*." *Aiken Cnty.*, 725 F.3d at 258. In *Aiken County*, then-Judge Kavanaugh issued a writ of mandamus based on an agency's constitutional violation in refusing to "comply with the law as it has been set by Congress." *Id.* at 257. The court held that, "[u]nder Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory *mandates*." *Id.* at 258. Although the agency action reflected a statutory violation, the court's holding was based on the separation of powers. The court's "decision … rest[ed] on the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress." *Id.* at 267.

The instant case, like *Aiken County* and unlike *Dalton*, involves "statutory mandates." Defendant "shall" establish 20 Comprehensive Centers and 10 RELs to carry out the applicable statutory schemes, and must spend the funds appropriated for these programs. On these points, the statutes do not confer *any* discretion on Defendants. As in *Aiken County*, Defendants have violated the separation of powers in their refusal to comply with "statutory *mandates*," in direct defiance of "the constitutional authority of Congress." 725 F.3d at 259, 267.

### E.  Plaintiffs' Properly Challenge Agency Action under 5 U.S.C. § 706(2) but Would Also Prevail under the Standards of 5 U.S.C. § 706(1)

Defendants mischaracterize Plaintiffs' APA-based Program Claims as challenging only Defendants' delay in recompeting terminated grants and contracts, and they argue from that premise that such a claim can only be brought under § 706(1) for action unlawfully withheld or unreasonably delayed. Defs.' Br. 14. The Program Claims do not merely challenge agency inaction or a failure to act; they challenge Defendants' active elimination of the Comprehensive Centers and REL programs. Prior to the actions challenged in this case, Defendants had

established and were operating the required number of Comprehensive Centers and RELs, and were spending the funds appropriated for those programs. Then, Defendants decided on new policies to eliminate or almost entirely eliminate the programs and the spending on those programs. They effectuated those policies in a single day for each program, through affirmative acts, by ceasing to operate the statutorily required number of Comprehensive Centers and RELs and ceasing to spend the funds appropriated for these programs.

It is those decisions and the actions effectuating those decisions that Plaintiffs challenge under § 706(2). The absence of any steps to re-establish the programs are part and parcel of those decisions, and crystallize the nature of the decisions that Defendants made, but this is not a § 706(1) case where an agency never took some action and is being challenged for the withholding or delay in taking action. The "decision[s] to close" the Comprehensive Centers and REL programs are agency actions subject to § 706(2) review. *Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051, at *13; *see also Vara v. DeVos*, 2020 WL 3489679, at *29 (D. Mass. June 25, 2020) ("[A]n agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." (quotations omitted)). In short, Plaintiffs seek to declare unlawful, vacate, and enjoin Defendants' policy decisions to not operate the required number of RELs and Comprehensive Centers, and to not spend the appropriations that they must.

Regardless, Plaintiffs' claims succeed even if the Court construes them as additionally or alternatively challenging action unlawfully withheld or unreasonably delayed under § 706(1). *See Leigh v. Salazar*, 2014 WL 4700016, at *4 (D. Nev. Sept. 22, 2014) (construing a § 706(2) claim as seeking relief under § 706(1)); *All. To Save Mattaponi v. U.S. Army Corps of Enf'rs*, 515 F. Supp. 2d 1, 10 (D.D.C. 2007) (noting that 706(1) and 706(2) are not mutually exclusive mechanisms for challenging a particular action or inaction).

Defendants are incorrect that a § 706(1) claim here would be for "unreasonably delayed" action. Defs.' Br. 14-15. Unlike with claims "contesting unlawfully withheld agency action," claims of unreasonable delay require the Court to engage in "discretionary analysis" to assess the "reasonableness of the delay." *South Carolina v. United States*, 907 F.3d 742, 759 (4th Cir. 2018). Defendants have no "discretion" under the statutes here; they must establish 20 Comprehensive Centers and 10 RELs, and spend appropriations before they expire. There is no "reasonable" period of time for Defendants to do nothing to comply with these requirements. The existence of a "deadline" can be probative of lack of discretion, but it is not a necessary condition as Defendants contend. Defs.' Br. 14. In any event, there is a deadline here: Defendants must obligate funds to operate these programs before the funds expire on September 30.

Finally, even if the proper question were whether Defendants have unreasonably delayed recompeting new Comprehensive Centers and REL awards, they undoubtedly have. The Fourth Circuit has held that district courts in this Circuit are "not limited to" and "not required to use" the *TRAC v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) factors, *see Gonzalez v. Cuccinelli*, 985 F.3d 357, 375 (4th Cir. 2021), but Plaintiffs would clearly prevail under those factors. There is no legitimate reason for Defendants' "mere five month[]" delay, and counting, to renew these statutorily required programs, Defs.' Br. 16, and it is certainly not reasonable to delay doing so until after funds appropriated for the programs have expired. The Department's self-inflicted "transition phase" does not qualify as a legitimate ground for violating statutory mandates. *Id.* at 16. The "nature and extent of the interests prejudiced by delay" and "human health and welfare are at stake" confirm that Defendants' actions are entirely unreasonable. *Cuccinelli*, 985 F.3d at 375. Teachers, students, and communities are all suffering from Defendants' lawless actions.

### III.    The Court Should Deny Defendants' Motion on the DOGE Claim

Plaintiffs allege at Count Four that DOGE unlawfully directed the termination of Plaintiffs' grants and the grants and contracts for which Plaintiffs were subcontractors. If the Court enters summary judgment for Plaintiffs on their other Termination Claims, the Court may dismiss this claim as prudentially moot. *See Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697, 707 (D.Md. 2008), *aff'd*, *United States v. Lentz*, 419 F. App'x 381 (4th Cir. 2011). But if the Court does not award relief on the other Termination Claims, the Court should deny Defendants' motion for summary judgment on the DOGE claim because there are materially disputed facts relevant to that claim. Consistent with Rule 56(d), Plaintiffs submit an affidavit outlining why discovery is needed to support this claim. *See* Declaration of Daniel F. Jacobson (attached as Ex. A); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002).

Defendants appear to concede the legal principles upon which Plaintiffs bring the DOGE claim. They admit that the United States DOGE Service (USDS) is only "empowered to advise and consult with" agencies, and that only "agency leadership and employees are empowered to make decisions relating to contracts and grants." Defs.' Br. 22. Defendants assert that "there is no evidence that the agency DOGE employees did more than function in an advisory role," or that these DOGE officials "are not part of USDS." *Id.* But those assertions raise more questions than they answer and illuminate the need for discovery to resolve this claim. Who are the relevant "agency DOGE employees," what was their "role" in the terminations, and what is their actual relationship to the USDS? The Administrative Record contains none of that information, and Plaintiffs must have an opportunity to seek discovery on these issues.

Discovery on this claim would be proper if the claim does not become moot. Because this claim does not arise under the APA, and challenges the "procedural validity" of the terminations,

the Court's review is not limited to the Administrative Record. *See Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013); *see also Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 2023 WL 5221367, at *7 (D.D.C. Aug. 15, 2023).

## IV.    Plaintiffs are Entitled to a Writ of Mandamus on their Program Claims

As explained above, Defendants have unambiguous duties to maintain specific numbers of Comprehensive Centers and RELs and to obligate funds Congress has appropriated for the Comprehensive Centers program. If there is no other relief available to Plaintiffs on their Programs Claims, then mandamus is necessary "to correct transparent violations of a clear duty to act." *Aiken Cnty.*, 725 F.3d at 258 (citation omitted). Writs of mandamus are appropriate to compel agency officials to comply with "statutory mandates," *id.* at 259, including mandates from Congress to spend appropriations for particular purposes, *see Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524 (1838) (affirming writ of mandamus against the Postmaster General to spend funds appropriated for a particular purpose).

## V.    Plaintiffs Withdraw Their Claims Based on Department Regulations

As explained above, *supra* p.13 n.2, the termination of the Comprehensive Center grants violated the regulations applicable to these grants. However, Plaintiffs no longer seek relief here based on these violations, and thus no longer pursue Count Five and the corresponding portion of Count Six. therefore withdraw these claims without prejudice to filing similar claims in the Court of Federal Claims, and ask the Court to dismiss the claims without prejudice to the same effect.

## VI.    The Relief Requested Is Not Overbroad

Plaintiffs' requested relief is not overbroad and presents no concerns under *Trump v. CASA*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025).

With regard to Plaintiffs' Program Claims under the APA, "[t]he APA empowers federal courts to 'hold unlawful and set aside agency action' that, as relevant here, is . . . contrary to law." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring); *see* 5 U.S.C. § 706(2). "[T]he text and history of the APA, [and] the longstanding and settled precedent adhering to that text and history," makes clear that to "set aside" an unlawful agency action means to "*vacate*" that action. *Id*. at 830 (emphasis added). Courts in this District routinely hold the same, that "[w]here agency action is found contrary to law, it is clear that vacatur is required. *City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 772 (D. Md. 2021); *see also Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (when agency action is found unlawful under the APA, "the ordinary result is that the rules are vacated—not that their application to the individual petitions is proscribed").

*CASA* expressly noted that its holding did not address courts' remedial authority under the APA. 2025 WL 1773631, at *8 n.10; *see also id.* at 19 (Kavanaugh, J., concurring). The Court's holding was purely based on its interpretation of the Judiciary Act of 1789; the Court found that the Act did not provide district courts "equitable authority to issue universal injunctions." 2025 WL 1773631, at *5. As Justice Kavanaugh has explained, even if "equitable relief is ordinarily limited to the parties in a specific case[,] in the APA, Congress did in fact depart from that baseline and authorize vacatur." *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring). Here, if this Court grants summary judgment on the APA-based Program Claims, this Court must declare unlawful and vacate Defendants' decisions not to operate the required number of Comprehensive Centers and RELs, and not to spend the relevant appropriations.

Independent of this APA remedy, the requested injunctive relief is necessary to provide "complete relief" to Plaintiffs, on both the Program and Termination Claims. *CASA*, 2025 WL

1773631, at *10. With the Program Claims, Plaintiffs' injury is the lost "opportunity to compete" for grants and subcontracts, which the Supreme Court recently affirmed is a cognizable injury. *Diamond Alternative Energy, LLC v. EPA*, 2025 WL 1716141, at *9 (U.S. June 20, 2025). It is simply not possible to craft a remedy for this injury that is "complete *and* benefits only the named plaintiffs." *CASA*, 2025 WL 1773631, at *11 n.12. As with the example of gerrymandered districts that the Court gave, there is "only one feasible option" to afford Plaintiffs complete relief: enjoin Defendants' unlawful actions ceasing the programs, to make the full number of required grants and contracts available for competition for Plaintiffs. *Id.* Such an injunction would have "the practical effect" of benefitting other nonparties, but that does not make it the kind of "universal injunction" that protects nonparties that was at issue in *CASA*. *Id.*

*CASA* clearly has no bearing on Plaintiffs' Termination Claims. The requested injunctive relief on those claims is limited to enjoining the termination of Plaintiffs' grants and the grants and contracts for which Plaintiffs were subcontractors.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary Judgment and deny Defendants' Motion.

July 16, 2025                          Respectfully submitted,

                                       */s/ Daniel F. Jacobson*
                                       Daniel F. Jacobson
                                       Lynn D. Eisenberg
                                       Kyla M. Snow*
                                       JACOBSON LAWYERS GROUP PLLC
                                       *1629 K Street NW, Suite 300*
                                       *Washington DC, 20006*
                                       *(301) 823-1148*
                                       *dan@jacobsonlawyersgroup.com*

                                       * Not admitted in the District of Columbia. Practice
                                       supervised by members of the D.C. bar.


                                       *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Daniel Jacobson, hereby certify that on July 16, 2025, I served the foregoing Motion for Summary Judgment, and all supporting documents, on Defendants' counsel via the Court's ECF filing system.

*/s/Daniel F. Jacobson*
Daniel F. Jacobson