## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CHILD TRENDS, INC., ET AL., | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. 25-1154-BAH |
| UNITED STATES DEPARTMENT OF EDUCATION ET AL., | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Child Trends, Inc. ("Child Trends") and RMC Research Corporation ("RMC") challenge the abrupt closure of Comprehensive Centers and Regional Education Laboratories ("RELs"). Both programs were created by Congress in order to assist education policymakers, professionals, agencies, and schools in efforts to improve student outcomes and close achievement gaps. Plaintiffs allege that the termination of these programs runs afoul of statutory and constitutional law and seek a remedy compelling Defendants, including the United States Department of Education ("Department" or "DOE"), Linda McMahon (in her official capacity as Secretary of Education), Matthew Soldner (in his official capacity as Acting Director of the Institute of Education Sciences), Mark Washington (in his official capacity as Deputy Assistant Secretary for Management and Administration at the Department of Education), the United States Department of Government Efficiency ("DOGE"), and Amy Gleason (in her official capacities as Acting Administrator of the United States DOGE Service and Consultant and Expert to the Department of Health and Human Services), to resume operating the full number of

Comprehensive Centers and RELs as required by law and to prevent the termination of grants Plaintiffs received under both programs.

The matter now comes before the Court on Plaintiffs' partial motion for summary judgment. ECF 48. Defendants have filed a cross-motion to dismiss or, in the alternative, for summary judgment. ECF 49. Both Plaintiffs and Defendants filed a response to the opposing party's motion. ECFs 51 and 52. All filings include memoranda of law, while ECFs 48 and 49 include exhibits, and ECF 52 includes Plaintiffs' Rule 56(d) affidavit.[1] Additionally, Defendants filed a response to Plaintiffs' Rule 56(d) affidavit. ECF 53. A hearing on the pending motions was held on August 4, 2025. *See* ECF 54. Following the hearing, and at the Court's request, the Parties each submitted a proposed order. *See* ECF 55 (Plaintiffs' proposal) and ECF 56 (Defendants' proposal). Plaintiffs also filed a response to Defendants' proposed order. ECF 57. Defendants then filed a status report addressing the feasibility of potential remedies in the event Plaintiffs prevailed on certain of their claims, *see* ECF 59, to which Plaintiffs responded, ECF 60. For the reasons stated below, Plaintiffs' motion is **GRANTED IN PART AND DENIED IN PART** and Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND

### A.    Statutory Framework

Congress enacted the Education Sciences Reform Act ("ESRA") for the purpose of "expanding fundamental knowledge and understanding of education from early childhood through postsecondary study, in order to provide parents, educators, students, researchers, policymakers, and the general public with reliable information" about education in the United States. 20 U.S.C.

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

§ 9511(b)(1). As part of this mission, the ESRA prescribed the institution of both the Comprehensive Center and REL programs.[2] The portion of the statute that authorizes RELs provides that the director of the DOE subagency called the Institute for Education Sciences ("IES")

> shall enter into contracts with entities to establish a networked system of 10 [RELs] that serve the needs of each region of the United States in accordance with the provisions of this section. The amount of assistance allocated to each [REL] . . . shall reflect the number of local educational agencies and the number of school-age children within the region served by such [REL], as well as the cost of providing services within the geographic area encompassed by the region.

20 U.S.C. § 9564(a). Section 9564 also delineates which entities constitute eligible applicants and the process by which the IES director enters into contracts, providing that the director "shall enter into contracts for a 5-year period" following a period of "competitions for contracts." *Id.* §§ 9564(e)(1)(A), (e)(3). Section 9602, which authorizes the Comprehensive Centers, provides that "the Secretary [of Education] is authorized to award not less than 20 grants to local entities, or consortia of such entities, with demonstrated expertise in providing technical assistance and professional development in mathematics, science, and technology, especially to low-performing schools and districts, to establish comprehensive centers." *Id.* § 9602(a)(1).

Congress funds RELs and Comprehensive Centers through annual appropriations. Most recently, the Appropriations Act of 2024 provided that of the $5.78 billion lump-sum appropriated for carrying out school improvement activities, "$50,000,000 shall be available to carry out" the Comprehensive Centers program, with these funds to remain available until September 30, 2025. Pub. L. 118–47, 138 Stat 460, 683 (Mar. 23, 2024). The Appropriations Act of 2024 also appropriated $793 million for IES, of which $53.7 million was intended for the REL program.

---

[2] RELs are authorized under Title I of the statute, Education Sciences Reform, while Comprehensive Centers are authorized under Title II, Educational Technical Assistance. *See* Pub. L. 107-279, 116 Stat. 1941. For clarity, the Court will refer to the statute encompassing both as the Education Sciences Reform Act or the ESRA.

Joint Explanatory Statement, Division–Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024, at 257, https://perma.cc/8J97-7K82. In addition, the most recent Continuing Resolution to the Appropriations Act, passed in March 2025, appropriated another $50,000,000 to the Comprehensive Centers program, with funds to remain available for obligation through September 30, 2026. Pub. L. 119-4, 139 Stat. 9, 1012 (Mar. 15, 2025).

### B.    Factual Background[3]

On September 26, 2024, the Department awarded Plaintiff RMC the grant for the Comprehensive Center of the Gulf Region. *See* ECF 46-6, at 3 (grant award notification for RMC for Region 6). While the anticipated performance period began in October 2024 and ends in September 2029, the grant was funded a year at a time through congressional appropriations, and the award notification specified a budget period of October 1, 2024, to September 30, 2025. *Id.* On the same day, Plaintiff Child Trends also received notice of a grant award for the Comprehensive Center of the Pacific East region, with the same anticipated performance and budget periods. *See* ECF 46-12, at 259 (grant award notification for Child Trends for Region 12). Simultaneously, both Plaintiff organizations served as subcontractors for a number of both Comprehensive Center and REL program grants. *See, e.g.,* ECF 46-4, at 191 and ECF 46-11, at 450–51.

Just after his inauguration, President Donald J. Trump issued Executive Order 14,151, captioned "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "DEI Order"). *See* Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025). The DEI Order provided

---

[3] The facts presented here are derived from the administrative record. *See* ECF 46. When necessary for clarity, the Court cites to the complaint, the Federal Register, or the transcript of the hearing on August 4, 2025.

that each agency head, "in consultation with the Attorney General, the Director of OMB [the Office of Management and Budget], and the Director of OPM [the Office of Personnel Management]," shall "provide the director of the OMB with a list of all . . . [f]ederal grantees who received Federal funding to provide or advance DEI, DEIA, or environmental justice programs, services, or activities since January 20, 2021."[4] *Id.* (internal quotation marks omitted). Thereafter, DOGE was created through Executive Order 14,158. *See* Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025). In the days that followed, Plaintiffs allege that DOGE team members arrived at the DOE "and began directing agency leadership on contract and grant terminations." ECF 1, at 13 ¶ 43; *see also* ECF 48-1, at 11–12.

On February 19, 2025, just a few months into the performance period, Plaintiffs received an email informing them of the Department's "decision to terminate [their] federal grant award[s]," explaining the grants were "now inconsistent with, and no longer effectuate[d], the Department's priorities." ECF 46-12, at 400 (termination email sent to Child Trends); *see also* ECF 46-7, at 1 (termination email sent to RMC).[5] Around the same time, the grants for which Plaintiffs served

---

[4] "DEI" stands for diversity, equity, and inclusion, while "DEIA" stands for diversity, equity, inclusion, and accessibility. *See* DEI Order.

[5] The email also attached a short letter from Defendant Washington noting that it is "a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States," which, in the Department's view, "includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." ECF 46-7, at 2–3 (letter to RMC); ECF 46-13, at 2–3 (letter to Child Trends). The letter asserted without further explanation that the grants for Child Trends and RMC "provide[] funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States." ECF 46-7, at 2 (RMC); ECF 46-13, at 1 (Child Trends).

as subcontractors were likewise terminated. *See, e.g.*, ECF 46-4, at 308–09 (notice of termination of award to RMC partner Research Triangle Institute).

One week previously, the Department issued a press release with the heading, "U.S. Department of Education Cancels Additional $350 Million in Woke Spending." ECF 46-3, at 75. The press release stated that the Department had "terminated 10 contracts totaling $336 million with the Regional Educational Laboratories," citing "wasteful and ideologically driven spending not in the interest of students and taxpayers." *Id.* On February 19, the same day Plaintiffs received notice of the cancellation of their Comprehensive Centers awards, the Department issued another press release, this time with the headline "U.S. Department of Education Cancels Divisive and Wasteful Grants under the Comprehensive Centers Program." *Id.* at 79. This press release likewise cited "radical agendas" such as teaching "race-based discrimination and gender identity ideology" as grounds for the terminations. *Id.* Plaintiffs ascribe these funding terminations to DOGE. ECF 1, at 14–15.[6] While the REL press release contained a general statement that "[t]he Department plans to enter into new contracts that will satisfy the statutory requirements[,]" *see* ECF 46-3, at 75, the Comprehensive Centers press release did not contain a similar message, *see id.* at 79. To date, nearly six months after the Department announced the terminations, only two

---

[6] Plaintiffs allege that the terminations began after soon after "activist" Christopher Rufo posted about the Comprehensive Centers program on X, alleging that the program "push[ed] left-wing ideologies." ECF 1, at 14–15. Plaintiffs further allege that Elon Musk, the owner of X and then "the public face of DOGE," replied to the post. *Id.* at 15. Later that day, Plaintiffs say, the activist again posted on X, specifically tagging DOGE, and stating: "Hey, @DOGE_ED, let's terminate the contracts for the 'comprehensive centers.' What do you think?" *Id.* The termination of the Comprehensive Centers grants occurred the following day. At the hearing on the pending motions, Defendants argued that there "is no evidence" that "the United States DOGE Service runs the [@DOGE_ED X] account." ECF 58, at 53:18–22.

of the twenty statutorily required Comprehensive Centers are operational.[7] *See* ECF 35, at 5:20–22. There are no operational RELs. *Id.* at 6:2–4.

### C.    Procedural History

Plaintiffs initiated this action on April 7, 2025. ECF 1. Plaintiffs contend that Defendants offended federal statutory and constitutional law by terminating eighteen out of twenty Comprehensive Centers and all of the RELs. Plaintiffs advance five counts: an Administrative Procedure Act ("APA") claim (count I), *id.*, at 27–31 ¶¶ 107–27; a constitutional *ultra vires* claim (count II), *id.* at 31–32 ¶¶ 128–33; a statutory *ultra vires* claim (count III), *id.* at 32–33 ¶¶ 134–41; an *ultra vires* claim as to DOGE's involvement in the "terminations of Comprehensive Center grants and REL contracts" (count IV), *id.* at 33–34 ¶¶ 142–47; and a mandamus claim (count VI), *id.* at 35–37 ¶¶ 155–67.[8] Plaintiffs separate out counts I through III into two sets of claims. The first set of claims challenges Defendants' decision to terminate eighteen of a total of twenty Comprehensive Centers awards and all REL awards, arguing that these actions violated the ESRA, the 2024 Appropriations Act (and subsequent Continuing Resolution), the Impoundment Control Act ("ICA"), U.S. Const. art. II, § 3 (the "Take Care Clause"), and the separation of powers under the Constitution (together, the "Program Claims"). ECF 1, at 27–33 ¶¶ 107–41 (counts I through III). Through the "non-statutory claims based on Defendants' alleged constitutional and statutory violations," Plaintiffs also challenge the terminations of Plaintiffs' specific grant awards (the "Grant Termination Claims"). ECF 1, at 31–33 ¶¶ 128–41 (counts II through III).

---

[7] At a hearing held before the Court on May 20, 2025, to address Plaintiffs' motion for a preliminary injunction, Defendants' counsel represented that the two operational Comprehensive Centers were the Bureau of Indian Education Center and the National Center on Improving Literacy. ECF 35, at 42:6–14 (hearing transcript).

[8] Plaintiffs previously brought a regulatory *ultra vires* claim (count V). ECF 1, at 34–35 ¶¶ 148–54. However, Plaintiffs have clarified that they are dropping that claim before this Court to instead pursue it in the Court of Federal Claims. ECF 52, at 28.

On April 15, Plaintiffs filed a motion for a preliminary injunction or, in the alternative for a writ of mandamus. ECF 16. Upon conclusion of the briefing, the Court held a hearing on May 20, 2025. *See* ECF 33. On June 11, the Court denied Plaintiffs' motion for a preliminary injunction but expressed an intent to proceed to a determination on the merits and set an expedited schedule for summary judgment briefing. *See* ECF 41 (memorandum opinion, which can also be found at *Child Trends, Inc. v. United States Dep't of Educ.*, Civ. No. 25-1154-BAH, --- F. Supp. 3d ---, 2025 WL 1651148 (D. Md. June 11, 2025)); ECF 42 (implementing order).

Plaintiffs seek partial summary judgment on their Program Claims and Grant Termination Claims, ECF 48, while Defendants ask the Court to dismiss all of Plaintiffs' claims or, in the alternative, to grant summary judgment in Defendants' favor, ECF 49. The Court held a hearing on the motions on August 4, 2025. *See* ECF 54. Both motions are now ripe for review.

## II.    LEGAL STANDARD

### A.    Plaintiffs' Motion

Plaintiffs have filed a motion for partial summary judgment on both their Program Claims and their Grant Termination Claims.

Plaintiffs have, in part, brought their Program Claims as an APA challenge. "Because claims brought under the APA are adjudicated without a trial or discovery, on the basis of an existing administrative record, such claims are properly decided on summary judgment." *Audubon Naturalist Soc. of the Cent. Atl. States, Inc. v. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007) (citing *Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*, 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd*, 972 F.2d 338 (4th Cir. 1992)). "From this review, the Court must determine whether the plaintiff has demonstrated that the agency action should be set aside as arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Williams v. Roth*, Civ. No. 21-2135-PX, 2022 WL 4134316, at *6 (D. Md. Sept. 12, 2022) (citing 5 U.S.C. § 706(2)(A)).

8

Because Plaintiffs also bring both their Grant Termination Claims and their Program Claims as standalone constitutional challenges, the APA standard of review does not apply to those claims. Instead, Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary

9

judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## B.    Defendants' Motion

Defendants have filed a motion to dismiss or, in the alternative, for summary judgment on all of Plaintiffs' claims. When presented with a motion to dismiss or, in the alternative, a motion for summary judgment, the disposition of the motion "implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

A motion to dismiss styled in the alternative as a motion for summary judgment implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011), *aff'd* 684 F.3d 462 (4th Cir. 2012). Conversion of a motion to dismiss to one for summary judgment under

Rule 12(d) is permissible where a plaintiff has notice that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When a movant expressly captions its motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261; *see also Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 657 (D. Md. 2021) ("Notably, 'the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion.'" (quoting *Ridgell v. Astrue*, Civ. No. 10-3280-DKC, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012))).

Here, Plaintiffs have filed a Rule 56(d) affidavit challenging the conversion of Defendants' motion into one for summary judgment as to their DOGE *ultra vires* claim (count IV). Plaintiffs maintain that the available record "contains no evidence revealing who decided to no longer operate any [RELs] and just two Comprehensive Centers, and the rationales of that decisionmaker." ECF 52-1, at 1 ¶ 3. Plaintiffs contend that further discovery is warranted because "[t]his evidence is critical to resolving the disputed factual questions regarding whether it was DOGE or the Department of Education that decided to terminate the awards, and if it was DOGE, whether the Department had any input and to what extent." *Id.* at 1–2. As the Court explains below, the claims at issue are sufficiently resolved on a motion to dismiss, and so the Court declines to convert Defendants' motion into one for summary judgment.

Defendants have moved to dismiss pursuant to both Rule 12(b)(1) and Rule 12(b)(6). Rule 12(b)(1) allows a party to move to dismiss a complaint for a lack of subject matter jurisdiction. "Motions to dismiss for lack of subject matter jurisdiction are properly granted where a claim fails

to allege facts upon which the court may base jurisdiction." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005) (citing *Crosten v. Kamauf*, 932 F. Supp. 676, 679 (D. Md. 1996)). Federal courts are courts of limited jurisdiction, and the plaintiff bears the burden of demonstrating that this Court has the authority to hear the case. *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014). In deciding whether a complaint alleges facts sufficient to support subject matter jurisdiction, the Court assumes the truthfulness of the facts alleged. *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III.   ANALYSIS

### A.   Program Claims

The Court begins with an evaluation of Plaintiffs' challenge to the shuttering of the RELs and nearly all of the Comprehensive Centers. Plaintiffs bring these "Program Claims" as both an APA action (count I) and as a constitutional challenge (counts II and III). ECF 1, at 31–33 ¶ 128–141. The Court turns first to Plaintiffs' APA challenge.

1.    APA Challenge

    i.    *Ripeness/Final Agency Action*

As a threshold matter, Defendants contend that Plaintiffs have failed to identify a final agency action subject to judicial review under the APA. ECF 49-1, at 17. Instead, Defendants argue, Plaintiffs are mounting an unreviewable "programmatic" challenge to the Department's functioning. *Id.* at 18. The Court disagrees.

Under the APA, agency action is "final" where (1) "the action [] mark[s] the 'consummation' of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature"—and (2) "the action [is] one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948) and *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)). For an agency action to be reviewable, a plaintiff must "identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on the government's operations." *City of New York v. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)).

Plaintiffs argue that the decision not to operate the statutorily required number of Comprehensive Centers and RELs represents a final agency decision and describe their APA challenge as limited to "*whether*," not "*how*," Defendants operate the programs at issue. ECF 48-1, at 16 (emphasis in original). Defendants counter that Plaintiffs' claims represent a "challenge to the wholesale dismantling of the programs themselves, not a discrete agency action." ECF 49-1, at 18.

As Fourth Circuit precedent makes clear, Defendants' position appears to incorrectly conflate the Plaintiffs' use of the word "program" in their challenge to the termination of the RELs

and Comprehensive Centers with the legal definition of what constitutes an unreviewable "programmatic attack." In *City of New York v. Department of Defense*, the plaintiffs attempted to challenge the Department of Defense's overall compliance with its reporting requirements on gun violence, which the appellate court classified as a request for the court to "mak[e] the assistance of the federal government more useful to [plaintiffs] than it is now." 913 F.3d at 435. A key part of the Fourth Circuit's analysis there turned on the fact that the reporting requirements did not "in any way determine [a party's] rights and obligations." *Id.* at 434. In holding that the *City of New York* plaintiffs were lodging an impermissibly broad "programmatic attack," the Fourth Circuit noted that courts "are woefully ill-suited . . . to adjudicate generalized grievances asking us to improve an agency's performance or operations." *Id.* at 433. "In such a case, courts would be forced either to enter a disfavored 'obey the law' injunction, or to engage in day-to-day oversight of the executive's administrative practices." *Id.* (citation omitted). As such, the Fourth Circuit concluded that "[t]he APA . . . does not permit . . . efforts to include judicial supervision of the myriad programmatic workings of the federal government." *Id.* at 436. However, Plaintiffs take a different tack here.

Rather than seeking judicial oversight of the manner in which the Department completes its required tasks, Plaintiffs contest the Department's "ongoing failure[] to carry out *discrete obligations*" at all, which the Fourth Circuit determined is a claim "subject to review." *Id.* at 433 (emphasis added). And the action Plaintiffs challenge, the complete rescission of the Comprehensive Centers and REL programs, clearly is an act that "determin[es] rights and obligations" in that it had "an immediate and practical impact" on Plaintiffs, who received grants to operate these statutorily mandated functions. *Id.* at 431 (quoting *Clear Sky Car Wash LLC v. City of Chesapeake, Va.*, 743 F.3d 438, 445 (4th Cir. 2014) and *Golden & Zimmermann LLC v.*

*Domenech*, 599 F.3d 426, 433 (4th Cir. 2010)). *City of New York* speaks to the impropriety of attempts to "challenge the overall accuracy and reliability" of federal agencies, *Ragan v. Fed. Bureau of Investigation*, Civ. No. 24-2771-EA, 2025 WL 1294920 (D. Md. May 5, 2025), and to claims alleging "[g]enerally misleading conduct," *Murphy v. Jackson*, Civ. No. 24-1588-JRR, 2025 WL 1446316, at *5 (D. Md. May 20, 2025). Plaintiffs' claims simply do not represent such a general challenge and thus are not barred by *City of New York*.[9]

### ii.   Jurisdiction

Defendants also argue that the Court does not possess jurisdiction over Plaintiffs' claims because they are functionally contract claims and so, pursuant to the Tucker Act, belong in the Court of Federal Claims. *See* 49-1, at 6 (citing 28 U.S.C. § 1491(a)).[10] "The Tucker Act grants jurisdiction to the United States Court of Federal Claims 'to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort.'" *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996) (quoting 28 U.S.C. § 1491). "Jurisdiction is exclusive in the Court of Federal Claims for claims over $10,000, while

---

[9] Reading *City of New York* as broadly as Defendants suggest would mean that few, if any, APA claims would be justiciable, as any argument about the legality of the termination of services or programs mandated by statue would amount to a critique of the overall accuracy and reliability of federal agencies. Because there is a "strong presumption favoring judicial review of administrative action," this position would be unworkable. *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 489 (2015).

[10] While their briefing appeared to concede that the Court may, in fact, hear the Program Claims, *see* ECF 49-1, at 13, Defendants further clarified their position during the hearing on the pending motions by arguing that the Tucker Act would preclude this Court from exercising jurisdiction in any circumstance where the remedy resulted in a restoration of Plaintiffs' grants. ECF 58, at 27:3–10.

district courts have concurrent jurisdiction with the Court of Federal Claims for claims at or under $10,000." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023) (citing *Randall*, 95 F.3d at 347).

Supreme Court "cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief," which may nonetheless require the payment of some money. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.*

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act." *United States v. Mitchell*, 463 U.S. 206, 216 (1983). "To determine whether a plaintiff seeks primarily injunctive relief such that a district court has jurisdiction over [a plaintiff's] claim, courts must look to the 'essence' of the complaint and whether the relief requested is 'not . . . an incident of, or collateral to, a monetary award.'" *Coleman*, 74 F.4th at 615–16 (quoting *Randall*, 95 F.3d at 347). "The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

The Tucker Act does not apply to Plaintiffs' Program Claims. In reaching this conclusion, the Court looks to the two-part evaluation announced in *Megapulse*, which the Fourth Circuit endorsed in *United States v. J&E Salvage Co.*, 55 F.3d 985, 987–88 (4th Cir. 1995); *see also Sols. in Hometown Connections v. Noem*, Civ. No. 25-885-LKG, 2025 WL 1530318 (D. Md. May 29, 2025); *Sci. Sys. & Applications, Inc.*, Civ. No. 14-2212-PWG, 2014 WL 3672908 (D. Md. July 22, 2024); *Lockheed Martin Corp. v. Def. Cont. Audit Agency*, 397 F. Supp. 2d 659 (D. Md. 2005) (all

16

applying *Megapulse*).[11]  The first prong of the *Megapulse* test, as noted above, examines the "source of the rights upon which" a plaintiff bases their claims, while the second examines the nature of the relief sought.  672 F.2d at 968.

The Court recognizes that "[t]he interplay between the Tucker Act and the APA is somewhat complicated and raises some significant issues of federal court jurisdiction." *Randall*, 95 F.3d at 346.  "The APA allows private parties to sue the federal government in district court over the final agency actions, so long as they seek relief other than monetary damages 'for which there is no other adequate remedy in a court.'" *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346).  "Claims for money, by contrast, proceed under the Tucker Act and in the Court of Federal Claims." *Williams v. Roth*, Civ. No. 21-2135-PX, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022) (citing 28 U.S.C. §§ 1346(a)(2), 1491)).  However, "where 'a plaintiff has an adequate remedy by suit under the Tucker Act,' they are precluded from review under the APA." *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346).

Here, Plaintiffs ground their Program Claims in the APA, averring that the decision to suspend the REL and Comprehensive Centers programs violates numerous statutes and constitutional provisions and is thus "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory . . . authority." *See* ECF 1, at 27 ¶ 108 (citing 5 U.S.C. § 706 (2)(A)–(C)).  Though Plaintiffs unquestionably did receive individual grants or contracts through the two programs, they do not rest any component of their Program Claims on those agreements.  Further, Plaintiffs do not cite to the text of these agreements as a basis for

---

[11] Plaintiffs contend that the *Megapulse* test need not apply to their Program Claims, as such claims do not involve any "express or implied contract." ECF 48-1, at 18.  The Court disagrees and notes that numerous other recent cases applied *Megapulse* to the same kind of challenge that Plaintiffs bring here.  Regardless, an application of the *Megapulse* test, as discussed, shows that Plaintiffs claims properly belong in federal district court.

their claims. The mere existence of these grants and contracts does not mean that Plaintiffs' claims are "necessarily on the contract[s] and therefore directly within the Tucker Act." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (citing *Megapulse*, 672 F.2d at 968). Stated plainly, the mere existence *of* a contract does not mean Plaintiffs' Program Claims rest *on* the contract such that the Tucker Act requires these claims to proceed before the Court of Federal Claims.

District courts evaluating factually similar cases have reached the same conclusion. For example, in *Woonasquatucket River Watershed Council v. Department of Agriculture*, the district court considered claims brought by nonprofit organizations who had received EPA funding under appropriations set aside by the Infrastructure Investment and Jobs Act, as well as the Inflation Reduction Act. 778 F. Supp. 3d 440, 451 (D.R.I. 2025). There, the court emphasized that the "gravamen" of the plaintiffs' claims turned "on federal statute and regulations put in place by Congress" rather than "the terms of a contract between the parties." *Id.* at 464 (citing *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 293 (D. Mass. 2025)). Indeed, the plaintiffs had not asked the court "to examine any contract or grant agreement" but to "review and interpret" federal law. *Id.* And as the court explained, "the fact that there are underlying contractual relationships between the [plaintiffs] and the Government does not automatically 'convert a claim asserting rights based on federal regulations into one which is, at its essence, a contract claim.'" *Id.* (quoting *Normandy Apartments, Ltd. v. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1299 (10th Cir. 2009)).

Similarly, in *San Francisco Unified School District v. AmeriCorps*, the district court found that where municipal plaintiffs receiving funding pursuant to AmeriCorps' statutory mandates had alleged "violations of the Spending Clause and provisions of the APA," they were articulating

constitutional and statutory claims, not contractual ones, regardless of the fact that the plaintiffs were federal grantees who had been injured by the government's unlawful termination of their grants. No. 25-CV-02425, 2025 WL 1180729, at *6–7 (N.D. Cal. Apr. 23, 2025). In a similar case, *Community Legal Services in East Palo Alto v. Department of Health and Human Services*, the district court considered claims brought by nonprofit organizations who had, pursuant to the congressional mandate set forth in the Trafficking Victims Protection Act, received funding from the Department of Health and Human Services to provide legal representation for unaccompanied children in immigration proceedings. No. 25-cv-2847, --- F. Supp. 3d ---, 2025 WL 1233674 (N.D. Cal. Apr. 29, 2025), *mot. stay injunction pending appeal denied*, 137 F.4th 932 (9th Cir. 2025). There, the court concluded that such claims should properly be considered as an APA claim for actions contrary to law, even though the plaintiffs were nonprofits who had received portions of the funding at issue in individual grants. *Id.* at *6; *see also Am. Bar Ass'n v. Dep't of Just.*, No. 25-CV-1263-CRC, --- F. Supp. 3d ---, 2025 WL 1388891, at *5 (D.D.C. May 14, 2025) (finding that jurisdiction was proper in the district court even though plaintiffs challenging an agency action had a contract with the agency to provide services because the plaintiffs' "theory of pretextual termination [did] not turn on contractual language").

Turning to the second prong of the *Megapulse* test, the "type of relief sought (or appropriate)," 672 F.2d at 968, the Court determines that Plaintiffs bring their Program Claims under the APA in order to seek equitable relief, not monetary damages. The APA Program Claims overtly do not seek reinstatement of any particular grant; instead, they directly challenge Defendants' decisions not to maintain any RELs and only two of the required twenty Comprehensive Centers. ECF 1, at 27–28 ¶¶ 111–13. What's more, Plaintiffs ask for such a remedy only "the *opportunity to compete* for grants and subcontracts [under the programs], a well-

established form of redressable injury." ECF 48-1, at 17–18 (citing *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1015 (D.C. Cir. 2022)). Accordingly, the Court is persuaded that the "type of relief sought" is equitable, and not for money damages, *Megapulse*, 672 F.2d at 968, because the equitable relief requested is "not . . . an incident of, or collateral to, a monetary award," *Coleman*, 74 F.4th at 615 (citing *Randall*, 95 F.3d at 347).

Again, the holdings of other district courts support this reasoning. In the cases detailed *supra*, courts have consistently recognized that plaintiffs bringing similar APA claims and seeking similar injunctive relief were not asking for "monetary damages," even where an injunction might "effectively result in the continuation of monetary grants payment by the government." *Am. Bar Ass'n*, 2025 WL 1388891, at *6; *see also Cmty. Legal Servs.*, 2025 WL 1233674, at *7 ("[Plaintiffs'] action does not seek money damages to compensate them for losses; instead, they seek an injunction and vacatur of the purportedly unlawful Cancellation Order. That such relief may result in the payment of money does not transform their claim into one for money damages."); *Woonasquatucket*, 778 F. Supp. 3d at 465 ("The Nonprofits' primary purpose in bringing their claims is to seek equitable, not monetary, relief. They do not bring claims for past pecuniary harms . . . . It would be legal error to construe the claims as couched pleas for monetary relief for which the Nonprofits never asked."); *S. Educ. Found. v. Dep't of Educ.*, Civ. No. 25-1079, --- F. Supp. 3d ---, 2025 WL 1453047, at *9 (D.D.C. May 21, 2025) ("Absent a clear indication from the Supreme Court that *Bowen* is no longer good law, the Court applies *Bowen's* settled principles to conclude that [plaintiff's] suit is not necessarily a 'contract dispute over money' simply because the government would have to continue paying grant money to [the plaintiff] if its requested relief is granted."). In the case at bar, Plaintiffs are similarly asking for relief in the form of an order directing Defendants to resume operating the Comprehensive Centers and REL programs that

Congress explicitly commanded they operate, not an order seeking monetary damages. The Court therefore determines that despite the fact that there were contracts between the Parties, the nature of relief sought is equitable in nature and does not turn on those contracts.

Where a plaintiff "demonstrate[s] that it is not relying on the contract at all," "does not claim a breach of contract," "seeks no monetary damages against the United States," and when a plaintiff's "claim is not properly characterized as one for specific performance," federal district courts retain jurisdiction, even if a contractual relationship existed between plaintiff and the government. *Megapulse*, 672 F.2d at 968. Applying this test to Plaintiffs' Program Claims, the Court holds that neither the source of the rights asserted nor the nature of the remedy sought turn on the individual contracts and grant agreements Plaintiffs executed with the DOE. This action therefore is properly brought in federal district court and is not subject to the Tucker Act. *See New York v. Kennedy*, No. 25-CV-196, --- F. Supp. 3d ---, 2025 WL 1803260, at *10 (D.R.I. July 1, 2025) (finding the Tucker Act did not apply where the plaintiffs were "seeking an order setting aside unlawful agency action, not an order to require specific performance or compensation under any contract").

The Supreme Court's recent decision in *Department of Education v. California* does not compel a contrary result. The issue before the Supreme Court in *California* concerned the cancellation of specific grants to specific entities, and the relief ordered by the district court explicitly compelled payment of those grant obligations. 604 U.S. ---, 145 S. Ct. 966, 968 (2025) (per curiam); *see also California v. Dep't of Educ.*, 769 F. Supp. 3d 72, 79–80 (D. Mass. 2025) (district court decision). As the Court has explained, this is not the issue here as it relates to the Program Claims. Instead, Plaintiffs' Program Claims specifically challenge the rescission of the Comprehensive Centers and REL programs and rest on both separation of powers arguments and

interpretations of federal statutes that Plaintiffs contend require the operation of these programs. Further, the relief sought does not compel a monetary award under any individual grant or contract and, as noted above, Plaintiffs specifically aver that their claims do "not involve past due payments" and that they are not seeking such relief. ECF 35, at 15:24–16:2. Even if the relief Plaintiffs sought did contemplate the possibility of some federal funding flowing back to Plaintiffs, the Supreme Court itself reiterated in *California*, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *California*, 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910).

Nor does the Fourth Circuit's recent decision in *Sustainability Institute v. Trump* apply to Plaintiffs' Program Claims. There, the canceled grants at issue were "funded generally" by congressional appropriations and so the plaintiffs had no basis for claiming entitlement to the grants outside the terms of the individual award contracts. No. 25-1575, 2025 WL 1587100, at *1–2 (4th Cir. June 5, 2025). Again, this is simply not the case here. Plaintiffs' Program Claims challenge not the termination of their particular grant awards but instead dispute the legality of the wholesale cancellation of the REL program and the decision to operate only two of twenty required Comprehensive Centers. Plaintiffs assert that Defendants are violating the specific congressional mandate to operate both programs, as laid out in the ESRA. In other words, there is an independent statutory basis for Plaintiffs' claims. Following other district courts' reasoning and faithfully applying *Bowen*, this Court is satisfied that its analysis of Plaintiffs' claims is not altered by the result in *California* or *Sustainability Institute*.

### iii.    Merits

"The APA provides that a reviewing court is bound to 'hold unlawful and set aside agency action' for certain specific reasons, including whenever the challenged act is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Back Bay v. U.S.*

*Army Corps of Eng'rs*, 681 F.3d 581, 586–87 (4th Cir. 2012) (quoting 5 U.S.C. § 706(2)(A)). Though review under the APA is highly deferential to the agency, it still "must operate within the legal authority conferred by Congress, and when those limits are transgressed, an individual may seek recourse in the Article III courts." *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 838 (D.C. Cir. 2024).

Plaintiffs argue that the decision to not operate the statutorily required number of Comprehensive Centers and RELs was contrary to law under the APA.  Specifically, Plaintiffs contend that such a decision violated the authorizing statute behind both programs, the 2024 Appropriations Act and 2025 Continuing Resolution, and the ICA.  ECF 48-1, at 23–29.  Further, Plaintiffs argue that this decision violates separation of powers principles and the Constitution's Take Care Clause. *Id.* at 29 (citing U.S. Const. art. I, § 1 and art. II, § 3).  Article II section 1 of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested" in Congress, while Article II section 3 commands that the president "shall take Care that the Laws be faithfully executed."  The Court addresses each argument in turn.

(1)    Appropriations Act of 2024 and the ICA

The Constitution's Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, reserves to Congress the exclusive authority over federal spending.  Congress has also enacted statutes that expressly restrict the Executive Branch from infringing upon its appropriation powers, including the ICA.  The ICA establishes "congressional control over the impoundment of funds by the Executive Branch" and prohibits the Executive from impounding congressionally appropriated funds, unless certain procedures are followed.  Pub. L. No. 93-344, 88 Stat. 297.  In the case of permanent impoundments or "rescissions," Congress specified that if the President "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs

for which it is provided" or "should be rescinded for fiscal policy or other reasons," he must "transmit to both Houses of Congress a special message" addressing the amount of funds, reasons for impoundment, and impact of the proposed rescission. 2 U.S.C. § 683(a). The President must also inform Congress in the event he wishes to defer appropriated funds. *Id.* § 684(a).

Plaintiffs argue that the Defendants are violating the Appropriations Act of 2024 and its applicable Continuing Resolution. The Appropriations Act determined that "\$50,000,000 shall be available to carry out section 203 of the Educational Technical Assistance Act [20 U.S.C. § 9602, the Comprehensive Centers authorizing statute]." Pub. L. 118-47, 138 Stat 460, 683 (Mar. 23, 2024). Congress also appropriated \$793,000,000 for the Institute of Education Sciences, *id.* at 690, of which approximately \$53,700,000 was intended for RELs, *see* Joint Explanatory Statement, Division–Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024, at 257, https://perma.cc/XAP6-KTRG.[12] The Appropriations Act required that both programs be funded through September 30, 2025. 138 Stat. 460, at 683, 690. Moreover, the most recent Continuing Resolution to the Appropriations Act, passed just two months ago, appropriated another \$50,000,000 to the Comprehensive Centers program, with funds to remain available for obligation through September 30, 2026. Pub. L. 119-4, 139 Stat. 9, 1012 (Mar. 15, 2025). By refusing to spend these funds, Plaintiffs argue, Defendants are failing to act in accordance with congressional appropriations.

---

[12] Though joint explanatory statements may not necessarily have the "force of law," they still offer persuasive evidence of legislative intent. *Laws.' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 30 (D.D.C. 2020), *aff'd*, 848 F. App'x 428 (D.C. Cir. 2021). Moreover, as the Court explains, the statutory mandate to operate both RELs and Comprehensive Centers exists wholly apart from any appropriations act. In other words, the appropriations issues discussed here largely serve of evidence of Congress's continuing recognition and funding of those programs, since Plaintiffs' Program Claims stand on the ESRA itself.

Specifically, Plaintiffs contend that Defendants are violating the Appropriations Act and its 2025 Continuing Resolution as well as the ICA. Defendants respond that the Appropriations Act's usage of the phrase "shall be for" in allotting funding to the programs evinces congressional intent to commit the question of not just *how* but also *whether* to spend the funds entirely to the Department's discretion. ECF 49-1, at 27. The Court finds this position untenable. Plaintiffs argue persuasively that "[i]t is black letter appropriation law that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend 'the full amount appropriated by Congress for a particular project or program.'" ECF 52, at 18 (quoting *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)); *see also Kane Cnty. v. United States*, 127 Fed. Cl. 696, 697 (2016) (finding that the phrase "appropriated sums shall be made available . . . for obligation or expenditure" amounted to "mandatory language").

Defendants also contend that there is no private right of action under the ICA. ECF 49-1, at 28. Defendants' position is not without support. *See, e.g.*, *Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 733 (S.D. Tex. 2024) (finding that because, by statute, "the ICA is enforced exclusively by the Comptroller General via civil suit," private plaintiffs could not bring an "ICA-based APA claim"). Most recently, in *Global Health Council v. Trump*, the D.C. Circuit concluded that plaintiffs lacked "a cause of action to undergird their APA contrary-to-law claim" on the basis of an alleged ICA violation. No. 25-5097, --- F.4th ---, 2025 WL 2326021, at *11 (D.C. Cir. Aug. 13, 2025). However, this view is not universally shared. Other courts have rejected such a "narrow view" of the APA's scope, reasoning that an ICA violation can support a claim that an agency action is "not in accordance with law" under 5 U.S.C. § 706(2)(A). *New York v. Trump*, 769 F. Supp. 3d 119, 138 n.13 (D.R.I. Mar. 6, 2025); *see also Rhode Island v. Trump*, 2025 WL 1303868, at *14 (D.R.I. May 6, 2025) (treating the ICA as relevant to APA claims alleging the Executive

25

unlawfully refused to spend appropriated funds); *Oregon Council for Humans. v. U.S. DOGE Serv.*, No. 3:25-CV-829, --- F. Supp. 3d ---, 2025 WL 2237478, at *23 (D. Or. Aug. 6, 2025) (finding the government acted contrary to the ICA and thus contrary to law where it failed to comport with the ICA's procedural requirements before deferring or rescinding appropriated funds). These decisions suggest that a statute's provision, or lack thereof, for a private right of action does not bar an APA claim where the statute is invoked to demonstrate that the challenged conduct is contrary to law.[13]

More importantly, this case presents a materially different situation than the one before the court in *Global Health Council*. There, the dispute centered solely on an alleged impoundment of appropriated funds, whereas here, Defendants have not only withheld funds appropriated by Congress but have also refused to carry out an express statutory mandate to operate Comprehensive Centers and RELs at the required capacity of twenty and ten, respectively. *See* 20 U.S.C. §§ 9564, 9602. By virtually shutting down all operations of both programs without any

---

[13] If the Court explicitly held that Plaintiffs *were* able to bring an ICA-based APA claim, the Court has little doubt that Defendants' argument that the funds remain available and have merely been "deferred" would not succeed. *City of New Haven v. United States* lays out the difference between "programmatic deferrals" and "policy deferrals," yet both are required to be "proposed" to Congress. 809 F.2d 900, 901 (D.C. Cir. 1987); *see also* 2 U.S.C. § 684(a) (outlining the "special message" notification procedure by which the Executive must notify Congress of the proposed deferral). In *New York v. Trump*, the court found that failure to abide by the notice procedure was contrary to law under the APA in that it failed to comport with the relevant procedure mandated by the ICA, which, the district court found, also stands for the proposition that an alleged violation of the ICA can support an APA action. 769 F. Supp. 3d at 138 ("Accordingly, the States have substantiated a likelihood of success in proving that the Executive's actions were contrary to law when bringing about a deferral of budget authority without sending a special message to Congress as the ICA requires."). Here, there is no indication that this procedure was followed, and the fact that Congress appropriated an additional $50,000,000 to the Comprehensive Centers program in mid-March 2025 suggests that there would be no such congressional agreement to proceed with the plans to "defer" the grants.

plan to restore them, Defendants have run afoul not only of the ICA and binding appropriations law[14] but also on the underlying statute that imposes fundamental programmatic duties.

The combination of statutory violations sets the case at bar apart from the narrower set of circumstances before the D.C. Circuit in *Global Health Council*.  Plaintiffs here do not rely on alleged violations of congressional appropriations and the ICA alone but invoke it alongside the statutes that obligate Defendants to operate a specific number of congressionally authorized programs in the Comprehensive Centers and RELs.  The Court turns next to an evaluation of the merits of these particular allegations.

(2)      20 U.S.C. §§ 9564, 9602

Plaintiffs contend that Defendants are violating the ESRA by failing to fund the full number of Comprehensive Centers and RELs as required.  The ESRA provides that the Director of the Institute of Education Sciences within the Department "*shall* enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States[.]"  20 U.S.C. § 9564(a) (emphasis added).  It also requires the Secretary of Education "*to award not less than 20 grants* to local entities . . . with demonstrated expertise in providing [educational] technical assistance and professional development . . . to establish comprehensive centers."  *Id.* § 9601(a)(1) (emphasis added).

---

[14] Both the ICA and Appropriations Act claims relate to the same central proposition that "the Executive does not have the 'unilateral authority to refuse to spend the funds'" appropriated by Congress, even on the grounds of policy disagreements. *Rhode Island*, 2025 WL 1303868, at *14; *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").  "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program.  But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds.  Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken County*, 725 F.3d at 261 n.1.

Defendants argue that the ESRA requires the Department merely to *award* the twenty Comprehensive Center and ten REL grants, without the concomitant obligation to *operate* them. ECF 49-1, at 20 (emphasis added). They contend because the Department did *award* the full number of grants required for each program, it has fulfilled its statutory mandate, even though no RELs and only two Comprehensive Centers are currently operational.

The Court finds Defendants' approach to statutory interpretation unpersuasive. "'[T]he starting point for any issue of statutory interpretation . . . is the language of the statute itself.'" *Redeemed Christian Church of God v. Prince George's Cnty.*, 17 F.4th 497, 508 (4th Cir. 2021) (quoting *D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016)). And "it is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022). "Principles of statutory construction require 'a court to construe all parts to have meaning' and, accordingly, avoid constructions that would reduce some terms to mere surplus[]age." *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (quoting *PSINet, Inc. v. Chapman*, 362 F.3d 227, 232 (4th Cir. 2004)).

The ESRA provides that RELs should be "establish[ed]" to "serve the needs of each region of the United States," and further requires the Secretary to award "not less than" than twenty grants in order to "establish" Comprehensive Centers to provide educational assistance. 20 U.S.C. §§ 9564(a), 9602(a)(1). The statute reflects the clear intention that the funding provided to Comprehensive Centers and RELs be affirmatively used "to ensure that the educational needs of [each] region are met and that the latest and best research and proven practices are being carried out as part of school improvement efforts." *Id.* § 9602(b)(3); *cf. id.* § 9564(f) (detailing the mission of the REL program, including "providing training" to state and local educational bodies and

28

"developing a plan for identifying and serving the needs of the region by conducting a continuing survey of the educational needs, strengths, and weaknesses within the region"). In authorizing the RELs, moreover, Congress required the Director to "enter into contracts for a 5-year period" and mandated that a Department official would ensure coordination between the different regional RELs. *Id.* § 9564(e)(1)–(2). These and other provisions unmistakably indicate that Congress intended a programmatic approach for Comprehensive Centers and RELs, involving continual dialogue between the program operators, the educational providers, and the Department. *See id.* § 9602(f)(2) (providing that each Comprehensive Center shall "coordinate its activities, collaborate, and regularly exchange information with" RELs, the Secretary's office, and the relevant state agency); *cf. id.* § 9564(g). The provision Defendants point to, that the Department "award" grants under these programs, does not stand alone but must be "read in [] context and with a view to [] the overall statutory scheme." *West Virginia*, 597 U.S. at 721. Read in its entirety, the statutory scheme here indicates that both programs be maintained and established beyond the initial awarding of grants.

Defendants also characterize the rescission of funding as essentially amounting to a mere procedural delay by contending that the ESRA allows for an "interruption" in maintaining the programs. ECF 49-1, at 21. Thus, Defendants argue, Plaintiffs are essentially challenging permissible delays in the programs, rather than final terminations. While it may well be the case that the enabling statutes envision temporary delays in implementation and execution of the Congressional mandate, the Court has reviewed the record evidence presented here and easily concludes that the challenged actions are not mere temporary pauses. Beyond a press release, Defendants pointed to absolutely no evidence in the administrative record that the decision was temporary or made as part of a process of reappropriating the funds. Further, despite multiple

opportunities, they provided no credible argument either in their filings nor during the two hearings that any efforts are underway to re-establish the statutorily required numbers of Comprehensive Centers and RELs.[15]

Other district courts evaluating similar arguments have reached the same conclusion. In *Wiley v. Kennedy*, the district court found that defendants failed to rebut plaintiff's "overwhelming evidence" of a final decision where it merely pointed to "press releases regarding a planned reorganization" of the agency. No. 2:25-CV-00227-ICB, 2025 WL 1384768, at *10 (S.D.W. Va. May 13, 2025). The reasoning spelled out in *Wiley*, a case where the plaintiff sued the government over the alleged shutdown of a federal program addressing health risks posed by work in coal mines (the Coal Workers Health Surveillance Program (CWHSP)), bears repeating verbatim here:

> The Defendants' evidence consisted solely of press releases regarding a planned reorganization of [the Department of Health and Human Services (HHS)] that contained no mention of the programs at issue. Thus, the only evidence before the Court is that the CWHSP and the RHD have been shut down. Shutting down programs without conducting rulemaking or otherwise engaging in a process that results in an official written statement announcing the shutdown is no less final. No evidence in the record suggests that the Defendants have any plan to provide the

---

[15] Defendants have had ample opportunity to present evidence to the contrary or to point the Court to relevant portions of the administrative record reflecting that the closures were merely temporary. Plaintiffs filed their claim on April 7, 2025. ECF 1. At the Parties' suggestion, the Court adopted a joint briefing schedule on April 11, 2025, allowing Defendants their requested timeline for responding to the motion for a preliminary injunction. ECF 15 (order granting the Parties' joint motion for a briefing schedule). The Court scheduled a hearing with the input of the Parties. *See* ECF 31. At the hearing, the Court provided Defendants with ample opportunity to present any evidence or argument in support of the contention that the Department intended to fully fund the RELs and Comprehensive Centers. On this critical point, Defendants noted only that they did not "have additional information as to what the plan is in the future." ECF 35, at 51:25–52:1. After the Parties filed the instant cross-motions, the Court held another hearing on August 4. After all of this, and even upon repeated inquiry of the Court, Defendants provided no evidence in support of their position that the programs will somehow be restarted. Moreover, in the hearing held on August 4, no party disputed that the Department's most recent budget request for the next round of appropriations asked for $0 for both the Comprehensive Centers and RELs. *See* ECF 58, at 5:18–6:3, 34:3–16; *see also* U.S. Department of Education, *Fiscal Year 2026 Budget Summary* (June 4, 2025), https://perma.cc/7XRM-F37A ("FY 2026 Budget Request"). Thus, the Court finds the argument that the recission of funding is a permissible procedural delay to be without merit.

> services that have been terminated. Therefore, the Court finds that the challenged
> actions are not merely tentative or interlocutory.

*Id.* Though the relevant press releases related to the shutdowns at issue here did mention the RELs

and Comprehensive Centers, *see* ECF 46-3, at 75 (RELs), at 79 (Comprehensive Centers),

Defendants are nonetheless in a similar position as the agency defendants in *Wiley*. During both

hearings—hearings that notably occurred months apart, *see* ECF 33 (hearing on May 20, 2025);

ECF 54 (hearing on August 4, 2025)—Defendants could not provide any information nor point to

evidence in the record supporting the claim there was a plan to re-fund the programs. *See* ECF 35,

at 51:7–11 (noting on May 20, 2025 that though counsel for Defendants "[did not] have as much

information as [counsel] would like on what the plan is as of right now, [] the Government's

position is that there's just no evidence that the money is not going to be used for these programs");

ECF 58, at 34:23–25 (acknowledging on August 4, 2025 that "nothing currently in the record"

reflects that the Department "has actually re-obligated anything at this point"). Thus, Defendants

concede that they cannot point to proof in the record establishing that the Department is going to

restore the programs as required by statute.

The best Defendants can offer is to suggest that the burden is on Plaintiffs to prove that

such efforts do not exist. *See id.* at 34:10–11 ("There's nothing in the record that states that the

Government is not going to [re-fund the RELs and Comprehensive Centers]."). This argument is

simply not enough to generate a legitimate dispute that the Department's decision is only

temporary. *See Rhode Island*, 2025 WL 1303868, at *12 (determining that the governmental

defendants were likely to maintain the grant cancellations as permanent policy in the face of "no

evidence" that any reallocation efforts were underway); *Widakuswara v. Lake*, 779 F. Supp. 3d 10,

32 (D.D.C. 2025) (explaining that "*final* does not mean *permanent*" and that just because the

government "maintains the ability to reverse these actions at some unidentified point in the future,

that does not change the fact that the agency has made decisions, communicated them to their employees, contractors, and grantees, and thereby altered their rights and obligations" (emphasis in original)). The record before the Court clearly establishes that Defendants are violating the ESRA by failing to fund the full number of Comprehensive Centers and RELs as required by statute.

### (3)    Constitutional Violations

In addition to arguing that Defendants have violated federal statutes, Plaintiffs also contend that Defendants' conduct is contrary to law in that it contravenes the Take Care Clause, which obligates the President to "take Care that the Laws be faithfully executed,"[16] U.S. Const. art. II, § 3, and the constitutional separation of powers. The Court agrees with respect to both Plaintiffs' APA claim and as to their standalone constitutional challenge asserting the same. Congress has mandated both programs be operated in clear statutory terms and has appropriated funds for their continued operation. Defendants' refusal to operate these programs and obligate the appropriated funds disregards a clear congressional mandate and offends the constitutional order.

Defendants argue that the terminations are unreviewable because they represent "claims simply alleging that the President exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." ECF 49-1, at 26 (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). But Defendants' position misapprehends the relevant law. As explained by the D.C. Circuit in *Chamber of Commerce v. Reich, Dalton* is limited to situations where "a statute entrusts a discrete

---

[16] This requirement extends "across the entire Executive Branch—including 'independent' agencies." *English v. Trump*, 279 F. Supp. 3d 307, 327 (D.D.C. 2018) (citing *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 496–97 (2010)). "And because federal agencies are 'creatures of statute,' and 'the Take Care Clause cannot be used to bypass agencies' limited status as creatures of statute, [they] possess only the authority that Congress has provided them.'" *Widakuswara*, 779 F. Supp. 3d at 36 (quoting *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024)).

specific decision to the President and contains no limitations on the President's exercise of that authority." 74 F.3d 1322, 1332 (D.C. Cir. 1996). By contrast, in instances where, as here, "the presidential action—not one, it should be added, even contemplated by Congress—independently violates [] a statute that delegates no authority to the president to interfere," the separation of powers is clearly implicated. *Id.*

While *Dalton* rejected the argument that the President violates the separation of powers "*whenever* [he] acts in excess of his statutory authority," it does not stand for the proposition that such a scenario would *never* offend the separation of powers. 511 U.S. at 471 (emphasis added). The D.C. Circuit's recent opinion in *Global Health Council* does not change this analysis. There, the D.C. Circuit confronted a purported constitutional separation of powers claim based only on an allegation that the Executive acted contrary to funding statutes, including the Appropriations Act of 2024 and the ICA. 2025 WL 2326021, at *5. It held that *Dalton* precluded foreign aid grantees from bringing a "freestanding constitutional" cause of action premised only on the Executive acting in excess of the authority delegated under the ICA. *Id.* at *9. Here, by contrast, and as explained above, the executive action at issue also violates the direct mandate of a separate statute—the ESRA. The D.C. Circuit acknowledged that "*ultra vires* review remains available to test presidential action alleged to violate any spending or other statute, provided that plaintiffs can plausibly allege action contrary to a clear and mandatory statutory prohibition." *Id.* at *8 n.14 (citing *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022)). The D.C. Circuit "simply h[e]ld that such claims must meet the standards governing review of *ultra vires* claims, and cannot be recast as constitutional claims through the mere invocation of the separation of powers." *Id.*

Plaintiffs have done so here. Terminating the Comprehensive Centers and RELs altogether violates the clear mandate of the ESRA that Department officials "enter into contracts with entities to establish a networked system of 10 regional educational laboratories that serve the needs of each region of the United States," 20 U.S.C. § 9564(a), and "coordinat[e]" the "activities among the regions," including by "shar[ing] information," "oversee[ing] a strategic plan," and "ensur[ing]" certain national and educations interests are met, *id.* (e)(2). Defendants do not, and indeed cannot, make the argument that any authority over *whether* to operate the Comprehensive Center and REL programs has been delegated to the Executive here. And the question of whether the Executive acted pursuant to a congressional grant of discretion is not relevant here, where Congress has afforded the President no latitude in how, much less whether, to implement and fund the Comprehensive Center and REL programs when both are mandated by statute. *See* 20 U.S.C. §§ 9564, 9602.

Precedent firmly rejects any claim that the Executive has the power to disobey a statutory mandate. In *Kendall v. United States ex rel. Stokes*, for example, the Supreme Court held that the President's constitutional obligation "to see the laws faithfully executed" cannot be inverted into "a power to forbid their execution," and resoundingly concluded that such a doctrine had "no countenance for its support in any part of the Constitution." 37 U.S. 524, 613 (1838). More recently, then-Judge Kavanaugh, writing for the D.C. Circuit in *In re Aiken County*, emphasized that an agency offends the Constitution where it refuses to "comply with the law as it has been set by Congress." 725 F.3d at 257. Then-Judge Kavanaugh explained that such a finding rested "on the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress." *Id.* at 267.

The Constitution provides that the power to make law resides exclusively with the legislative branch. U.S. Const. art I, § 1. That power necessarily encompasses the decision to create programs by statute and to fund them through appropriations. Where Congress has spoken in mandatory terms and appropriated funds accordingly, the Executive's refusal to carry out such programs does not represent merely a failure to comply with statute but usurps Congress's authority with the Executive's own policy preferences in violation of the Constitution.

### B.    Grant Termination Claims

Plaintiffs have also moved for summary judgment on their Grant Termination Claims, while Defendants have moved to dismiss these claims for lack of subject matter jurisdiction. Plaintiffs argue that because they cannot bring their constitutional Grant Termination Claims in the Court of Federal Claims, and because the Supreme Court's ruling in *Webster v. Doe* requires a clear statement from Congress that a federal statute precludes judicial review of constitutional claims, these claims must remain in federal district court. In *Webster,* the Supreme Court emphasized that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," given the "serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." 486 U.S. 592, 603 (1988).

Applying *Megapulse* to Plaintiffs' Grant Termination Claims, the Court finds that these claims do represent, "in essence," contractual claims that come within the ambit of the Tucker Act. As discussed above, *Megapulse* requires that a court examine (1) the source of the rights asserted and (2) the nature of the relief requested to determine whether a particular claim is properly heard in federal district court or in the Court of Federal Claims. 672 F.2d at 968. With respect to the first prong of the *Megapulse* test, the Court determines that the source of the rights asserted by

Plaintiffs in their Grant Termination Claims, at least regarding their primary grant awards, derives from the specific individual contracts previously awarded to Plaintiffs.[17]

Though Plaintiffs purport not to "rely on the terms of the contract and grant agreement at all," ECF 48-1, at 23, the Court "need not accept a plaintiff's proffered characterization of its asserted right" but must instead undertake its own analysis. *New York v. Nat'l Sci. Found.*, Civ. No. 25-4452, --- F. Supp. 3d ---, 2025 WL 2180478, at *10 (S.D.N.Y. Aug. 1, 2025). Here, Plaintiffs' entitlement to receive the specific funding that was terminated arose only because of the grant agreements executed between Plaintiffs and the Department of Education. By contrast, neither the ESRA nor indeed the Constitution creates enforceable rights for Plaintiffs to receive the grants in question. *See Sustainability Inst.*, 2025 WL 1587100, at *2 (finding that merely framing claims as arising in statute or the Constitution "provide a detour around the Tucker Act" where the "operative grant agreements" are what "entitle[s] [them] to receive federal funds." 2025 WL 1587100, at *2. Reviewing the "substance of the pleadings," it is clear that the only rights to which Plaintiffs can lay claim are those that arise under the individual contracts, and "artful pleading" may not "avoid Tucker Act jurisdiction simply by characterizing an action as equitable in nature." *Amoco Prod. Co. v. Hodel*, 815 F.2d 352, 361 (5th Cir. 1987).

A comparison with other cases involving similar but distinct grant terminations is helpful in clarifying this point. While Plaintiffs cite to the D.C. Circuit's decision upholding the preliminary injunction in *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) as supportive of their position regarding the Grant Termination Claims, the federal

---

[17] Again, Plaintiffs contend that *Megapulse* is inapplicable to their Grant Termination Claims. ECF 48-1, at 19. As the Court explained *supra* at n.11, this position is unpersuasive in the fact of numerous cases where courts have applied *Megapulse* to a wide variety of claims, not just claims brought under the APA. *See, e.g., Am. Bar Ass'n*, 2025 WL 1388891, at *5 (applying *Megapulse* to a standalone First Amendment claim).

statute at issue in *Widakuswara* mandated not just that the Executive spend appropriated funds on general programming but also required that such funding was designated by statute for *specific grantees*. There, the plaintiffs sued over the cessation of operations of and funding to the United States Agency for Global Media, "an independent executive agency *established by Congress*," as the lower court explained when granting the preliminary injunction. *Widakuswara*, 779 F. Supp. 3d at 19 (emphasis added); *see also Nat'l Endowment for Democracy v. United States*, No. 25-cv-00648, --- F. Supp. 3d ---, 2025 WL 2305477, at *4–7 (D.D.C. Aug. 11, 2025) (granting a preliminary injunction enjoining the government from withholding grant funding designated by Congress to be made by the Department of State to a specific organization). By contrast, it is not the case here that Congress has designated funding specifically for either Plaintiff. The appropriations in question here provide only for a pot of funding from which the Department may issue awards under the Comprehensive Center and REL programs in general. *See* Pub. L. 118–47, 138 Stat 460, 683; Joint Explanatory Statement, https://perma.cc/8J97-7K82. The absence of a statutory (and constitutional) right reinforces the point that the source of Plaintiffs' entitlement to the funds in question arises from the terms of their grant agreements.[18]

An analysis under the second prong of the *Megapulse* test, the type of relief sought, confirms that Plaintiffs' Grant Termination Claims are essentially contract claims. Plaintiffs seek relief in the form of a prohibition on Defendants "giving effect to the termination notices" of Plaintiffs' particular grants, ECF 48-1, at 14, amounting to an order compelling the Department to

---

[18] Indeed, as the Court noted at the most recent hearing, Plaintiffs' argument that their Program Claims can proceed on "a lo[st] opportunity to compete theory," ECF 58, at 11:9–11, undercuts their Grant Termination Claims. Inherent in the argument that the Department can choose who receives the specific awards to operate the Comprehensive Centers and RELs through a competitive bidding process is the recognition that they can change that decision. To do so unlawfully, or in violation of the terms of a contract, may give rise to a cause of action, but one that should be brought in the Court of Federal Claims. *Id.* at 58:3–9.

reinstate the rescinded funding directly to affected organizations. As another court explained in *American Library Association v. Sonderling*, "Plaintiffs ask the Court to order Defendants to restore funding pursuant to the terms of all grants, cooperative agreements, and contracts," the "practical effect of such relief [being] to order specific performance of those grant agreements." Civ. No. 25-1050, 2025 WL 1615771 (D.D.C. June 6, 2025) (internal citation omitted). This is precisely the posture here: ordering the Department to resume funding Plaintiffs' specific grants would amount to compelling performance of the individual contracts. Thus, as it relates to the Grant Termination Claims, "[t]he core dispute between plaintiffs and defendants arose when defendants terminated those contracts." *Id.* at *9. Therefore, "the source of Plaintiffs' asserted right is a contract." *Nat'l Sci. Found.*, 2025 WL 2180478, at *13.

Turning to the argument Plaintiffs advance regarding *Webster*, the Court is skeptical that it is, in fact, true that Plaintiffs would be altogether left without a court in which to bring their constitutional claims if the Grant Termination Claims proceeded in the Court of Federal Claims.[19] Through the Grant Termination Claims, Plaintiffs ask for relief in the form of restoration of their specific grant terminations and base this claim for relief on the argument that Defendants acted unconstitutionally. ECF 48-1, at 30. However, they make the argument in their Program Claims and argue more generally in their Grant Termination Claims that the specific grant rescissions were part of an unconstitutional decision to shutter the RELs and Comprehensive Centers, rather than unconstitutional acts in and of themselves. The Court has already ruled that Plaintiffs have a forum

---

[19] This is true with respect to grants Plaintiffs received as prime grantees as well as the subcontracts they worked on in partnership with other organizations. It is true, as Plaintiffs observe, that subcontractors do not have the right to sue under the Tucker Act. *See Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 938–39 (citing *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998)). But this does not mean that Plaintiffs are deprived of a forum in which to bring their statutory or constitutional claims related to the termination of the subcontracts; as explained, the Court is considering such arguments as properly part of the Program Claims.

in which to bring their statutory and constitutional claims, namely *this* Court. They simply seek a different form of relief in bringing the constitutional claims with respect to their individual grant awards. It appears, then, that *Webster* does not apply here since Plaintiffs are not denied a forum to raise "a colorable constitutional claim." 486 U.S. at 603.

### C.    Remaining Claims

While Plaintiffs have moved for summary judgment only on their Grant Termination Claims and Program Claims, Defendants have moved to dismiss all of Plaintiffs' claims, of which remain the *ultra vires* claim against DOGE and mandamus.

The Court dispenses with the Plaintiffs' request for a writ of mandamus first. "Mandamus is a 'drastic' remedy that must be reserved for 'extraordinary situations' involving the performance of official acts or duties." *Cumberland Cnty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48, 52 (4th Cir. 2016) (quoting *Kerr v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 426 U.S. 394, 402 (1976)). "Courts provide mandamus relief only when (1) petitioner 'has no other adequate means to attain the relief it desires'; (2) petitioner has shown a 'clear and indisputable' right to the requested relief; and (3) the court deems the writ 'appropriate under the circumstances.'" *In re Murphy-Brown, LLC*, 907 F.3d 788, 788 (4th Cir. 2018) (quoting *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380–81 (2004)) (cleaned up). Plaintiffs seek mandamus as a means to compel Defendants to fully fund and operate the Comprehensive Centers and RELs, but because they are already entitled to relief on their APA and constitutional Program Claims, there are no grounds for issuance of mandamus relief.

With respect to Plaintiffs' *ultra vires* claim against DOGE, Plaintiffs themselves acknowledge that the relief sought for their DOGE claims is duplicative of the relief sought on the Grant Termination Claims. ECF 52, at 27 (noting that "[i]f the Court enters summary judgment for Plaintiffs on their other [Grant] Termination Claims, the Court may dismiss this claim as prudentially moot"). Inasmuch as the DOGE *ultra vires* claim seeks reinstatement of funding for

specific projects pursuant to the terms of their grant agreements, *see* ECF 1, at 34 ¶ 146 (alleging that "[t]he terminations of Comprehensive Center grants and REL contracts were directly undertaken by, or specifically directed by, DOGE"), that would again represent an effort to compel performance under existing contracts.  As discussed *supra*, that relief is quintessentially contractual in nature, and thus subject to the Tucker Act's jurisdictional framework.

If, on the other hand, Plaintiffs intend to challenge an agency action that terminated the Comprehensive Centers and RELs in their entirety, the DOGE *ultra vires* claim would not meaningfully differ from the Program Claims already before the Court.  The gravamen of such a challenge would be that the Executive, whether acting through the Department of Education or DOGE, lacked authority to abolish the programs wholesale.  Such a claim rises and falls with the Court's analysis of the Program Claims and does not supply an independent basis for relief.  Either scenario would warrant dismissal of these claims.

### D.    Remedy

The APA provides that a "reviewing court shall hold unlawful *and set aside*" any agency action found to be contrary to law.  5 U.S.C. § 706(2)(A) (emphasis added).

In keeping with the statutory text, "[t]he normal remedy for a successful APA challenge is vacatur of the rule and its applicability to all who would have been subject to it." *Woonasquatucket*, 778 F. Supp. 3d at 478 (citing *Victim Rts. L. Ctr. v. Cardona*, No. 20-CV-11104-WGY, 2021 WL 3516475, at *1 (D. Mass. Aug. 10, 2021)).  "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (cleaned up).  "Indeed, appropriate relief for successful plaintiffs in APA cases may necessarily reach nationwide." *Cmty. Legal Servs*, 2025 WL 1233674, at *13 (citing *Dep't of Homeland Sec. v. Regents of the Univ. of California*,

591 U.S. 1, 9 (2020)). This is true for "unsupported agency action" as well, which likewise "normally warrants vacatur." *Advocs.for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005). Accordingly, the APA's provision "for the vacatur of federal agency action may confer" upon district courts the power to issue relief universal in scope "by statute."[20] William Baude et al., *The Federal Courts and the Federal System* 1354 (8th ed. 2025); *see also* Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L. J. 2305, 2314 (May 2024); *Commonwealth of Pennsylvania v. Trump*, Civ. No. 17-4540, 2025 WL 2349798, at *24–*25 (E.D. Pa. Aug. 13, 2025) (determining that the APA authorizes courts to vacate agency actions entirely, not simply as to the plaintiff seeking relief).

Vacatur of agency action is commonly understood to mean restoration of the status quo. *Drs. for Am. v. Off. of Pers. Mgmt.*, Civ. No. 25-1407, --- F. Supp. 3d ---, 2025 WL 2158340, at *7 (D.D.C. July 30, 2025). The Fourth Circuit "has defined the status quo as the 'last uncontested status between the parties which preceded the controversy.'" *Pashby v. Delia*, 709 F.3d 307, 320

---

[20] Though Defendants argue that the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. ---, 145 S. Ct. 2540 (2025) precludes the Court's ability to provide relief that reaches beyond the Parties, *see* ECF 51 at 8, the *CASA* decision explicitly did not extend to the APA. The majority opinion unambiguously stated that nothing in its decision "resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate agency action." *Id.* at 2554 n.10 (citing 5 U.S.C. § 706(2). And Justice Kavanaugh's concurrence emphasized that in the wake of *CASA*, plaintiffs seeking to challenge the legality of a new federal statute or executive action could, where appropriate, continue to bring suits asking courts to "preliminarily 'set aside' a new agency rule." *Id.* at 2567 (Kavanaugh, J., concurring) (citing *West Virginia v. EPA*, 577 U.S. 1126 (2016) and *Corner Post, Inc. v. Bd. of Governors*, 603 U.S. 799, 826–42 (2024) (Kavanaugh, J., concurring)); *see also Purl v. Dep't of Health & Hum. Servs.*, No. 2:24-CV-228, --- F. Supp. 3d - --, 2025 WL 1708137, at *27–*28 (N.D. Tex. June 18, 2025) (explaining the differences between vacatur and national injunction, though in advance of the Supreme Court's decision in *CASA*); *Cabrera v. Dep't of Lab.*, No. 25-CV-1909, --- F. Supp. 3d ---, 2025 WL 2092026, at *8 (D.D.C. July 25, 2025) (again differentiating vacatur from national injunctions, this time post-*CASA*). Further, that non-parties may reap a benefit from a Court's decision, as may be the case here, was expressly contemplated in *CASA*. *See* 606 S. Ct. at 2557; *see also Nat'l Fair Hous. All. v. Dep't of Hous. & Urb. Dev.*, Civ. No. 25-1965, 2025 WL 2105567, at *13 (D.D.C. July 28, 2025) ("So the Court is left providing a remedy with incidental benefits to applicants not before the Court.").

(4th Cir. 2013) (quoting *Aggaro v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 378 (4th Cir. 2012)). It appears that courts have some discretion to accept the parties' "assumption" or representation that vacatur requires certain actions. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1045 (D.C. Cir. 2021).

Despite Defendants' suggestions to the contrary, Plaintiffs clearly contemplate restoration of the "status quo" as encompassing the restoration of the Comprehensive Centers and RELs in general, rather than restoring any specific grants extant before February 2025. *See* ECF 55 (Plaintiffs' proposed order reflecting that Defendants are required to "obligate all funds that Congress made available under [the relevant statutes] before the appropriations to support each program expire" but not seeking the restoration of any particular grant); *see also* ECF 57, at 1 ("Plaintiffs' response to Defendants' proposed order) ("As Plaintiffs have emphasized time and again, for purposes of the Program Claims, Plaintiffs are not seeking a Court order restoring Plaintiffs' awards or compelling Defendants to restore Plaintiffs' awards."). The Court agrees that this is the proper remedy and sees no reason to go further at this time. Indeed, the remedy should be met with little objection from Defendants as they represented to the Court that they do intend to re-obligate the funds in question. ECF 58, at 33:11–12 (noting that "the Government has specifically stated in other proceedings that they are taking actions to rebid" the canceled awards). Regardless, understanding that the September 30 deadline to obligate all funds appropriated in FY 24 is fast approaching, the Court may revisit this order in the coming weeks.[21] *Id.*

The Court is mindful of the status report submitted by Defendants indicating that they face "certain issues which may present a challenge to implementation" of an order to re-establish the

---

[21] The urgency is perhaps heightened by the fact that the Government has signaled its intent to cease funding the Comprehensive Centers and RELs in future appropriations cycles. ECF 58, at 34:14–16.

Comprehensive Centers and RELs. ECF 59, at 2. Chiefly, the Department "has confirmed that it is not possible to solicit *entirely new grantees* and award all appropriated FY 2025 funds prior to the end of the current fiscal year on September 30, 2025." *Id.* (emphasis in original). The problem Defendants identify is of their own making.[22] It nevertheless remains the case that Defendants must fulfill their statutory obligations and, as Plaintiffs point out, does not "alter[] the conclusion that they have brazenly violated the law," ECF 60, at 1. While it may prove to be that the only course of action available to fulfill their legal obligations is to re-fund the grants awarded prior to the February 2025 terminations, the Court declines to order such relief at this time. Instead, the Parties are directed to confer on the most workable option for Defendants to comply with statutory mandates in advance of ordering any more specific relief. The Parties are to file a joint status report by 5 p.m. on Wednesday, August 20 advising of Defendants' plans for fully obligating and restoring the operation of the RELs and Comprehensive Centers by September 30, 2025. This status report should also provide a detailed, specific timetable of steps Defendants will take to meet their obligations. *See Ass'n of Am. Univs. v. Nat'l Sci. Found.*, No. 1:25-CV-11231, --- F. Supp. 3d ---, 2025 WL 1725857, at *24 (D. Mass. June 20, 2025) (ordering the government to provide notice of its compliance with a summary judgment order).

---

[22] As Plaintiffs noted at the August 4 hearing, the Department chose to eliminate staff expressly tasked with facilitating the mandate to operate RELs and Comprehensive Centers. ECF 58, at 5:10–17. Defendants acknowledged as much at the hearing by noting that "the [a]gency is operating on limited resources." *Id.* at 37:9. However, in declining to issue a preliminary injunction two months ago, the Court clearly forecast the possibility of today's outcome by noting that "Plaintiffs are likely to show success on the merits on their Program Claims, as the available evidence does suggest that the decision to shutter the Comprehensive Centers and RELs may very well represent a final agency action that flatly contradicts the express direction of Congress." ECF 41, at 23. Thus, Defendants have had ample opportunity to prepare for today's outcome.

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' partial motion for summary judgment is granted in part and denied in part, and Defendants' motion to dismiss is granted in part and denied in part. A separate implementing Order will issue.


Dated: <u>August 15, 2025</u>                                    <u>            /s/            </u>
                                                                                Brendan A. Hurson
                                                                                United States District Judge