IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHILD TRENDS, INCORPORATED *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION *et al.*, <br><br> *Defendants*. | Case No. 8:25-cv-01154-BAH |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR ATTORNEYS' FEES</u>**

## INTRODUCTION

On August 15, 2025, this Court entered judgment for Plaintiffs Child Trends, Inc. and RMC Research, compelling Defendants to comply with their statutory and constitutional duty to maintain the statutorily required number of Comprehensive Centers and Research Educational Laboratories (RELs) nationwide and to spend the millions that Congress appropriated to the Department of Education for these programs. In compliance with that order, as of September 29, Defendants have re-established the 18 Comprehensive Centers and 10 RELs they had shut down and obligated nearly $68 million in appropriated funds that they would not have spent were it not for the relief entered in this case.

Following this significant success, Plaintiffs seek attorneys' fees as prevailing parties under the Equal Access to Justice Act (EAJA). 28 U.S.C. § 2412. Plaintiffs are plainly entitled to such fees: they prevailed in the litigation, and Defendants cannot show that their position (including their pre-litigation actions precipitating this suit) was substantially justified.

The amount of fees Plaintiffs seek is reasonable. The excellent results obtained entitle Plaintiffs to full compensation for all work performed in the case. The billing documents accompanying this motion demonstrate that the hours expended on the litigation were reasonable and appropriate, and the cost-of-living increase since 1996 and distinctive knowledge and specialized skill of counsel warrant upward adjustments of the hourly rate. As explained below, the Court should award $200,612.00 in attorneys' fees, plus future amounts expended on the instant fee petition.

## BACKGROUND

In February of this year, after decades of maintaining Comprehensive Centers and REL Programs, the Department of Education abruptly closed nearly all of them through a mass

termination of grants and contracts to organizations nationwide. *See* Compl. ¶¶ 41–54, 81–88, ECF No. 1. Despite having a statutory obligation to maintain 20 Comprehensive Centers and 10 RELs in specific geographic areas, *see* 20 U.S.C. §§ 9564, 9602, the Department shuttered all but two Comprehensive and all 10 RELs. In so doing, the Department was failing to spend the full amount of congressionally appropriated funds that it was required to spend on those programs. *See generally* Compl.

In April, Plaintiffs Child Trends and RMC Research, who compete for and receive grants and subcontracts under these programs, brought suit to rectify Defendants' unlawful actions. *See* Compl. Plaintiffs brought two categories of claims: Program Claims challenging Defendants' refusal to operate the programs and spend the funds appropriated for them as statutorily required; and Termination Claims challenging the termination of Plaintiffs' grants. *See generally id.* For each category of claim, Plaintiffs alleged that Defendants' actions violated the Administrative Procedure Act (APA), various statutes, and the Constitution. *Id.* at ¶¶ 107–67. They sought relief, for the Program Claims, compelling Defendants to maintain the statutorily required number of Comprehensive Centers and RELs and, for the Termination Claims, compelling Defendants to reinstate Plaintiffs' terminated grants. *Id.*, Request for Relief, pp. 38–40.

Shortly after filing suit, Plaintiffs sought a preliminary injunction. *See* PI Mot., ECF No. 16. Although the Court declined to issue an injunction at that time, it nonetheless found that Plaintiffs were likely to succeed on their Program Claims. *See* PI Op., ECF No. 41. As to those claims, the Court rejected Defendants' argument that the Tucker Act stripped the district court of subject matter jurisdiction, finding that "Plaintiffs are likely to succeed in showing that the Program Claims should remain in" this Court. *Id.* at 18. On the merits of those claims, the Court stressed that "the available evidence … suggest[ed] that the decision to shutter the

Comprehensive Centers and RELs … represents a final agency action that flatly contradicts the express direction of Congress." *Id.* at 23. Even so, the Court declined to enter a preliminary injunction because, in its view, the harm from Plaintiffs' lost opportunity to compete for funds was not yet "imminent," since the relevant appropriations did not expire until September 30, 2025, approximately three months from the date the Court ruled on the preliminary injunction motion. *Id.* at 20. To swiftly resolve the case, and cure Defendants' likely unlawful actions challenged through the Program Claims, the Court expedited the deadlines for the government to produce the Administrative Record and the parties to brief summary judgment. *Id.* at 25. The parties completed briefing on summary judgment on July 16, and the Court held a hearing on the motions on August 4.

On August 15, the Court entered judgment on the Program Claims in Plaintiffs' favor but denied relief on the Termination Claims. *See* Op. & Order, ECF Nos. 61 & 62. After concluding that it had jurisdiction over the Program Claims, the Court found on the merits that Defendants' actions were contrary to multiple statutes and the Constitution. As the court put it, Defendants' actions "[t]erminating the Comprehensive Centers and RELs altogether violates the clear mandate[s]" of the relevant statutes to maintain 10 RELs and 20 Comprehensive Centers. Op. 34, 27–32. The Court flatly rejected Defendants' primary argument that the statutes merely obligated them to "*award*" grants "without the concomitant obligation to *operate*" the programs, concluding that the statutes "unmistakably indicate that Congress intended … that both programs be maintained and established beyond the initial award of grants." *Id.* at 28–29 (emphasis in original). By failing to operate the programs, moreover, the Court found that Defendants were violating "black letter appropriation law" and the Impoundment Control Act, because Defendants were refusing to spend the full amounts appropriated by the 2024 Appropriations Act and 2025

3

Continuing Resolution. *Id.* at 23–25. The Court concluded these actions not only "disregard[ed] a clear congressional mandate," but they also "offend[ed] the constitutional order" establishing the separation of powers. *Id.* at 32. Therefore, the Court granted relief on Plaintiffs' APA-based statutory and constitutional claims, ordering Defendants "to comply with their statutory obligations to fund the Comprehensive Center and [REL] programs … before the current fiscal year appropriations lapse on September 30, 2025." Order at 1–2.

Although the Court declined to order Defendants to reinstate Plaintiffs' awards pursuant to the Termination Claims, Defendants chose to reinstate all of the terminated grants and contracts, including Plaintiffs' awards, to comply with the Court's order to restart the Comprehensive Centers and REL Programs. *See* JSR, ECF No. 63.

By September 29, Defendants had re-established the shuttered Comprehensive Centers and REL Programs and obligated nearly $68 million in unspent appropriations. *See* Seventh JSR, ECF No. 75.

## LEGAL STANDARDS

Congress enacted EAJA to "diminish the deterrent effect of seeking review of, or defending against, governmental action by providing in specified situations an award of attorney fees[] … against the United States." Equal Access to Justice Act, Pub. L. 96-481, 94 Stat. 2321, 2325 (1980). To that end, EAJA makes the "award of attorneys' fees to a prevailing party" in a civil action "mandatory *unless* the government can demonstrate that its position was 'substantially justified' or that special circumstances make an award unjust." *Hyatt v. Barnhart*, 315 F.3d 239, 244 (4th Cir. 2002) (internal citation omitted); *see also* 28 U.S.C. § 2412(d)(1)(A); *Scarborough v. Principi*, 541 U.S. 401, 414 (2004).

**ARGUMENT**

I. **Plaintiffs Are Prevailing Parties**

Child Trends and RMC Research are "prevailing parties" entitled to attorneys' fees and costs under EAJA. First, Plaintiffs have clearly prevailed: the declaratory and injunctive relief entered against Defendants on Plaintiffs' Program Claims afforded Plaintiffs "sought-after relief on a substantial issue in the litigation," which "materially altered" the "legal relationship of the parties." *Roanoke River Basin Ass'n v. Hudson*, 991 F.2d 132, 139 (4th Cir. 1993) (citations omitted). Because of the Court's judgment, Defendants have restarted the Comprehensive Centers and REL Programs, obligated appropriated funds for those programs, and reinstated Plaintiffs' awards specifically—all of the relief that Plaintiffs requested in the case.

Plaintiffs are also "parties" as defined by EAJA. Under EAJA a party includes both (1) nonprofit organizations and (2) corporations with a net worth not exceeding $7 million, each of which must have not more than 500 employees at the time the civil action is filed. 28 U.S.C. § 2412(d)(2)(B); *Am. Ass'n of Retired Persons v. EEOC*, 873 F.2d 402, 404 (D.C. Cir. 1989). Child Trends is a non-profit that had approximately 240 employees when this action was filed on April 7, 2025. *See* Declaration of Natalia Pane ¶ 3. Also as of April 7, RMC Research, a for-profit corporation, had a net worth (calculated by subtracting total liabilities from total assets) of approximately ($1.58) million and had 55 employees. *See* Declaration of M. Christine Dwyer ¶ 3–5, and Exs. A & B. *See, e.g.*, *Lion Raisins, Inc. v. United States*, 57 Fed. Cl. 505, 511 (2003); *see also City of Brunswick v. United States*, 849 F.2d 501, 503 (11th Cir. 1988).

II. **Defendants' Position was not Substantially Justified**

"[T]he government has the burden of showing substantial justification." *Thompson v. Sullivan*, 980 F.2d 280, 281 (4th Cir. 1992). To satisfy its burden, the government must do more

than show that its actions were "merely undeserving of sanctions or frivolousness." *Pierce v. Underwood*, 487 U.S. 552, 566 (1988). "[A] position is substantially justified 'if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact.'" *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 967 (D.C. Cir. 2004) (quoting *Pierce*, 487 U.S. at 566 n.2). The "substantially justified" inquiry is not issue-specific but takes a whole-of-litigation approach, considering the totality of the circumstances. *See Roanoke River Basin*, 991 F.2d at 139 (district court correctly "refus[ed] to atomize the case but properly considered the [agency's] 'position' in its entirety").

Moreover, "[t]he government … must demonstrate the reasonableness not only of its litigation position, but also of the *agency's* actions." *Role Models*, 353 F.3d at 967; *see also* 28 U.S.C. § 2412 ("'[P]osition of the United States' means, in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based."). An agency's actions are not substantially justified where they are "wholly unsupported by the text" of governing law. *See Role Models*, 353 F.3d at 967 (quoting *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 593 (D.C. Cir. 1996)). And "where the government's unjustified prelitigation position forces the petitioner to institute the suit, the government is liable for fees for the whole suit, notwithstanding that it asserts justifiable positions on the various subsidiary disputes that may arise during litigation." *Thompson*, 980 F.2d at 281–82.

Defendants' position was not substantially justified. Here, the "position" is the pre-litigation determination and the argument advanced in Court that Defendants could lawfully cease operating the statutorily required number of Comprehensive Centers and REL Programs and refuse to spend the funds appropriated for those programs. *See Roanoke*, 991 F.2d at 139 (identifying the "position" as the agency action challenged in the suit). Defendants argued that

6

the statutes merely required the Department to "award" or "enter into" grants and contracts, but did not require the Department to actually maintain those awards to operate the programs for which Congress has set forth comprehensive statutory schemes. That position was farcical, and certainly not substantially justified. *See* 8/4/25 Hr'g Tr. 41:13 (the Court commenting "Oh, man" in response to this argument).

The Court also found "untenable" Defendants' litigation position that the 2024 Appropriations Act's mandate that "$50,000,000 shall be available to carry out" the Comprehensive Centers Program[1] granted the Department of Education discretion as to whether to spend those funds. Op. 25. As the Court explained, "it is *black letter appropriation law* that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend the full amount appropriated by Congress for a particular project or program." *Id.* (quotation omitted) (emphasis added). And in failing to spend those appropriated funds as required, the Court found, Defendants were also "refus[ing] to carry out … express statutory mandate[s] to operate Comprehensive Centers and RELs at the required capacity of twenty and ten, respectively." *Id.* at 26 (citing 20 U.S.C. §§ 9564, 9602); *see also id.* at 27–29 (rejecting "Defendants' approach to statutory interpretation [as] unpersuasive"). In the words of this Court in its preliminary injunction opinion, Defendants' actions "flatly contradict[ed] the express direction of Congress." PI Op. 23.

In the face of multiple, clear statutory mandates, Defendants' decisions to no longer operate the Comprehensive Centers and REL Programs, and to not spend the funds appropriated for that purpose, had no reasonable basis in law or fact. *See Pierce*, 487 U.S. at 566 n.2; *cf. Cornella v. Schweiker*, 728 F.2d 978, 985 (8th Cir. 1984) ("It was not reasonable for the

---

[1] *See* Pub. L. 118-47, 138 Stat. 460, 683 (Mar. 23, 2024).

7

Secretary to ignore her own regulations."). Even if the Court found any one of Defendants' arguments in the course of the litigation to be reasonable, Defendants' unjustified pre-ligitation actions forced Plaintiffs to initiate suit to seek relief, and that puts Defendants on the hook for fees for the entire suit. *See Thompson*, 980 F.2d at 281–82.

### III. There Are No Special Circumstances that Make an Award of Fees Unjust

The government can show no special circumstances that make an award of attorneys' fees unjust. The special-circumstances provision "'gives the court discretion to deny awards where equitable considerations dictate an award should not be made,'" and "[t]he doctrine of unclean hands is a traditional equitable consideration." *Priestley v. Astrue*, 651 F.3d 410, 430–31 (4th Cir. 2011) (internal citations omitted). No such equitable considerations are present here.

### IV. Plaintiffs' Request for Fees is Reasonable

As prevailing parties, Plaintiffs seek to recover all attorneys' fees reasonably incurred in the litigation. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The starting point is calculating the lodestar: "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.*; *Guidry v. Clare*, 442 F. Supp. 2d 282, 293–94 (E.D. Va. 2006).

Plaintiffs seek a reasonable fee of 200,293.50 for all work expended until November 9, which represents 523.22 hours reasonably expended on the litigation multiplied by the reasonable rate of $400 for Mr. Jacobson and Ms. Eisenberg and $350 for Ms. Snow. If the parties do not settle the fee request outside of litigation, Plaintiffs will seek an additional amount to cover all future hours billed on litigating the request for attorneys' fees.

At this stage, Plaintiffs seek the following for each attorney for costs incurred on the litigation until November 11, 2025:

| Attorney | Hours | Rate | Value |
|---|---|---|---|
| Daniel Jacobson | 206.67 | $400 | $82,668 |
| Lynn Eisenberg | 136.66 | $400 | $54,664 |
| Kyla Snow | 180.8 | $350 | $63,280 |
| **Total:** | 524.13 | | $200,612 |

### A. The number of hours billed is reasonable

In support of the hours expended, counsel submit with this motion declarations and detailed billing records. These documents constitute "evidence of considerable weight on the issue of the time required" to litigate this case. *See Perkins v. Mobile Hous. Bd.*, 847 F.2d 735, 738 (11th Cir. 1988). They show that the hours spent on this case are what "a reasonable attorney would have believed … to be reasonably expended in pursuit of success at the point in time when the work was performed." *Wooldridge v. Marlene Industs. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990). Here, approximately 483 hours have been split among three attorneys for all stages of the litigation, including: preparing a Complaint raising multiple claims on behalf of multiple parties; drafting preliminary injunction briefs and supporting declarations; drafting summary judgment briefs with additional declarations; reviewing the administrative record; presenting two oral arguments spanning multiple hours; submitting and responding to various notices of supplemental authority; and jointly submitting with government counsel seven status reports following summary judgment; and this petition for EAJA fees. All things considered, the hours expended here were eminently reasonable.

It matters not that the Court declined to grant relief on all grounds pursued by Plaintiffs. In cases where plaintiffs bring multiple claims based on different facts and legal theories and win

9

on some of those claims but not others, the plaintiffs are not entitled to fees for work expended on unsuccessful claims. *See Abshire v. Walls*, 830 F.2d 1277, 1283 (4th Cir. 1987). But in this case, where each of Plaintiffs' claims arose from "a common core of facts," Plaintiffs are entitled to "a fully compensatory fee" that "encompass[es] all hours reasonably expended on the litigation," regardless of whether they "prevail[ed] on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435; *see also Abshire*, 830 F.2d at 1283 (finding the district court abused its discretion when it reduced the total fee award because the plaintiff did not succeed on all claims when "[t]he facts surrounding" the claims were "inextricably intertwined"); *see also Plyler v. Evatt*, 902 F.2d 273, 280 (4th Cir. 1990) ("[E]ntitlement to fees for one aspect of a protracted litigation does not turn narrowly on whether the party prevailed on that particular matter, but whether a separate claim or … proceeding is so unrelated as to justify treating it as a 'separate lawsuit[].'" (citation omitted))

Plaintiffs' Termination and Program Claims were inextricably linked by a common core of facts. As explained in Defendants' summary judgment response brief, the mass termination of grants and contracts (challenged through the Termination Claims) was the means by which Defendants effectuated their decision not to continue operating the Comprehensive Centers and REL Programs (challenged through the Program Claims). Pls.' SJ Resp. 11–12, ECF No. 48-1. Defendants' actions following the Court's entry of summary judgment demonstrate that the Program and Terminate Claims were inextricably intertwined. To comply with the Court's order on the Program Claims, the Department reinstated Plaintiffs' terminated awards, the very relief that Plaintiffs sought on the Termination Claims.

Indeed, the Supreme Court has stressed that when it comes to determining whether a fee should be reduced for less than across-the-board success, the end "result is what matters."

*Hensley*, 461 U.S. at 435. And here, Plaintiffs' counsel "obtained excellent results." *Id.* The judgment in Plaintiffs' favor not only afforded Plaintiffs complete relief but also compelled Defendants to restart 18 Comprehensive Centers and 10 REL Programs nationwide and to spend the full amount of funds (millions of dollars) congressionally appropriated for those purposes. *See* Seventh JSR 2. The excellent results do not end there. The outcome of this litigation redounds to the benefit of countless others nationwide: the educational institutions served by the Comprehensive Centers and REL Programs will no longer lose out on the critical research and related instructional assistance that these Programs provide through the grantees and contractors, and schools and students nationwide will be better off as a result. That outcome certainly deserves compensation for all hours billed in the case.[2]

### B. The hourly rate is reasonable

Counsels' hourly rates are also reasonable. The rates represent upward adjustments from the EAJA's presumptive cap to account for "an increase in the cost of living" and the "distinctive knowledge [and] specialized skill" possessed by counsel that is "needful for the litigation." *See Pierce,* 487 U.S. at 572; 28 U.S.C. § 2412(d)(2)(A).

Courts in this Circuit routinely award fees in excess of the presumptive cap to account for a cost-of-living increase. *See Sullivan v. Sullivan*, 958 F.2d 574, 574 (4th Cir. 1992) ("[S]ection 2412(d)(2)(A) requires the use of a broad cost-of-living index."); *Martin v. Kijakazi*, 689 F. Supp. 3d 218, 225 (E.D. Va. 2023). The Consumer Price Index – Urban (CPI-U) is "[c]ustomarily" accepted as the appropriate measure for a cost-of-living increase. *Peek v. Astrue*,

---

[2] Even though they are entitled to full compensation, in efforts at exercising extra billing judgment, Plaintiffs' counsel have removed from their billing records any entries related to the Rule 56(d) affidavit seeking discovery on the DOGE-related Termination Claims. Plaintiffs' counsel has also removed hours billed by firm attorneys who put in less than 10 hours each on the case. Plaintiffs have also billed for only one attorney's time at each court hearing, in accordance with the Local Rules. *See* D.Md. Local R., App'x B.2.c.

09-cv-301, 2010 WL 5211499, at *2 (W.D.N.C. Dec. 15, 2010). Applying that index, and accounting for the difference between the cost of living in 1996, when the $125 cap was set, and 2025,[3] when this case was litigated, the hourly rate adjusted for cost of living is $262. *See, e.g.*, *Biddy v. Kijakazi*, No. 21-cv-533, 2023 WL 4462057, at *2 (W.D.N.C. July 11, 2023).

Additionally, a statutory "special factor" warrants further upward adjustment of the hourly rate. *See* 28 U.S.C. § 2412(d)(2)(A). Specifically, counsel here possess "distinctive knowledge or specialized skill" in the area of appropriations and grants, which was both "necessary" for this litigation "and can be obtained only at rates in excess of the [statutory] cap."[4] *Pierce*, 487 U.S. at 572 (finding that this standard satisfies EAJA's example special factor of "the limited availability of qualified attorneys for the proceedings involved"). The Supreme Court in *Pierce* identified knowledge and skill in "an identifiable practice specialty such as patent law, or knowledge of foreign law or language" as possible special factors but concluded that it "need not specify" what other factors could justify a higher hourly rate under EAJA. *Id.* at 572–73. Since *Pierce*, courts have found that expertise in immigration law, environmental law, Indian law, or social security law may meet the "special factors" exception for awarding a fee enhancement. *See, e.g.*, *Muhur v. Ashcroft*, 382 F.3d 653, 656 (7th Cir. 2004) (immigration); *Nat. Res. Def. Council, Inc. v. Winter*, 543 F.3d 1152, 1160–61 (9th Cir. 2008) (environmental law); *Hoopa Valley Tribe v. Watt*, 569 F. Supp. 943, 947 (N.D. Cal. 1983) (Indian law).

---

[3] Plaintiffs use the CPI-U data from August of this year, the last month that the CPI-U was updated. *See* CPI-U Baltimore-Columbia-Townson, MD, https://perma.cc/3KTW-RBRG. The cost-of-living increase here was calculated by multiplying $125 by 326, the CPI-U rate for August 2025, and then dividing that figure by 155, the CPI-U figure for March 1996 when EAJA's $125 rate was adopted. *See Thangaraja v. Gonzales*, 428 F.3d 870, 876–77 (9th Cir. 2005) (explaining the formula); *Biddy*, 2023 WL 4462057, at *2; *see also* Historical CPI-U, https://www.bls.gov/cpi/tables/historical-cpi-u-201710.pdf.

[4] The statutory cap was $75 prior to the 1996 amendment, *see* Pub. L. 104-121, § 231, 110 Stat. 847, 863 (1996), and therefore cases from before 1996 refer to $75 instead of $125.

As detailed in the attached declarations, Plaintiffs' counsel have distinctive knowledge and specialized skill in appropriations and grants law and extensive experience in APA and constitutional litigation involving the federal government. Mr. Jacobson founded Jacobson Lawyers Group after several years as the General Counsel at the Office of Management and Budget, where he was a lead attorney for the Executive Branch on issues involving federal appropriations, funding, grants, and administrative law. Declaration of Daniel F. Jacobson ("Jacobson Decl.") ¶¶ 4-6, 10. After leaving OMB, Mr. Jacobson also published several articles on issues related to appropriations law, including the impoundment of funds and the Tucker Act, and has been quoted by several news outlets reporting on these issues. *Id.* ¶ 10. Before Ms. Eisenberg joined and became Partner at Jacobson Lawyers Group, she served as Principal Deputy General Counsel at the Department of Education, where she assisted in managing legal issues for the Department, including relating to grant programs. *Id.* ¶¶ 11-13. And before Ms. Snow joined the firm as Counsel, she spent more than five years as a trial attorney at the U.S. Department of Justice, defending against APA and constitutional challenges to federal policies and decisions in courts across the country, some of which implicated federal funding law. *Id.* ¶¶ 14-15. Their specific experiences are laid out more fully in the attached declaration. Together, counsel bring a "combined knowledge of" legal subject matter and litigation experience that warrants a fee enhancement. *See Int'l Woodworkers, Local 3-98 v. Donovan*, 792 F.2d 762, 766 (9th Cir. 1985).

Moreover, since its founding in February 2025, the firm has been specifically sought out because of our attorneys' unique knowledge and experience. Jacobson Decl. ¶ 7. The firm has been retained by a number of clients impacted by actions at the Department of Education in particular, given Ms. Eisenberg's experience as a former senior attorney at the Department. *Id.*

And the firm has had considerable success in litigation over its nine months of existence, filing ten lawsuits and achieving full or partial success in nine of those lawsuits. *Id.* ¶ 8. Eight of these nine cases have had some connection to federal spending, and several relate to an agency's refusal to spend congressionally mandated appropriations, as in the instant case. *Id.* The firm has also filed three amicus briefs, one in the Supreme Court and two in the courts of appeals, in cases involving federal funding or the Tucker Act. *Id.* ¶ 9.

Counsels' knowledge and skills have been essential to this litigation in particular. *See Nadarajah*, 569 F.3d at 913–14. This case required understanding of complex questions of appropriations and grants law, including the procedures for appropriating and obligating funds and the timing by which agencies engage in those procedures to spend funds provided by Congress. *See, e.g.*, PI Hearing Trans. 23–24 (explaining the process of obligation and de-obligation). There are very few practicing litigators that possess the knowledge of appropriations law that Mr. Jacobson has based on his experience as General Counsel at OMB. That experience, along with Ms. Eisenberg's knowledge of grants and experience at the Department of Education and Ms. Snow's own years of experience litigating APA and constitutional actions at DOJ, was central to the successful prosecution of this case. Jacobson Decl. ¶ 23.

Additionally, it is highly unlikely that attorneys with the requisite skill and expertise in the area would take the case at the statutory rate, adjusted for inflation. *See Nadarajah*, 569 F.3d at 915; *Atlantic Fish Spotters Ass'n v. Daley*, 205 F.3d 488, 492–93 (1st Cir. 2000). It is nearly as unlikely that any comparable firm would have brought this action for the reduced rates of $400 and $350 per hour that Plaintiffs seek in this petition. Jacobson Decl. ¶ 24. Indeed, Mr. Jacobson founded the firm in part to address an emergent need for lawyers with knowledge and experience in federal funding to provide representation to those impacted by the federal

government's unprecedented funding actions, and with the specific goal to make the firm's services accessible to nonprofits and small businesses with limited resources. *Id.* ¶¶ 5-6. The firm has stayed true to that goal in charging rates, including in this case, that are a small fraction of the rates charged by major law firms. *Id.* ¶ 6.

The presumptively reasonable rates set by the District of Maryland Local Rules and the United States Attorney's Office Laffey Matrix support the conclusion that other attorneys having similar skill and experience would have taken the case for a lesser hourly rate. The Local Rules set a presumptively reasonable rate of $225–350 for lawyers admitted to the bar for 9 to 14 years (which would apply to Mr. Jacobson and Ms. Eisenberg), and a range of $165–300 for lawyers admitted to the bar for 5 to 8 years (which would apply to Ms. Snow). D.Md. L.R., Appendix B, p.122. But the Rules also provide that "[t]he Court recognizes that there are attorneys for whom, and cases for which, the market rate differs from these guidelines rates." *Id.* at \*. Additionally, the presumptively reasonable rates set by the Laffey Matrix are more than double the rate they are seeking compensation for here. *See* http://www.laffeymatrix.com/see.html. "[T]he rates produced by the USAO Laffey Matrix are frequently awarded to attorneys engaged in complex federal litigation" in the District of Columbia, *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 48 (D.D.C. 2011), where much of the litigation challenging federal government actions is filed.

For all of these reasons, the enhanced rate of $400 for Mr. Jacobson and Ms. Eisenberg and of $350 for Ms. Snow, which for the cost of living adjustment and counsels' distinctive knowledge and specialized skill, is reasonable.

**CONCLUSION**

The Court should award Plaintiffs attorneys' fees and costs under EAJA in the amount of $200,612, plus all future fees billed for hours related to the instant fee request.

Dated: November 12, 2025

Respectfully submitted,

<u>*/s/ Daniel F. Jacobson*</u>
Daniel F. Jacobson
Lynn D. Eisenberg
Kyla M. Snow
    *Admitted Pro Hac Vice*
JACOBSON LAWYERS GROUP PLLC
*1629 K Street NW, Suite 300*
*Washington DC, 20006*
*(301) 823-1148*
*dan@jacobsonlawyersgroup.com*

*Counsel for Plaintiffs*